UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC., ENERGY INTELLIGENCE GROUP (UK) LIMITED<br><br>Plaintiffs,<br><br>v.<br><br>UBS FINANCIAL SERVICES, INC.<br><br>Defendant. | ECF Case<br><br>Civil Action No.:<br>08-CV-01497 (DAB) |

_____

<br><br><br><br><br>

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

<br><br>

Winston & Strawn LLP
200 Park Avenue
New York, New York
(212) 294-6700 (ph)
(212) 294-4700 (fax)

*Attorneys for Defendant*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................2

        A.    The Parties and Publications ......................................................................2

        B.    Copyright Claims .......................................................................................3

        C.    Trademark and Unfair Competition Claims................................................4

III.    ARGUMENT.........................................................................................................5

        A.    Legal Standard...........................................................................................5

        B.    Counts Three, Four and Five Must Be Dismissed as Legally Deficient ..................5

              1.    Count Three Should Be Dismissed Because EIG's Mark Is Generic and
                    Therefore Not Entitled To Protection ...............................................6

              2.    Count Three Should Be Dismissed Even If EIG's Mark Were Protectable,
                    Because There Is No Probability of Confusion ...............................11

                    a)    The Evident Dissimilarity of the Marks Overwhelms Any Possibility
                          of Confusion.....................................................................12

                    b)    Further Review of the *Polaroid* Factors Underscores The Utter
                          Improbability of Consumer Confusion ................................16

                          i.    The Sophistication of the Consumers Mitigates Against A
                                Finding of Confusion ...............................................16

                          ii.   Confusion Is Improbable Because EIG's Mark Is Weak .............17

                          iii.  The Lack of Actual Confusion or Bad Faith Further Favors
                                Defendant .............................................................18

              3.    Count Four Should Be Dismissed Because EIG's Weak Mark Does Not
                    Support A Claim For Dilution, Nor Is There Any Likelihood Of Dilution ...19

              4.    EIG's Claim of Common Law Trademark Infringement and Unfair
                    Competition Must Be Dismissed (Count Five)................................21

                    a)    EIG's Common Law Trademark Infringement Claim Fails For The
                          Same Deficiencies As Its Federal Claims ...........................21

                    b)    EIG's Common Law Unfair Competition Claims Fail For A Lack Of
                          Bad Faith...........................................................................22

IV.    CONCLUSION ............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness, LLC,*
  277 F. Supp. 2d 356 (S.D.N.Y. 2003) ............................................................................ *passim*

*A.J. Canfield Co. v. Honickman,*
  808 F.2d 291 (3d Cir. 1986) ............................................................................................8

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
  537 F.2d 4 (2d Cir. 1976) ........................................................................................ *passim*

*CES Pub'g Corp. v. St. Regis Publ'ns, Inc.,*
  531 F.2d 11 (2d Cir. 1975) ................................................................................6, 8, 9, 10

*De Jesus v. Sears, Roebuck & Co. Inc.,*
  87 F.3d 65 (2d Cir. 1996) ...............................................................................................5

*Empresa Cubana Del Tabaco v. Culbro Corp.,*
  No. 97 Civ. 8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y March 26, 2004), *aff'd in part rev'd in part,* 399 F.3d 462 (2d Cir. 2005) ...................................................................20

*FragranceNet.com, Inc. v. FragranceX.com, Inc.,*
  493 F. Supp. 2d 545 (E.D.N.Y. 2007) ...........................................................................21, 22

*Garber v. Legg Mason, Inc.,*
  No. 06 Civ. 9436, 2008 U.S. Dist. LEXIS 20650 (S.D.N.Y. March 17, 2008)........................5

*Genesee Brewing Co., Inc. v. Stroh Brewing Co.,*
  124 F.3d 137 (2d Cir. 1997).............................................................................................22

*Hormel Foods Corp. v. Jim Henson Prods., Inc.,*
  73 F.3d 497 (2d Cir. 1996)...............................................................................................19

*In re Merrill Lynch & Co.,*
  289 F. Supp. 2d 416 (S.D.N.Y. 2003)..................................................................................5

*Katz v. Modiri,*
  283 F. Supp. 2d 883 (S.D.N.Y. 2003)................................................................................11

*Kraft General Foods, Inc. v. Allied Old English, Inc.,*
  831 F. Supp. 123 (S.D.N.Y. 1993).....................................................................................20

*Le Book Publ'g, Inc. v. Black Book Photography,*
  418 F. Supp. 2d 305 (S.D.N.Y. 2005)........................................................................ *passim*

iii

*Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
    875 F.2d 1026 (2d Cir. 1989)..............................................................................20, 21

*Medical Econ. Co., Inc. v. Prescribing Reference, Inc.*,
    294 F. Supp. 2d 456 (S.D.N.Y. 2003)....................................................11, 15, 16, 17

*Momentum Luggage & Leisure Bags v. Jansport, Inc.*,
    No. 00 Civ. 7709, 2001 U.S. Dist. LEXIS 10253 (S.D.N.Y. July 23, 2001), *aff'd,* 45
    Fed. App'x 42 (2d Cir. 2002).............................................................................. 21-22

*Nabisco, Inc. v. Warner-Lambert Co.*,
    220 F.3d 43 (2d Cir. 2000)....................................................................13, 14, 15, 16

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*,
    175 F.3d 266 (2d Cir. 1999).........................................................................................6, 11

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*,
    996 F.2d 577 (2d Cir. 1993)...............................................................................12, 16

*Pirone v. MacMillan, Inc.*,
    894 F.2d 579 (2d Cir. 1990).......................................................................................21

*Polaroid Corp. v. Polaroid Elec. Corp.*,
    287 F.2d 492 (2d Cir. 1961)...............................................................12, 13, 14, 16

*Reese Publ'g Co., Inc., v. Hampton Int'l Commc'ns Inc.*,
    620 F.2d 7 (2d Cir. 1980) ....................................................................................7, 10, 11

*Sally Gee, Inc. v. Myra Hogan, Inc.*,
    699 F.2d 621 (2d Cir. 1983).........................................................................................20

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)...........................................................................................5

*Solow Bldg. Co., LLC v. Nine West Group, Inc.*
    No. 00 Civ. 7685, 2001 U.S. Dist. LEXIS 8848 (S.D.N.Y. June 28, 2001), *aff'd,* 48
    Fed. App'x 15 (2d Cir. 2002)...........................................................................8, 12, 22

*Stix Products, Inc. v. United Merchants & Manufacturers Inc.*,
    295 F. Supp. 479 (S.D.N.Y. 1968)..........................................................................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush and Co.*,
    240 F.3d 832 (9th Cir. 2001) ......................................................................................7

*Swatch Group (U.S.) Inc. v. Movado Corp.*,
    No. 01 Civ. 0286, 2003 WL 1872656 (S.D.N.Y. April 10, 2003)...........................20

iv

*Te-Ta-Ma Truth Found. - Family of URI, Inc. v. World Church of the Creator*,
  No. 00 Civ. 2638, 2002 U.S. Dist. LEXIS 1478 (N.D. Ill. Jan. 31, 2002), *rev'd on
  other grounds,* 297 F.3d 662 (7th Cir. 2002) ......................................................................7

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
  155 F. Supp. 2d 1 (S.D.N.Y. 2001), *aff'd in part and remanded,* 277 F.3d 253 (2d
  Cir. 2002) .................................................................................................................5, 19, 22

*Two Pesos v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ............................................................................................................11

## STATUTES

15 U.S.C. § 1065(4) ..........................................................................................................6, 7

15 U.S.C. § 1125(a) ..............................................................................................................6

N.Y. Gen. Bus. Law § 360-l ......................................................................................... 19-20

## RULES

Fed. R. Civ. P. 10(c) .............................................................................................................5

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1

Fed. R. Evid. 201(b)...............................................................................................................4

Defendant UBS Financial Services, Inc. (*"UBS"* or *"Defendant"*) respectfully moves this Court to dismiss the third, fourth, and fifth counts of Plaintiffs' Complaint, with prejudice, on the basis that the claims fail to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

# I.

## INTRODUCTION

Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited (*"Plaintiffs"* or *"EIG"*) publish certain newsletters related to the daily news of the oil industry. EIG publishes an oil daily called *Oil Daily*, and a daily about the international oil industry called *International Oil Daily* (*"IOD"*), both of which contain news briefings. Plaintiffs seek to impose liability upon Defendant for the production and distribution of a global equity research report related to the oil industry called *UBS Investment Research Daily Oil News,* claiming copyright infringement for the unauthorized use of *IOD* content, and trademark infringement and unfair competition for the unauthorized use of their THE OIL DAILY mark. [1]

In suing for violations of federal and state trademark and unfair competition law, Plaintiffs claim exclusive rights to the daily facts of the oil industry and an exclusive right to publish daily oil newsletters under marks that denote such newsletters' content. No law provides such monopolistic protection.

Plaintiffs' mark – denoting a newsletter, published daily, about oil – is generic. Because neither federal nor state trademark law extends protection to such generic marks, Plaintiffs' trademark claims should fail. Even if the mark were protectable, there would still be no

---

[1] Although Defendant believes Plaintiffs have sued the wrong party (the allegedly infringing UBS publication states on its face: *"This report has been prepared by UBS Limited"*), Defendant will address that deficiency (along with others) at the appropriate time. For purposes of expediency only, Defendant may refer herein to *UBS Investment Research Daily Oil News* as *"Defendant's"* publication. Further, Defendant believes that Plaintiffs' copyright claims suffer from multiple legal and factual infirmities, but they are not the subject of this motion.

infringement.  Trademark infringement requires a likelihood of confusion.  According to EIG, the audience for both its newsletters and Defendant's *"consists predominantly of individuals with an interest in the oil and gas industry, including bankers, investors, stock market analysts and traders, commodity analysts and traders and others who follow the industry."*  Complaint, ¶¶ 8, 38.[2]  Such sophisticated consumers are unlikely to be confused by such evidently dissimilar marks as THE OIL DAILY and *UBS Investment Research Daily Oil News*.  Accordingly, Plaintiffs' trademark claims must be dismissed.

Further, EIG's state law dilution claim must be dismissed because New York law protects only *"extremely strong marks"* against dilution, and EIG's mark is generic or, at best, a weak, merely descriptive mark.  Additionally, because the marks at issue are obviously dissimilar, there is no likelihood of dilution.  Plaintiffs' common law trademark claim fails for the same reasons as its federal cause of action: the lack of a legally protectable mark and no probability of confusion.  Lastly, EIG's common law unfair competition claim fails for a lack of supported allegations of bad faith.  In sum, Plaintiffs' third, fourth, and fifth claims are ripe for dismissal.

## II.

### STATEMENT OF FACTS

#### A.    The Parties and Publications

Plaintiffs are publishers of newsletters for the global energy industry.  Complaint ¶ 17.  The names of its publications – e.g., *Petroleum Intelligence Weekly*, *Natural Gas Week Numerical Data Source* – typically denote exactly what they are.  Complaint ¶ 11.  Along these lines, EIG publishes a daily newsletter about the international oil industry called *International Oil Daily*.  Complaint ¶ 8.  EIG has allegedly published *IOD* since 2002, *id.*, and apparently has

---

[2] For the Court's convenience, the Complaint is attached to the Declaration of Thomas P. Lane (*"Lane Decl."*) as Exhibit 1.

registered copyrights for certain issues of *IOD* that were published in November 2007. Complaint, Exh. C.

Plaintiffs also publish a daily oil newsletter called *Oil Daily*. Complaint ¶ 19. EIG has allegedly published *Oil Daily* since 1951, and according to EIG its sophisticated readers recognize EIG as its source. Complaint ¶ 23. EIG apparently registered the mark THE OIL DAILY with the U.S. Patent and Trademark Office in 1998, expressly disclaiming any *"exclusive right to use the word 'daily.'"* Complaint, Exhibit D. The *Oil Daily* banner appears in large type next to an oil rig logo, and states that it is a *"news briefing."* Lane Decl., Exh. 2 (sample issue).[3]

*UBS Investment Research Daily Oil News* is published as part of *UBS Investment Research* reports. Its banner is in smaller type, under a heading of *"Global Equity Research"* and employs the UBS mark not once but twice in the title. Complaint, Exh. E. *UBS Investment Research Daily Oil News* is a daily research report dealing with the energy and petroleum industries. *See* Complaint ¶ 40. Its primary focus is analyst research and the stock market, rather than original news reporting and industrial concerns. C*ompare* Complaint, Exhs. E and F *to* Exhs. A and B. According to Plaintiffs, both dailies have a sophisticated readership consisting primarily of those whose livelihood depends upon specialized and expert knowledge of the oil industry and its most current developments. *See* Complaint ¶¶ 8, 38.

**B.    Copyright Claims**

Plaintiffs claim infringement of allegedly copyrighted content from the November 20, 2007 and November 21, 2007 issues of *IOD*. Complaint, ¶¶ 41-52, 53-64. Plaintiffs' allegations center around an individual named Mr. Jon Rigby. Complaint ¶¶ 24, 27-29. Plaintiffs allege that Mr. Rigby received *IOD* content through a single-user email subscription, copied fractions of

---

[3] Plaintiffs have allegedly applied to truncate the *"THE"* from its registered mark. Complaint ¶ 20.

*IOD* articles for use in two *UBS Investment Research Daily Oil News* reports, and then sent those reports to an undisclosed number of recipients, in alleged violation of his subscription agreement. *Id.* According to Plaintiffs, Mr. Rigby is physically located in London, and is not employed by Defendant. Complaint ¶¶ 24, 27.

## C.    Trademark and Unfair Competition Claims

Plaintiffs accuse Defendant of false designation of origin, dilution of their mark THE OIL DAILY and common law trademark infringement and unfair competition. In support of their federal and state trademark claims, Plaintiffs claim that the use of the words *daily* and *oil* in the publication *UBS Investment Research Daily Oil News* causes confusion among readers that the publication is somehow associated with EIG and THE OIL DAILY. *See, e.g.,* Complaint ¶ 35. Plaintiffs make this claim despite the fact that they have disclaimed *"the exclusive right to use"* the word *daily*. Complaint, Exh. D. Plaintiffs also generally claim that publication of *UBS Investment Research Daily Oil News* constitutes unfair competition in that it dilutes their mark THE OIL DAILY. Complaint ¶¶ 73-74. Notably, despite referring to the UBS newsletter as *"Daily Oil News"* throughout the Complaint, Plaintiffs admit the publication's true title is *"UBS Investment Research Daily Oil News"*. Complaint ¶ 28.[4]

Of course, the words *daily* and *oil* are widely and necessarily used throughout the oil daily newsletter market to denote oil dailies. *See*, *e.g., Daily Oil Bulletin*, available at dailyoilbulletin.com, *Daily Oil Blog,* available at dailyoilblog.com, and *Daily Oil Report*, available at dailyoilreport.com; Lane Decl., Exhs. 3, 4, 5 (screenshots of same).[5]

---

[4] On the face of the reports, it is indicated that they are published by a separate entity, namely UBS Limited. *See* Complaint, Exhs. E-F, p. 1 (*"This report has been prepared by UBS Limited"*).

[5] Defendant respectfully requests that the court take judicial notice of the existence of these publications and the marks under which they are published. Fed. R. Evid. 201(b) provides that a court may take judicial notice of a fact *"not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."* *"The Court may take judicial notice of newspaper articles for the fact of their publication without*

## III.

## ARGUMENT

### A.    Legal Standard

The Court should dismiss all causes of action for which Plaintiffs' factual allegations, accepted as true, fail to state an actionable claim.  "Mere conclusory allegations without factual support are insufficient to survive a motion to dismiss." *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 12 (S.D.N.Y. 2001), *aff'd in part and remanded,* 277 F.3d 253 (2d Cir. 2002) (citing *De Jesus v. Sears, Roebuck & Co. Inc.,* 87 F.3d 65, 70 (2d Cir. 1996)) ("A Complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (internal quotation and citations omitted).  In considering dismissal, the court may rely upon the Complaint, "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the Complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citing Fed. R. Civ. P. 10(c) and Second Circuit case law)  Therefore, in addition to issues of *IOD* and *UBS Investment Research Daily Oil News*, which are attached to the Complaint as exhibits, the Court may consider issues of *Oil Daily*, as "they are referenced in the Complaint and are crucial to plaintiff[s'] claims." *Le Book Publ'g, Inc. v. Black Book Photography*, 418 F. Supp. 2d 305, 308 (S.D.N.Y. 2005) (internal citation omitted).

### B.    Counts Three, Four and Five Must Be Dismissed as Legally Deficient

Counts Three, Four and Five of the Complaint must be dismissed because Plaintiffs' mark is not entitled to protection under state or federal trademark law, there is no probability of

---

transforming the motion [to dismiss] into one for summary judgment." *Garber v. Legg Mason, Inc.*, No. 06 Civ. 9436, 2008 U.S. Dist. LEXIS 20650, at *27-28 (S.D.N.Y. March 17, 2008) (taking judicial notice of news articles) (quoting *In re Merrill Lynch & Co.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003)).

confusion or dilution, and because Plaintiffs have failed to allege the bad faith necessary to support their claims of unfair competition.

### 1.    Count Three Should Be Dismissed Because EIG's Mark Is Generic and Therefore Not Entitled To Protection

Plaintiffs' third claim, arising under the Lanham Act, 15 U.S.C. § 1125(a), is for false designation of origin and alleges unauthorized use of the mark THE OIL DAILY.  In order to successfully state a federal claim for false designation of origin, Plaintiffs must allege ownership of a protectable mark.  *Le Book*, 418 F. Supp. 2d at 311 (*"*To prevail on a trademark infringement claim, plaintiff must prove that its mark is a protectable trademark*"*), *id.* (*"*Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical.*"*) *id.* at 312 (internal quotation and citation omitted).  Because this Court can readily determine that Plaintiffs' mark is generic, and therefore ineligible for protection, Plaintiffs' federal trademark claim must be dismissed.

"It is a bedrock principle of the trademark law that no trader may acquire the exclusive right to the use of a term by which the covered goods or services are designated in the language. Such a term is 'generic.'" *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *see CES Pub'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) (quoting Lanham Act, 15 U.S.C. § 1065(4):  "No incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise"). "The reason is plain enough.  To allow trademark protection for generic terms … would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are." *Id.*; *see Otokoyama*, 175 F.3d at 272 (quoting *Restatement (Third) of Unfair Competition, § 15, cmt. a* ("Competitors denied access to a [generic] term that denominates goods or services to prospective purchasers would be at a distinct disadvantage in communicating information

regarding the nature or characteristics of their product.*"*)); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (*"the user of a generic term … cannot deprive competing manufacturers of the product of the right to call an article by its name"*) (affirming finding of genericness and dismissal of Complaint) *Id.* at 13.  There is no law that can be cited to support the monopolistic effect of granting an individual publisher of a daily newsletter about the oil industry sole use of the words *oil* and *daily*, nor any evidence that could be introduced to undermine the clear conclusion that Plaintiffs' claims are fatally flawed.

The necessarily erroneous registration of a generic mark is never beyond contest, regardless of continuous use.  *Stuhlbarg Int'l Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 840 (9th Cir. 2001) (*"An incontestable mark may be challenged, however, on the grounds that the mark is generic."*); *Te-Ta-Ma Truth Found. - Family of URI, Inc. v. World Church of the Creator*, No. 00 Civ. 2638, 2002 U.S. Dist. LEXIS 1478, at *12 (N.D. Ill. Jan. 31, 2002), *rev'd on other grounds,* 297 F.3d 662 (7th Cir. 2002) (rejecting *"*plaintiffs' assertion that genericness is not a defense to an incontestable mark [as] contrary to both the statute and case law*"*) (citing 15 U.S.C. § 1065(4) (*"no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered"*)) (emphasis added; other citations omitted).  Plaintiffs' allegations of *"*de facto secondary meaning*"* – that *"*consumers have come to recognize EIG as the source of the OIL DAILY publication*"*, Complaint ¶ 23 – cannot save its mark, as secondary meaning cannot transform a generic mark into a subject for trademark.  *Reese Publ'g Co., Inc., v. Hampton Int'l Commc'ns Inc.*, 620 F.2d 7, 12 (2d Cir. 1980) (*"*generic terms cannot be *'*rescued as trademarks*'* by proof of secondary meaning*"*) (affirming finding of genericness and dismissal of Complaint) (internal citation omitted); *Abercrombie & Fitch*, 537 F.2d at 9 (discussing *"*doctrine of the impossibility of

achieving trademark protection for a generic term" and stating that "even proof of secondary meaning, by virtue of which some 'merely descriptive' marks may be registered, cannot transform a generic term into a subject for trademark") (affirming finding of genericness and dismissal of Complaint); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) ("evidence that a generic term is identified with one producer, indicative of a secondary meaning for a descriptive term, proves only what courts call 'de facto' secondary meaning," which "is not even relevant if the term is arbitrary, suggestive or generic"). Indeed, the Second Circuit has found it to be error for a district court to retain jurisdiction over an apparently generic term upon the belief that evidence of secondary meaning might redeem the mark. *CES Publ'g*, 531 F.2d at 15 (holding that district court "was in error in thinking that by proving secondary meaning plaintiff [user of generic mark] might save the day").

Motions to dismiss have repeatedly been granted in this context. In *Solow Bldg. Co., LLC v. Nine West Group, Inc.*, Solow Building, a real estate company headquartered at 9 West 57th St., in New York City, sued to enforce the mark "9 West," claiming trademark dilution, false designation of origin, trademark infringement, and unfair competition. No. 00 Civ. 7685, 2001 U.S. Dist. LEXIS 8848, at *1 (S.D.N.Y. June 28, 2001), *aff'd,* 48 Fed. App'x 15 (2d Cir. 2002) Defendant moved to dismiss, and the Court granted the motion, ruling that the claimed mark was definitively generic. *Id.* at *23.

Similarly, in *Le Book*, the Court granted defendant's motion to dismiss plaintiff's trademark-related claims. 418 F. Supp. 2d at 314. Considering only the Complaint and documents attached as exhibits or incorporated by reference, 418 F .Supp. 2d at 308*,* the Court found that the only term in common between plaintiff's registered mark and defendant's was a generic term, "an unregistrable component of the mark" and one that "cannot be registered as a

trademark." *Id.* at 311.  The Court therefore granted defendant's motion to dismiss plaintiff's

claims.  *Id.* at 314.

For more than three decades, the Second Circuit has refused to extend trademark

protection to magazines published under generic marks.  In *CES Publishing*, plaintiff brought

claims under the Lanham Act and New York unfair competition law, claiming the exclusive right

to publish a monthly trade magazine about consumer electronics under the mark CONSUMER

ELECTRONICS MONTHLY.  Ordering dismissal of plaintiff's federal and state claims, Judge

Friendly found that plaintiff:

> present[ed] a paradigm for which generic classification of
> periodicals is required:  it is hard to think of a name for a
> magazine, directed deliberately and effectively to industry
> personnel, which more accurately names the class of trade
> magazines within that industry than one which simply gives itself
> the name of the trade plus the word "Monthly."

*CES Publ'g*, 531 F.2d at 14.  The Court there could have been speaking directly about this case:

here, EIG publishes a trade newsletter, directed to industry personnel, Complaint ¶ 8, which

simply gives itself the name of the trade, "Oil," plus the word depicting the frequency of

publication, "Daily."  It is a paradigmatic example of a generic mark.

The Second Circuit has consistently followed *CES Publishing*.  For example, in

*Abercrombie & Fitch*, plaintiff clothes retailer accused one of its competitors of infringing upon

its registered trademarks using the word "Safari." 537 F.2d at 7.  The Court explained that a

word may be generic when used to mark certain goods, but arbitrary when applied to others.  *Id.*

at 9, n.6 ("To take a familiar example 'Ivory' would be generic when used to describe a product

made from the tusks of elephants but arbitrary as applied to soap.")  The Court then found that

plaintiff's claim to the mark SAFARI did not support an injunction of defendant's publication of

a *"'Safariland Newsletter'*, containing bulletins as to safari activity in Africa,*"* because the use

of such denotative terms *"was clearly a generic use ..."* 537 F.2d at 12.

Similarly, in *Reese Publ'g*, the Court affirmed the district court's finding that *"[t]he title

'Video Buyer's Guide'*, as applied to a publication that reports on and promotes the sale of video

products to consumers is a generic name.*"* 620 F.2d at 9.  The Court reasoned:

> We believe that *"video,"* like *"consumer electronics,"* is a generic
> term describing a particular class of products and that the term is
> the name of a trade or industry.  Therefore, if plaintiff sought
> trademark protection for *"Video"* as its magazine title, we think it
> would fail.  Similarly, use of the term *"Buyer's Guide"* on a
> magazine directed to consumers of a product is like the term
> *"Newsletter"* in Abercrombie & Fitch.  And the combination of
> the two terms *"Video"* and *"Buyer's Guide"* does not, as Reese
> suggests, destroy their generic nature; if anything, it intensifies it in
> this context. As in CES Publishing Corp., *"one might intelligibly
> speak of both plaintiff's and defendant's magazines"* as video
> buyer's guides.  Indeed, it is hard to think of a better way to
> describe them both, since *"periodicals must depend principally on
> their titles to convey their character."* If defendants were forbidden
> to use the phrase *"video buyer's guide"* in their title, it would be
> difficult for them *"to flourish and identify themselves to a relevant
> readership."* *531 F.2d at 14-15.*

620 F.2d at 10-11.

The same reasoning applies here.  *"Oil,"* like *"video"* or *"consumer electronics,"* is a

generic term describing a particular commodity and naming a particular trade or industry.  The

term *"Daily"* for a daily publication is like the term *"Newsletter"* in *Abercrombie & Fitch*, or, as

noted above, the term *"Monthly"* in *CES Publ'g*.[6]  Both EIG's and UBS's publications could be

intelligently described as oil dailies.  *See* Complaint, Exhs. A, B, E and F; *cf.* Complaint ¶ 38.

They concern oil and are published daily.  It is difficult, if not impossible, to imagine how

Defendant or a publisher of an oil daily might convey the character of their publications and

---

[6] In fact, according to its trademark registration, EIG has expressly disclaimed the right to use the word *daily*.
Complaint, Exh. D.

identify themselves to their target audience without the use of the terms *oil* and *daily*. *Cf.* Lane Decl., Exhs. 3-5 (numerous "Daily Oil" publications). Under EIG's legal analysis, *UBS Investment Research Daily Oil News* should apparently instead be called *UBS Investment Research Very Frequent Reports On the Petroleum Industry*, or something similarly silly. EIG can no more own the words *oil* or *daily* than it could own the terms *gas, nuclear, coal, wind, solar, global, frequent, weekly* or *often*.

Trademark law does not confer to EIG a monopoly on these generic terms, no matter whether they are used in conjunction, independently or in alternate order. *See Reese Publ'g*, 620 F.2d at 11, n.1 (finding title of trade magazine to be generic, even when read as a whole). "Generic terms are not eligible for protection as trademarks; everyone may use them to refer to the goods they designate." *Otokoyama*, 175 F.3d at 270 (citations omitted). Accordingly, EIG's trademark claims must be dismissed.

**2.    Count Three Should Be Dismissed Even If EIG's Mark Were Protectable, Because There Is No Probability of Confusion**

EIG's trademark claims fail regardless of whether its mark, THE OIL DAILY, used for a daily newsletter about the oil industry, is characterized as generic or otherwise. This is so because there is no likelihood of confusion between EIG's publication and *UBS Investment Research Daily Oil News*. *See Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (liability under § 43(a) of Lanham Act "requires proof of likelihood of the confusion"); *Medical Econ. Co., Inc. v. Prescribing Reference, Inc.*, 294 F. Supp. 2d 456, 462 (S.D.N.Y. 2003) ("A party claiming trademark infringement succeeds by showing both (a) a legal, exclusive right to the mark, and (b) a likelihood that customers will be confused as to the source of the infringing product.") (citing *Otokoyama*, 175 F.3d at 270); *Katz v. Modiri*, 283 F. Supp. 2d 883, 899-900

(S.D.N.Y. 2003) (finding both infringement and false designation of origin claims to fail under the same likelihood-of-confusion analysis).

The *Polaroid* factors guide courts in this Circuit to a determination on the *"probability"* that a trademark defendant's product will cause confusion among *"numerous ordinary prudent purchasers." 24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 361 (S.D.N.Y. 2003) (emphasis in original) (internal citations omitted).  The non-exclusive *Polaroid* factors are: 1) strength of the mark; 2) degree of similarity between the marks; 3) proximity of the products;  4) likelihood that the owner of the mark will bridge the gap; 5) actual confusion; 6) defendant's good faith in adopting the mark; 7) quality of defendant's product; and 8) sophistication of the buyers." *Id.* (quoting *Polaroid Corp. v. Polaroid Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).[7]

"Although the existence of consumer confusion is generally a question of fact, 'in considering a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may . . . make an initial finding as to whether or not a jury would find a likelihood of confusion as to source.'" *Solow Bldg. Co.,* 2001 U.S. Dist. LEXIS 8848, at *17-18 (internal quotation and citations omitted); *see Le Book,* 418 F. Supp. 2d at 311-14 (granting motion to dismiss false designation of origin, infringement and dilution claims upon finding that plaintiff's and defendant's "obviously dissimilar marks" overwhelmed any possibility of confusion).

### a)    The Evident Dissimilarity of the Marks Overwhelms Any Possibility of Confusion

In *Le Book*, this Court considered, on a motion to dismiss, the probability of confusion between two directories targeted to the creative industries, including fashion and photography.

---

[7] Because *Oil Daily* and *UBS Investment Research Daily Oil News* are alleged to compete in the same market, "the likelihood-of-bridging-the-gap factor, which examines whether the prior user may wish to enter the defendant's market in the future, [is] irrelevant." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993).

Plaintiff, publisher of *Le Book – New York 2003* sued defendant, the publisher of *The Black Book Creative Directory 2004* for copyright infringement, trademark infringement, false designation of origin and trademark dilution under New York law.  Defendant moved to dismiss all claims, and the Court granted the motion.

After listing the eight *Polaroid* factors, the Court declared that "[t]he 'degree of similarity' element here overwhelms any possibility of confusion." *Le Book,* 418 F. Supp. 2d at 311.  The Court compared the two marks under which the books were published and found them "obviously dissimilar." *Id.*  The Court then examined the books themselves and found them "physically and visually distinct."  The Court also noted that the only term in common between the two marks, "book," was "a generic term and cannot be registered as a trademark." *Id.*  The Court concluded: "The cumulative effects of the dissimilarity of the marks and the form, look and feel of the directories dispels any confusion consumers might have." *Id.* at 312.  Accordingly, the Court dismissed the claims for trademark infringement, false designation of origin and dilution. *Id.* at 312 ("plaintiff's claim for trademark infringement fails as a matter of law"), *id.* ("As discussed above, however, as a matter of law, *Le Book NY* and *The Black Book Directory* are so dissimilar that it is unlikely that a consumer would confuse one with the other, or mistakenly believe that both directories were published by either the plaintiff or defendant. Therefore, plaintiff fails to state a claim for false designation of origin"), *id.* at 313 ("As discussed above, the parties' marks and directories are blatantly different, and thus plaintiff fails to meet a critical requirement of a dilution claim.").

In so concluding, the Court followed the Second Circuit's decision in *Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43 (2d Cir. 2000).  The *Nabisco* Court examined two marks for chewing gum, ICE BREAKERS (plaintiff's) and DENTYNE ICE (defendant's), and found that

where marks are so dissimilar, *"in an appropriate case, the 'similarity of the marks' factor can be dispositive"* and warrant judgment without an examination of the remaining *Polaroid* factors. 220 F.3d at 46, 48 (*"Having determined that the parties' use of their DENTYNE ICE and ICE BREAKERS marks is so dissimilar as to require judgment for Warner-Lambert, we need not examine the remaining *Polaroid* factors"*). The Second Circuit found the marks *"at best marginally similar because of the common use of the word 'Ice,'"* and then immediately stated that the *"varying placement of "Ice" is a major difference."* 220 F.3d at 46. *"More critically,"* the Court continued, defendant *"prominently – indeed primarily – identifie[d]"* DENTYNE ICE as a member of its well known DENTYNE brand. *Id.* The Second Circuit found that defendant's *"prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products."* *Id.*

The holdings in *Le Book* and *Nabisco* compel dismissal here. The at-best marginal similarity between *Oil Daily* and *UBS Investment Research Daily Oil News* is even further marginalized by the genericness of the common words *oil* and *daily*. The varying placement of the words is also a major difference. *See Nabisco*, *supra.*, at 46; *see also 24 Hour Fitness*, 277 F. Supp. 2d at 365 (finding no probability of confusion between plaintiff's 24 Hour Fitness gym and defendant's 24/7 Fitness facilities despite *"the overlapping use of the terms '24' and 'Fitness'"*). Further, and importantly, *UBS Investment Research Daily Oil News* is primarily identified with the well-known house brand UBS, an international and highly regarded investment bank, with *"UBS"* repeated both at the top of the document and in the document's title. This primary identification eliminates any probability of confusion among consumers.

Additionally, the style, formatting and content of *Oil Daily* and *UBS Investment Research Daily Oil News* are *"noticeably dissimilar."*  *Le Book*, 418 F. Supp. 2d at 311 (noting stark difference in *"formats, typefacing, paper, and even the placement of advertising"*); *see* Lane Decl., Exh. 6 (comparison of front pages); *compare* Lane Decl., Exh. 2 (*Oil Daily* sample issue) *to* Lane Decl., Exhs. 7 and 8 (issues of *UBS Investment Research Daily Oil News*).  Even the most cursory review of the two publications reveals stark differences in format, font, typeface, setting, logos, arrangement, summaries, authors and characterization.  With either a contextual or a more heuristic simultaneous comparison, the marks and corresponding reports are not capable of confusion.  For example, comparison of the respective banners of the two publications reveals the lack of similarity between the two marks.  *Compare* Lane Decl., Exh. 2 *to* Lane Decl., Exhs. 7 and 8.  *Oil Daily* is centered and appears in large, bold-face type beside a logo depicting an oil rig.  Contrastingly, *UBS Investment Research Daily Oil News* is left-justified, and appears, without an accompanying logo, in type smaller than the name of its brand, which is printed above.  *See Nabisco*, 220 F.3d at 47 (finding that *"starkly different typefaces and styles"* further dispelled confusion); *Le Book*, 418 F. Supp. 2d at 311 (noting *"obviously dissimilar marks"*); *Medical Econ.*, 294 F. Supp. 2d at 464 (*"The parties use different typefaces and logotypes.  The parties color schemes also minimize confusion."*).

Further, from a contextual perspective, *Oil Daily* is characterized as a *"news briefing"* and refers to *"news in review."*  In direct contrast, *UBS Investment Research Daily Oil News* is under the banner of *"Global Equity Research."*  Under *"Key Headlines"* the report refers to UBS research conclusions, not to news headlines.  The UBS report also contains the repeated and required analyst certifications and required disclosures, which *Oil Daily* does not.  *"The cumulative effect of the differences between the parties' products and in the commercial

presentation of their marks creates distinct marketplace impressions" and "suffice to dispel completely any residual confusion." *Nabisco*, 220 F.3d at 47.

> **b)    Further Review of the *Polaroid* Factors Underscores The Utter Improbability of Consumer Confusion**
>
> > **i.    The Sophistication of the Consumers Mitigates Against A Finding of Confusion**

Although a review of the other *Polaroid* factors is not even necessary, *Nabisco,* 220 F.3d at 48 (finding review of other *Polaroid* factors unnecessary), *Le Book*, 418 F. Supp. 2d at 311-14 (same), further review only reinforces the ineluctable conclusion that consumers of the publications at issue are unlikely to be confused.  "The more sophisticated the consumers of a product are, 'the less likely it is that similarities in … trade marks will result in confusion.'" *Paddington,* 996 F.2d. at 587 (internal quotation and citation omitted).  For example, in *24 Hour Fitness,* the Court found that because gym goers tended to familiarize themselves with the amenities of competing clubs before joining a particular gym, they were unlikely to confuse defendant's 24/7 Fitness gym with plaintiff's 24 Hour Fitness facilities, notwithstanding "the overlapping use of the terms '24' and 'Fitness'."  277 F. Supp. 2d at 365.  Similarly, the Second Circuit found that ouzo drinkers were unlikely to confuse #1 Ouzo with No. 12 Ouzo, *Paddington, supra.,* and this Court found that doctors and physicians were unlikely to confuse *Monthly Prescribing Reference* with *Monthly Prescribing Guide*.  *Medical Econ.*, 294 F. Supp. 2d at 465 ("Such highly sophisticated consumers are unlikely to be confused.").

According to EIG, the readership of both dailies at issue includes "bankers, investors, stock market analysts and traders [and] commodity analysts and traders."  Complaint ¶¶ 8, 38.  If "doctors and physicians are 'as sophisticated a group as one could imagine,'" *Med. Econ.*, 294 F. Supp. 2d at 465 (internal citation omitted), certainly "bankers, investors, stock market analysts and traders, commodity analysts and traders" do not trail far behind.  *See* Complaint ¶ 8.  While

doctors *"tend to use great care in making decisions that relate to"* their patients' physical well-being, bankers, investors and others who follow the oil industry tend to use great care in making decisions – including and especially the source of daily oil industry news or research – that concern their own financial wherewithal. *Medical Econ.,* 294 F. Sup. 2d at 465. Driven by such a powerful incentive, it is unlikely that consumers in the oil industry newsletter or research market would confuse Plaintiffs' *Oil Daily* for Defendant's *UBS Investment Research Daily Oil News*, just because of *"the overlapping use of the terms" "Oil"* and *"Daily." 24 Hour Fitness*, *supra.* at 365.

### ii.    Confusion Is Improbable Because  EIG*'s* Mark Is Weak

The probability of confusion is particularly low because Plaintiffs' mark is weak. In *Abercrombie & Fitch*, Judge Friendly famously outlined the four categories of trademark classification. *"*Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.*"* 537 F.2d at 9. A generic term, as described above, is *"*one that refers … to the genus of which the particular product is a species.*" Id.* A common example is the term *ivory* when used to refer to elephant tusks. *Id.* n.6. It is impossible for a generic term to achieve trademark protection. *Id.* at 9. *"*A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.*" Id.* at 11 (internal quotation omitted). It may be eligible for trademark protection if it achieves secondary meaning. *Id*. at 10 *"*Proof of substantially exclusive and continuous use of the mark applied to the applicant's goods for five years*"* may establish a presumption that the mark is *"*distinctive of the applicant's goods in commerce,*"* rendering it eligible for trademark protection, but still categorically weaker than a suggestive or arbitrary or fanciful mark. *Id.* at 10

"A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Id.* at 11 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)). "If a term is suggestive, it is entitled to registration without proof of secondary meaning." *Id.* at 11. A fanciful term is one invented solely for its use as trademark; an arbitrary mark is a common word applied in an unfamiliar way. *Id.* at 11, n.12. Categorically, fanciful and arbitrary marks are the strongest.

Even accepting all of Plaintiffs' allegations as true, the mark THE OIL DAILY still simply designates the nature and content of the publication to which it refers. It is generic or, at best, "merely descriptive." *24 Hour Fitness*, 277 F. Supp. at 361-62 (finding mark that had been registered and in continuous use for more than five years to be "descriptive and therefore weak"). Plaintiffs do not allege, nor could they possibly offer evidence, that its mark, THE OIL DAILY is suggestive, *i.e.*, that it "requires imagination, thought and perception to reach a conclusion as to the nature of goods" that it denotes. *Abercrombie & Fitch*, 537 F.2d at 11. Nor do Plaintiffs allege that THE OIL DAILY is an arbitrary or fanciful name for an oil daily. *Oil* and *Daily* are common words applied in the most familiar of ways: to denote the contents to which they refer. This inherent weakness of Plaintiffs' mark further dispels any possibility of confusion.

### iii.    The Lack of Actual Confusion or Bad Faith Further Favors Defendant

Finally, there are no allegations of actual confusion, or of bad faith. Plaintiffs allege that the mark *UBS Investment Research Daily Oil News* is "likely to cause confusion," Complaint ¶¶ 38, 67, but nowhere in its 25-page Complaint does EIG allege any actual confusion of ordinary prudent consumers. Nor, apart from bald, unsupported allegations of intentionality and willfulness, do Plaintiffs lodge a single allegation of bad faith on the part of UBS. For example,

Plaintiffs do not allege to have sent UBS a cease-and-desist letter, or even to have contacted UBS, which was, after all, an alleged subscriber to Plaintiffs' publications. Complaint ¶ 36. Plaintiffs' purported averments of bad faith are nothing more than overly generalized conclusions of law masquerading as fact. *See, e.g.,* Complaint ¶ 80 (*"Defendant's acts and conduct set forth constitute willful infringement … and willful unfair competition…."*). They are *"merely conclusory"* and unsupported by sufficient factual assertions, and are therefore entitled to no weight. *See Twentieth Century Fox Film Corp.*, *supra.* The absence of such allegations militates against finding probable confusion among consumers.

It defies reason that consumers who deal in futures, reserves, options, differentials, and varietals from Heavy Louisiana Sweet to Columbian Cusiana Crude, would confuse the daily source of the news or research (in the case of *UBS Investment Research Daily Oil News*) upon which they rely for their livelihood. Because there is no probability that the readership of oil dailies would confuse Defendant's publication for Plaintiffs', EIG's claim of false designation of origin must be dismissed.

### 3.   Count Four Should Be Dismissed Because EIG's Weak Mark Does Not Support A Claim For Dilution, Nor Is There Any Likelihood Of Dilution

EIG's fourth claim is for state unfair competition/trademark dilution. **"**In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark; and (2) a likelihood of dilution.*" Le Book*, 418 F. Supp. 2d at 313 (citing *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir. 1996). EIG has alleged neither ownership of a sufficiently strong mark, nor sufficiently similar opposing marks to create a likelihood of dilution. Accordingly, its dilution claim is legally insufficient and must be dismissed.

N.Y. Gen. Bus. Law §360-l, upon which EIG bases its claim, *see* Complaint ¶ 73, provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

The Second Circuit has held that the "New York anti-dilution statute 'protects only extremely strong marks.'" *See, e.g, Empresa Cubana Del Tabaco v. Culbro Corp.*, No. 97 Civ. 8399, 2004 U.S. Dist. LEXIS 4935, at *157 (S.D.N.Y March 26, 2004), *aff'd in part rev'd in part,* 399 F.3d 462 (2d Cir. 2005) (affirming dismissal of dilution claim) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc*., 699 F.2d 621, 625 (2d Cir. 1983)); *see also Swatch Group (U.S.) Inc. v. Movado Corp.,* No. 01 Civ. 0286, 2003 WL 1872656, at *5-6 (S.D.N.Y. April 10, 2003) (internal citations omitted).   Examples of "extremely strong marks" include Dupont, Buick, Schlitz, Kodak and Bulova.  *Empresa Cubana Del Tabaco*, 2004 U.S. Dist. LEXIS 4935, at *157 (quoting *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989) (quoting hypothetical misappropriations cited in legislative history of New York anti-dilution statute: "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth").  As described above, THE OIL DAILY does not even remotely rise to the level of strength of these arbitrary marks.  *Cf. Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 134 (S.D.N.Y. 1993) ("Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes.") (quoting *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d at 1030).  At best, EIG's mark is descriptive, and as such, it falls far short of the strength threshold for protection under New York's anti-dilution statute.

Additionally, as described above, *Oil Daily* and *UBS Investment Research Daily Oil News* are facially dissimilar.  "In 'keeping with the original intent of the [New York] statute, the

similarity [between the marks] must be substantial before the doctrine of dilution may be applied.'" *Le Book*, 418 F. Supp. 2d at 313 (quoting *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1029 (2d Cir. 1989)).  Given the dissimilarity between *Oil Daily* and *UBS Investment Research Daily Oil News*, it is impossible that the former mark might suffer negative associations because of the latter publication.  *See Le Book*, 418 F. Supp. 2d at 313.  *"A consumer looking at [Oil Daily] and/or [UBS Investment Research Daily Oil News] will no doubt understand that they are two different publications, and will not think less of [the former] based on the presentation of [the latter]."  Id.*  Plaintiffs thus also fail *"to meet the similarity requirement for a dilution claim."  Id.*  Accordingly, Count Four of the Complaint must be dismissed.

> **4.      EIG's Claim of Common Law Trademark Infringement and Unfair Competition Must Be Dismissed (Count Five)**

>> **a)      EIG's Common Law Trademark Infringement Claim Fails For The Same Deficiencies As Its Federal Claims**

EIG's fifth claim, for common law trademark infringement, fails for the same reason as its federal statutory claim: the lack of a legally protectable trademark or any probability of confusion.  *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581-82 (2d Cir. 1990) (*"To prevail on a statutory or common law trademark infringement claim a plaintiff must . . . establish that the symbols in which this property right is asserted are valid, legally protectable trademarks"*); *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F. Supp. 2d 545, 548 (E.D.N.Y. 2007) (*"[t]he elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims."*) (internal quotation and citation omitted).  Whether examined under state or federal law, EIG's OIL DAILY mark remains generic.  Because such marks are not legally protectable, Plaintiffs' common law trademark infringement claim must be dismissed.  *See Momentum Luggage & Leisure Bags v.*

*Jansport, Inc.*, No. 00 Civ. 7709, 2001 U.S. Dist. LEXIS 10253, at *37, n.19 (S.D.N.Y. July 23, 2001), *aff'd,* 45 Fed. App'x 42 (2d Cir. 2002) (*"for the same reasons plaintiffs' federal claims fail, its corresponding state law [trademark and unfair competition] claims fail as well."*).

Even were the mark protectable, Plaintiffs have failed to allege any probability of confusion; the claim must be dismissed for this reason, too. *Solow Bldg. Co.*, 2001 U.S. Dist. LEXIS 8848, at *17 (*"plaintiff's cause of action also fails because the Complaint fails to sufficiently allege any likelihood of confusion between the parties' marks, as required by the Lanham Act and New York common law."*).

### b) EIG's Common Law Unfair Competition Claims Fail For A Lack Of Bad Faith

EIG's unfair competition claim fails because, as detailed above, Plaintiffs do not sufficiently allege bad faith on the part of Defendant. *See Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) (*"state law* claim of unfair competition is not viable without a showing of bad faith"*) (emphasis in original)*; FragrancenNet.com*, 493 F. Supp. 2d at 548 (*"To prevail on a claim for unfair competition under New York common law, a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith."*). The absence of any supported allegations of bad faith is fatal to EIG's common law unfair competition claim. *Cf. Twentieth Century Fox Film Corp.*, 155 F. Supp. 2d at 17 (dismissing claim where *"allegations of bad faith are merely conclusory"*). Count Five of the Complaint should therefore be dismissed with prejudice.

22

## IV.

## CONCLUSION

For the reasons stated above, the Court should dismiss Counts Three, Four, and Five of Plaintiffs' Complaint, with prejudice.

Dated:  April 11, 2008

WINSTON & STRAWN LLP

BY:    /s/ Thomas P. Lane
          Michael S. Elkin (ME-2300)
          Thomas P. Lane  (TL-8983)

200 Park Avenue
New York, New York 10166
(212) 294-6700

*Of Counsel*:

Timothy M. Broas

1700 K Street, N.W.
Washington, D.C.  20006-3817
(202) 282-5000

*Attorneys for Defendant*

# APPENDIX OF
# UNREPORTED CASES

LEXSEE 2004 US DIST LEXIS 4935

EMPRESA CUBANA DEL TABACO, d.b.a. CUBATABACO, Plaintiff, - against - CULBRO CORPORATION and GENERAL CIGAR CO., INC., Defendants.

97 Civ. 8399 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2004 U.S. Dist. LEXIS 4935; 70 U.S.P.Q.2D (BNA) 1650*

March 26, 2004, Decided
March 29, 2004, Filed

**SUBSEQUENT HISTORY:** Stay denied by, Stay granted by *Empresa Cubana Del Tabaco v. Culbro Corp., 2004 U.S. Dist. LEXIS 7443 (S.D.N.Y., Apr. 30, 2004)*

**PRIOR HISTORY:** *Empresa Cubana del Tabaco v. Culbro Corp., 2003 U.S. Dist. LEXIS 6979 (S.D.N.Y., Apr. 24, 2003)*

**DISPOSITION:**    Trademark registration cancelled.

**COUNSEL:** [*1]    Attorneys for Plaintiff: RABI-NOWITZ, BOUDIN, STANDARD, KRINSKY & LIE-BERMAN, New York, NY. By: MICHAEL KRINSKY, ESQ. DAVID B. GOLDSTEIN, ESQ. Of Counsel. WINSTON & STRAWN, New York, NY. By: KEVIN WALSH, ESQ., STEVE YOUNG, ESQ. Of Counsel.

Attorney for Defendants: LATHAM & WATKINS, New York, NY. By: JOHN J. KIRBY, JR., ESQ., E. MAR-CELLUS WILLIAMSON, ESQ., ALEXANDRA A. E. SHAPIRO, ESQ., Of Counsel. MORGAN & FINNE-GAN New York, NY. By: HARRY C. MARCUS, ESQ., JANET DORE, ESQ. Of Counsel.

**JUDGES:** ROBERT W. SWEET, United States District Judge.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**TABLE OF CONTENTS**

The Issues

The Parties

Prior Proceedings

FINDINGS OF FACT

History of the COHIBA Mark Prior to 1992

Cubatabaco's Use of the COHIBA Trademark

General Cigar's Use of the COHIBA Trademark

Fame of the COHIBA Mark in 1992 and Later

Evidence of the Fame of the Cohiba Mark in November 1992

The Shanken Survey

February 1992 Issue of the Wine Spectator

The Launch of Cigar Aficionado

Other Publicity Following the Premier Issue

Other Media References

The Introduction of the General Cigar COHIBA in 1992

The 1994 and 1995 Surveys

Evidence of General Cigar's Intent [*2] in Reintroducing the COHIBA Mark in 1992

General Cigar Executives' Trip to Havana

General Cigar's Communications with its Trademark Counsel

General Cigar Files for a Second COHIBA Registration

Cubatabaco's Intent with Respect to the COHIBA Mark in the U.S. Between 1992 and 1997

Padron's First Interview with Cigar Aficionado

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 2

Padron's Second Interview with Cigar Aficionado

Cubatabaco's Efforts to Promote the COHIBA Brand in the United States

Cubatabaco's Attempts to Cancel General Cigar's COHIBA Registration

Likelihood of Confusion of the Cuban COHIBA with the General Cigar COHIBA

General Cigar's Assessment of the COHIBA Brand from 1992 to 1997

The 1997 Launch of the Super-Premium General Cigar COHIBA

Advertising for the Relaunched General Cigar CO-HIBA

General Cigar's Actions Against the Cuban CO-HIBA

General Cigar's Actions Against Third Parties

The 1998 Cambridge Group Presentation

The 2000 Survey

CONCLUSIONS OF LAW

Jurisdiction and Venue

The Article 10bis Claim is Dismissed as Duplicative

The Inter-American Convention Claim is Dismissed as Duplicative

The Trademark Infringement Claim Under *Section 43(a) of the Lanham Act* is Granted

[*3] Cubatabaco Has a Protectable Mark

A Secondary Meaning Level of Recognition is Required for a Mark to be Famous

Factors to be Assessed in Determining COHIBA's Fame in November 1992

1. Consumer Studies

2. Unsolicited Media Coverage

3. Attempts to Plagiarize the Mark

A Likelihood of Confusion Exists Between the Cuban COHIBA and the General Cigar COHIBA

1. Strength of Plaintiff's Mark

2. Similarity Between the Two Marks

3. The Proximity of the Products

4. Likelihood that Plaintiff Will "Bridge the Gap"

5. Actual Confusion

6. Good Faith on the Defendant's Part

7. Quality of the Defendant's Product

8. Sophistication of Buyers

Cubatabaco did not Abandon the COHIBA Mark Between 1992 and 1997

General Cigar's COHIBA Mark is Cancelled and General Cigar is Enjoined from Using the COHIBA Mark

The FTDA Claim is Dismissed

The New York State Dilution Claim is Dismissed

The Unfair Competition Claim is Dismissed

The Claim for Trademark Cancellation Under *§ 1120* is Dismissed

The Misappropriation Claim is Dismissed

The Trade Dress Infringement Claim is Dismissed

The Deceptive Trade Practices Claim is Dismissed

The Trade Dress Dilution and False Advertising Claims [*4] are not Properly Before the Court

No Judgment is Appropriate at this Time on Cubatabaco's Claims for Monetary Relief

CONCLUSION

**Sweet, D.J.**

The plaintiff Empresa Cubana del Tabaco d/b/a Cubatabaco ("Cubatabaco") seeks to recover for alleged willful acts of trademark infringement, trade dress infringement, unfair competition, misappropriation and trademark dilution by defendants Culbro Corporation (now known as General Cigar Holdings, Inc. and General Cigar Co., Inc. (collectively, "General Cigar") with respect to Cubatabaco's trademark COHIBA for premium Cuban cigars and for cancellation of General Cigar's trademark registrations for that mark.

After the completion of the pretrial proceedings, a non-jury trial was held on various dates between May 27, 2003 and June 23, 2003. Upon all the prior proceedings and the following findings of fact and conclusions, judgment will be entered in favor of Cubatabaco cancelling General Cigar's trademark registrations and enjoining General Cigar from using the COHIBA mark. Several of Cubatabaco's other claims, however, are dismissed.

**The Issues**

This action considers trademark issues in the unique context of the [*5] trade embargo against Cuba. Cuba has developed several strong cigar trademarks. While nearly all of them were developed before the Cuban

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 3

revolution, i.e., Partagas, Punch and Ramon Allones, the COHIBA trademark was registered in 1969, and was first sold outside of Cuba in 1982. Cubatabaco alleges that General Cigar has unlawfully infringed on the COHIBA mark in the United States despite the fact that Cubatabaco not only cannot sell Cuban COHIBA cigars in this country because of the embargo [1], but did not register the trademark when General Cigar stopped selling its CO-HIBA cigars for a number of years, nor did it object to General Cigar's application to register the mark in December 1992.

> [1] The Cuban Assets Control Regulations, 31 C.F.R. Part 515, prohibit, inter alia, (1) the importation into the United States of merchandise from Cuba or merchandise of Cuban origin; and (2) the use in U.S. commerce of any trademark in which Cuba or a Cuban national has, at any time since July 8, 1963, had any interest, direct or indirect. *31 C.F.R. §§ 515.201, 515.204, 515.311.* These same regulations allow for, however, filing in the United States applications for trademark registrations, prosecuting said applications, receiving registration certificates and renewal certificates and recording any instrument affecting title to trademark registrations. *31 C.F.R. § 515.527.*

[*6] Several different issues were explored at trial and in the post-trial submissions by both parties. However, as explained in greater detail below, the following issues are the most important in resolving the liability issues in this litigation:

> * Was COHIBA a well-known or famous mark in the United States on November 20, 1992, the date of General Cigar's first new use of the COHIBA trademark?

> * Is there a likelihood of confusion between the Cubatabaco COHIBA and the General Cigar COHIBA?

> * Did Cubatabaco abandon the CO-HIBA mark in the United States from 1992 to 1997?

> * Did General Cigar act in bad faith in exploiting the COHIBA trademark?

**The Parties**

Cubatabaco is a company organized under the laws of Cuba with its principal place of business in Havana,

Cuba. Directly, and through its licensee, Habanos, S.A., Cubatabaco exports tobacco products from Cuba throughout the world, excluding the United States because of the current trade embargo. It was established by the Cuban government as an independent entity with its own assets and administration and is subject to the jurisdiction of a Cuban ministry.

Culbro has been merged into and is survived [*7] by General Cigar Holdings, Inc. General Cigar Holdings is a Delaware corporation with its principal place of business in the county of New York and functions as a holding company for General Cigar Co. Inc.

General Cigar Co., Inc. is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. General Cigar Co., Inc. is in the business of manufacturing, marketing, advertising and distributing tobacco products.

General Cigar and its predecessors in interest have been major U.S. manufacturers and distributors of cigars for more than a century.

**Prior Proceedings**

Cubatabaco filed its complaint on November 12, 1997, alleging that Cubatabaco possessed a COHIBA mark for its cigars that was "well-known" in the United States at the relevant time, and that General Cigar's efforts to exploit and trade upon Cubatabaco's COHIBA mark in order to generate profits on the sale of its own cigars entitled Cubatabaco to relief under Articles 6bis and 10bis of the Paris Convention; Articles 7, 8, 20 and 21 of the Inter-American Convention; *sections 38 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1120,1125(c)(1)* and *1125(a)*; and New York state [*8] law.

On December 11, 1997, the parties in settlement discussions entered into a written agreement that, inter alia, (1) the actions of both parties in this court and in the U.S. Patent and Trademark Office ("PTO") are "stopped"; (2) "the time spent during the negotiation will not be used by any of the parties to the detriment of the other, in case there is no [settlement] agreement;" and (3) "use of General Cigar's COHIBA trademark as from the signing of this Contract will not be used in detriment of Cubatabaco if agreement is not reached." The parties reported this agreement to the Court on December 16, 1997, and, at their request, all proceedings were stayed, including discovery, until litigation was renewed in February 2000.

By order dated December 5, 2000, Counts V (Article 22 of TRIPS), VI (Article 10 of the Paris Convention), VIII (false representation of origin in violation of *Section 43(a) of the Lanham Act*) and IX (deceptive advertising in violation of *Section 43(a) of the Lanham Act*) were dismissed with prejudice in light of the decision in *Ha-*

Page 4

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

*vana Club Holding S.A. v. Galleon S.A., 203 F.3d 116, 124 (2d Cir. 2000).* Cubatabaco's motion to strike the [*9] jury demand of General Cigar was granted on December 15, 2000. See *Emmpresa Cubana Del Tobaco v. Culbro Corp., 123 F. Supp. 2d 203 (S.D.N.Y. 2000) ("Empresa I").*

On June 26, 2002, this Court granted summary judgment for General Cigar dismissing Counts I (Article 6bis of the Paris Convention) and III (Article 7 and 8 of the Inter-American Convention), granted summary judgment for Cubatabaco on its claim that General Cigar had abandoned the COHIBA mark from 1987 until 1992, and dismissed General Cigar's equitable defenses. See *Emmpresa Cubana del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247 (S.D.N.Y. 2002) ("Empresa II").* Accordingly, Cubatabaco's claims are now limited to:

> (1) Count II (Article 10bis of the Paris Convention); (2) Count IV (Articles 20 and 21 of the Inter-American Convention); (3) Count VII (Trademark Infringement under *Section 43(a) of the Lanham Act*); (4) Count X (state and common law unfair competition); (5) Count XI (cancellation of the 1995 registration); (6) Count XII (dilution under state and federal law); and (7) [Count] XIII (common law misappropriation).

*Id. at 286-87.* Motions by both [*10] plaintiff and defendants to reconsider Empresa II were denied on October 8, 2002. See *Emmpresa Cubana del Tabaco v. Culbro Corp., 2002 U.S. Dist. LEXIS 21731, 2002 WL 31251005 (S.D.N.Y. Oct. 8, 2002) ("Empresa III").*

In an opinion dated March 12, 2003, the Court struck General Cigar's inadequate defense of abandonment and permitted it to amend its answer to assert an adequate abandonment defense, and excluded the testimony of two late-disclosed witnesses. See *Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.R.D. 151 (S.D.N.Y. 2003) ("Empresa IV").*

In accordance with these rulings, the trial took place on various dates between May 27, 2003 and June 23, 2003. Post-trial argument was heard on October 9, 2003.

## FINDINGS OF FACT

The following constitute the findings of fact of this Court and are based upon evidence adduced from the trial, testifying witnesses, over 1,500 exhibits, and the proposed findings of fact from Cubatabaco and General Cigar.

## History of the Cohiba Mark Prior to 1992

### Cubatabaco's Use of the COHIBA Trademark

In 1969, Cubatabaco filed an application to register the "COHIBA" mark in Cuba. By 1970, cigars branded [*11] with Cubatabaco's COHIBA trademark were being produced at the El Laguito factory in Havana. The cigar box and band bore a distinctive design developed for the COHIBA cigar as well as the COHIBA trademark. The box is plain and unpainted -- the box top contains only the COHIBA name and an Indian Head logo, colored solid black, in the lower right corner. The band consists of a solid yellow field on the bottom section, and rows of white squares on a black field on the top. The name COHIBA, in all capitals in black on a white background in a bold sans serif font, straddles the top and bottom sections. The registration issued on May 31, 1972.

Throughout the 1970's, Cuban COHIBA cigars were commercially available and sold in Cuba at Havana's main hotels, upscale restaurants and two retail outlets. From 1970 to 1975, Cubatabaco claims that annual sales at the two retail outlets in Havana averaged approximately 100,000 cigars and increased to approximately 180,000 cigars per year by 1975. In addition, since at least 1970, COHIBA cigars had been sold to the Cuban Council of State, which includes the office of the Cuban President and to another Cuban state enterprise which in turn sold the cigars [*12] to Cuban Ministries and other government institutions. [2] Cubatabaco claims that the total volume of sales grew from approximately 350,000 to 375,000 per year from 1970 to 1975 to approximately 550,000 to 600,000 per year from 1975 to 1980. There are no records of these sales, however, as Cubatabaco has a policy of destroying its sales and production records after five years.

> 2    General Cigar contests the characterization that cigars obtained and given away by Fidel Castro, other governmental officials and entities were sales by Cubatabaco.

By January 1978, Cubatabaco had made application to register COHIBA in 17 countries, including most of the Western European countries. [3] The applied-for registrations issued in due course. Cubatabaco did not, however, sell COHIBA cigars outside of Cuba until 1982.

> 3    The countries were: Great Britain, Ireland, Belgium, the Netherlands, Luxembourg, Spain, France, Denmark, Portugal, Australia, Egypt, South Africa, Argentina, Mexico, Switzerland, Venezuela, Colombia, and Italy. Cubatabaco has by now registered the mark in more than 115 countries total.

Page 5

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

[*13] In July 1981, Cubatabaco announced that it would soon begin commercial exports of COHIBA in Cubatabaco International (July- December 1981), published in English for the foreign cigar trade. The CO-HIBA cigar was on the issue's front cover. In this publication, Cubatabaco expressly positioned COHIBA as the pinnacle of Cuban cigars.

On June 30, 1982, Cubatabaco launched COHIBA's international commercial sales at an event in Madrid during the World Cup.

In 1983, Cubatabaco sought to register the COHIBA mark in the United States for the first time. In August 1984, its United States attorneys, Lackenbach, Siegal, Marzullo, Pesa & Aronson ("Lackenbach"), informed Cubatabaco that General Cigar had already obtained the registration on February 17, 1981.

On February 22, 1985, Cubatabaco filed an application with the PTO to register in the United States the BEHIQUE mark with the same trade dress it used on COHIBA cigars.

In 1987, Cubatabaco sought and obtained an opinion from Lackenbach on whether to begin legal proceedings over the COHIBA registration. Thereafter, Cubatabaco learned that General Cigar had filed a Declaration of Use and Incontestability for its COHIBA registration [*14] under *Sections 8* and *15 of the Lanham Act* in 1986 in connection with its 1981 registration for COHIBA. Cubatabaco chose not to take any action against General Cigar.

**General Cigar's Use of the COHIBA Trademark**

General Cigar first learned of the name "COHIBA" in the late 1970's. General Cigar executives had read a Forbes article published on November 15, 1977 discussing the impact of Cuban cigars on the U.S. industry and noting that Cubatabaco was developing a COHIBA cigar to market abroad. In addition, a December 1977 internal memorandum refers to COHIBA as "sold in Cuba/brand in Cuba" and "Castro's brand cigars." [4]

> 4    The words came from handwritten notations on an internal memoranda, and the handwriting was never identified. General Cigar claims that this writing cannot establish that it knew that Cubatabaco was using the COHIBA mark or selling COHIBA cigars prior to General Cigar's first use or application to register the COHIBA mark.

In February 1978, General Cigar employee Oscar Boruchin [*15] ("Boruchin") discussed the COHIBA brand with Edgar Cullman Jr. ("Cullman"), chairman of Culbro. Boruchin purportedly had learned of COHIBA from a friend who visited Cuba on behalf of the State

Department during the Carter Administration and was given COHIBA cigars in Cuba by "the highest echelons of government."

On March 13, 1978, General Cigar filed an application to register "Cohiba," with a claimed first use date of on or before February 13, 1978. Before or after pursuing this application, General Cigar did not request counsel to conduct a trademark search in Cuba or internationally, which would have disclosed the Cuban registrations. There is evidence to suggest that such a search would not have been industry practice in these circumstances. [5]

> 5    While other U.S. law firms could and did conduct international trademark searches at the time, General Cigar cites the testimony of a U.S. trademark lawyer retained by Cubatabaco who stated that he has never conducted a trademark search in Cuba for a party who did not intend to use or register the mark in Cuba. Moreover, he stated that he generally does not conduct any foreign trademark searches for clients who want to use the mark in the United States only.

[*16] It is a disputed issue as to whether the CO-HIBA name was well-known at this time. Boruchin testified that he told Cullman that "nobody knew the brand," and it was "not on the market," "didn't mean anything to anybody," and was "just given to visitors, diplomats." Cubatabaco states, however, COHIBA cigars were well-known in the United States cigar industry and among the public because of the Forbes magazine article and a February 6, 1978 article in New York magazine featuring Cubatabaco and COHIBA. Further, numerous United States journalists, business executives, and others knew of the brand from seeing it on cigars for sale in retail outlets and hotels in Havana, from receiving COHIBA cigars as gifts in Cuba and at receptions in the United States, and by word of mouth.

On July 25, 1978, the U.S. Patent and Trademark Office ("PTO") asked General Cigar "whether the term COHIBA has any meaning or significance in the relevant trade or industry." General Cigar answered in the negative.

On March 20, 1979, the PTO, in another Office Action, noted, "Cohiba is a geographical tobacco growing region of Cuba," and stated that the COHIBA application would be refused as either geographically [*17] descriptive or misdescriptive, depending on whether the goods were from Cohiba. In a September 14, 1979 response, General Cigar asserted that COHIBA was "wholly arbitrary" and "fanciful and arbitrary," which Cubatabaco claims General Cigar clearly knew to be false.

On November 4, 1980, General Cigar's COHIBA application was published in the Trademark Office Offi-

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 6

cial Gazette for opposition purposes. Neither Cubatabaco nor any other entity opposed General Cigar's COHIBA application. General Cigar obtained United States registration for the COHIBA mark, Registration 1,147,309, on February 17, 1981. ⁶

> 6   Whether the trademark was legitimately obtained is a matter of dispute. Cubatabaco claims that General Cigar's incomplete, misleading and false responses to the PTO's queries were certain to mislead the PTO from a full and proper consideration of the matter, including that the Cuban brand was protected from registration or use in the United States under the Inter-American Convention.

General Cigar sold a cigar [*18] under the COHIBA name from 1978 until late 1987. From 1978 to 1982, General Cigar shipped 1000 or fewer COHIBA-branded cigars per year. The cigars were White Owl "stock" machine-made cigars that were shipped along with other White Owl cigars (or other "seconds") labeled with as many as 32 other different brands as part of a "trademark maintenance program."

Beginning in November 1982, General Cigar placed the COHIBA brand on its pre-existing Canario D'Oro premium cigar. The total sales from 1982 to 1985 were approximately 600,000 cigars, while fewer than 10,000 cigars were sold in 1986-87. The cigars are described by General Cigar as an "upscale bundle" of cigars, "positioned between premium and machine-made cigars in terms of price and quality." As a result of the declining sales, the lack of advertising by General Cigar, and the nearly complete absence of media mentions of the early General Cigar COHIBA, "by November 1992, whatever goodwill, if any, generated by the sales in the early-mid 1980's would have long been entirely dissipated." Alan Siegel ("Siegel") Report, PX 318, at P 5.

## Fame of the COHIBA Mark in 1992 and Later

### Evidence of the Fame of the COHIBA   [*19] mark in November 1992

No studies were commissioned by either party to determine the level of awareness of COHIBA in the U.S. in 1992. As a result, the quantitative data that experts from both sides relied on was from periods before and after General Cigar resumed use of the mark.

Cubatabaco has presented evidence which demonstrates that there was a significant interest in Cuban cigars generally in the period before General Cigar's reintroduction of the mark. Cullman has acknowledged that "Cuban cigars have had a mystique in the U.S. since the embargo." Tr. at 1021. In addition, according to the Cigar Association of America, the cigar industry's national

trade organization, in 1988-89, despite the embargo, "as much as 10% of the 56 million premium cigars smoked in the United States were of Cuban origin." PX 217. The most substantive indication of interest in Cuban cigars and/or COHIBA cigars by premium cigar smokers, however, comes from survey evidence.

## The Shanken Survey

In December 1991, a survey was conducted on behalf of M. Shanken Communications, Inc. (the "Shanken Survey"). The results were tabulated in January 1992. The survey participants were not representative [*20] of the general population, nor were they intended to be. Approximately 44% of the respondents reported annual incomes of over $ 100,000. Most of the respondents were selected from a list of subscribers to Wine Spectator, which is published by M. Shanken Communications, Inc.

The survey respondents expressed a particular interest in Cuban cigars: 47% of the respondents thought Cuba produced the best cigars; 33% of the respondents traveled outside the U.S. at least two times a year, and 54% of these travelers indicated that they had purchased Cuban cigars while traveling; and 24% of the respondents stated that the brand of cigar they normally smoked was Cuban.

The Shanken Survey did not measure either unaided awareness or aided awareness for any cigar brands. Unaided awareness is awareness of a brand without the benefit of prompting, while aided awareness measures the recognition of a brand after that brand has been mentioned. As measured by the Shanken Survey, awareness of the Cuban COHIBA was quite low:

> Only 0.6% of respondents mentioned COHIBA as the most preferred brand they normally smoked, which placed it in a tie for 25th out of 26 among all brands mentioned. [*21] COHIBA was only ranked 8th among all Cuban cigars.

> When asked about all brands of cigars normally smoked, 1.1% of respondents mentioned COHIBA, which placed it in a tie for the 29th position out of 30 among all brands. Among Cuban brands, COHIBA was ranked 8th.

> 2.2% mentioned COHIBA when asked about the finest cigar they had ever smoked. On this measure, COHIBA was tied for the 8th position out of 9, and was ranked 6th among Cuban brands. However, in the over $ 3.50 per cigar group,

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 7

COHIBA tied for fourth place, with 6% mentioning it.

Based in part on the Shanken Survey, General Cigar's expert Itamar Simonson ("Simonson"), a marketing professor at Stanford University, hypothesized an unaided awareness level of 3.5%. Simonson also testified that given that figure, the true awareness level was "well below 50% and in all likelihood, well below 15 to 20%," although he could not "put a number on that." Simonson Dep. at 119.

## February 1992 issue of The Wine Spectator

The Wine Spectator magazine published a feature in its February 15, 1992 issue entitled "The Allure of Cuban Cigars, Special Report from Havana 30 Years After the U.S. Embargo." PX 1157. The [*22] issue included several articles on Cuban cigars, and described COHIBA as Cuba's "finest" cigar. Another article reported that CO-HIBA is "the hot brand" in London's cigar shops. In an article entitled "The Man Behind the Coveted Cohiba," it is reported that

> Cohiba is revered by cigar aficionados like Lafite or Petrus are treasured by wine connoisseurs. American cigar collectors are known to pay three or four times the normal retail price for a box of 25 Cohibas smuggled into America. Actor Tom Cruise reportedly has a standing order for two boxes of Cohiba Robustos whenever he is in Europe.

Id. The total paid circulation of the February 15 issue was 105,659 issues. PX 1221.

## The Launch of Cigar Aficionado

Sometime in 1992, Marvin Shanken ("Shanken"), the editor and publisher of Wine Spectator, approached Cubatabaco to seek advertising and assistance in putting together articles for Cigar Aficionado. Cubatabaco agreed to advertise in the magazine and to provide information for articles about its cigars by giving Shanken and his reporters access to farms and factories and setting up interviews upon request. Cubatabaco agreed to pay the [*23] expenses of Shanken and others from Cigar Aficionado for their trips to Cuba.

On September 1, 1992, M. Shanken Communications, Inc. ("Shanken Communications") published the premier issue of Cigar Aficionado magazine (the "premier issue"). Other than trade papers, it was the only U.S. publication devoted to premium cigars, and remained the sole publication of its kind for several years. Before Cigar Aficionado was published, the only article discussing the Cuban COHIBA in any detail was one written by Shanken and James Suckling, Cigar Aficionado's European Editor, in the February 15, 1992 issue of Wine Spectator.

The premier issue of Cigar Aficionado[[had a U.S. ]]circulation of 115,000 copies. Of these, 73,000 represented paid subscriptions, 32,000 went to newsstands (inclusive of cigar retail stores, street newsstands and bookstores) and 10,000 were promotional.

At year-end 1991, there were 467,000 premium cigar smokers in the U.S.; by year-end 1992, there were 483,100. Thus, the circulation of the premier issue of Cigar Aficionado[[was equal ]]to approximately 25% of all premium cigar smokers at the time.

Cigar Aficionado's premier issue [*24] was a glossy, full color upscale publication with high production values. The issue contains a six-page story entitled, "The Legend of Cohiba: Cigar Lovers Everywhere Dream of Cuba's Finest Cigar." COHIBA is described as "legendary to cigar aficionados," and smoking a CO-HIBA is described as "giving the same kind of satisfaction as a wonderful glass of Chateau Lafite-Rothschild does to a wine lover or a superb main course at a Michelin three-star restaurant does to a gourmet." The issue also rated cigar brands, and gave the COHIBA Robusto the highest ranking, a 96 out of 100. Other highly positive references to the COHIBA appear throughout the magazine. Other than COHIBA, no article in the premier issue is devoted to a particular cigar brand. Siegel, who has extensive experience in the branding and marketing of products, testified that "in my more than 35 years of experience, I cannot recall any product in any category getting more powerful and favorable publicity than the Cuban Cohiba received in the premier issue of Cigar Aficionado." Siegel Direct P 17.

The premier issue was published with two different covers, one for the U.S. market and one for the rest of the world. [*25] Both mentioned "Cuba's Best Cigar" on the cover, but the international cover featured those words, while the U.S. cover placed the words in smaller print at the bottom, headlining instead "America's Favorite Cigars," a reference to an article within about Dominican-made cigars.

Although it cannot be quantified with precision, the Cuban COHIBA was further publicized by pass-along readership, the phenomenon whereby "readers talk to others about what particularly memorable articles they have read in an authoritative publication and frequently pass along the issue." Siegel Direct P 51. Cubatabaco's expert, Alvin Ossip ("Ossip") testified that a premier

Page 8

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

issue of a magazine would receive greater than average pass-along readership.

**Other Publicity Following the Premier Issue**

The September 21, 1992 issue of Newsweek, with a national circulation of 3,195,309, see PX 64.1, reported on the launch of Cigar Aficionado magazine. The article described Cigar Aficionado's "blind tastings," and noted, "Unfortunately this month's winner, the five-inch Cohiba Robusto ('mouth-filling with rich coffee, spicy flavors and an impressively long finish'), is Cuban and can't be bought [*26] on the open U.S. market." PX 1112(c)(1)-49 at P10897. The article also commented on the "impressive 60 pages of ads for such premium products as a handblown bottle of Glenlivet Scotch at $ 650, Louis Vuitton luggage and, of course, Cohiba cigars." Id.

Other articles published soon after the premier issue focused on the growing cigar market and referenced both Cigar Aficionado and COHIBA. See Cynthia Penney, "Puff Piece," Forbes, Nov. 23, 1992 (observing that Cuban cigars "have enormous cachet" and noting demand for "the fabled Cohibas and Punches and Monte Cristos"); Gregory Katz, "Dominicans Burn With a Desire to Claim Cigar Dominance," Dallas Morning News[[., Nov. 1, 1992 (referring to ]]COHIBA and Montecristo as "the best Cuban cigars").

**Other Media References**

Between 1986 and November 20, 1992, there were approximately 46 news articles published which mentioned COHIBA. The majority of the articles are not about cigars and mention COHIBA only in passing. Over 70% of the articles contain only a single reference to COHIBA. No evidence has been produced as to how many premium cigar smokers were exposed to the articles. However, COHIBA is referred [*27] to in the articles very positively and is portrayed as the cigar of the rich and powerful. A 1990 New York Times article on the film director Michael Winner reports that Winner smoked a "$ 15 Cohiba cigar as smoked by Castro" and quotes him observing: "Have you noticed that the world's greatest luxury items in the world are always 'as used by' Communist leaders?" John Culhane, In 'Bulls-Eye!' the Aim is Laughter[[, N.Y. Times, Jan. ]]14, 1990, at Sec. 2, p. 15. A 1992 article in a Miami newspaper stated in a featured sentence in large print: "Cohibas, the best of the Cuban-made cigars, sell for $ 12 to $ 25 in London." Nancy San Martin, Fake Cuban Cigars Raise Quite A Stink, Miami Herald, Sep. 30, 1992, at 1B.

The evidence presented by Cubatabaco demonstrates that there was significant awareness of the COHIBA brand in November 1992. While the Shanken Survey shows that awareness was quite low prior to the premiere

issue of Cigar Aficionado[[, ][that issue ]] provided a significant boost in name recognition for the brand. The only significant data on the fame of the brand that postdates the premier issue comes a year and a half after General Cigar resumed [*28] sales of its COHIBA cigar, as set forth below. Undoubtedly, the continued publicity of the Cuban COHIBA in subsequent issues added to whatever fame the brand had achieved in November 1992. Nevertheless, the data from July 1994 can be reasonably extrapolated to determine that the estimates provided by Ossip for mid-1994 to mid-1995 do not grossly overestimate the probable awareness of the Cuban COHIBA brand in November 1992.

**The Introduction of the General Cigar COHIBA in 1992**

In September 1992, following the publication of the premier issue of Cigar Aficionado, General Cigar made a decision to adopt the name "Cohiba" for a new super-premium cigar product. General Cigar made the decision in part to capitalize on the success of the Cuban Cohiba brand and especially the good ratings and the notoriety that it had received in Cigar Aficionado[[. The ]]General Cigar management, including President David Burgh ("Burgh"), discussed the Cigar Aficionado[[article. The management ]] was pleased that the Cuban Cohiba had rated so well in the premier issue, and thought that it would be good if General Cigar were able to capitalize on those good ratings.

On November 20, 1992, General [*29] Cigar reintroduced its COHIBA as a premium cigar, sold through Alfred Dunhill, a high-end nationwide chain of cigar stores. General Cigar acknowledges that the reintroduction was at least in part a response to Cigar Aficionado's coverage of the Cuban COHIBA. However, Cullman and Ronald Milstein ("Milstein"), a former in-house attorney for General Cigar, both testified that General Cigar had intended to launch a premium COHIBA cigar and had been engaged in discussions with outside counsel since 1989 regarding possible use of the Cuban trade dress on such a cigar. No documentary evidence was adduced showing that General Cigar had plans for a "super-premium" cigar prior to the premier issue of Cigar Aficionado[[. General Cigar has ]]stated that "the high ranking of the Cuban COHIBA and the perception at the company that the brand would grow in prominence motivated General Cigar management to direct that a product be introduced as soon as possible." Def.'s PFF, P 63.

In reintroducing its COHIBA, the General Cigar management wanted to use trade dress for its product as close as permissible to that of the Cuban COHIBA. General Cigar pursued this strategy because "they wanted [*30] to somehow capitalize on the success of the Cuban brand, and especially at this point in time the good rat-

Page 9

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

ings that it got, the notoriety that it got from Cigar Aficionado[[." ]] Milstein Dep. at 283. General Cigar's Vice-President of Marketing, John Rano ("Rano"), retained a graphic designer and asked him to produce packaging that was "exactly same." Bachner Dep. at 56-57. The designer did as instructed, although the prototypes that were made were never used in commerce.

When considering packaging for the General Cigar COHIBA, Milstein wrote to General Cigar's trademark counsel, Harry Marcus ("Marcus") of Morgan & Finnegan, stating: "Enclosed is a label, a box with a label, and a cigar with a band from Cubatabaco's COHIBA brand cigar. As we discussed, we would like to use a label as near as possible to this one. Please review their U.S. registration and suggest label designs as close as possible to these." PX 926. General Cigar did not tell Marcus that their purpose for wanting to use a label as close as possible to the Cuban COHIBA was in order to capitalize on the success and notoriety of the Cuban brand. See Tr. 1154-55 ("He wouldn't have told me because that is not [*31] what I understood his purpose to be.").

The General Cigar COHIBA that was introduced in November 1992 was sold in a high quality but plain wooden box. The box had only the COHIBA name on the lid and the name of General Cigar's importing company on the bottom with the words "made in the Dominican Republic." DX 287. The COHIBA name printed on the box was in a bold sans serif typeface like that of the Cuban COHIBA and was in a location similar to that of the Cuban COHIBA box. General Cigar did not use any element of Cubatabaco's registered Cuban COHIBA trade dress, such as the Indian Head logo or the black, white and yellow design. The box did not have any logo or design, and the cigars were sold without bands. The cigars were sold without bands because General Cigar "didn't want anything to be registering in a very big way with the consumer for a long period of time," Rano Dep. at 99, and "because the brand image was in transition, [General Cigar] did not wish to commit to a band with a particular design on it." Collman Direct P 56.

The General Cigar COHIBA introduced in November 1992 was in fact a preexisting General Cigar product, "Temple Hall." General Cigar initially manufactured [*32] a small quantity -- 3600 cigars -- and sold them exclusively through Alfred Dunhill stores. Dunhill agreed to sell the unbanded Temple Hall-COHIBA branded cigar because of the COHIBA name. The Dunhill catalog advertised the General Cigar COHIBA as the "rightful heir to the Cuban legend," and noted that "the cigars have no band, but you[[will ]]know." PX 335. Another Dunhill catalog states in reference to the General Cigar COHIBA that "today's cigar enthusiast need look no further than the Alfred Dunhill humidors for this celebrated range of Cuban origin." PX 1153. In March

1994, Marc Perez ("Perez"), a buyer for Dunhill, characterized the Cuban Cohiba as "the most legendary cigars in the U.S. market, which they cannot legally be purchased." PX 899. Perez testified that when he wrote that he was "playing off the hype that I believe started with the article in the premier issue of Cigar Aficionado[[." Perez Dep. at 436. ]]

The Temple Hall-COHIBA was sold by Dunhill, and later by Mike's Cigars, a Florida retailer, wholesaler, and mail-order distributor, for almost five years, from the end of 1992 to sometime in 1997. General Cigar engaged in no advertising or promotion [*33] of its Cohiba cigar from 1992 to 1997. Sales of the General Cigar COHIBA from November 1992 to 1996 were as follows:

1992: 5600

1993: 50,000

1994: 49,000

1995: 101,000

1996: 96,000

These sales constituted less than 0.05% of General Cigar's annual premium cigar sales from 1992 to 1996.

In late 1992 and early 1993, General Cigar decided to seek Cubatabaco's permission to use its registered Cohiba trade dress. According to a memo authored by Milstein in January 1993, the stated rationale for seeking Cubatabaco's permission was that in order "to aid GC in successfully repositioning and relaunching its Cohiba brand cigar, it would be useful to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." PX 1084. According to Milstein, this referred to General Cigar's intent to develop a brand image in the U.S. based on the growing reputation of the Cuban COHIBA outside the United States. Tr. 1286-87. The memo also stated that "the obvious immediate benefit for GC of such an arrangement is to promote its relaunch of Cohiba and exploit the brand recognition and image of its Cuban cousin." PX 1084. The plan to [*34] seek permission from Cubatabaco, however, was ultimately abandoned.

In the same period from late 1992 to early 1993, General Cigar developed a marketing and advertising strategy with its long- time advertising agency, McCaffery, Ratner, Gottlieb & Lane ("McCaffery Ratner"). The strategy, "Marketing the Cuban Cigar," was prepared either by McCaffery Ratner or by General Cigar in late 1992 and early 1993. The document describes the fame of Cuban Cohiba:

Page 10

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Cohiba is the magic word in the cigar industry. It is consistently given top ranking by the industry judges and the name has a high recognition factor here in the U.S. despite the fact that it cannot be purchased in the country.

PX 966. The possibility of confusion between the two brands was also considered:

There is a problem that could lead to confusion in the marketplace with the introduction of a premium cigar with the Cohiba name. There is a "Cuban" Cohiba already being advertised here. This creates an uneven playing field for the new introduction. It means, essentially, that every Cohiba ad will benefit that cigar equally as well as the American Cohiba cigar. When the embargo is lifted, it is [*35] important that General Cigar continue to own the Cohiba name so that they will have leverage in distributing the real, Cuban Cohiba.

Id. Part of General Cigar's strategy was to foster an association of the General Cigar COHIBA with Cuba. Phase 1 of the marketing strategy was to "exploit the Cohiba name, with its reputation as one of the world's finest cigars, to build a brand image for the U.S. product." PX 314. Among the "tactics" to be used in implementing that strategy was "subliminally connecting the Cohiba name with the romance of pre-Castro Cuba," id.[[, despite the ]]fact that Cohiba was developed after the Cuban Revolution. To do this, McCaffery Ratner originally suggested a "Cohiba Launch Campaign":

For the introduction of Cohiba we recommend a special event. The time is the 50's, the place Havana, Cuba, where the fantasy, glamour, romance and mystic [sic] were at its height and the wealthy Americans and Europeans used it as their playground. We want to titillate the memories of those who have known and those who have wondered.

PX 940.1. The phrase "the place Havana, Cuba" was replaced with "And the place is reminiscent of [*36] the favored playgrounds of the Caribbean," id., but the proposal was otherwise unchanged.

**The 1994 and 1995 Surveys**

The first survey after Cigar Aficionado's publication was conducted by General Cigar in July 1994 by telephone with a sample of 200. The source of the respondents or their qualifications has not been provided by General Cigar. However, Ossip reports that:

The respondents in these studies, compared with those in the Shanken Study, were less likely to be $ 200,000 a year earners and less likely to be corporate executives and managers, although there was a general upward income skew among respondents. They were somewhat more likely to be under 35 years of age than those in the Shanken Study and somewhat less likely to buy cigars via mail order.

Ossip Direct, P 36. The 1994 survey measured the percentage of respondents who indicated that they had tried a COHIBA cigar ("trial awareness") at 18.5%, placing it 10th among all brands of premium cigars. Unaided awareness in this survey, and in subsequent surveys, was measured by first asking "What is the first brand of cigar you can think of?" and following that up with "What other brands [*37] of cigar can you think of?" Respondents were not asked to name Cuban brands. According to the survey, the unaided awareness level for COHIBA was 14.5%. No aided awareness survey data was taken for COHIBA, or for any other Cuban brand.

Another telephone survey, reported in February 1995 with a sample of 304, but likely conducted earlier, registered a trial awareness for COHIBA of 21.4% and an unaided awareness of 17.1%. A third post-publication survey, reported in May 1995 with a sample of 363, registered a trial awareness of 23.4% and an unaided awareness of 16.7%. Simonson, the defendant's expert, hypothesizes that trial awareness is higher than unaided awareness because the previous trial awareness questions "are likely to aid the consumer in retrieving cigar names from memory." Simonson Direct P 47. Ossip similarly suggests that unaided awareness data

is obtained in studies like these in a telephone interview where the respondent may not give deep thought to plumbing his memory for brand names, and where the interviewer, who has a long interview to complete, will move the questioning along when the respondent pauses.

Ossip Direct P 38. On average, respondents [*38] volunteer 4.4 brand names (some of which are not premium

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

brand names) but they report having tried an average of 6.8 brands.

All three surveys collected aided awareness data for other brands. The following tables summarize the figures for four brands with comparable trial and unaided awareness rates:

| July 1994 | | | |
|---|---|---|---|
| | Trial | Unaided | Aided |
| Davidoff | 27 | 18.0 | 73 |
| Hoyo de Monterey | 26 | 11.5 | 76 |
| Avo | 26 | 13.0 | 52 |
| Ashton | 22 | 8.5 | 60 |
| COHIBA | 18.5 | 14.5 | |

| February 1995 | | | |
|---|---|---|---|
| | Trial | Unaided | Aided |
| Davidoff | 28 | 16.8 | 77 |
| Hoyo de Monterey | 32 | 16.4 | 80 |
| Avo | 31 | 15.0 | 58 |
| Ashton | 22 | 7.2 | 58 |
| COHIBA | 21.4 | 17.1 | |

| May 1995 | | | |
|---|---|---|---|
| | Trial | Unaided | Aided |
| Davidoff | 31 | 18.4 | 80 |
| Hoye de Monterey | 32 | 17.1 | 83 |
| Avo | 32 | 14.6 | 61 |
| Ashton | 23 | 7.7 | 57 |
| COHIBA | 23.4 | 16.7 | |

Aided awareness frequently overstates the true brand awareness because of the phenomenon of "spurious awareness." Spurious awareness occurs when survey respondents are asked whether they have heard of a particular brand name; if the name seems plausible for the product category, some respondents will say they have heard of it [*39] even if they have not. Both Cubatabaco's and General Cigar's experts have concluded, however, that "it is almost always the case that true awareness exceeds unaided awareness." Tr. 1427 (Simonson). One way to address the problem of spurious awareness is to include "controls," which are "often fictitious brand names that appear plausible for the product category or

existing brands from related but different product categories." Simonson Direct P 26. Controls were not used in the 1994 and 1995 surveys. Neither General Cigar nor Cubatabaco provided an estimate of the degree of spurious awareness in the three telephone surveys.

Cubatabaco's expert, Ossip, has estimated that based on the survey data "it is likely that Cohiba awareness in mid-1994 to mid-1995 was in the 62-71% range." Ossip Direct P 50. Ossip examined the three surveys for the differences between unaided and aided awareness for nine brands (four of which are shown above), and then averaged the differences as a guideline for the likely increment over Cohiba's reported unaided awareness. Os-

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

sip initially averaged seven of the nine brands, which yielded an average increment of 55%. Ossip excluded Macanudo and Partagas "because [*40] their extremely high trial rates limit the potential for the increment between unaided and aided awareness." Id.[[at P 43. ]]In response to criticism by Simonson, Ossip averaged all nine brands, which produced an average increment of 48%. Neither of these approaches are generally used, and are not reported in the relevant literature. Ossip explains his resort to estimation as follows:

> The task of deriving an estimate of aided awareness from unaided awareness numbers is uncommon since if one has an interest in both measures then such information would be collected. Apparently, General Cigar was interested in the nine brands for which both types of data were collected, but not in Cohiba unaided awareness. Consequently, I cannot draw on established procedures.

Ossip Direct P 41. Simonson criticizes the methodology because it is guaranteed to yield an aided awareness level of 48%, even for a brand with zero unaided awareness. While such a result would not make sense, Simonson's criticism has only limited application when applied to unaided awareness levels which are comparable to other brands. In fact, three to four brands in each survey registered lower [*41] unaided awareness than COHIBA, despite being available in the United States. It is therefore appropriate to use an estimation technique in determining the Cohiba's aided awareness level in 1994 and 1995.

While it is true, as General Cigar argues, that "there is no way to derive aided awareness for a given brand from the relationship between aided awareness (or trial awareness) for other brands because these relationships may vary significantly from one brand to another," Def. PFF P 86, it does not therefore follow that it is illegitimate to estimate[[aided awareness based on similar ]]data for other brands. General Cigar provides no evidence that the aided awareness figures for COHIBA would be significantly lower than those of other brands with comparable trial and unaided awareness figures. Indeed, Simonson also uses estimation techniques to derive an awareness figure from the Shanken Survey, which did not ask about unaided or aided awareness. See id. at PP 77-81. Based on the evidence provided in the 1994 and 1995 surveys, aided awareness of the COHIBA brand was significantly higher than 50% in July 1994.

Ossip also testified persuasively that the unaided awareness [*42] of Cohiba would have measured sig-

nificantly higher if questions such as "What brands of Cuban cigars can you think of?" were asked, instead of asking about cigar brands generally. Ossip Direct P 40. Such an approach is suggested by Kevin Keller in his book Strategic Brand Management: Building, Measuring and Managing Brand Equity (2d ed. 2003), pp. 453-57, a book also cited by Simonson.

### Evidence of General Cigar's Intent in Reintroducing the COHIBA Mark in 1992

#### General Cigar Executives' Trip to Havana

In November 1992, Milstein and Alfons Mayer ("Mayer"), then General Cigar's Vice President for tobacco, attended a symposium in Havana celebrating the fifth centennial of the discovery of tobacco. Milstein does not speak or read Spanish, although he was involved in the legal aspects of General Cigar's international business. Mayer had worked for General Cigar in Cuba prior to the revolution, and was fluent in Spanish.

Neither Milstein nor Mayer had been instructed to engage in any discussion with Cubatabaco. Their plans were to learn more about the world cigar markets and assess the implications for the company should the embargo end.

Milstein and Mayer [*43] had a meeting with Cubatabaco's President, Francisco Padron ("Padron"), on November 3, 1992. There was no mention of COHIBA at the meeting. However, according to a memo by Milstein dated November 25, 1992, "Padron made it very clear that trademarks are not important. He said that Havana will sell cigars no matter what name they have." DX 88.

Milstein was also introduced to a junior Cubatabaco attorney named Adareglio Garrido de la Grana ("Garrido") at a party in Havana. At the time Garrido did not speak English and only understood spoken English poorly. Garrido did not have any responsibilities for Cubatabaco's trademarks in the United States or in any other English-speaking territory. According to a memo prepared by Milstein on November 20, 1992, when Milstein and Garrido discussed COHIBA, Garrido stated that Cubatabaco "acknowledged that we owned the name in the U.S. and that we would be free to sell a cigar under that name there." DX89. However, the memo states that Garrido objected to the use of the COHIBA trade dress. Milstein has no recollection of his conversation with Garrido other than reviewing the memo he prepared afterward, and does not remember if he made any notes relating [*44] to the conversation.

Garrido testified that he never told representatives of General Cigar that it was free to sell cigars in the U.S. under the COHIBA name, stating that "not even if I had lost my mind would I have said anything" about the

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 13

rights to COHIBA. Garrido Direct P 3. Milstein describes the meeting as "very much a social meeting in that it was a friendly sort of chat rather than us sitting down around a conference table." Tr. 1224. There was also no discussion of whether Garrido had been authorized to speak on behalf of Cubatabaco concerning CO-HIBA. Only Milstein and Garrido were present and Milstein does not recall whether Garrido spoke to him in Spanish or English.

General Cigar has argued that at Milstein's meeting with Garrido in Havana in November 1992, Cubatabaco recognized that General Cigar owned the COHIBA word mark in the United States. However, the evidence shows that General Cigar intended to reintroduce the COHIBA mark in September 1992, before the Milstein- Garrido meeting. Further, Garrido was not authorized to make such statements, and General Cigar's trademark counsel further warned that "an acquiescence defense may be difficult to prove based on oral remarks. [*45] " PX 834 at GC 87. Finally, in consideration of Garrido's denial that he made any statement to that effect and the language barrier that separated Milstein and Garrido at the time, the evidence adduced by General Cigar of Cubatabaco's alleged acknowledgment is not credible.

## General Cigar's Communications with Its Trademark Counsel

General Cigar's relaunch of its COHIBA cigar took place before it had consulted with its trademark counsel specifically on the use of the word mark or the use of the Cuban COHIBA trade dress. Shortly afterward, however, General Cigar requested an opinion on these issues.

In a December 1992 draft opinion letter that was never formalized or signed, trademark counsel advised General Cigar that the use of the COHIBA name along with Cubatabaco's trade dress would likely lead a trier of fact "to conclude that there was deliberate copying to take advantage of the goodwill associated with the Cuban product." PX 834. The letter opined that for Cubatabaco to establish a superior right to the COHIBA word mark, "it would have to prove that (a) a segment of the U.S. public associates the COHIBA mark with Cubatabaco, or even an anonymous source of Cuban cigars; [*46] and (b) this brand recognition antedates General Cigar's use of the mark in the ordinary course of trade." Id. However, the letter concluded that it was "unlikely that Cubatabaco could prove sufficient exposure of the COHIBA brand to cigar smokers in the U.S. to establish the requisite secondary meaning or likelihood of confusion necessary for Cubatabaco to prevail." Id. The opinion letter also raises the possibility that General Cigar may have abandoned the COHIBA mark by periods of non-use following its application for registration in 1978 and the issuance of the registration in 1981.

The letter took into account the publicity created by the premier issue of Cigar Aficionado, but noted that "any brand recognition which may exist in the U.S. is limited to the highest echelon of the cigar smoking public in terms of amount spent per cigar." Id.

The letter acknowledged the alleged comments made by Garrido to Milstein regarding the use of the COHIBA mark in the U.S., and raised the possibility that the statements "may give rise to the defense of acquiescence in connection with your use of the word mark." Id. However, it also noted that "an acquiescence defense may [*47] be difficult to prove based on oral remarks," and suggested obtaining written confirmation from Cubatabaco. Id.

Trademark counsel's advice in the letter was to "file a new U.S. trademark application, based either on use in commerce or intent-to-use, coinciding with the new launch of COHIBA product. If a new application for COHIBA depicts the mark in some stylized form, or even in block letters, it would not be deemed duplicative of the existing registration." Id.

General Cigar did not rely on the draft letter when it adopted and began use of the Cohiba mark in late November of 1992. Trademark counsel's letter is dated December 1992, and it was transmitted to General Cigar on December 2, 1992, after General Cigar has already begun marketing COHIBA cigars.

## General Cigar Files for a Second COHIBA Registration

Pursuant to the advice of trademark counsel, General Cigar applied for a second COHIBA registration on December 30, 1992. In December 1991, trademark counsel had conducted a trademark search and provided a legal opinion that no one else had a right to the COHIBA word mark in the U.S. at that time. General Cigar's application was published for opposition on April 12, 1994, and [*48] granted without opposition in 1995.

For the purposes of the second application, trademark counsel faxed to a trademark illustrator a photocopy of the COHIBA mark from the Cuban COHIBA box. The resulting block letter drawing was attached to the application that trademark counsel filed in December 1992 on General Cigar's behalf to reregister the CO-HIBA word mark using a specific typeface.

General Cigar claims that it did not believe there was much awareness of the Cuban COHIBA in the U.S. It relied on the opinion of its trademark counsel, who were aware of the Cigar Aficionado articles on the Cuban COHIBA, that COHIBA was unlikely to be well-known in the U.S. General Cigar also claims that it believed that Cubatabaco did not and would not assert

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

rights to the COHIBA word mark in the U.S. as a result of the conversation between Milstein and Garrido in Havana and Padron's published remarks.

## Cubatabaco's Intent with Respect to the COHIBA Mark in the U.S. Between 1992 and 1997

### Padron's First Interview With Cigar Aficionado

In a November 1992 interview, published in the Spring 1993 Cigar Aficionado, Francisco Padron, director of Cubatabaco, replied to [*49] a question regarding the company's future strategy for Cuban cigars. The magazine included the following purported exchange:

> CA: Many American smokers don't realize that there are two brands of Partagas, a Partagas in America from the Dominican Republic and a Partagas sold around the world from Cuba. Assuming that tomorrow the embargo was lifted, how would it work?

> Padron: We are not going to have two brands over there. Not even in Europe. We decided to break off our deal with Davidoff because of that. So what would happen is that we would launch new things for the North American market, new brands. Or we could make an arrangement with the brand owners there.

> CA: General Cigar, as an example, owns the brand names Partagas, Ramon Allones and Cohiba for the U.S. market, and it has tremendous distribution in the United States. I would imagine that they would love to sit down with you and work it out to represent those brands of Cuban cigars in America. Is this possible or a problem? You are shaking your head no.

> Padron: The first condition is that they must pass the brand name to us. This is the first condition immediately. If not, forget about it. Second condition, [*50] they must be our partner the same way that we have it with the rest of the world. There is no other way to make a deal with us. If not, forget about it.

Padron also stated:

> We want to have [a] Habano cigar, not a brand name. It doesn't matter if it is Bolivar. Montecristo or even Cohiba. For the last four years, we have been telling the

connoisseur how to recognize a Havana. When we launched the smoke ad we just put Havana, now Habanos. We think the most important thing is the umbrella that can cover all brand names. We can create a brand name whenever we want.

Cubatabaco challenges these statements as unreliable given the difficulties of translation (the interviewer spoke no Spanish) and complexity of legal issues. In response, General Cigar notes that Padron never corrected or disclaimed the statements attributed to him in the interviews.

### Padron's Second Interview with Cigar Aficionado

In a December 1993 interview with Padron, which appeared in the Spring 1994 edition of Cigar Aficionado, the following exchange purportedly took place:

> CA: If the embargo ended tomorrow or two to five years from now, have you thought through [*51] how it would happen and what the scenario would be? You have problems with certain brands as far as trademark issues, and with other brands you do not have a problem. Have you thought how you would introduce your brands to the American market?

> Padron: First there is going to be a fight. We have not been able to have the brand name in the United States because of the embargo. It was forced by [the United States]. It was not decided on our side ... . But we are not going to fight in order to get our cigars into the United States. As we always say, a Habano [cigar] is a Habano [cigar]. With a name of Marvin or Padron or Meyer or whatever goes on the cigar, it is a Habano. So, we are going to let everybody know that we are here, and this is a Habano. We are not going to fight with somebody else because he owns the brand name of Cohiba or Montecristo in America. We have been living without that for a long time.

Cubatabaco challenged this statement for the same reasons it objected to Padron's earlier interview excerpts. As noted in Empresa II, Padron's statement is internally contradictory on the issue of whether there is "going to be a fight." *213 F. Supp. 2d at 277 n. 44* [*52] Further, both interviews were made without "the true knowledge of the

Page 15

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

facts -- that General Cigar was pursuing a new registration for the COHIBA mark." Id.[[at 277. Padron's ]] statements to the press therefore do not constitute a conclusive expression of Cubatobaco's intent.

### Cubatabaco's Efforts to Promote the COHIBA Brand in the United States

Since the 1970's, Cubatabaco has registered Cohiba in International Class 34 in 115 countries. Cubatabaco launched COHIBA internationally in Spain in 1982. By 1987, the brand was being exported to more than 22 countries, including Canada, Mexico, and several European countries. Despite their inability to sell cigars in the U.S., Cubatabaco has made efforts to promote the brand in the United States. In January 1997, Cubatabaco filed an application to cancel General Cigar's registration of the COHIBA mark.

After the article in The Wine Spectator in February 1992, Shanken returned to Havana to seek the support and collaboration of Cubatabaco for the launch of Cigar Aficionado. Cubatabaco agreed and assisted the magazine by facilitating the visit of journalists to Cuba, arranging for them to visit Cuba's tobacco farms [*53] and cigar factories, and arranging interviews. The staff of Cubatabaco were instructed to collaborate with Cigar Aficionado[[in order to promote ]]Cuban cigars, including COHIBA, to cigar smokers in the United States as well as other English-speaking consumers.

In the 1992 meeting between Cubatabaco and Shanken, both Shanken and Cubatabaco representatives expressed the view that the premier issue of Cigar Aficionado should feature a major article on COHIBA. Cubatabaco did not suggest that an article be written about any other brand.

Cubatabaco decided that its advertisement in Cigar Aficionado would be for COHIBA and not for any other brand. The ad ran in the premier and second issues of Cigar Aficionado, but further advertisements were prevented by General Cigar's threat of infringement actions. The advertisement was a full-page, color advertisement that bore the legend, "COHIBA is the first name in cigars."

After the premier issue, the Cubatabaco Marketing Department continued to provide ongoing assistance to Cigar Aficionado's writers, who visited Cuba between two and three times per year between 1992 and 1997, as well as later. Cigar Aficionado [*54] reported much more on COHIBA than on any other brand.

In November 1992, Cubatabaco launched the 1492 Siglo line of COHIBA at the 5th Centennial celebration of the landing of Columbus in Cuba. Cubatabaco invited Shanken and Suckling from Cigar Aficionado, and both

attended. The March 1993 issue of Cigar Aficionado contained a laudatory feature on the Siglo launch, and gave high ratings, from 90 to 96, to each cigar in the line.

The Cubatabaco Marketing Department requested that Shanken be granted an interview with President Castro, to be published in Cigar Aficionado. The interview, conducted by Shanken, appeared in Cigar Aficionado's June 1994 issue. The magazine's cover portrayed Castro with a COHIBA cigar. The Shanken interview with Castro generated articles referencing COHIBA in several newspapers.

In 1994, Cubatabaco collaborated with Cigar Aficionado on the organization of the "Dinner of the Century," promoted by Cigar Aficionado as a lavish cigar dinner for elite personalities in Paris on October 22, 1994. The Marketing Department understood that a number of U.S. personalities would be invited and the event would be covered by Cigar Aficionado[[. [*55] Cubatabaco proposed that ]]COHIBA be the featured cigar, and produced and provided, free of charge, new vitolas, or cigar shapes, of COHIBA created especially for the dinner, as well as special COHIBA boxes.

The association of the COHIBA cigar with this event provided substantial publicity for COHIBA in Cigar Aficionado and in other U.S. publications, including the New York Times and the Miami Herald. Numerous prominent Americans sat on the dinner board, including R.W. Apple Jr., Washington Bureau Chief of the New York Times, and Steven Florio, President of Conde Nast Publications.

The Marketing Department invited Shanken and Suckling to the cigar events it organized in Cuba in 1994 and 1995, and in 1996, it extended to them invitations to attend its 30th anniversary celebration of the COHIBA. In 1995, Habanos, S.A., Cubatabaco's licensee, named Shanken "Habanos Man of the Year for Communications" at the September 1995 dinner it held in Havana.

In late 1995, Habanos, S.A. decided to organize a gala celebration to mark the 30th anniversary of COHIBA, to take place in 1996. In early 1996, it decided to postpone the event until 1997 to allow for adequate preparation. The Marketing [*56] Department carried out planning of the event from early 1996 and invitation lists were drawn up in 1996. The 30th anniversary events took place in Havana during the last week of February 1997.

In drawing up the invitation list, Habanos included a wide range of U.S. press, celebrities and business persons. More than 800 persons attended the event, including almost 100 persons from the U.S., of which more than 30 were journalists. NBC and CNN covered the event, as did journalists from Cigar Aficionado.

Page 16

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

More than 35 stories were published on the CO-HIBA celebration in the U.S. press preceding the event. Cigar Aficionado included articles in both its May/June and July/August 1997 issues, as did the Summer 1997 issue of Smoke. With Habanos' permission and assistance, CNN filmed footage in the spring of 1996 in preparation of the celebration, and aired a program using this material on April 10, 1996. In late 1996, CNN shot footage at the El Laguito factory and conducted numerous interviews with Cubans connected with the production and sale of COHIBA cigars. CNN covered the 30th Anniversary, and CBS broadcast a report on its "Sunday Morning" program that included footage of the [*57] 30th anniversary celebration. National Public Radio introduced its live broadcast from Havana on February 28, 1997 with a piece about the 30th anniversary of CO-HIBA.

Between 1992 and the end of 1996, as well as after that, Cubatabaco's Marketing Department met with and assisted numerous U.S. journalists in order to promote Cuban cigars, and COHIBA in particular. The head of the Marketing Department met with, among others, representatives of CNN and CBS, Business Week[[, ]][[Smoke]][[, and ]]Tobacco International, as well as Cigar Aficionado. Throughout the 1990's, the Marketing Department worked with and provided assistance to many other U.S. writers and journalists, almost all of whom pursued a particular interest in COHIBA.

During the 1992-1997 period, the Marketing Department assisted several authors in their research of books on cigars that prominently featured and praised COHIBA, and granted them the use of photographs and materials. It contracted for the U.S. publication of the leading Cuban book on Cuban cigars, which also contained material on COHIBA. It also assisted U.S. filmmakers who made videos on Cuban cigars with prominence given to COHIBA.

[*58] It has been the policy and practice of the Marketing Department to assist all U.S. journalists. It has given preference to requests of U.S. journalists for information and interviews about COHIBA, and has facilitated their visits to the El Laguito factory and other factories where COHIBA cigars are manufactured.

According to Ana Lopez Garcia ("Lopez Garcia"), the Director of Marketing for Cubatabaco from 1993 to 1994, and the Director of Marketing at Habanos, S.A., from 1994 until the present, Cubatabaco has always intended to sell COHIBA in the United States market as soon it was legally possible, and the Marketing Department, in furtherance of this intention, engaged in activities aimed at building and maintaining the reputation of COHIBA in the U.S., including during the period 1992-1997. Lopez Garcia Direct § 50.

After learning in 1996 that a Dominican company named Monte Cristi was manufacturing Dominican cigars bearing the COHIBA name and the Cuban COHIBA trade dress and exporting them in large numbers to the United States, Cubatabaco moved against Monte Cristi in the Dominican Republic. Cubatabaco successfully cancelled Monte Cristi's Dominican trademark registration, and [*59] Cubatabaco's exclusive licensee, Habanos, S.A., now sells Cuban COHIBAs in the Dominican Republic.

## Cubatabaco's Attempts to Cancel General Cigar's COHIBA Registration

In January 1994, Cubatabaco received a box of General Cigar's COHIBA-branded Temple Hall cigars. Along with the box, Cubatabaco received a note stating that the box was not sold as a "regular item" and that it was being produced by General Cigar only for purposes of its trademark registration. [7] At the time Cubatabaco believed that General Cigar was not making stable or continuous use of the COHIBA trademark in the United States. Cubatabaco's counsel did not learn of the box until some time later.

---

7   The note read in full: "This Box of Cohiba is produced by General Cigar for trademark registration purposes in the U.S.A. only. This is not to be sold as a regular item. That is why you only see the name Cohiba. The cigar is ??? Tom." The back of the box bore a stamp, "Dunhill by Alfred Dunhill of London, Inc. Handmade in Santiago Republica Dominicana 42K Beverly Hills."

---

[*60]   On April 12, 1994, General Cigar's application to register COHIBA in a block letter format was published for opposition. No entity challenged General Cigar's application to register COHIBA in block letter format at that time.

After its aborted attempt to register the COHIBA mark in 1983 and 1984, Cubatabaco pursued registration again in June 1994 when it learned that General Cigar had filed a second application for the mark and believed that General Cigar's prior registration and use rights might be vulnerable. Cubatabaco's chief counsel at that time conferred with the law firm Rabinowitz, Boudin, Standard, Krinsky & Lieberman ("Rabinowitz, Boudin") in June and July 1994 as to the availability of legal remedies with respect to General Cigar's registration and use of the COHIBA mark, and with other United States attorneys at other times in 1995 and 1996. Garrido conducted investigations in Cuba in late 1995 and 1996, and presented a final memorandum to Cubatabaco's president in August 1996. Cubatabaco's board authorized litigation on September 12, 1996.

Page 17

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

On January 15, 1997, Cubatabaco commenced a proceeding in the Trademark Trial and Appeal Board ("TTAB") to cancel General Cigar's [*61] registration of the COHIBA mark and filed an application with the United States Patent and Trademark Office ("USPTO") to register COHIBA in International Class 34. General Cigar's senior management was aware of the cancellation petition at that time.

On May 28, 1997, Cullman, Jr. contacted Francisco Linares ("Linares"), president of Habanos, S.A., a marketing arm of Cubatabaco, to propose a settlement meeting. As noted earlier, the instant lawsuit was filed on November 12, 1997.

During the period from 1992 to 1997, Cubatabaco intended to market its COHIBA in the United States in the event that it became legally possible to do so.

**Likelihood of Confusion of the Cuban COHIBA with the General Cigar COHIBA**

**General Cigar's Assessment of the COHIBA Brand From 1992 to 1997**

Cullman, Jr. was interviewed by Cigar Aficionado for its September 1996 issue. The following exchange was reported in the magazine:

> CA: One obvious question is Cohiba. What are you doing with that? You own the American rights but you haven't done much with it. Why haven't you taken the brand to market and made it a priority given the awareness and consumer demand for the brand? [*62]

> Cullman: I think it's a very good question and the answer really lies in the fact that we don't have a blend and a unique taste for the cigar that we would be happy with. We think it's such a blockbuster brand name that we must come out with something that is equal to the expectation of the brand... . We need to develop a third leg, in essence, a taste for Cohiba. If we just came out with something that was a variation of a Macanudo or a variation of a Partagas, we don't think that would cut it.

PX 1123(8).

Cullman also testified that "by May of 1997, the awareness and the cult status of the Cuban Cohiba was much more recognized." Cullman Dep. at 442. He also stated that "it was impossible not to acknowledge at that point a strong awareness among cigar smokers that Cohiba existed, there was a Cuban Cohiba, and as I mentioned before, there was great interest, among new smokers especially, to walk around with, showing off the Cuban Cohiba label." Id.[[at 443. ]]

**The 1997 Launch of the Super-Premium General Cigar COHIBA**

In late January or February 1997, General Cigar made a decision to launch a new product under the COHIBA name at the July 1997 annual [*63] Retail Tobacco Dealers of America ("RTDA") convention. The earliest evidence adduced concerning the proposed General Cigar COHIBA launch is a document from February, 23, 1997. Rano testified that the decision to launch the new product was made "very early in '97." Rano Dep. at 178.

McCaffery Ratner did no work on COHIBA from mid-1993 until late 1996 or early 1997. General Cigar asked McCaffery Ratner to use the same 1950's Havana/Caribbean mystique proposal they had prepared in 1993 in the various "Marketing the Cohiba Cigar" documents. The 1950's Caribbean mystique strategy was executed as the advertising and promotion that accompanied the General Cigar COHIBA launch in September 1997.

General Cigar has repeatedly acknowledged that the Cuban COHIBA was well known by U.S. cigar consumers prior to General Cigar's super-premium COHIBA launch in fall 1997. Cullman, Jr. testified that "in 1997 the Cuban Cohiba was certainly well known in the United States." Tr. 1103. A Fall 1997 General Cigar document created for the sales force as a selling tool described COHIBA as "the most recognized cigar brand in the world." PX 881.

The marketing strategy of General Cigar was to exploit the fame [*64] of the Cuban brand for the new General Cigar product. In its Product Development Guide, dated May 13, 1997, General Cigar stated that the "Cuban cigar heritage and the near 'cult' status of the Cohiba Cuban version will be a benefit to generate initial trial of the brand, and easy brand recognition, but not the main engine driving the brand." PX 98. Further, the design of the relaunched General Cigar COHIBA was modeled after the look of the Cuban COHIBA. The same document states: "Packaging/presentation will be minimal in keeping with [the] clean, sparse look of [the] Cuban Cohiba." Id. The band of the new General Cigar COHIBA consists of two thick black stripes on the top and bottom of the band. The remainder of the band is white, except for the name COHIBA in black bold letters, with a red dot inside the "O", and a red oval with the words "HAND MADE" in small black letters.

Page 18

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

The look of the cigar band, while similar in typeface to the Cuban COHIBA, is significantly different, as reported by Cigar Insider in August 1997:

> The unvarnished mahogany box in which the cigars will be packaged is still plain, but the new band has a distinct graphic identity that's [*65] in the spirit of the famous Cuban logo, but doesn't precisely imitate it. Instead of the signature yellow and black of Cuba's Cohiba, General's brand has simple black lettering; a splash of red in the circle of the "O" is the only flourish.

PX 867. The assessment of the "graphic" difference between the two bands is, of course, a distinct issue from the identically worded trademarks.

### Advertising for the Relaunched General Cigar COHIBA

The 1997 advertising for the General Cigar COHIBA attempted to create an association in the consumer's mind to Cuba and the Cuban COHIBA. General Cigar's expert acknowledged that advertising themes such as "past and present come together in COHIBA" evoked an association with Cuba. Simonson Dep. at 187-88. In-store posters for use by retail tobacconists were created based on a work order to "create a Cohiba brand image poster that incorporates the mystique of Cuba." PX 987. Several of the initial advertisements, as well as the flyleaf enclosed in the cigar box, also promoted the claim that the filler of the General Cigar COHIBA contained "Cuban seed" tobacco. See[[DX34A (flyleaf); ]]PX 882 (promotion sent to retailers stating [*66] that "the filler is grown from Cuban seed, 'Piloto Cubano' grown in the Dominican Republic.")

Cigar retailers promoting the General Cigar product advertised the cigar in a manner that suggested its association with the Cuban COHIBA. General Cigar has submitted no evidence showing that it attempted to dissuade retailers from pursuing such a strategy. In August 1998, Famous Cigars, a major retailer, provided General Cigar with pre-publication catalog copy for its COHIBA with the heading "COHIBA: THE CIGAR EVERYONE WANTS TO SMOKE! NOW AVAILABLE IN THE U.S.!!" PX 327. The copy also described the General Cigar COHIBA as "true to its Cuban roots." Id.[[Another ]]major retailer, Thompson & Co., stated in its catalog that "there are only two places in the world where this brand is legitimately manufactured: Castro's Cuba and in the Diaz y Cia subsidiary of General Cigar Co. in Santi-

ago, Dominican Republic." PX 356. The catalog later states that

> As you might imagine, given the popularity of the Cohiba brand, getting a supply of them is quite difficult. After all, tobacconists the world over are clamoring for any supply they can procure, legitimate or otherwise.

[*67] Id. Cubatabaco has provided evidence of numerous similar advertisements for the General Cigar COHIBA by less prominent retailers. See e.g., PX 1131-1 (internet website of Amalfi Cigar Company: "The pride of the Havanas is now made in the Dominican Republic. Named after what the Taino Indians of Cuba called tobacco.") The existence of such advertisements contributed to possible consumer misunderstanding over the relation between the two brands, a misunderstanding that General Cigar did not attempt to dispel.

### General Cigar's Actions Against the Cuban COHIBA

General Cigar has consistently acted against the importation, advertisement and display of the Cuban COHIBA in the U.S. on the ground that the Cuban COHIBA infringes on General Cigar's COHIBA.

In November 1997, after Cubatabaco commenced this lawsuit, counsel for General Cigar wrote to the United States Custom Service to demand that Customs stop U.S. persons returning from Cuba from legally bringing Cuban COHIBAs into the United States on the ground that such COHIBA-labeled cigars infringed General Cigar's trademark rights. In the letter, Cuban COHIBAs are referred to as "counterfeit goods." PX 1134-17. Although [*68] returning visitors are allowed under the U.S. embargo to bring up to $ 100.00 worth of Cuban goods into the U.S., General Cigar prevailed upon Customs to bar consumers from bring back more than one item bearing the COHIBA mark. Under U.S. trademark law, persons returning from abroad are allow to bring only one infringing item into the country for personal use.

At Cubatabaco's request, Hunters & Frankau, a distributor of cigars in London, placed an advertisement in the premier issue of Cigar Aficionado featuring the Cuban COHIBA. After the advertisement appeared, General Cigar gave formal notice in a November 5, 1992 letter to Hunters & Frankau, with a copy to the editor and publisher of Cigar Aficionado, that it considered the advertisement to infringe on General Cigar's registered mark (1981 registration).

Case 1:08-cv-01497-DAB    Document 9-2    Filed 04/11/2008    Page 20 of 91

Page 19
2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

In September 1993, General Cigar wrote to Havana House, a Canadian cigar distributor, and accused it of intending to advertise the Cuban COHIBA in Cigar Aficionado[[. General Cigar ]]threatened Havana House with an injunction under *15 U.S.C. § 1114* if it ran such an advertisement. General Cigar similarly responded to advertisements in [*69] Cigar Aficionado by the Cohiba Cigar Divan in Hong Kong.

General Cigar's General Counsel, Ross Wollen ("Wollen"), testified that it remained the company's position that all of these Cigar Aficionado advertisements were infringing because any use of the word "COHIBA" in association with cigars would cause confusion in the U.S. marketplace. Wollen Dep. at 306. Wollen testified that "an American consumer reading this magazine [Cigar Aficionado] and a customer of Dunhill might be confused that this is the General Cigar Cohiba sold in Dunhill, and it isn't." Id. at 303. Austin McNamara ("McNamara"), President of General Cigar at the time, testified that advertisement of the Cuban COHIBA in 1994 would "absolutely" cause confusion with consumers in the United States. McNamara Dep. at 135.

### General Cigar's Actions Against Third Parties

General Cigar has brought enforcement actions against third parties who made use of the COHIBA name in conjunction with trade dress used by the Cuban CO-HIBA. Some of these counterfeit cigars bore a Dominican designation of origin, some bore a Cuban designation of origin, some bore no designation of origin at all; many [*70] used elements of the Cuban COHIBA checkerboard, Indian Head and black, white and yellow colors. As was implied by the trade dress, consumers understood these products to be the Cuban COHIBA or affiliated with the Cuban COHIBA, and General Cigar understood this to be the consumer's perception.

From late 1995, counterfeit COHIBAs bearing trade dress used by the Cuban COHIBA became increasingly prevalent in the U.S. market. General Cigar brought enforcement actions against counterfeit COHIBAs in the ground that they were likely to cause confusion.

Many of the counterfeit COHIBAs were manufactured in the Dominican Republic by a company called Monte Cristi de Tabacos. Monte Cristi COHIBAs used trade dress very similar to that used by the Cuban CO-HIBA. Monte Cristi COHIBAs sometimes, but not always, featured a "Republica Dominica" designation of origin.

On January 31, 1996, General Cigar recorded its COHIBA mark with U.S. Customs, giving Customs the power to seize Monte Cristi Cohibas and other goods bearing the mark as infringing upon the defendant's mark. At General Cigar's urging, and with its assistance, Customs seized over 35,000 counterfeit Cohibas by May of 1997, most of which [*71] mimicked the Cuban Cohiba's trade dress.

In July 1997, General Cigar sent a letter to retailers regarding Monte Cristi Cohibas and other counterfeits. It stated that it had received

> numerous complaints about product which has been purchased by unwary consumers who think they are buying a high quality General Cigar or Cuban made Cohiba. Instead, what they have found they have purchased are low grade, inferior quality cigars manufactured for the most part in the Dominican Republic and banded to deceive the uneducated buyer.

PX 1077. General Cigar's COHIBA was unbanded in July 1997. In the letter, General Cigar stated that consumers purchasing counterfeit cigars banded like the Cuban COHIBA were in fact confused among such cigars, Cuban Cohibas and General Cigar Cohibas.

In fall 1997, General Cigar successfully sought a preliminary injunction from this Court against one of Monte Cristi's distributors, Global Direct Marketing. See [[General Cigar ]]*Co. v. G.D.M., Inc., 988 F. Supp. 647, 660 (S.D.N.Y. 1997)*. General Cigar argued to this Court that all eight Polaroid factors favored the issuance of a preliminary injunction, and that [*72] confusion was inevitable because "the marks and type of goods are identical, except that G.D.M.'s Cohiba cigars are inferior." PX 649 at GC 005481. Mark Perez of Dunhill testified on behalf of General Cigar that differences between the counterfeit Cuban Cohiba trade dress employed by G.D.M. and General Cigar trade dress would not be sufficient to dispel confusion because, "the name is what people attach to the product, not necessarily the band or the trade dress. The name is the most important thing that drives consumers I believe." Perez Dep. at 455-56 (acknowledging G.D.M. testimony). The Court found it "extremely likely that confusion will occur between the COHIBA marks used by GDM and General Cigar." *General Cigar, 988 F. Supp. at 665.*

In 1998, General Cigar brought criminal infringement proceedings against various Los Angeles operations selling Cohiba cigars bearing the Cuban Cohiba trade dress. In an affidavit prepared in support of a search warrant, John R. Geoghegan, Vice President for Strategic Planning and Brand Development at General Cigar, stated that consumers are "likely to attribute the inferior quality [of counterfeits] to General Cigar." PX 290.

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 20

[*73] Also in 1998, General Cigar brought suit, and in November 1999 obtained a consent injunction against a company called Cohiba de Dominica that sold cigars, clothing and other goods bearing the mark COHIBA and using trade dress used by the Cuban COHIBA, some of which bore the designation "La Habana, Cuba."

### The 1998 Cambridge Group Presentation

In 1998, General Cigar retained a market consultant and research firm, The Cambridge Group, which was paid over $ 500,000 for its work on a focus group and quantitative research on several General Cigar brands, including COHIBA. The Cambridge Group made a presentation to senior General Cigar management, including Cullman, Jr. on June 15, 1998, in which it projected transparencies of pages from its report, "Building the Premium Cigar Consumer and Brand Factbase - Progress Update." PX 185. It also provided a hard copy of the report to General Cigar.

One of the report's pages presented at the meeting read as follows:

> Consumer Confusion Over "Different Kinds" of Cohiba Is a Major Concern
>
> Substantial confusion exists over Dominican versus Cuban Cohibas
>
> - Knowledgeable people tend to look down on Dominican Cohibas as an [*74] imitator or a fake
>
> - Others are simply confused
>
> "There are two brothers, one who makes Cohibain Cuba and the other in the Dominican Republic"
>
> Strategically, it appears questionable to invest behind extending our Cohiba brand to new categories while this issue remains.

Id. The report contained several other references to consumer confusion, including a summary which states that "there is serious consumer confusion over different types of Cohibas." Id. The observations about COHIBA in the report were generated from "focus group qualitative research, based on perhaps six to eight groups of about eight cigar smokers each." Ossip Direct P 83. General Cigar took no corrective action in response to these findings. General Cigar did not undertake any investigation or additional research to test the accuracy of the findings in The Cambridge Group's report.

A 1998 survey taken by NFO Research, Inc. for The Cambridge Group measured aided awareness of CO-HIBA at 56%. See[[PX ]]181 at NFO 1263.

### The 2000 Survey

In late 2000, Ossip conducted a survey designed to measure consumer confusion between the Cuban CO-HIBA and the General Cigar COHIBA. [*75] The report on the study is dated March 2001. Households that participate in an Internet survey panel were sent an e-mail soliciting their participation if any household member over 21 years of age smokes cigars. The participating cigar smokers then accessed a survey questionnaire via the Internet. The survey interviews took place in October and November 2000.

Of 1873 respondents, 962 were identified as cigar smokers who will buy premium cigars, defined for the purposes of this study as cigars priced at $ 65 or higher for a box of 25 or $ 2.81 per cigar or higher. This level was selected by considering cigar prices for approximately 375 individual cigars for over 80 premium brands shown by Cigar Insider magazine in December 1999.

Those respondents that had heard of COHIBA, and who indicated that at least some COHIBA cigars are made in Cuba -- 30% of respondents -- were then shown pictures of a General Cigar COHIBA box, as well as cigars, and were told that they were from "a box of cigars sold by quality retailers in the United States." Ossip Direct P 116, 126. The respondents were then asked questions to determine if they believed that (a) Cuban COHI-BAS and General Cigar COHIBAS [*76] were made by the same company; (b) if the two companies have an association or business connection; and (c) if one company received authorization or approval from the other to use the name COHIBA. About 53% of those respondents indicated source confusion.

Ossip's analysis of the data shows a level of source confusion at

> a little above 15% in the gender balanced sample and almost 16% among male smokers. Among all those who have heard of Cohiba, where the potential for trading on the Cohiba name may exist, about 21% are confused.

Id. at P 121. Among those likely to buy cigars for $ 120 a box (the low end of the price range for General Cigar Cohibas), Ossip estimates the confusion level at 19%, based on the fact that the confusion level for those who had heard of COHIBA is over 24%.

Case 1:08-cv-01497-DAB    Document 9-2    Filed 04/11/2008    Page 22 of 91

Page 21

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Simonson contends that the 2000 survey shows that aided awareness of the Cuban COHIBA was only 28% because that is the percentage of respondents indicated that they had heard of COHIBA from a list and had listed Cuba as one of the countries where COHIBA cigars are made. Simonson Direct P 81. Simonson criticizes the 2000 survey as a measure of likelihood of confusion because it [*77] used "gender balancing," because it did not use a control in order to determine the "noise level" of the survey, and because it used a "side-by-side" methodology that misleadingly asked questions about the Cuban COHIBA and the General Cigar COHIBA by placing them in close proximity to one another, which allegedly did not reflect true marketplace. Def.'s PFF P 166-67.

The gender balancing used in the 2000 survey was employed to reflect the greater tendency of females to respond to surveys, which resulted in their being over-represented in the survey relation to their numbers in the premium cigar buyer population. The survey results were therefore properly adjusted to reflect the fact that "females would account for about 11% of the premium cigar buyer population." Ossip Direct P 119.

Simonson argues that "a survey designed to estimate likelihood of confusion must include a proper control." Simonson Direct P 79. This categorical statement is made after citing to what Simonson states is the most common type of survey -- the "Eveready format," after the case in which the survey was used, *Union Carbide Corp. v. Ever-Ready, Inc.[[, 531 F.2d 366 (7th Cir. ]]1976),* [*78] cert. denied, *429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976).* The study in that seminal case, however, did not contain a control. See Ossip Direct P 160. A control in such a study would be a fictional mark which is "equivalent to the junior mark at issue, without infringing on the senior mark." Simonson Direct P 79. The purpose of a control is to determine to what extent reports of confusion in fact reflect guessing or survey bias. It is difficult to determine from Simonson's criticism exactly how a control could have been helpfully employed in the 2000 survey. Any non-COHIBA word trademark would not serve as an effective control, while a fictional third COHIBA cigar would clearly infringe on the senior mark. The likelihood of confusion shown by the 2000 survey undoubtedly reflects some degree of guessing on the part of the respondents. However, Simonson has not shown that the survey as designed would significantly overstate the actual likelihood of confusion.

Simonson also criticizes the 2000 survey for presenting the two COHIBA brands side-by-side even though the Cuban COHIBA is not sold in the United States. The two brands are not actually shown side by side at any point [*79] during the survey. However,

Simonson argues that the design of the survey unduly focused the attention of the respondents on the two marks in a manner "they would not have considered in a normal purchase situation." Ossip Direct P 157 (quoting Simonson Report). Cubatabaco submitted evidence at trial, however, showing that over half of the "heavy users of COHIBA" purchased their cigars on the Internet, Tr. 1357- 58, where sales of the Cuban COHIBA and the General Cigar COHIBA are effectively sold side by side, albeit on different websites. In an internet cigar forum run by General Cigar, references by participants to the Cuban COHIBA are hyperlinked to the General Cigar COHIBA, that is, when the word COHIBA is "clicked on," the user is brought to a website advertising the General Cigar COHIBA. See Tr. 1364-69. Further, the numerous implicit references to the Cuban COHIBA in advertising for the General Cigar COHIBA would likely also cause potential consumers to focus their attention on the two marks. Under such marketing conditions, the use of a side- by-side methodology in the 2000 Survey was not misleading.

The 2000 Survey confirms the likelihood of confusion between the COHIBA [*80] marks as evidenced by General Cigar's assessments, its 1997 launch and advertising, its actions against the Cubatabaco COHIBA mark and counterfeit marks, and the assessment of the Cambridge Group, as found above.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

This court has subject matter jurisdiction under *28 U.S.C. §§ 1331* and *1338(a)* for claims arising under the Paris Convention for the Protection of Industrial Property, the Inter- American Convention for Trademark and Commercial Protection; under *28 U.S.C. §§ 1331,1338(a)* and *15 U.S.C. § 1121(a)* for claims arising out of alleged violations of *Sections 38, 43(a)and (c), and 44(b)and (h)* of the *Lanham Act, 15 U.S.C. §§ 1120,1125(a)* and*(c)* and*1126(b)* and*(h);* under *28 U.S.C. §§ 1338(b)* and*1367* for claims arising out of the state law of unfair competition, misappropriation and dilution. Venue is proper in this district under *28 U.S.C. § 1391.*

### The Article 10bis Claim Is Dismissed As Duplicative

General Cigar has contended that Count II of the Complaint, [*81] which alleges a violation of Section 10bis of the International Convention for the Protection of Industrial Property (the "Paris Convention"), should be dismissed as it does not confer any rights beyond those conferred by the common law. General Cigar cites several cases for the proposition that "trademark protection under [Article 10bis of] the Paris Union Convention gives no greater protection than that already provided by

Page 22

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

section 43(a) of the Lanham Act." *Scotch Whisky Ass'n v. Majestic Distilling Co.[[, ]]958 F.2d 594, 597 (4th Cir. 1992).* See also *[[Int'l Cafe, S.A.L v. ]] Hard Rock Cafe Int'l (U.S.A.), Inc.,* 252 F.3d 1274, 1278 (11th Cir. 2001) (same).

Cubatabaco cites only one case in which simultaneous claims under the *Lanham Act* and under foreign treaties, including the Paris Convention, were permitted to go forward. See *Benard Indus. Inc. v. Bayer Aktiengesellschaft, 1996 U.S. Dist. LEXIS 15622, 38 U.S.P.Q.2d 1422, 1425-26, 1996 WL 218617 (S.D. Fla. Feb. 29, 1996)* (". . . it does not appear that Bayer cannot prove any set of facts which would entitle it to relief under the [Paris and Inter-American] Conventions [*82] as well as the *Lanham Act*.").

In the leading case of *Vanity Fair Mills v. T. Eaton Co.[[, ]]234 F.2d 633 (2d Cir. 1956),* the Second Circuit held that the Paris Convention

is essentially a compact between the various member countries to accord in their own countries to citizens of the other contracting parties the rights comparable to those accorded their own citizens by their domestic law. The underlying principle is that foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens.

*Id. at 640.* Because a United States citizen could not file a distinct Paris Convention claim alleging unfair competition, neither can Cubatabaco. See also *Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 172 (S.D.N.Y. 1988)* (holding that plaintiff's "Paris Convention claim is duplicative of it *Lanham Act* claim and thus must be dismissed.").

**The Inter-American Convention Claim is Dismissed as Duplicative**

Count IV of the Complaint alleges a violation of the prohibition against unfair competition under Articles 20 and 21 [*83] of the General Inter-American Convention for Trade Mark and Commercial Protection, Feb. 20, 1929, 46 Stat. 2907, 2930-34 ("IAC"). General Cigar argues that the IAC does not confer any rights beyond those conferred by the common law. The Second Circuit

dismissed a claim under Article 21 of the IAC because the language of Article 21 "authorizes the prohibition of its specified acts of unfair competition 'unless otherwise effectively dealt with under the domestic laws of the Contracting States.'" *Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 134 (2d Cir. 2000).* The Second Circuit then found that "because article 21(c) of the IAC prohibits a subset of the conduct already effectively prohibited under American law by *Section 43(a)*" of the *Lanham Act,* the plaintiff had failed to state an Inter-American Convention claim via *section 44(h)* of the Lanham Act. *Id. at 135* (quoting Article 20, 46 Stat. at 2932); see also *Empresa III, 2002 U.S. Dist. LEXIS 21731, 2002 WL 31251005 at *3 n.2.* Accordingly, Cubatabaco's article 21 claim is dismissed.

Article 20, however, does not contain language relating to whether the conduct it proscribes is already effectively dealt [*84] with by domestic law. See 46 Stat. at 2930-32. However, Article 1 of the IAC states the principle behind the Convention as a whole:

The Contracting States bind themselves to grant to the nationals of the other Contracting States and to domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the States which have ratified or adhered to the present Convention the same rights and remedies which their laws extend · to their own nationals or domiciled persons with respect to trade marks, trade names, and the repression of unfair competition and false indications of geographical origin or source.

*Id. at 2912.* The language of Article I establishes that the purpose of the IAC is analogous to that of the Paris Convention, that is, "to accord in their own countries to citizens of the other contracting parties the rights comparable to those accorded their own citizens by their domestic law." *Vanity Fair[[, 234 F.2d at 640. ]]*Accordingly, the IAC confers no greater rights than are found under domestic law, whether that law is the common law or the *Lanham Act.* Cubatabaco's Article 21 claim [*85] is therefore dismissed.

Cubatabaco argues that this Court's holdings that "*Section 44(h)* incorporates the substantive provisions of Articles 20, 21, and 22" and that "Articles 20 and 21 of the IAC . . . have the force of law under *Section 44(h)*", *Empresa II[[, 213 F. Supp. 2d ]]* at 280 and n. 49, imply that the IAC claims can survive as distinct claims. How-

Page 23

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

ever, the fact that these provisions of the IAC have the force of law does not imply that they make available forms of relief not already available under domestic law. As the above analysis has shown, they do not.

### The Trademark Infringement Claim Under Section 43(a) of the Lanham Act is Granted

"The purpose of the trademark laws is to protect the public from the confusion and deception which flows from the copying of marks which, through their distinctiveness or exclusivity of use, identify the origin of the marked products." *W.E. Bassett Co. v. Revlon, Inc., 354 F.2d 868, 871 (2d Cir. 1966)* (Lumbard, C.J.). The property right of the plaintiff is important, but it is the perspective of the consumer that must be borne in mind in determining if infringement has occurred. See 1 McCarthy on [*86] Trademarks and Unfair Competition ("McCarthy") § 2:33 at 2-58 (4th ed. 2000)). Accordingly, trademark infringement may be found even when the two parties are not in competition and no harm will necessarily befall the plaintiff as a result of the infringement.

Cubatabaco alleges that General Cigar's conduct with respect to the COHIBA brand constitutes willful trademark infringement and trade dress infringement in violation of *Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)*. To prevail on this claim, Cubatabaco must establish both that its mark is entitled to protection and that General Cigar's "use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enterprises, Ltd. v. Nawab[[, 335 F.3d ]]141, 146 (2d Cir. 2003)* (citing *Gruner + Jahr Publ'g v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993))*. See also *Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113, 117 (2d Cir.1999)* (noting that Gruner test is applicable to claims brought under §§ 1125(a)).

### Cubatabaco Has a Protectable Mark

The Court has previously held that General [*87] Cigar abandoned the COHIBA mark between 1987 and 1992. *Empresa II, 213 F. Supp. 2d at 271.* Accordingly, General Cigar's 1981 registration and 1986 incontestability declaration are cancelled. Id.[[Further, ]]the Court rejected General Cigar's argument that Cubatabaco cannot be the owner of the COHIBA mark because it did not register the mark with the USPTO because "one need not have registered the mark to 'own' it." *Id. at 286.*

General Cigar argues that it is the owner of the mark because it was the first to use the mark after it was abandoned. "It is well established that the standard test of ownership is priority of use." *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001)* (citing 2 McCarthy § 16.1). While Cubatabaco was using the COHIBA mark throughout the

world in 1992, it is also well established that "foreign use of a trademark cannot form the basis for establishing priority in the United States." Id. (citing *Person's Co. v. Christman, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990))* ("Foreign use has no effect on U.S. commerce and cannot form the basis for a holding [*88] that [the foreign user] has priority here."). This principle is known as the territoriality principle. [8] See *Grupo Gigante, S.A. v. Dallo & Co., Inc., 119 F. Supp. 2d 1083, 1089 (C.D. Cal. 2000)*. Because of the embargo, Cubatabaco could not legally use the COHIBA mark commercially in the United States.

---

8  The Fourth Circuit has recently called the territoriality principle into question. See International Bancorp, LLC v. Societe Des Bains De Mer et du *Cercle Des Etrangers a Monaco, 329 F.3d 359 (4th Cir. 2003)*, cert. denied, *157 L. Ed. 2d 891, 124 S. Ct. 1052 (2004)*. The court held that because the term "commerce" in the *Lanham Act* is coterminous with the conduct that Congress may regulate under the *Commerce Clause*, and because Congress may regulate transactions by U.S. citizens in foreign countries, the "use in commerce" requirement of the *Lanham Act* is satisfied by the services offered by a foreign casino operator to citizens of the United States. *Id. at 365-70.* The dissent warned that the decision "threatens to wreak havoc over this country's trademark law" because potential trademark registrants "would be forced to scour the globe to determine when and where American citizens had purchased goods and services from foreign subjects to determine whether there were trademarks involved that might be used against them in a priority contest or in an infringement action in the United States." *Id. at 388* (Motz, J., dissenting). The Court concurs with McCarthy, 29:4 (2003), who "agrees with the result, but disagrees with the legal analysis." Rather than decide the case on the meaning of "use in commerce," McCarthy argues, "the case should have been analyzed as an application of the 'famous marks' doctrine.'"

---

[*89]  General Cigar's priority of use, however, is not the end of the matter. Under the common-law "well-known" or "famous marks" doctrine, "a party with a well-known mark at the time another party starts to use the mark has priority over the party using the mark." *Empresa II, 213 F. Supp. 2d at 286*; see also 4 McCarthy at 29:4 (recognizing the doctrine); 3 Rudolf Callman, The Law of Unfair Competition, Trademarks and Monopolies (4th ed.) ("Callman") § 20:26 at 20-170-73 (same). The concept of a well-known mark was first recognized in Article 6bis of the Paris Convention. See Fre-

Case 1:08-cv-01497-DAB    Document 9-2    Filed 04/11/2008    Page 25 of 91

Page 24

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

derick W. Mostert, Famous and Well-Known Marks 7 (1997). Article 6bis states, in relevant part,

> (1) The countries of the Union undertake, ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the [*90] benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.

It has already been held that "the rights guaranteed by Article 6bis have been subsumed by federal and common law."*Empresa III[[, ]]2002 U.S. Dist. LEXIS 21731, 2002 WL 31251005, at \*4.*

The well-known marks doctrine was applied in two frequently cited New York cases: *Vaudable v. Montmartre, Inc.[[, 20 ]]Misc.2d 757, 20 Misc. 2d 757, 193 N.Y.S.2d 332 (N.Y. Sup. Ct. 1956)* and *Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551, 288 N.Y.S. 529 (N.Y. Sup. Ct. 1936).* The doctrine has also been recognized in decisions of the Trademark Trial and Appeal Board ("TTAB"). See, e.g., *Mastic Inc. v. Mastic Corp., 230 U.S.P.Q. 699, 701 n. 3 (T.T.A.B. 1986); All England Lawn Tennis Club, Ltd. v. Creations Aromatiques, Inc., 220 U.S.P.Q. 1069, 1072, 1983 WL 51903 (T.T.A.B. 1983); Techex, Ltd. v. Dvorkovitz, 220 U.S.P.Q. 81, 83, 1983 WL 51872 (T.T.A.B. 1983);* [*91] *Mother's Restaurants, Inc. v. Mother's Other Kitchen, 218 U.S.P.Q. 1046, 1048 (T.T.A.B. 1983).* While decisions of the TTAB are "not binding courts within this Circuit, [they] are nonetheless 'to be accorded great weight.'" *Buti v. Perosa, S.R.L., 139 F.3d 98, 105 (2d Cir. 1998)* (quoting *Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 874 F.2d 95, 101 (2d Cir. 1989)).* The Second Circuit recognized the famous marks exception to the territoriality principle in dicta in Buti. See *139 F.3d at 104 n.2.* The district court in Buti had considered the famous marks doctrine, although it concluded that the mark in question was insufficiently famous to trigger the

doctrine. See *Buti v. Perosa, S.R.L., 935 F. Supp. 458, 473-74 (S.D.N.Y. 1996).*

**A Secondary Meaning Level of Recognition Is Required For A Mark to be Famous**

This court has held that the relevant question is "whether the Cuban COHIBA was 'so famous that its reputation [was] known in the United States' and thus 'should be legally recognized in the United States.'" *Empresa II[[, 213 F. Supp. 2d at 285* (quoting ]] [*92] *Grupo Gigante, 119 F. Supp. 2d at 1089).* It was not decided, however, what level of renown is required to establish a known reputation.

The available case law does not provide a consistent standard to determine whether a mark is famous within the meaning of the famous marks doctrine. Several TTAB decisions, however, cite the requirement that the mark must be famous "within the meaning of Vaudable v. Montmartre[[." ]][[See]][[, ]][[e.g.]][[, ]]*[[Mother's ]]Restaurant, 218 U.S.P.Q. at 1048; All England Lawn Tennis, 220 U.S.P.Q. at 1072.* See also *Buti, 139 F.3d at 104 n.2* (citing the Vaudable standard). In Vaudable, the owner and operator of Maxim's restaurant in Paris sought to restrain defendants from opening a restaurant in New York City using the same name. See *20 Misc.2d at 758.* Its fame is described as follows:

> It received wide publicity as the setting of a substantial portion of Lehar's operetta, "The Merry Widow," has been the subject over a long period of years of numerous newspaper and magazine articles, and has been mentioned by name [*93] and filmed in movies and television. There is no doubt as to its unique and eminent position as a restaurant of international fame and prestige. It is, of course, well known in this country, particularly to the class of people residing in the cosmopolitan city of New York who dine out.

Id. This level of fame was not, however, required for the court to find that plaintiff's mark entitled to protection. In response to defendant's argument that the name Maxim's had originally become famous as a name of both a "smokeless powder" and a machine gun, the court held that it is not the source of the name that is relevant, but "the origination and development of its use in a particular field which may entitle the user thereof to protection by virtue of the secondary meaning acquired therein[[." ]][[Id.]][[at 758- ]]59 (emphasis added). As shown below, a mark which has achieved secondary meaning

Page 25

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

standard need not have achieved a "unique and eminent position" internationally, or in the United States.

Secondary meaning is a characteristic of descriptive marks, that is, marks that describe the product in some way, rather than of arbitrary or fanciful marks such [*94] as COHIBA. Secondary meaning

is used generally to indicate that a mark or dress "has come through use to be uniquely associated with a specific source." Restatement (Third) of Unfair Competition § 13, Comment (Tent. Draft No. 2, Mar. 23, 1990). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."

*Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 766 n.4, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992) (quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851, n. 11, 102 S. Ct. 2182, 2187, n. 11, 72 L. Ed. 2d 606 (1982)).* The secondary meaning standard can, however, be applied by analogy to distinctive marks such as COHIBA because some of the measures of secondary meaning can be appropriately applied to descriptive and distinctive marks. District courts considering the degree of fame needed to satisfy the famous marks doctrine have used a secondary meaning standard. See *Grupo Gigante, 119 F. Supp. 2d at 1091; Buti, 935 F. Supp. at 473-74* [*95] (because defendant failed to offer admissible evidence of "any secondary meaning of its [trademark] in the United States . . . the Court cannot find the Vaudable exception applicable here.").

While Cubatabaco agrees that the secondary meaning inquiry may be partially analogous to the question of the level of fame needed to establish that a mark is protectable under the famous marks doctrine, it argues that less renown should be required under the famous marks doctrine because the secondary meaning standard is applied to restrict the use of a descriptive term that other producers would have a legitimate reason to use. In the case of a distinctive mark such as COHIBA, by contrast, no other producer would have a legitimate reason to use the mark. While Cubatabaco raises a cogent distinction, it fails to mention, however, that the secondary meaning standard is applied in the domestic context and the famous marks doctrine is applied internationally. Because the famous marks doctrine carves out an exception to the well settled territoriality principle, and may result in the cancellation of a trademark by the domestic registrant even though the foreign user neither filed its own registration [*96] nor contested the domestic user's registration, there is no justification for requiring less renown than the secondary meaning standard.

General Cigar argues that the appropriate standard is the statutory standard for fame contained in the *Federal Trademark Anti-Dilution Act ("FTDA"), 15 U.S.C. 1125(c).* The FTDA protects only those marks that have shown "a substantial degree of fame." *TCPIP Holding Co. v. Haar Communications Inc.[[, 244 F.3d 88, 99 (2d ]]Cir. 2001).* The legislative report on the FTDA used as examples "Dupont, Buick, and Kodak . . . marks that for the major part of the century have been household words throughout the United States." Id. (citing H.R. Rep. No. 104-374, at 3 (1995)). While a legislative report is not dispositive as to the standard of fame required, the Second Circuit found it improbable that Congress intended to confer anti-dilution protection on "marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population . . ." Id.[[As shown below, in ]]November 1992 the COHIBA mark could not meet the standard for fame under the*FTDA*.

General Cigar makes [*97] no argument for why the standard for anti-dilution actions should be applicable in the context of the famous marks doctrine, except for the empirical observation that "the FTDA standard for fame is consistent with cases analyzing fame under the well-known marks doctrine." Def.'s Post-Trial Mem. at 17. Each of the cases cited by General Cigar draw on the Vaudable standard which, as shown above, requires a showing of secondary meaning and not a "substantial degree of fame."

There are a number of reasons why the FTDA standard is inappropriate in the context of the famous marks doctrine. As noted in the leading treatise on trademarks, "the international 'famous marks' doctrine developed outside the United States and addresses an issue of trademark protection that is significantly different from that of dilution." 4 McCarthy[[, § 24:92 at 24-166 ]]n.1. The primary purpose of the *FTDA* is to protect marks with regard to use on dissimilar goods. See[[H.R. Rep. No. 104-374, at ]]3, reprinted in 1995 U.S.C.C.A.N. 1029, 1030 ("Thus for example, the use of DUPONT shoes, BUICK aspirin, and KODAK pianos would be actionable under [the FTDA]."). The protection available under [*98] the *FTDA* is much greater. "It permits the owner of a qualified, famous mark to enjoin junior uses throughout commerce, regardless of the absence of competition or confusion." TCPIP[[, *244 F.3d at 95* ]](citing *15 U.S.C. § 1127*). Accordingly, "the standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection." Id. (quoting *I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 47 (1st Cir. 1998)).*

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 26

Leading commentators have suggested standards that are comparable to the secondary meaning standard used in Vaudable[[and ]]Grupo Gigante. McCarthy argues that

> If a mark used only on products and services sold abroad is so famous that its reputation is known in the United States, then that mark should be legally recognized in the United States. If a junior user were to use a mark in the United States that is confusingly similar to the foreign famous mark, then there would, by definition, be a likelihood of confusion among United States customers.

4 McCarthy, § 29:4 at 29-10. Further commentary strongly suggest [*99] that the "known reputation" standard for fame is significantly lower than the FTDA's. In reference to the Vaudable[[case, ]][[McCarthy ]]states that the famous mark rule may be interpreted "as not constituting an exception to the general rule at all, since it could be said that the foreign service business had already established priority in the United States through advertising and reputation prior to the defendant's opening." Id.[[The footnote to ]]this sentence cites to another section of the treatise that discusses the Tea Rose-Rectanus doctrine. Under the doctrine, "priority of use of a mark in one area of the United States does not give rights to prevent its use by a good faith and innocent user in a remote geographic area." *Grupo Gigante, 119 F. Supp. 2d at 1090* (citing McCarthy § 26:2). There is an exception, however, "when a senior user located in one area of the United States has achieved an appreciable level of fame in the junior user's trading area." Id.

WhileMcCarthy states that the Tea Rose-Rectanus doctrine does not apply outside the United States, see[[§ 26:5 at 26-12, the ]]citation to the doctrine [*100] in the discussion of the famous marks doctrine suggests that the Tea Rose-Rectanus doctrine may provide guidance in applying the famous marks doctrine. See [[Grupo Gigante]][[, ]]*119 F. Supp. 2d at 1090* (finding the Tea Rose-Rectanus doctrine "helpful in delineating the famous mark doctrine."). The Grupo Gigante court drew on the doctrine for the purpose of restricting the fame of the mark at issue to the geographical area of the United States where the plaintiffs sought protection. *Id. at 1090-91.* That aspect of the doctrine is not relevant in the instant case because premium cigar smokers are spread throughout the United States. Instead, the reference to the Tea Rose-Rectanus[[doctrine ]]in McCarthy's discussion of the famous marks doctrine suggests that Cubatabaco need only show that the COHIBA mark had a "known reputation" to premium cigar smokers in No-

vember 1992. This standard is consistent with the secondary meaning standard from *Vaudable*, discussed above.

**Factors To Be Assessed In Determining COHIBA's Fame in November 1992**

The same factors which are used in the caselaw in determining whether [*101] a trademark has established a secondary meaning will obviously be critical in determining whether COHIBA was famous within the meaning of the famous marks doctrine. However, other factors have also been suggested in an international document which has been endorsed by the United States. The Joint Recommendation Concerning Provisions on the Protection of Well-Known Marks (the "Joint Recommendation") has been adopted by both intergovernmental bodies concerned with trademark protection: the General Assembly of the World Intellectual Property Organization ("WIPO") and the Assembly of the Paris Union. ' It identifies factors relevant to determining whether a mark is well-known:

> Determination of Whether a Mark is a Well-Known Mark in a Member State
>
> (1) [Factors for Consideration]
>
> (a) In determining whether a mark is a well-known mark, the competent authority shall take into account any circumstances from which it may be inferred that the mark is well known.
>
> (b) In particular, the competent authority shall consider information submitted to it with respect to factors from which it may be inferred that the mark is, or is not, well known, including, but not limited [*102] to, information concerning the following:
>
> 1. the degree of knowledge or recognition of the mark in the relevant sector of the public;
>
> 2. the duration, extent and geographical area of any use of the mark;
>
> 3. the duration, extent and geographical area of any promotion of the mark, including advertising or publicity and the presentation, at fairs or exhibitions, of the goods and/or services to which the mark applies;
>
> 4. the duration and geographical area of any registrations, and/or any applications for registration, of the mark, to the

extent that they reflect use or recognition of the mark;

5. the record of successful enforcement of rights in the mark, in particular, the extent to which the mark was recognized as well known by competent authorities;

6. the value associated with the mark.

(c) The above factors, which are guidelines to assist the competent authority to determine whether the mark is a well-known mark, are not pre-conditions for reaching that determination. Rather, the determination in each case will depend upon the particular circumstances of that case. In some cases all of the factors may be relevant. In other cases some of the factors [*103] may be relevant. In still other cases none of the factors may be relevant, and the decision may be based on additional factors that are not listed in subparagraph (b), above. Such additional factors may be relevant, alone, or in combination with one or more of the factors listed in subparagraph (b), above.

The WIPO factors do not provide guidance as to what level of fame is required to find that a mark is well-known. However, they do suggest that the inquiry into fame must be wide-ranging, taking into account any available relevant evidence.

9   The Assembly of the Paris Union is the group of nations that are signatories to the Paris Convention. See Paris Convention art. 1(1). It includes both Cuba and the United States.

The factors to be considered in determining secondary meaning in this Circuit are similarly wide-ranging. They include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts [*104] to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) (quoting *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987)).

Factors relating to advertising and sales will be of minimal relevance because of the inability to sell Cuban

COHIBA cigars. The sixth factor is also not relevant to the instant litigation, as it has been previously determined that the COHIBA mark was in the public domain in November 1992 following General Cigar's abandonment of the mark. Accordingly, the determination of whether the fame of the COHIBA mark is equivalent to the secondary meaning standard for recognition will rest largely, but not exclusively, on the three remaining factors.

**1. Consumer Studies**

Evidence from consumer surveys rarely provides the sole evidence of secondary meaning. See 5 McCarthy, § 32:190 at 32-315 ("survey data is not a requirement, and secondary meaning can be, and often is, proven by circumstantial evidence.") A survey of the caselaw, then, cannot provide a magic number above which secondary [*105] meaning may be established. Further, different surveys are taken in different contexts, with different questions and measurement techniques. Nevertheless, they provide a rough estimate of the level of recognition required.

In Grupo Gigante, the court dismissed the probativeness of two of the three pieces of evidence put forward by plaintiffs in showing the renown of their foreign mark, leaving only a survey conducted one year prior to defendant's use of the mark. See [[Grupo ]]*Gigante, 119 F. Supp. 2d at 1092-93*. Upon a showing that 20-22% of the relevant public was aware of plaintiff's mark, the court found that the secondary meaning standard was met, and that plaintiff's mark was protectable. Id. The court made this determination by drawing on caselaw on likelihood of confusion, after citing the argument from McCarthy that "there is no logical reason to require [a] higher percentage to prove secondary meaning than to prove likelihood of confusion." Id. (citing 5 McCarthy, § 32:190).

In the Second Circuit, survey data showing 50% or greater recognition has generally been required to establish secondary meaning. See *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 n.2 (2d Cir. 1981) [*106]   (50% recognition of publisher's name properly found probative but "not conclusive" of secondary meaning); *RJR Foods, Inc. v. White Rock Corp.[[, 1978 U.S. Dist. LEXIS 15080, 201 U.S.P.Q. 578, ]]581 (S.D.N.Y. 1978)* (66% recognition supported finding of secondary meaning), aff'd *603 F.2d 1058 (2d Cir. 1981)*; *Essie Cosmetics, Ltd v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 955, 960 (S.D.N.Y. 1992) (65% recognition provided "ample evidence" that trade dress had acquired secondary meaning). General Cigar cites *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 689-90 (S.D.N.Y. 1963) for the proposition that 25% recognition is insufficient to establish secondary meaning. However,

Case 1:08-cv-01497-DAB    Document 9-2    Filed 04/11/2008    Page 29 of 91

Page 28

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

the court did not treat the 25% survey figure as indicative of the actual level of awareness because the survey was taken three years after the relevant date, and because the survey also showed that nearly as many respondents identified the trade dress with another producer. General Cigar also cites the testimony of Cubatabaco's expert, Ossip, to the effect that 50% awareness is required to find a trademark well- known. While Ossip's expertise [*107] in brand recognition is noted by the Court, his opinions as to legal standards carry no weight.

General Cigar has not argued that the promotion of its COHIBA mark from 1981-1987 would have resulted in any residual fame of the COHIBA mark in November 1992. Indeed, General Cigar's position is that the mark was virtually unknown at that time. Accordingly, any consumer studies which may be useful for determining the November 1992 level of fame would be measuring the level of fame of the Cuban COHIBA.

The absence of any consumer studies from the relevant period necessitates making inferences from surveys conducted both beforehand and afterward. The Shanken Survey, conducted in December 1991, shows a low level of trial awareness of COHIBA. COHIBA is mentioned by only 1.1% of respondents when asked about the brand of cigar normally smoked. The most impressive result is the 6% of respondents who spend more than $ 3.50 per cigar who named COHIBA as the finest cigar they had smoked.

The Shanken Survey is deeply flawed, however, for it takes no measure of either unaided or aided awareness, and focuses only on those cigars actually smoked. Given the extraordinary difficulty of obtaining a Cuban [*108] COHIBA, the results are entitled to little weight. The survey also underestimates the renown of the mark in November 1992 because it was taken before the considerable publicity that COHIBA received around the time of the premiere issue of Cigar Aficionado[[. ]]

The next survey was not reported until September 1994, although it likely was administered somewhat earlier. That survey reported an unaided awareness figure of 14.5% for COHIBA, and a trial awareness of 18.5%. Unfortunately, aided awareness was not tested. Cubatabaco's expert, Ossip, has used the average differential between unaided and aided awareness for other brands to estimate that COHIBA's aided awareness should be approximately 48-52% greater than the unaided awareness figures. General Cigar's expert, Simonson, counters with the reductio ad absurdum[[argument ]]that an entirely unknown brand, with 0% unaided awareness, would still score at least 48% aided awareness. Simonson is unpersuasive on this point, however, because Ossip has compared COHIBA to the other brands surveyed using a number of methods which demonstrate that COHIBA is

not an outlier brand whose aided awareness figures should be expected [*109] to differ significantly from the others. Although it is impossible to determine a particular figure from the data presented, Ossip has shown persuasively that COHIBA's aided awareness in September 1994 is significantly higher than its 14.5% unaided awareness for that period.

It is also impossible, from survey evidence alone, to determine whether COHIBA's level of renown is closer to the September 1994 survey or the December 1991 survey. Other evidence is required to determine this question.

2. Unsolicited Media Coverage

With the exception of the coverage related to the launch of Cigar Aficionado, the 46 articles mentioning COHIBA between 1986 and 1992 are minimally probative of the level of recognition of the mark in November 1992. Because the relevant public is the premium or super-premium cigar smoker, which numbered approximately half a million in 1992, mentions of the product in general circulation publications would not be expected. Mentions of COHIBA during this period, however, are quite favorable, referring to the cigar either as Fidel Castro's preferred brand (until he quit smoking), or as the best of the Cuban cigars.

The coverage of COHIBA in first [*110] The Wine Spectator[[and ]]then Cigar Aficionado cannot be considered entirely unsolicited, given the cozy relationship that has been described between Cubatabaco's marketing department and the editorial staff of Cigar Aficionado, which shares editorial staff with its sister publication. However, even if the COHIBA-related articles published in both magazines are "puff pieces," they have undeniably generated positive publicity for the brand. The Cuban COHIBA received the strongest possible endorsement in the premiere issue of Cigar Aficionado. Praise for COHIBA in the premiere issue also spilled over into magazines with wider circulation, such as Forbes, Newsweek, and the Dallas Morning News.

Cubatabaco argues that the circulation figures of Cigar Aficionado demonstrate that 25% of the premium cigar smokers in the United States were aware of COHIBA because of the premiere issue. Such an inference is not warranted given that some issues may have been received by those who do not smoke cigars, and the issue may have been unread by others. Cubatabaco also argues that a premiere issue of a magazine would have strong "pass-along" readership. While the [*111] publication and distribution of the premiere issue, by itself is not sufficient to establish a 25% awareness of the COHIBA brand, it is undoubtedly probative evidence that awareness increased significantly from the time when the Shanken Survey was administered.

Page 29

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

### 3. Attempts to Plagiarize the Mark

General Cigar argues that because Cubatabaco did not have a protectable mark in 1992, any evidence of copying cannot be used to establish secondary meaning. It is true that "proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish, Ltd. v. F.A.O. Schwartz, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001).* General Cigar urges an even stronger holding, namely that intentional copying is irrelevant if the trademark is not protectable. See *Ergotron, Inc. v. Hergo Ergonomic Support Systems, Inc., 1996 U.S. Dist. LEXIS 3822, No. 94 Civ. 2732, 1996 WL 143903, at *9 (S.D.N.Y. 1996).* However, Ergotron found evidence of copying irrelevant because the trade dress in question was not distinctive and because the defendant believed it was copying only functional features. Id. Because CO-HIBA [*112] is a distinctive mark, evidence of copying may be probative.

Also inapposite is *Person's Co. v. Christman[[, 900 F.2d ]]1565, 1570 (Fed. Cir. 1990),* in which the court found that deliberate copying of a foreign trademark did not establish bad faith on the defendant's part. The bad faith inquiry is distinct from an inquiry into fame or secondary meaning, and the Person's court had already established that the plaintiff's company "had no goodwill and the 'PERSON'S' mark had no reputation here." *Id. at 1569-70.* The Second Circuit has held that "imitative intent can help support a finding of secondary meaning." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992).* Accordingly, General Cigar's intentions, as well as its statements made at the time it was reintroducing the mark, will be considered as evidence of secondary meaning.

Because General Cigar had abandoned the COHIBA mark in 1992, see *Empresa II, 213 F. Supp. 2d at 271,* the decision to use the name again in 1992, by itself, provides strong evidence of intentional copying. General Cigar argues that it used the COHIBA name at least in part because [*113] Cubatabaco, through Garrido, acknowledged that it did not own the U.S. rights to CO-HIBA. Even if Garrido had said something to that effect, it would not demonstrate that General Cigar was not plagiarizing the COHIBA mark for purposes of the secondary meaning inquiry, in view of the facts found above to the contrary.

Beyond the evidence of fame provided by the mere fact of the adoption of the COHIBA name, there is further evidence that the decision to reintroduce the CO-HIBA brand was connected with the fame of the CO-HIBA mark. General Cigar made the decision in part to capitalize on the success of the Cuban COHIBA brand and especially the good ratings and the notoriety that it

had received in Cigar Aficionado. According to General Cigar, the choice of the COHIBA name reflected not the fact that the brand was famous in November 1992, but that the brand would grown in prominence as a result of the publicity and the high rankings it was given in Cigar Aficionado.

Contemporaneous statements from General Cigar, however, demonstrate that it regarded the brand as well-known at that time. The January 14, 1993 memo from Milstein to General Cigar executives states that the rationale [*114] for seeking permission from Cubatabaco to use the COHIBA trade dress is "to aid GC in successfully repositioning and relaunching its Cohiba brand cigar, it would be useful to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." PX 1084. General Cigar argues that this referred to the success of the brand outside the U.S., and that in any case the memo reflected talking points to be used with Cubatabaco, and was therefore designed to be flattering. While the context of the memo diminishes its probativeness as an indicator of fame, it is not true, as General Cigar argues, that it shows only "that the Cuban COHIBA was prominent in the minds of General Cigar executives." Def.'s Mem. at 10. It is unlikely that General Cigar based its exploitation strategy on such an extremely constricted sense of popularity, familiarity and brand recognition.

The strategy document "Marketing the Cohiba Cigar," PX 966, prepared either by McCaffery, Ratner, or General Cigar, similarly describes COHIBA as "the magic word in the cigar industry," and as having "a high recognition factor here in the U.S. despite the fact that it cannot be purchased in the country." [*115] Id. General Cigar argues that the document was written by someone with little knowledge of the cigar industry, and that it was created at a time when General Cigar's management were heavily focused on the Cuban COHIBA and the ratings it had received in Cigar Aficionado. As with the Milstein memo, these circumstances diminish the import given to the claims made about the fame of the CO-HIBA. However, because McCaffery, Ratner and General Cigar would have no reason to misrepresent the fame of the Cuban COHIBA in these documents, they provide an important perspective on the renown of the Cuban COHIBA to premium cigar smokers in late 1992.

In March 1994, a buyer for Dunhill described the General Cigar COHIBA as selling "very well simply because of the strength of the [Cuban COHIBA] name." PX 899. The buyer also described the Cuban COHIBA as "the most legendary cigars in the U.S. market where they cannot legally be purchased." Id. [[While the fact that ]] Dunhill was the exclusive retailer for the General Cigar COHIBA may lead to some exaggeration, the remainder of the letter does not uniformly praise every

Page 30

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

cigar brand. Its assessment of the fame of the brand in March [*116] 1994 and, implicitly, some time before that, is entitled to some weight.

Advertisements by Dunhill of the General Cigar COHIBA at time refer to its Cuban counterpart as the "Cuban legend," PX 335, and "this celebrated range of Cuban origin." PX 1153. More than any internal document, a public advertisement is likely to overstate the prestige and recognition of the brand with which it attempts to create an association. However, the COHIBA name must resonate with premium cigar smokers in order for such an advertising strategy to be effective.

In light of the credible evidence presented by Cubatabaco of the level of renown of the COHIBA name in November 1992, it is concluded that the COHIBA trademark achieved a level of fame consistent with secondary meaning as described in *Vaudable*[[and ]]other cases. The COHIBA mark is therefore famous within the meaning of the famous marks doctrine, and it is concluded that Cubatabaco had a legally protectable right to the mark at that time.

## A Likelihood of Confusion Exists Between the Cuban COHIBA and the General Cigar COHIBA

In Empresa II, this Court held that, for the purposes of Cubatabaco's motion to dismiss General Cigar's [*117] equitable defenses, "Cubatabaco's claim of likelihood of confusion is . . . not brought into reasonable doubt." *213 F. Supp. 2d at 275* (internal quotations omitted). Both parties have submitted further evidence to show that there is, or is not, a likelihood of confusion. After considering those submissions, at trial and afterward, it is concluded that the evidence supports the prior ruling that there is a likelihood of confusion between the Cuban COHIBA and the General Cigar COHIBA.

The standard test for confusion in this Circuit is laid out in *Polaroid Corp. v. Polarad Elec. Corp.[[, 287 F.2d 492, 495 (2d ]]Cir. 1961)*. The factors are: (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the comparative proximity of the services; (4) the likelihood that plaintiff will "bridge the gap" and offer a service like defendants; (5) actual confusion; (6) good faith on the defendant's part; (7) the quality of the defendant's service; and (8) the sophistication of the buyers. See [[also Estee Lauder, Inc. v. The ]]*Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997)*; *Empresa II, 213 F. Supp. 2d at 274.* [*118] The Polaroid factors are "not dispositive, and additional factors may be considered or initial factors abandoned." *Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993).*

General Cigar acknowledges that if the Cuban CO-HIBA were currently available in the U.S., the fact that both products have the same name and both are cigars would, as a practical matter, "end the inquiry under the Polaroid[[test." Def.'s Post-Trial Mem. ]]at 46 n.24. It argues, however, that the embargo against Cuban goods casts the analysis in an entirely different light. Because the embargo has been in place for four decades, General Cigar argues, consumers are highly aware that cigars sold in the U.S. are not made in Cuba and contain no Cuban tobacco.

The embargo significantly changes the Polaroid[[analysis. ]]When two marks are identical and are used for the same product in the same market, consumer confusion is "inevitable." *Empresa II, 213 F. Supp. 2d at 274* (collecting cases). The unavailability of the Cuban COHIBA makes the issue of confusion a closer call. In addition, not all forms of consumer confusion are relevant in the [*119] context of a trademark infringement action. "Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Lang v. Retirement Living Publishing Co., 949 F.2d 576, 583 (2d Cir. 1991).* General Cigar argues that, to the extent that consumers may have mistaken impressions about past or present relations between the Cuban COHIBA and the General Cigar COHIBA, such confusion is unrelated to purchasing decisions.

In particular, General Cigar argues that "[a] consumer who mistakenly believes that the maker of the General Cigar COHIBA had once been affiliated with the maker of the Cuban COHIBA does not buy it under the misapprehension that it is produced or sponsored by Cubatabaco." Def.'s Post-Trial Reply Brief at 33. General Cigar provides no support for this proposition. As previously noted by this Court, "the embargo does not prevent a Cubatabaco-sponsored cigar from being sold in the United States under similar circumstances."*Empresa II[[, 213 F. Supp. 2d at 275 ]]*(citing *31 C.F.R. §§ 515.204; 515.302-303*); see also *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d Cir. 1979)* [*120] ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

In order for confusion between the two brands to be relevant in the present litigation, there must be a significant risk that the consumer will make a purchasing decision based not on the goodwill or reputed quality of the General Cigar COHIBA but on the mistaken association with the Cuban COHIBA, a brand with a reputation as being one of the best cigars in the world. See e.g., *El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986)* ("One of the most valuable and important protections afforded by the *Lanham Act* is the right to control the quality of the good manufactured and sold under the holder's trademark."); 1 McCarthy, § 3-2 at 3-3 (among the functions which trademarks perform is

Page 31

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

"to signify that all goods bearing the trademark are of an equal level of quality."). While it is true that a misapprehension as to historical lineage does not, by itself, necessarily imply that the consumer will believe that the quality of the Cuban COHIBA is imparted to the General Cigar COHIBA, such confusion [*121] is certainly possible. In examining the likelihood of confusion under the *Polaroid*[[factors, that ]]possibility must be considered.

### 1. Strength of Plaintiff's Mark

The strength of a trademark encompasses both the mark's inherent distinctiveness, or its arbitrariness in relation to the product for which it is used, and its "acquired distinctiveness," or "the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." *Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 147 (2d Cir. 2003).* Cubatabaco's COHIBA mark is arbitrary or fanciful for use on cigars. See *General Cigar Co. v. G.D.M., Inc., 988 F. Supp. 647, 660 (S.D.N.Y. 1997)* ("It seems doubtful that prospective purchasers of COHIBA cigars . . . would make the association between the mark and the word in a language spoken by the indigenous population of the Dominican Republic."). Further, the Cuban COHIBA also has significant acquired distinctiveness. The findings above detail the fame of the mark in November 1992. By the time of the introduction of the super-premium COHIBA by General Cigar in 1997, as Cullman, Jr. testified, [*122] "the Cuban Cohiba was certainly well- known." Tr. 1103. The strength of Cubatabaco's COHIBA mark weighs toward a likelihood of confusion.

### 2. Similarity Between the Two Marks

Because Cubatabaco has alleged infringement only of the COHIBA word mark, the fact that the two marks are identical also weighs toward a likelihood of confusion. Further weighing toward confusion is the testimony of Mark Perez, a buyer for Dunhill, who acknowledged the statement he had made in previous litigation by General Cigar with respect to infringement of the COHIBA mark by a company selling cigars in the U.S., that "the name is what people attach to the product, not necessarily the band or the trade dress. The name is the most important thing that drives consumers I believe." Perez Dep. at 455-56. See also *Cullman Ventures, Inc. v. Columbian Art Works, Inc., 717 F. Supp. 96, 128 (S.D.N.Y. 1989)* ("As courts have long recognized, consumers ask for a product by its name, not its logo.").

### 3. The Proximity of the Products

The fact that both Cubatabaco and General Cigar both produce COHIBA cigars clearly weighs in favor of confusion. See *id. at 127* [*123] ("the products are more than confusingly similar --they are identical -- and thus

consumer confusion is inevitable") (citing *Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47-48 (2d Cir. 1978)).* However, because the two products do not compete with each other in the U.S. limits the proximity under this factor. But the competitive limitation is not sufficient to weigh against a likelihood of confusion, or even to neutralize the factor. The relevant consideration is whether the proximity of the products in the mind of the consumer will lead that consumer to make a purchasing decision based on that proximity. Consumer confusion is not limited to the belief that Cubatabaco or the Cuban government controls the content of the General Cigar COHIBA. An imagined informal present or past arrangement may, nevertheless, suggest to the consumer that the quality of the Cuban COHIBA is to be found in the General Cigar COHIBA.

Advertisements for the General Cigar COHIBA from 1992 to the present imply that the quality of the Cuban COHIBA will carry over to the General Cigar COHIBA. A pre-1997 Dunhill catalog advertised the General Cigar COHIBA as the "rightful heir to the [*124] Cuban legend." PX 335, while JR Cigars, which holds over a third of the retail premium cigar market, described it as "a flavorful Dominican version of this classic Cuban cigar." PX 276. Cubatabaco has produced evidence of numerous other similarly misleading advertisements. "The way that a challenged mark is used in advertising is highly probative of whether it is likely to cause confusion." McCarthy, § 23:58; see also *Sports Auth. v. Prime Hospitality Corp., 89 F.3d 955, 962-63 (2d Cir. 1996)* (considering use of marks in advertising).

General Cigar's actions against the Cuban COHIBA and against third parties using the COHIBA name also provide evidence that the trade dress of the Cuban COHIBA, and even a Cuban designation of origin, is not sufficient to differentiate the products. The possibility of confusion between General Cigar COHIBAs and cigars with no designation of origin or a Dominican designation are not relevant to the proximity analysis. However, General Cigar has taken as well as threatened legal action against several parties using the COHIBA name in the United States, even though many of the products of which General Cigar complained bore the designation "La Habana, Cuba." General Cigar [*125] has made no distinction between the origins of designation on the products, contending that they all infringe on General Cigar's trademark. General Cigar's in-house counsel also testified that advertising for the Cuban COHIBA in Cigar Aficionado[[in 1992 and 1993 might ]]lead a consumer to "be confused that this is the General Cigar COHIBA sold in Dunhill, and it isn't." Wollen Dep. at 303.

General Cigar argues that the "red dot" in the "O" in COHIBA will serve to dispel confusion, as will tobacconists who encounter confused consumers. These minimal

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 32

measures are insufficient to counteract the proximity that is created by the use of the same brand name on the same product. Accordingly, this factor weighs toward likelihood of confusion.

### 4. Likelihood that Plaintiff Will "Bridge the Gap"

Cubatabaco argues that because the parties already offer the same product, "there is no gap to be bridged." *Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 492 (2d Cir. 1988)*. Such an argument ignores the effect of the embargo, which currently prevents Cubatabaco from offering a product like the defendant's in the U.S. market.

In *Empresa II*, it was held [*126] that "the likelihood of Cubatabaco 'bridging the gap' and entering the U.S. cigar market is dependent upon whether the political tide will shift to bring an end to the Cuban embargo." *213 F. Supp. 2d at 275*. At that time, it was projected that "the end of the embargo appears more likely now than in the past." Id. Cubatabaco has provided indirect evidence of the eventual end of the embargo in the form of the substantial number of registrations by U.S. corporations of their trademarks in Cuba. See PX 1099, 1115 (listing trademarks registered in Cuba). Cubatabaco argues that such registrations show that these corporations consider the prospects for future trade with Cuba to be significant.

The relevant consideration for this factor, however, is not when the embargo will end but whether Cubatabaco will enter the U.S. market once the embargo has ended. See *Katz v. Modiri, 283 F. Supp. 2d 883, 896 (S.D.N.Y. 2003)* ("If a trademark owner intends to enter the same market as the defendant, 'such a showing is indicative of future likelihood of confusion as to source.'") (quoting *Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 517 (S.D.N.Y. 1993)*). [*127] It was held previously that in the event the embargo is lifted, "Cubatabaco will almost definitely bridge the gap," *Empresa II, 213 F. Supp. 2d at 275*, and the above findings of fact after the trial confirm that conclusion. Accordingly, this factor weighs towards likelihood of confusion.

### 5. Actual Confusion

"Actual confusion is defined as the likelihood of consumer confusion that enables a seller to pass off his goods as the goods of another." *1-800 Contacts, Inc. v. WhenU.com, 309 F. Supp. 2d 467, 2003 U.S. Dist. LEXIS 22932, at *84, No. 02 Civ. 8043, 2003 WL 22999270, at *23 (S.D.N.Y. Dec. 22, 2003)* (citing *W.W.W. Pharm. Co., Inc. v. Gillette Co., 984 F.2d 567, 574 (2d Cir. 1993)*). However, "it is black letter law that actual confusion need not be shown to prevail under the *Lanham Act*, since actual confusion is very difficult to prove and the

Act requires only a likelihood of confusion as to source." Id. (quoting *Lois Sportswear, Inc. v. Levi, Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986)*).

Cubatabaco has presented several instances of anecdotal actual confusion. The 1998 Cambridge Group report, based on focus groups and not on statistically significant [*128] surveys, found that there was "serious consumer confusion" between the Cuban and Dominican COHIBAs. It cited one focus group participant, who believed that there were "two brothers, one who makes COHIBA in Cuba and the other in the Dominican Republic."

The 2000 survey conducted by Cubatabaco's expert also demonstrated a significant degree of confusion among consumers: among those who had heard of COHIBA, approximately 21% were confused as to the source of the products, and approximately 15% of all premium cigar consumers were confused. Comments from the respondents indicate that some believed that COHIBA was a parallel brand which was expropriated by Castro, where the original makers then immigrated to the Dominican Republic and produced cigars there.

"Proof of actual confusion, in the form of market research survey evidence, is highly probative of the likelihood of consumer confusion, 'subject to the condition that the survey must . . . have been fairly prepared and its results directed to the relevant issues.'" *1-800 Contacts, 2003 U.S. Dist. LEXIS 22932, at *84, 2003 WL 22999270, at *23* (quoting *Schieffelin & Co. v. Jack Co. of Boca, Inc.[[, 850 F. Supp. ]]232, 245 (S.D.N.Y. 1994)*). General Cigar's expert, [*129] Simonson, argues that the survey is flawed because Ossip used "gender balancing" to compensate for the disproportionate response to the survey by female cigar smokers. However, gender balancing is appropriate to model the results on the actual premium cigar population. Simonson also claims that Ossip misleadingly showed the two cigar brands side by side. Such an approach is not inaccurate: at trial, Cubatabaco showed Simonson examples of internet advertising that depicted or described the two brands side by side, as in the survey, and he acknowledged that such advertisements followed the approach of the survey. Tr. 1160-1163.

Figures comparable to those in the 2000 survey have been found probative of a likelihood of confusion. See *[[RJR Foods, Inc. v. White Rock Corp. ]][[, 603 ]] F.2d 1058, 1061 (2d Cir. 1979)* (finding "evidence from two witnesses who were actually confused . . . together with the results of a consumer study showing a fifteen to twenty percent rate of product confusion" probative of actual confusion). General Cigar cites *Girl Scouts of U.S. of America v. Bantam Doubleday Dell Pub. Group[[, ]]808 F. Supp. 1112, 1128 (S.D.N.Y. 1992)*, which found

Page 33

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

a survey showing 12.6% confusion [*130] between the Girl Scouts and a book series bearing the title "Pee Wee Scouts" insufficient to demonstrate actual confusion. The Girl Scouts[[court, however, used a more ]]stringent standard for actual confusion in light of the *First Amendment* concerns implicated in restricting artistic expression. It interpreted the survey evidence as the Second Circuit did in *Rogers v. Grimaldi, 875 F.2d 994, 1000 (2d Cir. 1989)*, in which it was held that courts "need not interpret the Act to require that authors select titles that unambiguously describe what the work is about nor to preclude them from using titles that are only suggestive of some topics that the work is not about." The standards for actual confusion with respect to book titles are therefore of little relevance in assessing confusion between cigar brands.

Cubatabaco has presented survey evidence as well as anecdotal evidence of actual confusion between the Cuban COHIBA and the General Cigar COHIBA. Accordingly, this factor weighs toward likelihood of confusion.

### 6. Good Faith on the Defendant's Part

This factor considers whether the defendant "adopted plaintiff's marks with the intention [*131] of capitalizing on the plaintiff's reputation and goodwill and any confusion between [it] and the senior user's product." *Nora Beverages, Inc. v. Perrier Group of America, Inc., 269 F.3d 114, 124 (2d Cir. 2001)* (quoting *Lang. 949 F.2d at 583*).

General Cigar concedes that its development of the COHIBA brand in 1992 was an attempt "to somehow capitalize on the success of the Cuban brand." Milstein Dep. at 284. If Cubatabaco was unambiguously the senior user of the mark at that time, that admission would be sufficient to establish General Cigar's bad faith. The central question, however, is whether General Cigar believed it was the senior user of the mark when it resumed use in November 1992. See *Person's, 900 F.2d at 1569* ("Defendant is the senior user, and we are aware of no case where a senior user has been charged with bad faith. The concept of bad faith adoption applies to remote junior users seeking concurrent use registrations . . ."). Although it has been determined that General Cigar was not the senior user in November 1992 because of the operation of the famous marks doctrine, the evidence is not sufficient to show that General [*132] Cigar's failure to recognize that fact was in bad faith.

General Cigar first applied to register the COHIBA mark in 1978, before Cubatabaco sold COHIBA cigars outside of Cuba. It also began selling the COHIBA-branded "White Owl" cigars in 1978, and in 1982 placed the COHIBA brand on its Canario D'Oro premium cigar. See *Empresa II, 213 F. Supp. 2d at 257-258*. While General Cigar executives were aware of the Cuban brand, and of Cubatabaco's intent to develop its brands for the international market after the embargo, there is insufficient evidence to show that COHIBA was well-known then. The USPTO issued a registration in February 1981.

During the period of General Cigar's sale of its CO-HIBA-branded cigars from 1978 to 1987, Cubatabaco made no objection to General Cigar's use of the mark. Nor did Cubatabaco take any action to register the mark following the five-year period in which General Cigar made no sales under the COHIBA name, from 1987 to 1992.

The only indication that General Cigar had by late 1992 and early 1993 that it may not have been the senior user came from its trademark counsel, Morgan & Finnegan. Morgan & Finnegan first assured General Cigar that because [*133] "it is doubtful that Cubatabaco's CO-HIBA product was known to any significant number of purchasers [in 1978], especially not in the United States," the 1981 registration created a valid trademark right. PX 834. In its draft opinion letter, Morgan & Finnegan discussed the presumption of abandonment from two or more years of non-use, and opined that

> there may have been several such periods of abandonment since Culbro/General Cigar filed the application for the CO-HIBA mark in 1978 and/or since the registration issued in 1981. Moreover, if General Cigar's COHIBA mark has not been used for over two years up until the present, it may be deemed to be abandoned now.

Id. Abandonment, by itself, would not be sufficient to make Cubatabaco the senior user, because General Cigar's resumption of the mark in 1992, along with its second registration application, could re-establish its rights to the mark. Marcus, the attorney at Morgan & Finnegan in charge of the relationship between his law firm and General Cigar, testified that the concern expressed in the letter about possible abandonment was based on the incorrect belief that "General Cigar had only made token use [*134] of the mark in the 1980's." Marcus Direct P 16. Further, Milstein believed that General Cigar CO-HIBA cigars were sold by Dunhill throughout the 1980's and 1990's, and therefore did not believe that General Cigar had abandoned the mark. See[[Tr. 1271-72. ]]

The opinion letter also discusses the possibility that, if abandonment of the mark could be shown, Cubatabaco could establish a priority right to the mark

Page 34

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

by showing that its COHIBA mark enjoys a continuous, existing reputation among U.S. purchasers, dating back to a time prior to any newly resumed use by General Cigar, by virtue of: (a) the various aforementioned means of exposure of the mark to U.S. purchasers, including publicity and promotional material circulated in the United States for their CO-HIBA cigars; and (b) direct evidence of familiarity on the part of U.S. purchasers, including travelers who have purchased Cuban COHIBA cigars abroad.

Id. The cases cited in the letter do not specifically refer to the famous marks doctrine, but it is stated implicitly. Morgan & Finnegan also sent an earlier letter to Milstein, dated April 20, 1989, explaining the famous marks doctrine in the context [*135] of the possible use and registration in the U.S. of trademarks owned and used abroad by Cubatabaco. See PX 923. The COHIBA mark is not discussed in the 1989 letter, which cites Maison Prunier, and advises Milstein that if the trademark "enjoys a known reputation in the United States," Cubatabaco may be able to establish priority rights, notwithstanding its inability to sell cigars in the United States. Id.

The two letters, however, do not conclude that Cubatabaco would be likely to prevail in a priority contest. Marcus testified that the advice related in the opinion letter only set out the legal doctrine, and did not conclude that the mark was sufficiently famous in the United States to give Cubatabaco priority rights to the mark. See Tr. 1164. It was Marcus's opinion, given his knowledge of the renown of the Cuban COHIBA in late 1992, that the Cuban COHIBA "was not well known in the United States." Id. at 1159.

Cubatabaco argues both that General Cigar withheld pertinent information from Morgan & Finnegan, thus skewing its legal advice, and that it failed to follow the advice given by the law firm. As to the first issue, it has not been established that General [*136] Cigar held back information from its counsel which could later be used against it in a trademark registration dispute. Marcus testified of Milstein that

because he was seeking my opinion concerning [General Cigar's] rights and potential liabilities with respect to this brand,... he was giving me whatever information he had. He would hardly have held back any important information.

Id. Marcus's testimony is credible and establishes that General Cigar was not advised in late 1992 or early 1993 that Cubatabaco could establish priority rights to the COHIBA mark. See [[Estee ]] Lauder, Inc. v. The Gap, Inc., 932 F. Supp. 595, 615-616 (S.D.N.Y. 1996), rev'd on other grounds, 108 F.3d 1503 (2d Cir. 1997) (finding no bad faith where defendant "proceeded on the advice of experienced counsel, advice that was not patently unreasonable," even though the court disagreed with counsel's opinion).

Cubatabaco has also failed to establish that General Cigar ignored the advice of its counsel. The advice regarding abandonment was based on misinformation. Counsel's opinion that General Cigar must not "take advantage of the goodwill [*137] associated with the Cuban product" by "deliberate copying," PX 834, refers only to the Cuban COHIBA trade dress, which General Cigar knew Cubatabaco was seeking to protect, rather than the word mark, which counsel believed that General Cigar could properly use.

Cubatabaco has presented no credible evidence that General Cigar believed that they did not own the CO-HIBA mark at that time. General Cigar's conduct in copying the COHIBA mark and attempting to exploit the reputation of the Cuban COHIBA was not, therefore, taken in bad faith. See [[Mushroom Makers, Inc. v. R.G. ]] Barry Corp., 441 F. Supp. 1220, 1229-30 (S.D.N.Y. 1977), aff'd 580 F.2d 44 (2d Cir. 1978) ("The fact that one believes he has a right to adopt a mark already in use because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct as in bad faith," even after the USPTO refused registration in light of the plaintiff's mark). Accordingly, this factor weighs against a likelihood of confusion.

## 7. Quality of the Defendant's Product

The first and most frequent use of this factor is to determine "whether [*138] defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *The Morningside Group Ltd v. Morningside Capital Group, Inc., 182 F.3d 133, 142 (2d Cir. 1999).* However, this formulation begs the question by looking to the negative consequences of hypothetical confusion rather than determining whether confusion is likely. There is also another manner in which the quality of the defendant's product may be relevant: "Products of equal quality may tend to create confusion as to source because of that very similarity of quality." Id.[[; ]][[see also Hasbro Toys, ]] Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78 (2d Cir. 1988) (noting both senses in which quality is relevant "without taking sides"). Because the second use of the factor cor-

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 35

relates more strongly to a finding of confusion, it will be weighed more strongly than the first use.

Both ways of taking quality into account, however, favor a finding of confusion. In Empresa II[[, it was found that although ]]General Cigar's COHIBA

> has received several high evaluations from Cigar Aficionado, those [*139] rankings are not consistently as high as those of the Cuban COHIBA. The Cuban COHIBA has the reputation as the best cigar in Cuba and, perhaps, the world -- a reputation that General Cigar's COHIBA has not surpassed according to the evidence presented here.

*213 F. Supp. 2d at 275.* The evidence presented subsequently confirms that conclusion. A chart prepared by Cubatabaco demonstrates that Cigar Aficionado rates the General Cigar COHIBA consistently between 83 and 89, while more than half of the Cuban COHIBA's dozens of ratings are over 90, with only four below 85. Lopez Garcia Direct, Exh. N. The only retailer to testify regarding the quality of the two products described the Cuban COHIBA as "one of the highest quality cigars, in terms of tobacco, craftsmanship and taste, produced anywhere in the world," while "neither the tobacco used, nor the craftsmanship employed in manufacturing the [General Cigar COHIBAs] are of extraordinary quality. The taste of the General Cigar COHIBA similarly does not merit the high cost that the consumer pays for the product." Jorge Armenteros Direct PP 22, 23.

While the quality of the Cuban COHIBA is consistently higher [*140] than that of the General Cigar counterpart and presents a risk, although a small one, that the reputation of the Cuban COHIBA will be tarnished, there is a greater risk that the generally high quality of the General Cigar COHIBA will lead consumers into believing that the two brands are affiliated in some way. Given the publicity that counterfeit COHIBAs have received, a poor quality COHIBA is more likely to make a consumer believe that the cigar is a fraud rather than confusing it with the Cuban COHIBA. This factor weighs toward a likelihood of confusion.

### 8. Sophistication of Buyers

In Empresa II, it was determined at that time that the sophistication of buyers of COHIBA cigars was a controverted issue:

> While purchasers of fine cigars tend to be knowledgeable and would realize that Cuban COHIBAS are not legally avail-

able in this country, Cubatabaco has presented market research to suggest that buyers who would be influenced by the "Cuba mystique" are not sophisticated purchasers. Therefore, a person who would buy a COHIBA because of its "mystique" may not understand that the General Cigar COHIBA is not sponsored by or related to the Cuban COHIBA. [*141]

*213 F. Supp. 2d at 275.* At most, the evidence presented by Cubatabaco shows that younger consumers have become interested in COHIBA, that some consumers may be in search of status or prestige, and that some customers rate their cigar knowledge as low.

That evidence, however, must be viewed in the context of the high price of premium cigars, and COHIBA cigars especially, as well as the sophistication of premium cigar buyers generally. See *General Cigar, 988 F. Supp. at 664* ("Ultimate consumers of [COHIBA] cigars are men sufficiently enthusiastic about smoking cigars to spend a significant amount of money on that pleasure, and are therefore presumably discerning purchasers."); *Camacho Cigars, Inc. v. Compania Insular Tabacalera, S.A., 1971 U.S. Dist. LEXIS 11123, 171 U.S.P.Q. 673, 674 (D.D.C. 1971)* (purchasers of high-priced cigar brands "are careful, well-informed buyers."). Accordingly, this factor weighs against likelihood of confusion.

The *Polaroid* analysis weighs strongly toward a finding of a likelihood of confusion, even when the unique circumstances of the Cuban embargo is taken into account. Further support [*142] for the conclusion from the Polaroid factors may be found from two other types of confusion which have been found actionable: initial interest confusion and post-sale confusion. Initial interest confusion occurs when "potential customers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 514-15 (S.D.N.Y. 1993)* (citing *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1342 (2d Cir. 1975)).* Post-sale confusion occurs after a product has been purchased and put into use, and occurs "when a manufacturer of knock-off goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes Intern. v. Lederer de Paris Fifth Avenue, Inc., 219 F.3d 104, 108 (2d Cir. 2000)* (citing *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre*

Page 36

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

*Watches, Inc.,* 221 F.2d 464, 466 (2d Cir. 1955)). [*143] In the age of the internet, initial interest confusion can readily occur even though it is not possible to purchase Cuban COHIBAs in the United States. While the embargo diminishes the possibility of post-sale confusion, it does not entirely eliminate it.

General Cigar's choice of COHIBA as the name for its premium cigar, by itself, provides some evidence of intent to create initial interest confusion. The advertising undertaken by others which misleadingly suggests an affiliation only adds to the possibility of confusion at the initial stage, even if the consumer later learns that there is no affiliation between the two brands. As to post-sale confusion: while the General Cigar COHIBA is not properly described as a cheap knockoff copy, it is less expensive, less prestigious, and overall less highly regarded than the Cuban COHIBA. The use of an almost identical typeface on the band only adds to the possibility that the consumer may acquire the prestige of smoking a Cuban COHIBA without actually purchasing one. It is therefore held that, considering the *Polaroid* [[factors, as well as ]] the risk of both initial interest and post-sale confusion, that there is a likelihood of [*144] confusion between the Cuban COHIBA and the General Cigar COHIBA.

**Cubatabaco Did Not Abandon the COHIBA Mark Between 1992 and 1997**

In Empresa IV, it was held that the question whether Cubatabaco abandoned the mark between November 1992 and the filing of the cancellation petition in January 1997 presented "a question of fact, weighing the facts that Cubatabaco did not attempt to register its mark or contest the General Cigar COHIBA mark until 1997 with the fact that it could not in any case use the mark in the United States, and with any efforts that it took to maintain its fame in the United States." *213 F.R.D. at 158.* The abandonment analysis was oriented by the decision of the TTAB in Jose M. Arechabala Rodrigo v. Havana Rum & Liquors, S.A.[[, ]]Cancellation No. 22,881, slip op. at 15 (T.T.A.B. Oct. 19, 1995). In Rodrigo, the TTAB rejected the argument that the Cuban registrant had abandoned the "Havana Club" mark because of the embargo and "because the respondents used the mark worldwide and intended to use the mark in the United States 'as soon as it is legally possible to do so.'" *Empresa IV, 213 F.R.D. at 157* (quoting Rodrigo [*145] , slip op. at 19).

The Rodrigo decision was distinguished from the instant case, however, because the respondent in Rodrigo had registered the Havana Club mark, whereas Cubatabaco took no official action manifesting its intent to use the COHIBA word mark until the cancellation petition, over 4 years after General Cigar had resumed using the

COHIBA mark. Cubatabaco is therefore not entitled to a presumption of its intent to begin using the mark as soon as the embargo is over, and "its intent to use the mark in the United States must be found by other means."*Id.[[at 158. ]]*

In ruling on General Cigar's abandonment of the mark from 1987 to 1992, it was held that intent to use mark must be shown by "objective, hard evidence of actual 'concrete plans to resume use' in the 'reasonably foreseeable future when the conditions requiring suspension abate.'" *Empresa II, 213 F. Supp. 2d at 268* (quoting *Silverman v. CBS, Inc., 870 F.2d 40, 46 (2d Cir. 1989)).* However, "the party claiming abandonment bears the burden of proof" of establishing intent not to resume use. Id.[[; ]][[see also ]]*Procter & Gamble Co. v. Quality King Distributors, Inc., 123 F. Supp. 2d 108, 116 (E.D.N.Y. 2000)* [*146] (to succeed on "an abandonment claim, the defendants must meet a 'high burden of proof.'") (quoting *Warner Bros, Inc. v. Gay Toys, Inc.[[, 724 F.2d 327, 334 (2d ]]Cir. 1983)).* Also, "because it constitutes forfeiture of a property right, abandonment of a mark must be proven by clear and convincing evidence, and a statutory aid to such proof must be narrowly construed." *Empresa IV, 213 F.R.D. at 156-57* (citations omitted). The relevant statutory aid is the presumption that nonuse for two or three consecutive years shall constitute prima facie abandonment. [10] To show excusable nonuse, "the registrant must produce evidence showing that, under his particular circumstances, his activities are those that a reasonable businessman, who had a bona fide intent to use the mark in United States commerce, would have taken." *Empresa II, 213 F. Supp. 2d at 268-69* (quoting *Rivard v. Linville, 133 F.3d 1446, 1449 (Fed. Cir. 1998)).*

> 10  In November 1992, the law provided that two consecutive years was sufficient to show abandonment. See *Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 307 n.16 (S.D.N.Y. 2000); 15 U.S.C. § 1127 (1993).* The law was amended on December 8, 1994, to provide that three consecutive years of abandonment are required. See Pub. L. 103-465, § 521, 1994 Amendments;*15 U.S.C. § 1127.* Because Cubatabaco could not use the mark for the entire period, it is not necessary for the purposes of this litigation to decide whether the two or three year presumption applies.

[*147]  General Cigar argues that Cubatabaco abandoned the mark because it did not register the CO-HIBA word mark even though it is excused from the requirement of use that other registrants must comply with in order to maintain their rights. Cubatabaco need only register a mark and file a certificate of excusable

Page 37

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

non-use periodically in order to maintain the rights to that mark. General Cigar notes that Cubatabaco made efforts to protect its rights to use other marks and registered its COHIBA trade dress in the United States, but did not do so for the COHIBA word mark.

As found above, the legal actions taken by Cubatabaco are consistent with the intent to resume use beginning in June 1994, given its inability to use the mark during the relevant period. Cubatabaco took no legal action prior to June 1994 because of the 1981 registration, the 1986 Declaration of Use and Incontestability, and its belief that "General Cigar was not making stable or continuous use of the COHIBA trademark in the United States." Id. at 262. From June 1994 until the filing of the cancellation petition, the evidence shows that Cubatabaco was contemplating legal action in defense of the COHIBA mark.

The evidence [*148] also shows that Cubatabaco's efforts to maintain the fame of the COHIBA mark in the United States were sufficiently significant and sustained, in the context of the embargo, to demonstrate an intent to resume use when it became legally possible. During the period, General Cigar undertook no advertising and publicity for its Temple Hall COHIBA, and sold the cigar in limited numbers through two mail-order retailers. The publicity generated by Cubatabaco, on the other hand, brought the brand from relative obscurity, as measured by the January 1992 Shanken Survey, to the point in 1997 where General Cigar acknowledged that "the Cuban COHIBA was well-known in the U.S. in 1997." Def.'s Post-Trial Mem. at 2.

Cubatabaco's efforts did not include concrete business plans for resuming use of the mark after the end of the embargo. However, such plans should not be expected under circumstances in which the end of the embargo was not in the foreseeable future. Instead, Cubatabaco's efforts were devoted to raising awareness of the COHIBA brand. The evidence shows that among all of Cubatabaco's brands, COHIBA was promoted most forcefully. Very few of its marketing efforts were directed solely at the [*149] United States. Such a strategy would have made little sense, given that promotion of COHIBA in Europe and elsewhere would be more immediately productive. Cubatabaco, however, consistently made efforts to direct its promotion of COHIBA to premium cigar consumers in the United States. Most significant among these efforts is its long-standing relationship with Cigar Aficionado[[. ]]Cubatabaco proposed ]] articles, accommodated reporters, arranged an exclusive interview with Fidel Castro, and participated in the planning of a dinner in Paris to which numerous prominent Americans were invited. Habanos, S.A. also named Shanken, the American publisher of the magazine, as its "Habanos Man of the Year for Communications" in

1995. While Cigar Aficionado is sold throughout the world, it reaches a significant number of premium cigar smokers in the United States.

Cubatabaco also encouraged and accommodated publicity from other American media outlets, such as The New York Times, CNN, CBS, and National Public Radio. The celebration of the 30th anniversary of COHIBA included numerous Americans, and generated significant publicity for COHIBA. Although the event took place in February [*150] 1997, the planning for the event, including invitations, was done as early as 1995.

General Cigar argues that Cubatabaco affirmatively abandoned the mark in late 1992 and early 1993 by failing to protest when General Cigar insisted that it owned the mark and that Cubatabaco no longer ran ads for COHIBA in Cigar Aficionado[[. ]]Cubatabaco acknowledges that "further advertisements were prevented by General Cigar's threat of infringement actions." Pl.'s Mem. at 62. Lopez Garcia, the Director of Marketing at Habanos, S.A., testified that she believes that Cubatabaco may not advertise in the U.S. "because of General Cigar's registration and use of the COHIBA mark." Lopez Garcia Direct P 105. Such actions may, under certain circumstances, constitute evidence of Cubatabaco's acquiescence to General Cigar's use of the mark. However, General Cigar's affirmative defense of acquiescence has been dismissed. See Empresa II, 213 F. Supp. 2d at 277-78. Such actions are not sufficient to show an absence of intention to resume use at an unknown point in the future.

General Cigar also points to the interviews given by Padron to Cigar Aficionado, in which he expressed the [*151] view that "Habanos" was more important than any brand name. Padron also stated that if the embargo were to end, "we would launch new things for the North American market, new brands. Or we could make an arrangement with the brand owners over there." D72. Such statements, to the extent that they constitute reliable statements of Cubatabaco's intent, at most demonstrate that Cubatabaco believes that it will be able to market its Cuban cigars successfully with or without the COHIBA name. They do not demonstrate an affirmative intent not to resume use of the COHIBA mark once the embargo is ended. Padron's statements were also made without the knowledge "that General Cigar was pursuing a new registration for the COHIBA mark." Empresa II[[, 213 F. Supp. 2d at ]] 277. Because of this, General Cigar was precluded from "relying on the interviews to show conduct supporting its acquiescence and estoppel claims." Id. For similar reasons, General Cigar may not rely on the interviews in support of its abandonment defense.

In light of the evidence presented, General Cigar has not met its burden of proving by clear and convincing

evidence that Cubatabaco abandoned the COHIBA mark between [*152] November 1992 and January 1997. Cubatabaco has consistently undertaken the efforts that a reasonable businessman with an intent to resume using the mark would have taken under the circumstances. It did not initiate legal action because of General Cigar's 1981 registration, but began the process of contesting General Cigar's re-registration of the mark as soon as it learned of it. Further, its efforts to promote the mark in the United States are consistent with an intent to maintain the fame of the mark for the unknown duration of the embargo.

**General Cigar's COHIBA Mark is Cancelled and General Cigar is Enjoined From Using The COHIBA Mark**

Cubatabaco has presented evidence that it possessed a protectable mark in November 1992 under the famous marks doctrine, and that there is a likelihood of confusion between the Cuban COHIBA cigar and the General Cigar COHIBA. General Cigar has not established that Cubatabaco abandoned the COHIBA mark between 1992 and 1997. Cubatabaco is therefore entitled to relief under *§ 43(a) of the Lanham Act.* General Cigar's trademark registration No. 1,898,273 is cancelled, and General Cigar is permanently enjoined using the COHIBA word mark on [*153] or in connection with any product or service or the manufacture, exportation, sale, offering for sale, distribution, advertising, promotion labeling or packaging of any product or service. General Cigar is also ordered to deliver up to Cubatabaco for destruction or other disposition any and all merchandise, packaging, package inserts, labels, signs, prints, wrappers, receptacles, advertising, plates and other mechanical means of reproduction or other materials now or hereafter in their possession, custody or control, which bear the infringing trademark and any reproduction, copy or colorable imitation thereof.

**The FTDA Claim is Dismissed**

Count XII of Cubatabaco's complaint alleges that General Cigar's conduct is likely to cause the blurring and dilution of the distinctive quality of its COHIBA trademark in violation of the FTDA, *15 U.S.C. § 1125(c).* While the COHIBA mark was famous within the meaning of the famous marks doctrine in November 1992, it does not meet the considerably more stringent requirements of the FTDA.

"In the Second Circuit, five elements are necessary to establish a claim under the *FTDA*: (1) the senior mark must be famous; (2) [*154] it must be inherently distinctive; (3) the challenged junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it causes dilution of

the distinctive quality of the senior mark." *Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr., 2003 U.S. Dist. LEXIS 373, No. 00 Civ. 5502, 2003 WL 115234, at *4 (S.D.N.Y. Jan. 13, 2003)* (citing *Nabisco Inc. v. P.F. Brands, Inc.[[, 191 F.3d 208, 215 (2d Cir.1999);* ]] Lanham Act *§ 43(c); 15 U.S.C. § 1125(c)).* Because the COHIBA mark is insufficiently famous, the other factors need not be addressed.

As discussed above, the FTDA protects only those marks that have shown "a substantial degree of fame."*TCPIP[[, 244 F.3d at ]]99;* see also Smithers, 2003 WL 115234, at *5 ("Very few trademarks qualify as famous marks."). In particular, the fame required "must exist in the general marketplace, not in a niche market." *Smithers, 2003 WL 115234, at *5* (citing *TCPIP, 244 F.3d at 99*). In TCPIP, the Second Circuit found that the mark "The Children's Place" was not famous under the *FTDA* standard [*155] despite the fact that its owner operated 228 retail stores in 27 states under the name, and had achieved sales of $ 280 million. *TCPIP, 244 F.3d at 99.* The court found that while the evidence "shows considerable commercial success and growth, the aggregate sales under the mark since it originated . . . may well not equal the sales of Dupont, Buick, or Kodak in any given month." Id.[[at 100. ]]

Cubatabaco has put forward no evidence showing that the renown of the COHIBA mark extended beyond premium cigar smokers in 1992 or at any other time. All survey evidence comes from premium cigar smokers, and the publicity received by the mark outside of publications such as Smoke and Cigar Aficionado has been extremely

limited. Further, the fact that the Cuban COHIBA cannot legally be sold in the United States, combined with the fact that the General Cigar COHIBA was not sold from 1987 to 1992 is further evidence that the COHIBA mark has not acquired the level of fame required by the *FTDA.* Accordingly, the federal dilution claim of Count XII is dismissed.

**The New York State Dilution Claim is Dismissed**

Count XII also includes a claim alleging dilution [*156] of the COHIBA mark and injury to business reputation in violation of New York's anti-dilution law. The statute provides that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered in cases of unfair competition. notwithstanding the absence of competi-

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

tion between the parties or the absence of confusion as to the source of goods and services.

*N.Y. Gen Bus. Law § 360-l* [[(formerly *§ 368-d*). ]]

Cubatabaco argues that a mark need not be famous in order to make out a dilution claim under New York law. In support, Cubatabaco cites *Welch Allyn, Inc. v. Tyco Int'l Servs. AG, 200 F. Supp. 2d 130, 150 (N.D.N.Y. 2002)*, which adopts that proposition. However, Welch Allyn also states that "the New York anti-dilution statute 'protects only extremely strong marks.'" Id. (quoting *Sally Gee, Inc. v. Myra Hogan, Inc. [[, 699 F.2d 621, 625 (2d ]]Cir. 1983)).* The case law on the standards for establishing the distinctiveness required to show dilution [*157] under New York law closely resemble the standards for fame under the FTDA. See [[Mead ]]*Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir. 1989)* (mental association between marks required to show distinctiveness "may be created where the plaintiff's mark is very famous and therefore has a distinctive quality for a significant percentage of the defendant's market."). In Sally Gee, the Second Circuit in dicta interpreted extremely strong marks as applying only to the "most well known names." *699 F.2d at 625* (quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc., 42 N.Y.2d 538, 548, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)* (Cooke, J. dissenting) (interpreting the majority opinion)). The legislative history for New York's anti-dilution statute cites the same very famous hypothetical misappropriations of trademarks as does the federal legislation: "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth," *Mead Data, 875 F.2d at 1031* (quoting 1954 N.Y.Legis.Ann. 49-50) suggesting that only highly recognizable marks merit protection. [*158] See also *id. at 1033* (Sweet, J., concurring) (noting that the majority's conclusion "limits *section 368-d*'s protection to nationally famous marks.")

These examples are to be expected, since the legislative history also discloses that the purpose of the *§ 360-l*, like the *FTDA*, is to prevent "the whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products." Id.[[It is inappropriate, ]]therefore, to bring an anti-dilution claim on the basis of two identical marks, especially when Cubatabaco has also made other claims. As the Second Circuit held in regard to *§ 360-l*[['s ]]predecessor statute:

Section 368-d provides a cause of action distinct from other state law actions for trademark infringement and unfair com-

petition. "The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancerlike growth of dissimilar products or services which feeds on the business reputation of an established distinctive trademark or name."

*Sally Gee, 699 F.2d at 624* (quoting [*159] *Allied, 42 N.Y.2d at 544*). Accordingly, the state dilution claim of Count XII is dismissed because the COHIBA mark is not extremely strong and because an anti-dilution action is not properly brought to protect against competition from similar products.

**The Unfair Competition Claim is Dismissed**

The essence of New York's unfair competition law "is that the defendant has misappropriated the labors and expenditure of another." *Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).* To determine that misappropriation has occurred, bad faith must be found: "Under New York law, common law unfair competition claims closely resemble *Lanham Act* claims except insofar as the state law claim may require an additional element of bad faith or intent." *Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000)* (quoting *Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997)); see also Empresa II, 213 F. Supp. 2d at 284.*

Cubatabaco's claim that General Cigar acted in bad faith by copying the COHIBA name in November 1992 has been considered above [*160] and rejected. In the absence of a finding of bad faith, Cubatabaco's New York unfair competition claim is dismissed. See *Mejia and Associates v. IBM Corp., 920 F. Supp. 540, 552 (S.D.N.Y. 1996).*

**The Claim for Trademark Cancellation Under *§ 1120* is Dismissed**

Count Eleven of Cubatabaco's complaint alleges a violation of *15 U.S.C. § 1120*, which provides

Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

Page 40

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Cubatabaco requests an order, pursuant to this statute, cancelling General Cigar's 1995 registration of the CO-HIBA trademark. Such an order has already been granted under Count Seven for violations of *15 U.S.C. § 1125(a)*.

In addition, Cubatabaco has not met the standard for cancellation under this provision. "Misstatements in a registration application provide a basis for cancelling the registration only *"if the misstatements* (1) were made [*161] with knowledge of their falsity, and (2) were material to the determination to grant the application." *Baker v. Parris, 777 F. Supp. 299, 305 (S.D.N.Y. 1991)* (quoting *Rick v. Buchansky, 609 F. Supp. 1522, 1537 (S.D.N.Y. 1985))* (emphasis in original). The General Cigar statement in 1979 in response to the PTO inquiry concerning the geographic description of COHIBA was not entirely accurate when it described the mark as "wholly arbitrary." See *Empresa II, 213 F. Supp. 2d at 255.* However, that abandonment does not invalidate the 1995 registration.

It has been found above that General Cigar believed at the time it applied to register the mark that it was the valid owner. Cubatabaco has therefore not demonstrated that General Cigar made any misstatements in its registration application with knowledge of their falsity.

### The Misappropriation Claim is Dismissed

Count XIII lists a claim for common law misappropriation. General Cigar argues that Cubatabaco's misappropriation claim is subsumed within its unfair competition claim and provides no independent basis for relief. In Empresa II[[, it was observed that ]]"at [*162] least one district court has dismissed a common law misappropriation claim" on the grounds that the two claims are duplicative. *213 F. Supp. 2d at 284* (citing *Something Old, Something New, Inc. v. QVC, Inc., 1999 U.S. Dist. LEXIS 18878, No. 98 Civ. 7450, 53 U.S.P.Q.2d 1715, 1999 WL 1125063, at *13 (S.D.N.Y. Dec. 8, 1999)*. However, the misappropriation claim was not dismissed because the parties had not briefed the issue. In its post-trial briefs, General Cigar raises the same cases and arguments referred to by the Court in Empresa II. Cubatabaco has not responded on this issue. Accordingly, in recognition of the fact that "the essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another," *Saratoga Vichy Spring Co. v. Lehman[[, 625 F.2d 1037, 1044 (2d Cir. ]]1980)*, Count XIII is dismissed as duplicative of Cubatabaco's common law unfair competition claim.

Cubatabaco also includes a "passing off" claim in its Pre-Trial Statement of Claims, as part of Count Ten. This claim is also dismissed as duplicative. See *[[Regal Jewelry Co. v. ]] Kingsbridge Int'l Inc., 999 F. Supp. 477,*

*491 (S.D.N.Y. 1998)* [*163] ("The very purpose of unfair competition law [is] to keep a seller from passing off his goods as those of another.").

### The Trade Dress Infringement Claim Is Dismissed

In addition to its claim of trademark infringement in Count Seven, Cubatabaco also alleges that General Cigar's conduct constitutes trade dress infringement under *§ 43(a) of the Lanham Act. In* particular, Cubatabaco alleges that the bands which General Cigar included on its COHIBA cigars beginning in 1997 infringe on the trade dress of the Cuban COHIBA band.

In order for Cubatabaco to prevail on its trade dress infringement claim, it must show that: (1) Cubatabaco's cigar band was inherently distinctive or had acquired distinctiveness through secondary meaning; (2) the design of Cubatabaco's band is nonfunctional; and (3) a likelihood of confusion exists between the Cubatabaco band and the General Cigar band. See *Two Pesos v. Taco Cabana, Inc., 505 U.S. 763, 769, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992).*

The Cuban COHIBA band is inherently distinctive because of its arbitrary graphical design. *Fun-Damental Too, Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 1000 (2d Cir. 1997).* General [*164] Cigar has also acknowledged that awareness of the COHIBA band was high in 1997. See Cullman Dep. at 443 ("It was impossible not to acknowledge at that point [May 1997] a strong awareness among cigar smokers that Cohiba existed, there was a Cuban Cohiba, and as I mentioned before, there was great interest, among new smokers especially, to walk around with, showing off the Cuban Cohiba label."). The design of the band also serves no functional purpose; it is merely decorative.

Cubatabaco fails, however, to demonstrate that there is a likelihood of confusion between the two cigar bands. The Cuban COHIBA band is yellow on the bottom, and black with white squares on the top. The COHIBA name, in black block letters on a white background, straddles the yellow and black field. Below the name are the words "La Habana, Cuba" on the yellow field in black script. The General Cigar band, by contrast, consists of two thick black stripes on the top and bottom of the band. The remainder of the band is white, except for the name COHIBA in black bold letters, with a red dot inside the "O", and a red oval with the words "HAND MADE" in small black letters.

While the font of the word COHIBA on [*165] the two bands undoubtedly bear a resemblance to one another, the similarity between the two bands ends there. The only evidence presented of confusion between the two brands is the testimony of Siegel, Cubatabaco's expert, who testified that both the cigar band and the box

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

Page 41

used by General Cigar have a "direct familial relationship to the Cuban Cohiba tradedress." Siegel Direct, P 176(a). At most, Siegel's testimony demonstrates that the cigar bands of the two brands stand out from other brands by their "clean, sparse look." Id. at P 169 (quoting PX 98, a General Cigar memo dated May 13, 1997). The combination of the COHIBA word mark and the look of the General Cigar band is likely to lead to confusion, as determined above. However, Cubatabaco has shown no evidence that the band itself, apart from the word mark, is likely to cause confusion. Were a different brand name to be used with the General Cigar trade dress, any confusion between the two bands would be removed, and the most one could conclude is that "both the Cubatabaco and General Cigar designs have a different look and feel from almost all competitive premium luxury cigars, which use traditional, ornate designs." Pl. PFF, [*166] P 69. In the absence of more substantive evidence of confusion, such as survey data, the fact that the two bands share a different look and feel is insufficient to establish a likelihood of confusion. Accordingly, Cubatabaco's claim for trade dress infringement is dismissed.

### The Deceptive Trade Practices Claim is Dismissed

In the Joint Pretrial Order, Cubatabaco alleges a claim for deceptive trade practices as part of Count Ten, citing "N.Y. Gen. Bus. § 349 and analogous laws in each and every State." A trademark infringement claim such as the one brought by Cubatabaco is not properly brought under § 349. "The gravamen of the complaint [under § 349] must be consumer injury or harm to the public interest." Securitron Magnalock Corp. v. Schnabolk[[, 65 F.3d ]]256, 264 (2d Cir. 1995) (internal quotation and citation omitted). While confusion as to the source or quality of the COHIBA cigar does count as a form of consumer injury, it has not been held to be actionable under § 349. "The Courts of this Circuit have held that trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers required to state a claim [*167] under section 349." Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 1997 U.S. Dist. LEXIS 3403, No. 96 Civ. 5150, 1997 WL 137443, at *3 (S.D.N.Y. March 24, 1997) (collecting cases). Accordingly, Cubatabaco's deceptive trade practices claim is dismissed.

### The Trade Dress Dilution and False Advertising Claims Are Not Properly Before the Court

Within the section of the Joint Pretrial Order entitled "Plaintiff's Statement of Claims to Be Tried," Cubatabaco raises two claims that were never pled in its original Complaint: "False Advertising," alleged to be part of Count Ten, and "Trade Dress Dilution" under state and

federal law, alleged to be part of Counts Seven and Twelve.

Count Ten asserts that General Cigar "violated principles of the state and common law of unfair competition by wilfully passing off their goods as those of Cubatabaco, by competing unfairly, and by employing deceptive trade practices." Complaint, P 72. However, there is no reference in the claim to false advertising. General Cigar could not have been put on notice of its need to defend against this claim.

Counts Seven describes a claim for "Trademark and Trade Dress Infringement," but makes no reference [*168] to trade dress dilution. Count Twelve alleges that General Cigar violated New York's anti-dilution law, but reference is made only to the COHIBA trademark and not to the COHIBA trade dress. General Cigar also was not given notice of this claim.

Cubatabaco cites Rule 15(b) in arguing that it was sufficient to state its claim in the Joint Pretrial Order. Rule 15(b) does permit issues not raised in the pleadings to be tried "as if they had been raised in the pleadings," but only by the "express or implied consent of the parties." Fed. R. Civ. P. 15(b). General Cigar objected to the inclusion of both the false advertising and trade dress dilution claims in the Pretrial Order and has not consented, either implicitly or explicitly to raising these claims. Accordingly, they are dismissed.

### No Judgment is Appropriate At This Time On Cubatabaco's Claims For Monetary Relief

As part of Count Ten, which claims unfair competition under state law, Cubatabaco also asserts a claim for unjust enrichment and constructive trust. In its brief, Cubatabaco argues that equitable principles mandate that General Cigar not be permitted to retain profits from [*169] the sale of its COHIBA cigar. Cubatabaco also argues for an award of profits under the Lanham Act and the New York common law of unfair competition. Finally, Cubatabaco argues that it is entitled to attorney's fees under the Lanham Act.

As part of the Joint Pretrial Order, the parties stipulated and the Court ordered:

> Any trial on the issue of monetary relief claimed by Plaintiff against Defendants shall be bifurcated from a trial on liability on the cause of action raised in Plaintiff's complaint and Defendant's counterclaim. Any trial on Plaintiff's claim for monetary relief shall only be held after a finding by the district or appellate courts that one or more of the Defendants is liable to Plaintiff on one or more causes of action for

2004 U.S. Dist. LEXIS 4935, *; 70 U.S.P.Q.2D (BNA) 1650

which Plaintiff has asserted it is entitled to monetary relief.

Because the Court has made a finding that General Cigar is liable on the claim of trademark infringement, a trial on the issue of monetary relief is warranted, and no decision will issue at this time.

The Court recognizes that one or both parties may wish to have the liability determinations made thus far ruled on by the appellate court before the issue of monetary [*170] relief is considered. Accordingly, if either party desires certification of the claims adjudicated to date pursuant to *Federal Rule of Civil Procedure 54(b)*, a motion to that effect should be brought within 10 days of the issuance of this opinion and order.

## CONCLUSION

For the reasons set forth above, General Cigar's COHIBA trademark registration is cancelled. No other relief has been granted at this time. Following the stipulation of the parties, the issue of any monetary relief for Cubatabaco remains to be tried.

Submit judgment on notice.

It is so ordered.

New York, NY

March 26, 2004

**ROBERT W. SWEET**

U.S.D.J.

LEXSEE 2008 US DIST LEXIS 20650

**ROBERT L. GARBER, On Behalf of Himself and All Others Similarly Situated, Plaintiff, - against - LEGG MASON, INC. et al., Defendants.**

06 Civ. 9436 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2008 U.S. Dist. LEXIS 20650*

March 17, 2008, Decided
March 17, 2008, Filed

COUNSEL: [*1] For Plaintiff: Samuel Howard Rudman, Esq., David Avi Rosenfeld, Esq., Joseph Russello, Esq., Mario Alba, Jr., Esq., COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP, Melville, New York.

For Defendants Legg Mason, Inc., Raymond A. Mason, and Charles J. Daley: James N. Benedict, Esq., Sean Miles Murphy, Esq., Christopher Neil Gray, Esq., Deborah A. Elman, Esq., Rachel Penski, Esq., MILBANK, TWEED, HADLEY & MCCLOY LLP, New York, New York.

For Defendant Citigroup Global Markets Inc.: Mark Adam Kirsch, Esq., Mark Holland, Esq., Mary Kathryn Dulka, Esq., Valeria Calafiore, Esq., CLIFFORD CHANCE US, LLP, New York, New York.

JUDGES: DENNY CHIN, United States District Judge.

OPINION BY: DENNY CHIN

OPINION

CHIN, District Judge

In this securities class action, plaintiffs allege that defendants engaged in an illegal scheme to defraud purchasers of defendant Legg Mason, Inc. ("Legg Mason") stock by failing to disclose certain information relating to Legg Mason's "swap" of certain assets with defendant Citigroup Global Markets Inc. ("Citigroup"). Plaintiffs further allege that this scheme resulted in an artificial inflation of the stock price and that when defendants' conduct became apparent to the market, Legg Mason's stock price [*2] fell.

All defendants now move to dismiss the consolidated amended complaint for failure to state a claim upon which relief may be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)* and for failure to comply with the pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the Private Securities Litigation Reform Act ("PSLRA"), *15 U.S.C. § 78u-4(b)*. For the reasons set forth below, the motions are granted.

BACKGROUND

A. Facts

For purposes of these motions to dismiss, the facts as alleged in the consolidated amended complaint are assumed to be true.

1. Legg Mason

Legg Mason, a global asset management company, was founded in 1962. (Compl. PP 5, 10). Legg Mason's founder, defendant Raymond "Chip" Mason ("Mason"), started Mason & Co. in Newport News, Virginia in 1962. (*Id.* P 10). He merged his company with a 71-year-old Baltimore firm, Legg & Co., in 1970, forming Legg Mason. (*Id.*). Mason has been the Chairman of the Board and Chief Executive Officer ("CEO") of Legg Mason since 1981. (*Id.* P 6). Defendant Charles J. Daley ("Daley") is Chief Financial Officer ("CFO"), Senior Vice President, and Treasurer of Legg Mason. (*Id.* P 7). Daley was elected CFO in July 2005, and Senior [*3] Vice President, Principal Financial Officer, and Treasurer in January 2002. (*Id.*).

In 1998, Mason stated that he intended to build Legg Mason, which then had S 54 billion in assets under management, into one of the country's fifty largest financial companies. (*Id.*). It is now the fifth largest U.S.-based global asset management company. (*Id.* P 10).

Legg Mason currently provides investment management and related services -- both directly and through financial intermediaries -- to institutional and individual clients, company-sponsored mutual funds, and other investment vehicles. (*Id.* P 12). The company is divided into three divisions: Mutual Funds/Managed Services, Institutional, and Wealth Management. (*Id.*). Within each division, it provides its services through asset managers, which are individual businesses contained in one or more different subsidiaries. (*Id.*). These subsidiaries typically market their products and services under their own brand name. (*Id.*).

### 2. Legg Mason's Swap with Citigroup

On June 24, 2005, Legg Mason issued a press release announcing that it would swap its brokerage unit plus $ 2.1 billion in stock and cash for Citigroup's $ 435 billion worldwide asset management [*4] division ("CAM"). (*Id.* P 13). Specifically, Legg Mason would acquire CAM in exchange for (1) Legg Mason's private client brokerage and capital markets businesses, (2) approximately $ 1.5 billion of Legg Mason common and non-voting convertible preferred shares, and (3) approximately $ 550 million in the form of a five-year loan facility provided by Citigroup's Corporate and Investment Bank (together, the "CAM Swap"). (*Id.*). Additionally, Legg Mason would sign a three-year distribution agreement with Citigroup to distribute its financial products. (*Id.*).

In an unrelated transaction, Legg Mason announced that it would also buy hedge fund firm Permal Group for an initial payment of $ 800 million. (*Id.*). Mason commented on the announcements, stating, in part:

> The business swap with Citigroup should benefit both companies. On our part, we expect to more than double our assets under management, broaden our geographical reach into critical global markets and, through a joint three-year global distribution agreement, significantly expand our ability to distribute our retail money management products around the world through a financial powerhouse.

(*Id.*).

Legg Mason also held an investor conference [*5] on June 24, 2005, to discuss the CAM Swap and Permal deals. (*Id.* P 14). Mason emphasized that both transactions would positively affect Legg Mason's profitability, including leaving it with a "Conservative Balance Sheet." (*Id.*). Defendants also told investors that the transactions

were expected to generate a 9% GAAP EPS increase in the first 12 months following the consummation of the transactions. (*Id.*).

On December 1, 2005, Legg Mason issued a press release announcing that it had completed the CAM Swap. (*Id.* P 16). The release stated that the company had acquired almost all of Citigroup's worldwide asset management business for (1) Legg Mason's private client brokerage and capital markets businesses; (2) 5,393,545 newly issued shares of Legg Mason common stock; (3) non-voting convertible preferred stock, convertible upon sale into 13,346,632 shares of common stock; and (4) approximately $ 500 million cash. (*Id.*). In commenting on the CAM Swap, Mason stated:

> We have worked exhaustively over the last several months to establish the proper structure and strategy for our integrated global operations, while seeking, to insulate our investment management professionals -- and therefore our [*6] clients -- from the distractions inherent in many large acquisitions. While much work remains to be done in the coming months to rationalize and fully integrate our operations, we're delighted now to be able to direct our energies toward making our vision for the future a practical reality: moving forward with our significantly broadened operations and now singular focus on being one of the best asset managers in the world.

(*Id.*).

Early the next year, on February 1, 2006, Legg Mason issued a press release announcing its financial results for the quarter ending December 31, 2005. (*Id.* P 73). The company reported net income of $ 0.77 per share from continuing operations and $ 850.8 billion under management. (*Id.*). Mason stated:

> The divestiture of our brokerage business, while certainly difficult on a personal level, enables us to focus solely on making Legg Mason, now one of the largest asset managers in the world, hopefully one of the most highly regarded asset managers in the world.
>
> I am both pleased by the results of our "legacy" Legg Mason asset management business this quarter and encouraged by the prospects of the Citigroup Asset

2008 U.S. Dist. LEXIS 20650, *

Management and Permal businesses we have acquired. . [*7] . .

The quarter also recognizes our capital gain and related tax bill from the sale of our brokerage business, as well as certain transaction-related compensation costs, including certain retention costs related to the next six months' transition period. Yet minimal cost savings or other benefits that we expect from the consolidation and rationalization of our businesses are reflected in this quarter's results.

(*Id.*).

### 3. The Secondary Offering: Citigroup'S Sale of Legg Mason Shares

As a result of the CAM Swap, Citigroup (and its affiliated companies) became one of Legg Mason's largest shareholders. (*Id.* P 17). On March 6, 2006, three months after the CAM Swap closing, Legg Mason issued a press release announcing that Legg Mason planned to release its holdings of Legg Mason common stock and sell approximately 8 million shares (or 9.2 million shares if it fully exercised its over-allotment option). (*Id.* PP 18, 19). The sale would be done by a secondary public offering (the "Secondary Offering") pursuant to a Registration Statement on Form S-3 filed by Legg Mason on February 27, 2006. (*Id.* P 9). Citigroup served as the underwriter of the Secondary Offering. (*Id.* P 9). The Registration Statement [*8] was signed by both Mason and Daley, along with others. (*Id.* P 19).

On March 9, 2006, the Prospectus for the Secondary Offering (the "Prospectus"), which was incorporated into the Registration Statement, was declared effective and Citigroup began selling off 9 million shares of Legg Mason stock to the public at a price of $ 125 per share. (*Id.* P 20). The Prospectus disclosed that the selling shareholder was AMAD Holdings, Inc. ("AMAD"), a wholly owned subsidiary of Citigroup, and that an additional 1,350,000 shares of common stock were available to be sold to cover over-allotments. (*Id.*).

### 4. Disclosures in the Registration Statement

The Prospectus contained a series of risk disclosures that claimed to warn investors of the risks associated with the company and its operations. (*Id.* P 43). For example, the Prospectus warned that "Assets Under Management May Be Withdrawn." (*Id.* P 44). It stated:

[M]utual fund investors may redeem their investments in the funds at any time

without prior notice. Institutional and individual clients can terminate their relationships with us, reduce the aggregate amount of assets under management, or shift their funds to other types of accounts with different [*9] rate structures for any number of reasons, including investment performance, changes in prevailing interest rates, changes in investment preferences of clients, changes in our reputation in the marketplace, changes in management or control of clients or third party distributors with whom we have relationships, loss of key investment management personnel and financial market performance.

(*Id.*).

The Prospectus specifically addressed the possibility of asset management professionals and their clients leaving the company:

The market for experienced asset management professionals is extremely competitive and is increasingly characterized by the frequent movement of employees among different firms. . . . In addition, since many of the individual employees at our subsidiaries often maintain a strong, personal relationship with their clients that is based on the clients' trust in the employee, the departure of one or more of these employees could cause the subsidiary to lose client accounts, which could have a material adverse effect on our results of operations and financial condition.

. . .

. . . CAM will be transitioning from being a unit of Citigroup to being a part of Legg Mason, which will [*10] entail many changes, including changes in senior management and in administrative and other support. . . . If we are unable to retain the key asset management personnel of CAM, because of any of these transitions or for any other reasons, it could have an adverse impact on CAM'S business. Similarly, if CAM is unable to retain its existing . . . client relationships as a result of any of the uncertainties discussed above or for any other reasons, it could

have an adverse impact on CAM'S business.

(Holland Decl. Ex. A at 10, 13). [1]

> 1 I may take judicial notice of documents incorporated by reference into the plaintiffs' pleadings and documents publicly filed with the Securities Exchange Commission. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re the AES Corp. Sec. Litig.*, 825 F. Supp. 578, 584 & n.6 (S.D.N.Y. 1993).

### 5. *Defendants' Omissions in the Registration Statement for the Secondary Offering*

The Registration Statement for the Secondary Offering did not specifically disclose the following four matters:

#### a. *Peter Wilby's Planned Departure*

At the time of the Secondary Offering, Peter Wilby, a CAM asset manager, had decided to leave Legg Mason to start his own firm, [*11] Stone Harbor Investment Partners ("Stone Harbor"), and to take $ 8.5 billion in client assets with him. (Compl. P 24). He had negotiated a deal, however, to stay with Legg Mason until March 2006 to help with the transition. (*Id.* P 24). Legg Mason began negotiating with Wilby as early as October 2005 to keep him on during the transition. (*Id.* P 25). In April 2006, Wilby publicly announced the formation of Stone Harbor and left his position at Legg Mason. He took to Stone Harbor $ 8.5 billion in client assets that he had previously managed at CAM. He also took dozens of Legg Mason employees (who were former CAM employees). (*Id.* P 26).

#### b. *Increase in Customer Withdrawals*

At the time of the Secondary Offering, Legg Mason was experiencing an increase in customer withdrawals. (*Id.* P 29). The increase in customer withdrawals was a result of broker attrition: starting when the CAM Swap was announced, some Legg Mason brokers decided to leave rather than work for Citigroup's brokerage arm, Smith Barney. (*Id.* P 30). Many of these brokers, took clients with them, resulting in increased customer withdrawals of assets from Legg Mason. (*Id.*). By the Secondary Offering, broker attrition was increasing, [*12] as were customer withdrawals from Legg Mason. (*Id.*).

#### c. *Integration-Related Expenses*

Legg Mason was also experiencing a dramatic increase in integration-related expenses at the time of the Secondary Offering. (*Id.* P 33). This increase greatly exceeded the expense figures in the company's internal budget. (*Id.*). By the time of the Secondary Offering, Legg Mason was spending considerable and increasing time and resources on integrating its operations with those acquired in the CAM Swap and was attempting to eliminate redundant costs. This effort was largely unsuccessful. (*Id.* P 34).

One such example of an integration-related expense related to information technology. (*Id.* P 35). Citigroup granted Legg Mason an 18-month license to use the propriety information technology systems used to handle trading and customer processes following the CAM Swap. (*Id.*). If at the end of the 18-month license period Legg Mason was unable to develop and transition to its own systems, it would pay substantial licensing fees to Citigroup. (*Id.*). Legg Mason quickly attempted to develop and transition to its own system and spent increasing amount of capital on the project, far exceeding its internal projected [*13] expenses. (*Id.*).

#### d. *Distribution Fees Owed*

In using third-party distributors to sell its financial products, Legg Mason paid these distributors -- primarily mutual funds -- fees. (*Id.* P 39). The Registration Statement failed to disclose that Legg Mason owed and failed to pay approximately $ 12 million in distribution fees related to the CAM business to third-party distributors at the time of the Secondary Offering. (*Id.* PP 38, 40).

### 6. *Announcements Following the Secondary Offering*

Legg Mason reported disappointing financial results following the closing of the Secondary Offering. (*Id.* P 45). On May 10, 2006, Legg Mason disclosed that its fourth quarter 2006 earnings missed previous estimates. (*Id.* P 47). Leading up to the announcement, analysts and investors were concerned that the price of Legg Mason common stock fell from over $ 118 to $ 112 per share and that the company was not performing as expected. (*Id.* P 46). The company reported net income of $ 1.03 per share; previous estimates had been $ 1.25 per share. (*Id.* PP 47, 76). It also announced that costs rose quicker than revenues following the CAM Swap. (*Id.*).

Defendants blamed the expense overruns on the costs associated with [*14] combining and operating the former Citigroup division and retaining its employees. (*Id.* P 47). Mason stated, "We will continue to have dual costs," and "[t]here's nothing we can do about it." (*Id.*). The market had previously been led to believe that Legg Mason would achieve the previous earnings estimates based on a lower cost structure, despite the fact that expenses nearly tripled after the CAM Swap, and that these costs were already accounted for in financial projections. (*Id.*). Mason stated:

Our timetable to complete this integration appears to be on target with little if any slippage.

Financial results will continue to be confusing as we go through the process of employee reductions, redundancy, dual systems, stay bonuses and adjusting to our new size. As I have stated in the past, it will probably be difficult until the September quarter to show results that reflect our actual and future earnings capacity.

Most of our primary asset managers had solid positive asset flows during the March quarter.

(*Id.* P 76).

Revenues also declined as investors withdrew $ 11 billion from money-market funds and withdrew from stock and bond funds acquired from Citigroup. (*Id.* P 47). Additionally, the [*15] brokerage unit continued to perform poorly, with a loss of $ 2.2 million. (*Id.*). The unit had posted a gain of $ 31.6 million a year earlier. (*Id.*). Finally, the Legg Mason Value Trust reported a loss of 1.3%, although the S&P 500 was up 5.6% for that period. (*Id.*). In response to the announcement, the price of Legg Mason common stock declined from a closing price of $ 116 per share on May 9, 2006, to a closing price of $ 101.40 per share on May 12, 2006. (*Id.* PP 48, 78).

On July 25, 2006, Legg Mason again missed income estimates, reporting income of $ 1.08 per share instead of the $ 1.23 per share the market had been led to believe would be achieved. (*Id.* PP 50, 79). The same day, the company issued a press release announcing the financial results for the quarter ending June 30, 2006. (*Id.*). It reported revenues declined 1.3% "due primarily to a significant decrease in performance fees received in the quarter and reduced market values of equity assets under management." (*Id.*). Furthermore, "[a]ssets under management fell approximately 1.5% from $ 868 billion at March 31 to $ 855 billion, due principally to $ 7 billion in client cash outflows and to equity asset depreciation caused [*16] by a difficult market environment." (*Id.*). Following the earnings release, the price of Legg Mason stock declined from $ 94.33 per share to $ 86.32 per share on extremely heavy trading volume. (*Id.* PP 51, 80). Despite these developments, defendants continued to conceal the true condition of the company. (*Id.* P 80).

On October 10, 2006, Legg Mason issued a press release regarding its expected financial results for the quarter ending September 30, reporting that "it expects its net income for the quarter ended September 30, 2006 to be below analysts' consensus estimates and to be in the range of $ .96 to $ 1.02 per diluted share, or $ 138 million to $ 148 million." (*Id.* PP 52, 81). Legg Mason attributed the numbers to several factors: (1) lower revenues than expected, with revenues down approximately 1% from the previous quarter (attributable in part to changes in the mix of the company's mutual fund assets under management during the quarter) and (2) approximately $ 12 million ($ .04 per diluted share) in unanticipated mutual fund distribution fee expenses payable by its acquired business to its principal third-party distributor that related to prior quarters. (*Id.*). In response to the [*17] announcement, the price of Legg Mason stock declined from $ 105.31 to $ 87.15 per share, representing a 30% decline from the $ 125 Secondary Offering price. (*Id.* PP 53, 82).

**B. Procedural History**

Robert Garber, individually and on behalf of all others similarly situated, filed his original complaint on October 16, 2006. On October 25, 2006, Harthia Bockman, individually and on behalf of all others similarly situated, filed a related complaint. On December 15, 2006, the City Westland Police and Fire Retirement System, West Virginia Laborers' Pension Trust Fund, and Wirral MBC on Behalf of Merseyside Pension Fund ("Merseyside") (together, the "Pension Fund Group") moved to be appointed lead plaintiff and to consolidate the two actions. Their motions were unopposed. On January 11, 2007, Judge Castel ordered the Pension Fund Group lead plaintiff for the class and ordered the actions consolidated. Lead plaintiff pursues this action on behalf of all persons who purchased common stock of Legg Mason between February 1, 2006 and October 10, 2006.

On April 16, 2007, the Pension Fund Group filed its consolidated amended complaint against Legg Mason, Citigroup, and Mason and Daley individually, alleging [*18] violation of *Sections 11, 12(a)(2)*, and *15* of the Securities Act and *Sections 20(a)* and *10(b)* of the Exchange Act and *Rule 10b-5*. On April 25, 2007, the consolidated cases were transferred to me. No class has been certified to date.

On June 15, 2007, Citigroup, Legg Mason, Mason, and Daley moved to dismiss the respective claims asserted against them. For the following reasons, the motions are granted.

**DISCUSSION**

**A. Standard on a Motion to Dismiss**

On a motion to dismiss pursuant to *Federal Rule of Procedure 12(b)(6)* for failure to state a claim upon which relief can be granted, the court must accept the

factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996); *see Erickson v. Pardus,* 127 S. Ct. 2197, 2199, 167 L. Ed. 2d 1081 (2007) (per curiam); *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).

In its recent decision in *Bell Atlantic Corp.,* the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 45-47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), adopting in its place a "plausibility" requirement. *Bell Atl. Corp.,* 127 S. Ct. at 1969. As interpreted by the Second Circuit, *Bell* [*19] *Atlantic Corp.* did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" *Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting *Bell Atl. Corp.,* 127 S. Ct. at 1974).

In deciding a motion to dismiss, a court may consider the pleadings and attached exhibits, documents incorporated by reference, and matters subject to judicial notice. *See Prentice v. Apfel,* 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993)). "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations'" and will not defeat the motion. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. LEXIS 19771, 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting *Citibank, N.A. v. Itochu Int'l, Inc.,* No. 01 Civ. 6007 (GBD), 2003 U.S. Dist. LEXIS 5519, 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

**B.** [*20] *Section 11 and 12(a)(2) Claims Against All Defendants*

**1.** *Applicable Law*

To establish a claim under *Section 11* of the 1933 Act, a plaintiff must allege: (1) defendant is a signer of a registration statement, director of the issuer, or underwriter for the offering (or other individual specified by the statute); (2) plaintiff purchased the registered securities; and (3) any part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. § 77k(a). To establish a claim under *Section 12(a)(2)* of the 1933 Act, a plaintiff must prove that (1) defendants sold or offered a security (2) by means of a prospectus (3) that included an untrue statement of material fact or omitted a

material fact necessary to make such statements not misleading. *See* 15 U.S.C. § 77*l*(a)(2). [1] Although fraud "is not an element or a requisite to a claim under *Section 11* or *Section 12(a)(2),*" those claims "may be -- and often are -- predicated on fraud." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004); *accord In re Scottish Re Group Sec. Litig.,* 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007). [*21] Several additional principles govern the analysis of *Section 11* and *12(a)(2)* claims.

[2] Therefore, when a registration statement incorporates the prospectus, as it does in the instant case, only the prospectus needs to contain a material misstatement or omission for liability to attach under both sections. *See Steinberg v. PRT Group, Inc.,* 88 F. Supp. 2d 294, 299-300 (S.D.N.Y. 2000).

**a.** *Materiality and the Duty to Disclose*

To state a claim under *Sections 11* and *12(a)(2),* a plaintiff must allege that defendants had a legal obligation to disclose the allegedly omitted information. *See Geiger v. Solomon-Page Group, Ltd.,* 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996) (defendants not required to disclose allegedly omitted information, warranting dismissal).

An omission or misrepresentation must be material -- there must be a substantial likelihood that a reasonably prudent investor would consider it important in making a decision -- for a duty to disclose to attach. *Steinberg v. PRT Group, Inc.,* 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000). Materiality is established upon a showing of "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor [*22] as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); *see In re APAC Teleservices, Inc. Sec. Litig.,* No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, 1999 WL 1052004, at *9 (S.D.N.Y. Nov. 19, 1999). "It is well-established law that the securities laws do not require disclosure of information that is publicly known." *In re Progress Energy, Inc.,* 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005).

Ordinarily, materiality is a mixed question of law and fact left to the finder of fact to determine. *TSC,* 426 U.S. at 450. Therefore, "the standard for [dismissing] is high: '[A] complaint may not properly be dismissed pursuant to *12(b)(6)* . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Milman v. Box Hill Sys. Corp.,* 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v.*

*Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)* (alterations in original); *see also Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996).*

### b. Item 303

Form S-3, a registration statement [*23] filed by certain issuers in connection with a secondary offering, permits an offer or to incorporate other periodic filings, such as Forms 10-K and 10-Q, by reference. Item 303 of Securities Exchange Commission ("SEC") Regulation S-K provides guidance on what should be included in incorporated forms. *See In re Corning, Inc. Sec. Litig., 349 F. Supp. 2d 698, 716 (S.D.N.Y. 2004).* Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *17 C.F.R. § 229.303(a)(3)(ii).* "An omission of fact 'required to be stated' under Item 303 will generally produce liability under *section 11.*" *In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004).* Plaintiffs must therefore plead facts indicating that the alleged known trends existed at the time of the purported misleading statements or omissions. *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)* ("The complaint fails to allege that there [were] 'trends' or that they were 'known' as of the date [*24] the Prospectus became effective.").

### c. Pleading Requirements Under Rule 9(b)

The Second Circuit has held "that the heightened pleading standard of *Rule 9(b)* applies to *Section 11* and *Section 12(a)(2)* claims insofar as the claims are premised on allegations of fraud." *Rombach, 355 F.3d at 171* ("[W]hile a plaintiff need allege no more than negligence to proceed under *Section 11* and *Section 12(a)(2)*, claims that do rely upon averments of fraud are subject to the test of *Rule 9(b).*").

### 2. Application

Merseyside alleges that the Registration Statement and Prospectus for the Secondary Offering were negligently prepared and, as a result, defendants failed to disclose several material facts relating to changes to Legg Mason's continuing operations. [3] Merseyside argues that each of the following facts alone would have altered the total mix of information available to investors in the Secondary Offering: (1) the loss of Wilby and the associated $ 8.5 billion withdrawal of client assets; (2) increasing, customer withdrawals; (3) increasing integration-related expenses; and (4) unpaid distribution fees.

---

3   In the consolidated amended complaint, only Merseyside asserts Securities Act claims against

defendants.    [*25] The entire Pension Fund Group asserts the Exchange Act claims.

#### a. Adequacy of Pleading

In the consolidated amended complaint, Merseyside pleads negligence with respect to the Securities Act claims and specifically disclaims "that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent." (Compl. PP 54, 62). Defendants argue that, nonetheless, the consolidated amended complaint fails to plead fraud with particularity under *Rule 9(b)*, compliance with which is demanded because the claims sound in fraud and rely on allegedly fraudulent acts. Because plaintiffs have specifically disclaimed any component of fraud in their *Sections 11* and *12(a)(2)* claims, there are no "averments of fraud." *See Rombach, 355 F.3d at 171.* Rather, these allegations clearly "sound in negligence," do not rely on fraudulent acts, and allege no fraudulent intent. *See id. at 178; In re Prestige Brands Holding, Inc., No. 05 Civ. 06924 (CLB), 2006 U.S. Dist. LEXIS 46667, 2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006)* ("Plaintiffs disclaim any intention to plead fraud except with respect to the *Rule 10b-5* claims . . . and of course they are not required to. . . . A representation of fact  [*26] in a prospectus may be material, false and misleading without regard to the motive or intent of the author."). Therefore, Merseyside's Securities Acts claims are subject only to the pleading requirements of *Rule 8(a).*

#### b. The Duty to Disclose and Materiality

I discuss defendants' duty to disclose and the materiality of each of the four purported materially misleading nondisclosures.

##### i. Wilby's Departure

Plaintiffs have failed to adequately plead materiality as a matter of law with respect to the most significant of the alleged omissions -- Wilby's planned departure.

First, by their very nature, swap transactions -- in this case, the swap of a brokerage business for an asset management business -- will generate changes in personnel and increases in expenses (at least initially). Any reasonable investor would know that this type of significant change in ownership and structure would lead to brokers and asset managers changing jobs.

Second, as noted above, the risk of the loss of key personnel and accompanying clients was specifically disclosed in the Prospectus. It stated: "The market for experienced asset management professionals is extremely competitive and is increasingly characterized by [*27] the frequent movement of employees among different firms" and "the departure of one or more of these employees could cause the subsidiary to lose client ac-

counts, which could have a material adverse effect on our results of operations and financial condition." (Holland Decl. Ex. A at 10, 13).

Third, Wilby's departure was already publicly reported in several news articles, including an article in Fortune Magazine on January 30, 2006, prior to the Secondary Offering. (Holland Decl. Ex. F). Defendants therefore had no duty under the securities laws to disclose Wilby's planned departure. *See White v. H & R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *5-*6, *14 (S.D.N.Y. July 28, 2004) (concluding that public court filings, press releases, and articles about litigation were sufficient public disclosure).[ ]

> 4  I may take judicial notice of these articles. *See Pension Comm. of the U. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016 (SAS), 2007 U.S. Dist. LEXIS 11807, 2007 WL 528703, at *4 (S.D.N.Y. Feb. 20, 2007); *In re Merrill Lynch & Co.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming [*28] the motion [to dismiss] into one for summary judgment.").

### ii. *Increasing Customer Withdrawals*

The consolidated amended complaint merely alleges that Legg Mason was "experiencing an increase" in broker attrition and customer withdrawals. Merseyside alleges no specific facts regarding the volume of customer withdrawals or the rate of broker defections at the time of the Secondary Offering. While Merseyside's Securities Acts claims are not required to be supported by "detailed factual allegations," Merseyside must still plead facts sufficient to render the claims "plausible" and they must provide more than a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp.*, 127 S. Ct. at 1964-65; *see In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003); *see also Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" of *Section 11* claims.). Merseyside fails to do so.

The Prospectus disclosed that it was the nature of Legg Mason's business that "clients can [presently] terminate their [*29] relationships with us . . . for any number of reasons, including . . . loss of key investment management personnel," which provides additional support that there was no duty to disclose. (Holland Decl. Ex. A at 8). *See Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (concluding that failure to disclose the level of sales of a key customer was not a

material omission because the Prospectus did not list the current volume of sales for the customer, predict future sales, or suggest that it would remain a customer, and warned that the largest customers may vary over time and that the loss of a large customer could have a material affect on the company).

### iii. *Integration-Related Expenses*

Merseyside alleges that Legg Mason experienced a dramatic increase in integration-related expenses in excess of its internal budget. Merseyside fails, however, to describe in any way the magnitude of the increase, the initial projections, or by how much the actual costs exceeded the internal budget. The pleadings are simply too conclusory, as they offer no possibility at all of assessing materiality as a matter of law.

### iv. *Owed Distribution Fees*

The alleged material omission from the [*30] Prospectus of $ 12 million in owed distribution fees accounted for only 0.4% of Legg Mason's annual revenue. This share is simply too small to be material as a matter of law when considered in the broader context of the company's revenues and expenses.[ ] *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 630-31 (S.D.N.Y. 2005) ("Changing the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors."); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161-62 (S.D.N.Y. 2003) (inflation of revenues amounting to approximately 0.3% of company's total revenues is immaterial percentage as a matter of law); *see also, Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) ("Defendants' alleged overstatement of assets by $ 6.8 million was immaterial as a matter of law [because] a reasonable investor . . . would not have been put off by an asset column that was 2% smaller."); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (1.2% overstatement of total assets was immaterial).

> 5  As a general matter, I reject defendants' implication that issues of materiality should be considered [*31] in strict terms of the omission's relative percentage impact on a company's total assets or revenue. There is no bright-line rule that if an omission or misstatement falls below a certain percentage of a company's total assets or revenue that it is automatically rendered immaterial -- rather a court will assess the entire context of the alleged omission.

Furthermore, disclosure of the owed fees was not required under Item 303, because Merseyside fails to allege the trend was "known" at the time of the Secondary Offering. Merseyside merely pleads that "Legg Mason had at least $ 12 million of owed, but unpaid, distri-

bution fees" but not that it knew of the fees. Merseyside argues that pleading a trend's *existence* is enough to support a claim, and whether defendants were actually aware of the trend is not legally operative. Merseyside misreads Item 303, which requires that the trend actually be *known*. [6]

> 6   Legg Mason's October 10, 2006 press release stating that it had discovered "unanticipated mutual fund distribution fee expenses payable to our principal third-party distributor that relate to prior quarters," further supports defendants' claim that the trend was unknown at the time of [*32] the Secondary Offering. (Compl. PP 52, 81).

As explained above, Merseyside has failed to state a claim upon which relief may be granted under *Sections 11* and *12(a)(2)*, and, accordingly, these claims are dismissed.

**C. *Section 10(b) and Rule 10b-5 Claims Against Legg Mason and the Individual Defendants***

**1. *Applicable Law***

To state a cause of action under *Section 10(b)* and *Rule 10b-5*, plaintiffs must allege that defendants: (1) in connection with a purchase or sale of securities; (2) with scienter; (3) made a material false representation or omitted to disclose material information; (4) upon which plaintiff relied; (5) proximately causing plaintiff to suffer injury. *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).*

**a. *Pleading Requirements for Securities Fraud***

Securities fraud allegations under *Section 10(b)* and *Rule 10b-5* are subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *Rule 9(b)* requires that, whenever a complaint contains allegations of fraud, the circumstances constituting fraud shall be stated with particularity. *See Fed. R. Civ. P. 9(b); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996)* [*33] (noting that the fraudulent statements or conduct must be stated with particularity). "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).* A plaintiff must "set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Woods v. Empire Blue Cross & Blue Shield, No. 99 Civ. 4968 (DC), 2002 U.S. Dist. LEXIS*

*15251, 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002)* (quotation omitted).

The PSLRA requires securities fraud plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1).* While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading [*34] statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks, 216 F.3d 300, 313-14 & n.1 (2d Cir. 2000).*

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id. at 309.* To survive a motion to dismiss, plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).* For example, an "unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip. Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996).*

Additionally, the Second Circuit does not recognize "fraud by hindsight." *Shields, 25 F.3d at 1129.* "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999)* [*35] (quotations omitted); *see also Novak, 216 F.3d at 309.*

**b. *Materiality***

The standard for assessing materiality under *Section 10(b)* and *Rule 10b-5* is the same as under *Sections 11* and *12(a)(2). See I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991); Geiger, 933 F. Supp. at 1184.*

**c. *Scienter***

To satisfy the *Rule 9(b)* and PSLRA pleading requirements with respect to scienter, plaintiffs must allege facts giving rise to a "strong inference" of fraudulent intent. *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); see Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 770-71 (S.D.N.Y. 2006).* [7] The Supreme Court has held that for the inference of fraudulent intent to qualify as "strong," it must be more than merely plausible or reasonable -- it "must be cogent and at least as compelling

as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05, 168 L. Ed. 2d 179 (2007).*

   7   The Supreme Court recently noted that this circuit's formulation of the pleading demands for scienter have historically been "the most stringent" of all the circuits. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2508, 168 L. Ed. 2d 179 (2007).*

The requisite [*36] intent may be established either by alleging facts (1) showing that defendants had both motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).* With respect to motive, "[g]eneral allegations that the defendants acted in their economic self-interest are not enough," *Ganino v. Citizens Utils. Co., 228 F.3d 154, 170 (2d Cir. 2000),* and "[m]otives that are generally possessed by most corporate directors and officers do not suffice," *Kalnit, 264 F.3d at 139.* As to circumstantial evidence of conscious misbehavior or recklessness, these have been defined by the Second Circuit as "deliberate illegal behavior," and "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," respectively. *Novak, 216 F.3d at 308* (quotations omitted).

### d. *Loss Causation*

To state a *Section 10(b)* and *Rule 10b-5* claim, plaintiffs must allege loss causation. *See Lentell, 396 F.3d at 172.* Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura, 544 U.S. at 342.* "[A] plaintiff must allege [*37] . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell, 396 F.3d at 173* (quotation and citation omitted). "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id. at 174* (quotations and citations omitted).

"[I]f the loss was caused by an intervening event, like a general fall in the price of [ ] stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a *Rule 12(b)(6)* motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).* When the plaintiff's loss, however, "coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plain-

tiff's loss was caused by the fraud decreases." *Lentell, 396 F.3d at 174* (quotation omitted).

### 2. *Application*

The consolidated amended [*38] complaint alleges that defendants:

> (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Legg Mason publicly traded securities during the Class Period.

(Compl. P 86).

### a. *Pleading with Particularity*

With respect to the allegations that defendants withheld information regarding increasing customer withdrawals and increasing integration-related expenses at the time of the Secondary Offering, plaintiffs fail to adequately describe the facts upon which they base their beliefs. As previously noted, plaintiffs are required to plead fraud with particularity and must cite the sources of data that indicate, that the basis of the alleged omission existed. Plaintiffs cite no reports or data supporting the existence of either of these alleged trends, and therefore fail to state facts on which their belief of fraud could reasonably [*39] be based. Plaintiffs' *Section 10(b)* and *Rule 10b-5* claims regarding increasing customer withdrawals and integration-related expenses must therefore be dismissed.

### b. *Materiality*

As previously discussed, plaintiffs fail to allege that any of the alleged omissions were material. This provides an independent basis for dismissing plaintiffs' *Section 10(b)* and *Rule 10b-5* claims.

### c. *Loss Causation*

Plaintiffs allege that "in a series of partial disclosures, Legg Mason slowly began to reveal its true condition and the problems with the CAM Swap." (Compl. P 75). As a preliminary matter, disclosures attributing a share price drop to the failure to meet earnings estimates are not alone sufficient to plead loss causation. *See Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 239*

(S.D.N.Y. 2006) (allegations that plaintiff purchased shares at an artificially inflated price do not, without more, plead loss causation); see also Dura, 544 U.S. at 347.

Additionally, none of the public statements made by Legg Mason or its executives after the Secondary Offering correctively disclosed three of the alleged omissions -- increasing integration-related expenses, Wilby's planned departure, and increasing customer withdrawals [*40] -- so as to cause the price of Legg Mason shares to drop. Regarding integration-related expenses, Legg Mason announced on May 10, 2006 that its "timetable to complete [the] integration appears to be on target with little if any slippage." (Compl. P 76 (emphasis added)). On October 10, 2006, Legg Mason "confirmed that its integration of the business . . . remains on schedule, and that it continues to expect to achieve the previously announced cost savings from integration." (Holland Decl. Ex. E.). These statements are not corrective disclosures -- quite the opposite, they continued to inform the market that integration was proceeding as expected.

Plaintiffs' reliance on (1) the May 10, 2006 announcement that most of the company's "primary asset managers had solid positive net asset flows during the March quarter" and (2) the July 25, 2006 announcement that there was a further decline in revenues "due primarily to a significant decrease in performance fees received in the quarter and reduced market values of equity assets under management" as corrective disclosures is misplaced. (Id. PP 50, 76, 79). These statements failed to specifically attribute the losses to Wilby's departure, increasing [*41] integration-related expenses, or increasing customer withdrawals occurring at the time of the Secondary Offering. While the July 25 announcement did state that assets fell "due principally to $ 7 billion in client cash outflows and to equity asset depreciation caused by a difficult market environment," this disclosure -- despite mentioning client outflows -- did not indicate that the outflows were occurring at the time of the Secondary Offering or were attributable to anything other than the market.

Accordingly, failure to plead loss causation is another independent basis for dismissing plaintiffs' claims regarding (1) Wilby's planned departure, (2) increasing integration-related expenses, and (3) increasing customer withdrawals occurring at the time of the Secondary Offering.

Only the $ 12 million in distribution fees plaintiffs allege were owed at the time of the Secondary Offering was the subject of a corrective disclosure. On October 10, 2006, the company reported lower revenues, attributing them to "changes in the mix of the company's mutual fund assets under management" and "approximately $ 12

million . . . in unanticipated mutual fund distribution fee expenses . . . that relate [*42] to prior quarters." (Id. PP 52, 81). Although the statement does not specifically state that the fees were attributable to the quarter when the Secondary Offering occurred, this disclosure is nonetheless sufficiently corrective in nature.

### d. Scienter

Plaintiffs allege that defendants "disseminated or approved the false statements . . . which they knew or deliberately disregarded were misleading [sic] in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (Id. P 85). Plaintiffs' pleading fails to comply with the heightened pleading requirements for scienter under Rule 9(b) and the PSLRA.

The facts pled fail to support a strong inference of fraudulent intent -- the allegations are not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 127 S. Ct. at 2504-05. Plaintiffs plead absolutely no facts supporting the assertion that defendants had the motive and opportunity to commit fraud. They do not even plead that defendants acted with self-interest. Puzzlingly, a discussion of motive is entirely absent [*43] from the consolidated amended complaint.

Plaintiffs identify no internal reports of which defendants were aware and failed to disclose, and do not indicate specific data used by defendants in their fraud. The facts alleged simply do not rise to the level of circumstantial evidence that would be evidence of conscious misbehavior or recklessness. There is no mention of "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308 (quotations omitted). Ultimately, there are opposing inferences of innocent omission that are far more compelling than an inference of scienter.

Plaintiffs' generic, conclusory statement that fraudulent intent existed is simply not enough to meet the heightened pleading standards for securities fraud cases. This failure to properly plead scienter provides an independent basis for dismissing plaintiffs' fraud claims. See Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC., 474 F. Supp. 2d 505, 520 (S.D.N.Y. 2007).

For the foregoing reasons, plaintiffs' Section 10(b) and Rule 10b-5 claims are dismissed.

### D. Section 15 of the Securities Act and Section 20(a) [*44] of the Exchange Act

#### 1. Applicable Law

To plead a claim under *Section 15* of the 1933 Act and *Section 20(a)* of the 1934 Act, plaintiffs must allege (1) a primary violation of the corresponding Act by a controlled person and (2) direct or indirect control by the defendant of the primary violator. *See In re Adelphia Commc'ns Corp. Sec. and Derivative Litig., No. 03 MD 1529 (LMM), 2007 U.S. Dist. LEXIS 66911, 2007 WL 2615928, at * 10 (S.D.N.Y. Sept. 10, 2007).* Additionally, *Section 20(a)* claims must allege "culpable participation." *Id.* (citing *Wallace v. Buttar, 378 F.3d 182 (2d Cir. 2004).* Mere "[a] negations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Parmalat Sec. Litig., 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).*

### 2. Application

As there are no surviving primary violations upon which plaintiffs could rest these claims, plaintiffs' *Section 15* and *Section 20(a)* claims are dismissed: *See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir.*

*1996)* ("[T] o establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted. [*45] The Clerk of the Court shall enter judgment dismissing the consolidated amended complaint, with prejudice, and with costs but without fees.

SO ORDERED.

Dated: New York, New York

March 17, 2008

/s/ Denny Chin

DENNY CHIN

United States District Judge

LEXSEE

**MOMENTUM LUGGAGE & LEISURE BAGS, a partnership between ROBERT RUDKO and WILLIAM M. GREYSTONE, Plaintiff, -v- JANSPORT, INC., LUGGAGE & LEATHER GOODS MANUFACTURERS OF AMERICA, INC., and BUSINESS JOURNALS, INC., Defendants.**

00 CIV. 7909 (DLC)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 10253*

**July 23, 2001, Decided
July 23, 2001, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted. Plaintiff's complaint dismissed.

**COUNSEL:** For Plaintiff: John P. Bostany, The Bostany Law Firm, New York, NY.

For Jansport, Inc., Defendant: Thomas A. Canova, Gianni P. Servodidio, Pennie & Edmonds LLP, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiff Momentum Luggage & Leisure Bags ("Momentum") filed this action on October 17, 2000, and moved for a temporary restraining order and preliminary injunction, seeking to enjoin defendants' use of plaintiff's alleged trademark -- "Momentum" -- in connection with the promotion of a line of luggage defendant Jansport, Inc. ("Jansport") introduced in 2000. [1] At an initial conference on October 19, 2000, plaintiff requested expedited discovery in lieu of a preliminary injunction. [2] This Opinion addresses Jansport's motion for summary judgment, which followed the close of discovery.

1 Plaintiff has voluntarily discontinued its claims against Business Journals, Inc. and Lug-

gage & Leather Goods Manufacturers of America, Inc.

[*2]

2 Pursuant to the Court's Pretrial Scheduling Order of October 23, 2000, discovery was to be completed by February 23, 2001, and the parties were placed on the April trial ready calendar.

In its complaint, plaintiff asserts that it "developed . . . the Momentum trademark to identify a line of *luggage and bags,* which Momentum has marketed, sold and advertised widely." (emphasis supplied). Plaintiff alleges that it "has and continues to prominently display the 'Momentum' trade dress and trademark for its Momentum *luggage* products," and that "Momentum has extensively advertised and promoted the Momentum *luggage* by its trade dress and trademarks in various media in the United States." (emphasis supplied). [3] The complaint further alleges that, based on plaintiff's "continuous and exclusive use of the trade dress and trademark, the extensive advertisement and promotion of the *luggage* sold using its trade dress and trademark, and its sales, the purchasing public has come to associate Momentum as the source and sponsor of the *Momentum line of luggage marketed as Momentum luggage* [*3] ." (emphasis supplied).

3 Plaintiff's complaint alleges that the "the Momentum trade dress is the word mark itself used to identify Momentum's line of luggage and bags." Since plaintiff's "trade dress" claim is solely an assertion that the word "Momentum" was infringed, a discussion of plaintiff's trademark claim will fully address any trade dress rights asserted here.

In sharp contrast to its allegations, the record submitted on this summary judgment motion shows that plaintiff's "use" of the "Momentum" mark in connection with anything that could be liberally construed as luggage has consisted of one sale in 1999, of a few tote bags and briefcases and one paid advertisement for a tote bag in 1999, in a trade journal. Notwithstanding these meager activities, plaintiff alleged that Jansport violated the Lanham Act and New York's General Business Law by infringing plaintiff's trade dress, diluting plaintiff's trademark, and engaging in acts of unfair competition, false designation of origin, and false description [*4] or representation. For the reasons set forth below, Jansport's motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff is a partnership between Robert Rudko ("Rudko") and William Greystone ("Greystone"). As noted, plaintiff claims trademark rights in the name "Momentum," which is the name of its partnership and the name used in connection with its one sale of "luggage and bags" in 1999. Plaintiff owns no federal or state trademark registration for the name "Momentum."

The plaintiff's business arose in the mid-1990s from discussions between Rudko and Greystone about forming a company to sell high-end leather cellular telephone cases. To create the appearance of an established business, they rented a mail box from Mail Boxes, Etc. at 244 Madison Avenue in Manhattan to use as the company address.

Rudko and Greystone filed partnership papers in 1996, using Greystone's parents' address in Long Island, New York, where Greystone lived at the time. The name of the partnership was "Celmate." During 1996, neither Rudko nor Greystone devoted their full time to the partnership. [4] During their free time, however, Greystone [*5] measured cellular telephone dimensions and prepared drawings, and Rudko engaged in "office activities," such as paying a bill for a piece of leather. The business was operated out of the partners' homes. Plaintiff made no sales in 1995, and made two sales in 1996, which totaled about $ 1300 to $ 1500. Plaintiff did not pay for any advertising or promotional efforts, but received "photographic consideration" and "small write-ups" for the cellular telephone cases in two trade magazines. Plaintiff did not market its products in 1997, and lost between $ 10,000 and $ 50,000 that year.

4  Rudko has worked at various jobs over the last twelve years, since graduating from high school. Greystone has worked as a salesperson in the luggage department of Bloomingdale's for the past six years.

In 1997, Rudko and Greystone decided to switch their focus and to develop a business to sell high-end leather luggage pieces and call the luggage collection "Momentum." Greystone chose the name "Momentum" to identify both the partnership [*6] and luggage because he had "always liked the name and equated it with a fast-pace such as the pace of New York." They changed the partnership name from Celmate to Momentum on April 5, 1999.

Before 1999, plaintiff kept its Momentum name "confidential," and its first attempt to sell any products bearing the mark Momentum was on February 18-20, 1999, at the first luggage trade show that either Rudko or Greystone had ever attended, the International Travelgoods, Leather and Accessories ("ITLA") trade show in Florida. [5] It had ordered five to seven sample tote bags, satchels, and a small, "computer style briefcase" -- all made out of "crinkle vellenium," a micro fiber used in raincoats -- about three weeks before the show. At the show, plaintiff shared booth space with another exhibitor. Plaintiff made no sales at the trade show. [6] The ITLA is only open to members of the luggage industry and is not open to the general public.

5  Plaintiff made two invoiced sales of leather envelopes in 1998, under the company name Celmate/Momentum to a store in Manhattan. These envelopes did not bear the "Momentum" mark. The gross sales from plaintiff's business activities in 1998 totaled approximately $ 800.

[*7]

6  In his deposition testimony, Rudko stated that plaintiff did not make any sales at the trade show. Long after his deposition and in connection with the filing of his papers opposing this motion, Rudko corrected his answer in an errata sheet to assert that plaintiff wrote its "original Sam Flax order" at the show. In his affidavit submitted with plaintiff's opposition papers, Rudko states that this order was for "a dozen of our portfolio style envelopes." Jansport claims not only that the errata sheet was produced more than 30 days after the deposition, and thus not admissible under *Rule 30(e), Fed. R. Civ. P.*, but has also submitted a declaration from Rolf Fjord, an employee of Sam Flax, the alleged purchaser at the trade show. Fjord states that his company did not order any goods from Momentum at the trade show.

Plaintiff's only paid advertisement for its Momentum products or business was a quarter-page advertisement for a tote bag in the March/April 1999 issue of *Travelware* magazine. [7] Plaintiff also had several unpaid mentions, product photographs, and directory listings in issues [*8] of the trade magazines *Travelware* and *Show-*

*case International.* [8] None of these publications resulted in any sales.

> 7   The word "Momentum" does not appear on the tote bag pictured in the advertisement, but is a significant feature of the advertisement.
>
> 8   *Travelware* has over 12,000 subscribers and is published seven times a year. *Showcase International* is now known as *Travel Goods Showcase,* and is published by Travel Goods Association (formerly Luggage & Leather Goods Manufacturers of America, Inc.) six times a year. The trade journal is not available on newsstands or otherwise available to the general public: Rather, the 12,000 subscribers are industry members, such as manufacturers, sales representatives, wholesalers, distributors, and retail stores. The journal is also distributed to about 1,500 members of the trade and consumer press.

Plaintiff has made only one arms-length sale of anything that could be loosely termed luggage. [9] On July 19, 1999, plaintiff sold six tote bags and [*9] two briefcases for $ 760 to a retail store named Max Tamara after Greystone walked into the store on his lunch hour to peddle the products. According to Greystone, these products were embossed with the "Momentum logo," which is the word "Momentum" in capital letters. [10] Max Tamara is a high-end boutique in Manhattan, which specializes in designer handbags. The owner of Max Tamara had not previously heard of the Momentum company or product line. After July 1999, plaintiff did not sell any more "luggage" to Max Tamara. [11] In 1999, plaintiff also made one invoiced sale of leather envelopes to an art supply store in Manhattan. [12] These envelopes did not bear the trademark Momentum. Momentum's gross sales in 1999 were approximately $ 1400 to $ 1500.

> 9   In an Opinion of February 1, 2001, the Court precluded certain documentary evidence produced by plaintiff, pursuant to *Rule 37, Fed. R. Civ. P. Momentum Luggage & Leisure Bags v. Jansport, Inc., 2001 U.S. Dist. LEXIS 760,* No. 00 Civ. 7909, 2001 WL 91707, at *2 (S.D.N.Y. Feb. 1, 2001). The Court found that such a severe sanction was necessary where, as here, plaintiff had failed to participate in discovery in good faith -- discovery which plaintiff requested proceed on an expedited basis. Further, the Court found that plaintiff's delay in producing discovery had prejudiced Jansport. *Id.*

[*10]

> 10   The only evidence of any "logo" in the record is the word "Momentum" in plaintiff's one paid advertisement and the testimony from Greystone that some of the bags sold to Max Tamara

in 1999 were embossed on the front with the "Momentum" mark. While plaintiff concedes that the leather envelopes it sold in the past did not have the "Momentum" mark on them, it has submitted a sample leather envelope which is embossed with the name "Momentum" on the inside as an example of its "logo." In both the advertisement and the sample envelope submitted with plaintiff's opposition papers, the "logo" is simply the word "Momentum" in capital letters.

> 11   While plaintiff asserts that it received payment from several individuals for Momentum tote bags in 1999, these were not arms-length transactions. They were undocumented cash transactions to friends for which the plaintiff has no invoices. Rudko also states that plaintiff made a sale of two leather envelopes to the U.S. House of Representatives in 2000, and he attaches to his affidavit a copy of a check, dated March 12, 2001, made payable to "Momentum Leather" from New York Representative Michael P. Forbes.
>
> 12   Plaintiff's complaint alleges that Jansport infringed on its "luggage and bags." It does not mention envelopes.

[*11]  In 2000, plaintiff did not solicit any sales of luggage or tote bags and made no invoiced sales of any luggage or tote bags. According to Rudko, Momentum focused exclusively on selling envelopes. Plaintiff made three invoiced sales of leather envelopes to an art supply store and a designer leather goods store in Manhattan. The name "Momentum" was not on these envelopes; its gross sales for all of its business activities in 2000, totaled approximately $ 1500. Although plaintiff asserts that it is expecting to launch a luggage line in late August 2001, it has no sales orders or inventory. [13] Further, there is no evidence that the "Momentum" mark will be placed on the luggage itself or on point of sale materials.

> 13   Momentum states that it has formed a joint venture with The White Mountain Stitching Company for its fall 2001 luggage collection, but has not produced any evidence aside from Rudko's statements in his affidavit and an unsworn, un-notarized statement from Scott Manning, the general manager of White Mountain Stitching.

[*12]  Defendant Jansport is one of the world's largest manufacturers of backpacks with annual sales of Jansport branded products of approximately $ 200 million. Jansport spends about $ 5 million a year on advertising the Jansport brand in the United States alone. It is not disputed that the "Jansport" brand name is "famous" in the United States.

2001 U.S. Dist. LEXIS 10253, *

In 1998, Jansport began to develop a new line of nylon luggage as a natural expansion of its backpack business. In August 1999, Jansport selected the designation "Momentum" as its "collection" name for the new Jansport luggage line. [14] Jansport has never used the name "Momentum Collection," however, on any of the luggage itself. Nor has Jansport used the name on any hang tags, point of sale materials, or on anything that would be seen by consumers. The only name that appears on Jansport's luggage or its hang tags for its luggage is "Jansport."

14 A market research firm proposed the name "Momentum" to Jansport. The firm was not aware of plaintiff's company.

Jansport has [*13] used the name "Momentum" or "Momentum Collection" in connection with promotional materials distributed to the trade, such as a wholesale catalog, purchase order form, CD-Rom, and trade show literature. Jansport distributed these materials to its sales representatives and certain members of the luggage trade. The name "Momentum" appears twice in the 18-page Jansport luggage catalog for the year 2000. Jansport has never used the name "Momentum" by itself without the "Jansport" brand name. Jansport uses "collection" names such as "Momentum" to differentiate among its various product lines. Collection names typically serve as stand-ins for style numbers, which are a combination of numbers and letters. The use of collection names is a common practice. Indeed, plaintiff has used the collection name "Tribeca" even though it was aware that another company used that name for its luggage business.

Jansport's new luggage line includes staple luggage pieces such as 20 and 24 inch Pullmans, a flight bag, and a garment bag. Its luggage is sold at a lower price point than the higher-end luggage such as Louis Vuitton, Gucci, Prada, Tumi, and Hartman. The majority of Jansport's sales of luggage have [*14] been to (1) a large, discount chain department store; (2) outdoor recreational chain stores; and (3) specialty stores.

In late July 2000, Rudko left a message with a receptionist at Jansport, claiming that plaintiff owned a business named "Momentum" on Madison Avenue in New York City. After receiving plaintiff's phone call, Jansport revised its promotional materials for its upcoming December 2000 holiday promotion and for its 2001 luggage line by removing any reference to the designation "Momentum" or "Momentum Collection."

There is no evidence of consumer confusion and plaintiff has conceded that there has been no actual confusion. [15] There is also no evidence that Momentum lost any sales because of Jansport's use of the name "Momentum" for its line of luggage.

15 During discovery, plaintiff repeatedly represented that it had no knowledge of any actual confusion. In opposition to this motion, Momentum has submitted several nearly identical affidavits from Greystone's co-workers at Bloomingdale's, which state that they saw Jansport's advertisements for the "Momentum Collection" in trade magazines and believed plaintiff had licensed the name to Jansport.

[*15] Several companies besides Jansport have also used the "Momentum" name in connection with their products. A manufacturer named The Coleman Company sells a "Momentum" branded backpack, which has been on the market for two years, and a manufacturer named Outdoor Products sells a "Momentum" wheeled backpack with a retractable luggage handle, which has been on the market since the fall of 2000. A luggage manufacturer named Skyway Luggage filed a federal trademark application for the mark "Momentum" for luggage in 1999, but withdrew the application after Rudko told one of its representatives that it owned trademark rights in the name "Momentum."

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1987). [*16] The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed. R. Civ. P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

### A. Common Law Trademark Rights

Jansport argues that Momentum's de minimus activities did not create common law trademark rights in the word "Momentum." Although plaintiff contends it has continuously exploited the mark "Momentum" since February 1999, in connection with luggage, it has advertised

2001 U.S. Dist. LEXIS 10253, *

a tote bag once and has only shown one sale of six tote bags and two briefcases. Its informal and sporadic sales activity does not constitute sufficient use of a trademark in commerce to qualify [*17] for Lanham Act protection.

Section 43(a) of the Lanham Act provides a cause of action against any party who

> in connection with any goods . . . or any container for goods, *uses in commerce* any word, term, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship or approval of his or her goods . . . by another person.

*15 U.S.C. § 1125(a)* (emphasis supplied). The Lanham Act defines "use in commerce" as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. [A] mark shall be deemed to be in use in commerce on goods when it is placed in any manner on the goods . . . or the displays associated therewith or on the tags or labels affixed thereto . . . and the goods are sold or transported in commerce.

*15 U.S.C. § 1127; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 63 L. Ed. 141, 39 S. Ct. 48 (1918); Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir. 1998).*

To prevail on a Lanham Act infringement [*18] claim, a plaintiff must satisfy two elements: it must demonstrate that "'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Morningside Group Ltd. v. Morningside Capital Group, 182 F.3d 133, 137 (2d Cir. 1999)* (citation omitted). Thus, plaintiff must first show that its mark is entitled to Lanham Act protection. As the Supreme Court stated, "the right to a particular mark grows out of its use, not its mere adoption." *United Drug, 248, 248 U.S. at 97. See Buti, 139 F.3d at 103.* Further,

> under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, *as long as the initial appropria-*

*tion and use are accompanied by an intention to continue exploiting the mark commercially.*

*LaSociete Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974)* (emphasis supplied). Because "the right to a particular mark grows out of its use, . . . to [*19] prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Id. at 1271-72. See Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 315-16 (3d Cir. 1999); Larsen v. Terk Techs. Corp., 151 F.3d 140, 146 (4th Cir. 1998).* Accordingly, the Second Circuit has observed that

> "trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade. Absent these elements, no trademark can be created or exist."

*LaSociete Anonyme, 495 F.2d at 1274* (citation omitted). *See Lucent Info., 186 F.3d at 317-18* (plaintiff did not acquire common law trademark rights in mark where plaintiff made only one sale using mark and promotional activities were limited to sending out announcement of new business and making several product presentations).

The activities in which Momentum engaged can be divided into two categories: (1) advertising [*20] and promotion, and (2) sales. Neither of these activities, taken singly or together, were sufficient to create ownership rights in the "Momentum" mark.

Despite plaintiff's allegations in the complaint that its "luggage and bags" were "marketed . . . and advertised widely," this was not the case. Momentum exhibited at one luggage trade show two years ago, paid for one advertisement for Momentum luggage, and had several mentions in two trade journals. While Momentum argues that it should not be penalized for its "word of mouth" marketing, door-to-door sales calls, or lack of significant paid advertising, Momentum's activities do not constitute sufficient commercial promotion to establish common law trademark ownership. *See, e.g., Windows User, Inc. v. Reed Bus. Publ'g Ltd., 795 F. Supp. 103, 105, 109 (S.D.N.Y. 1992)* (distributing a brochure with 50,000 copies of another publication and contacting 200 potential advertisers). *Compare Marvel Comics Ltd. v. Defiant, a Division of Enlightened Entm't Ltd., 837 F. Supp. 546, 549 (S.D.N.Y. 1993)* (denying motion to dis-

miss because plaintiff's allegations that title was announced to 13 million readers established [*21] necessary commercial use).

Momentum has never made any sale of products commonly classified as luggage. It made one invoiced sale of tote bags and briefcases for $ 760 in 1999, and did not attempt to solicit any sales for Momentum luggage or tote bags in 2000. [16] Momentum claims that this one sale is enough to establish common law trademark rights in the "Momentum" name. While "a single use in trade may sustain trademark rights if followed by continuous commercial utilization," *Blue Bell v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975),* plaintiff's commercial use of its mark has been too sporadic to create such rights. For example, the Second Circuit has found that a plaintiff's 89 sales in 20 years was not "the kind of bona fide use intended to afford a basis for trademark protection." *LaSociete Anonyme, 495 F.2d at 1272.* The Court noted that the plaintiff had not "put its product on the market in any meaningful way," and had given "no indication that it has any current plans to do so." *Id. at 1272-73. See Jaffe v. Simon & Schuster Inc., 3 U.S.P.Q.2D (BNA) 1047, 1049,* No. 86 Civ. 1577 (GLG), 1987 WL 124312 [*22] (S.D.N.Y. Jan. 16, 1987) (granting summary judgment for defendant, finding that sales to personal friends and relatives do not constitute ownership of the mark and that federal trademark laws are not invoked by a small shipment of goods between business associates).

> 16  Plaintiff made one sale of leather envelopes in 1999, and three sales in 2000. Plaintiff made no profit and $ 1400-$ 1500 in gross revenue in 1999, and made no profit and $ 1500 in gross revenue in 2000.

The conclusion that the plaintiff's limited activities do not constitute a "use in commerce" is underscored by an analysis of its claim that its trademark rights extend across the nation. The Third Circuit has set out a test for determining whether a party has established common law trademark rights in a specific geographic area: (1) volume of sales; (2) growth trends; (3) the number of persons purchasing the product in relation to the potential number of purchasers; and (4) the amount of product advertising. *Lucent Info., 186 F.3d at 317.* [*23]

Applying these four factors to plaintiff's evidence, each weighs against Momentum: (1) Momentum's sale volume was *de minimus*; (2) because it made only one sale, there is no growth trend to review, *see Lucent Info., 186 F.3d at 317;* (3) there are many potential customers for luggage and bags, but only one retailer purchased eight items; and (4) Momentum's advertising and promotion were sporadic and limited. In *Natural Footwear,* the Third Circuit found that no trademark rights were estab-

lished by the defendant's "*de minimus*" sales, which the court defined to be gross sales of less than $ 5,000 and to less than 50 customers for any state in at least two of three years for which there was data. *Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1400 (3d Cir. 1985)* (denying nationwide injunction). *See also Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 503 (7th Cir. 1992)* (plaintiff's few sales over the counter in Illinois and a few items mailed to friends in Texas and Florida insufficient to create rights); *Jaffe, 3 U.S.P.Q.2D (BNA) at 1049* (nominal sales to friends and relatives did not constitute bona [*24] fide commercial use).

Finally, it is relevant to place the paucity of plaintiff's sales and advertising in the context of its commercial activities as a whole. For example, plaintiff has never leased office space, operates its business out of a residential apartment shared by Rudko and Greystone, and rents a mail box at "Mail Boxes, Etc." on Madison Avenue to give the impression that it has an established business. Plaintiff has no manufacturing or warehousing facilities and keeps its inventory of cellular telephone covers and other items in Rudko and Greystone's apartment. Further, plaintiff does not have any distribution or delivery arrangement, and instead uses the United States Postal Service or, in the case of the 1999 sale to Max Tamara and the 2000 sales of leather envelopes to Sam Flax, personal delivery. Finally, Greystone is employed full time by another company, and Momentum has not reported any income over the past two years. *See, e.g., Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45, 48, 52 (S.D.N.Y. 1965)* (where plaintiff had no telephone listing, did no advertising, had no factory, had no reportable income from sales, did not sell to any department [*25] stores, and sold to relatives and personal friends, plaintiff "was not operating such a bona fide commercial operation as would entitle it to claim ownership of the mark it used").

In sum, Momentum has not raised a genuine issue of material fact that it has made deliberate and continuous use of the "Momentum" mark in commerce in connection with "luggage" or bags. It has failed to present sufficient evidence to support a claim that it has a valid mark entitled to protection in connection with the sale of luggage.

**B. *Trademark Infringement***

Since plaintiff has not demonstrated that it has a valid mark entitled to protection, its Lanham Act claim for infringement must be dismissed. *See Morningside Group, 182 F.3d at 137.* Even if plaintiff owned common law trademark rights in the "Momentum" mark, however, its federal claim for trademark infringement would fail because it has not shown that Jansport's use of the "Momentum" mark is likely to cause confusion. To establish a trademark infringement claim under the

Lanham Act, a plaintiff must prove that "'numerous ordinary prudent purchasers are likely to be misled or confused'" because of the defendant's mark. *Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 477-78 (2d Cir. 1996)* [*26] (citation omitted). A finding of infringement must be supported by "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 743 (2d Cir. 1998). See also Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997).*

*Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961),* identifies eight non-exhaustive factors relevant to the likelihood of confusion inquiry: (a) the strength of the plaintiff's mark; (b) the degree of similarity between the plaintiff's and the defendant's marks; (c) the proximity of the products; (d) the likelihood that the plaintiff will bridge the gap, using the mark on products closer to the defendant's area of commerce; (e) the sophistication of the buyers; (f) the quality of the defendant's product; (g) actual confusion; and (h) the defendant's good or bad faith. *See TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88, 100 (2d Cir. 2001).* No single one of these factors is dispositive. *Morningside Group, 182 F.3d at 139.* Further,

> the evaluation of the *Polaroid* factors is not a mechanical [*27] process 'where the party with the greatest number of factors weighing in its favor wins.' Rather, a court should focus on the ultimate question of whether consumers are likely to be confused.

*Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 584 (2d Cir. 1993)* (citation omitted). Summary judgment is appropriate where the undisputed evidence would lead only to one conclusion under the *Polaroid* test as to whether confusion is likely. *Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996); Cadbury Beverages, Inc., 73 F.3d at 478.*

### Strength of the Mark

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." *Streetwise Maps, 159 F.3d at 743.* In determining a mark's inherent distinctiveness, this Court uses the familiar typology developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976),* under which a mark is classified in one of four categories "progressing from least to most distinctive: [*28] (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful." *TCPIP Holding, 244 F.3d at 93.*

Although plaintiff argues that its mark is arbitrary, at most, the "Momentum" mark is suggestive. Suggestive marks require "imagination, thought and perception to reach a conclusion as to the nature of goods." *Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999)* (citation omitted). Greystone stated in his deposition that he selected the "Momentum" name because it described "movement" and "motion." Although this explanation might support Jansport's argument that the name is merely descriptive, the Court concludes that it requires some degree of imagination to relate the "Momentum" name to luggage. As a consequence, there is no need to prove secondary meaning. "Marks that do not directly describe goods or their attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning." *TCPIP Holding, 244 F.3d at 94.*

"Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark. [Courts] must still consider [*29] the mark's distinctiveness in the marketplace." *Streetwise Maps, 159 F.3d at 744* (citation omitted). "Momentum" is not distinctive in the marketplace. As described above, other manufacturers of luggage and bags have used the "Momentum" mark in the sale of their products. Such third-party use weakens the strength of plaintiff's mark. *See id.; Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 581 (2d Cir. 1991).* Moreover, the plaintiff has none of the classic indicia of a strong mark, such as extensive sales or advertising. *See Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc., 832 F.2d 1317, 1321 (2d Cir. 1987).* Thus, while plaintiff's mark is suggestive, it is a weak mark.

### Similarity of the Marks

To assess the similarity between two marks, the Court considers whether the similarity is likely to cause consumer confusion. *Morningside Group, 182 F.3d at 139-40.* The similarity of marks is determined by evaluating a mark in its entirety, and in the context in which it is presented. *Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 394 (2d Cir. 1995).*

Compared in their entirety, [*30] plaintiff's use of the "Momentum" name and Jansport's use of the "Momentum" or "Momentum Collection" name are not confusingly similar. Although both the plaintiff and Jansport use an identical word, Jansport did not use the designation "Momentum" as a brand name trademark or anywhere on the luggage pieces themselves, on the hang tags, or on any advertising or promotion directed at consumers. Jansport instead used "Momentum" as a descriptive collection name, and did so only in promotional materials distributed to the trade. Finally, Jansport never used the designation "Momentum" or "Momentum Col-

lection" without the prominent use of the "Jansport" brand name. It always has the brand name "Jansport" on each piece of luggage. Prominent use of a famous brand name "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." *Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000). See W.W.W. Pharm, Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993)* (finding the marks "Sportstick" and "Right Guard Sport Stick" not confusingly similar because of the use of the [*31] company name). Thus, this factor favors Jansport.

### Proximity and Likelihood of Bridging the Gap

Under the *Polaroid* factors addressing the proximity of the marks and the likelihood of bridging the gap, the Court considers the nature of the products themselves, whether and to what extent the two products compete with each other, the structure of the relevant market, and whether a plaintiff is likely to enter defendant's market or "bridge the gap," recognizing "the senior user's interest in preserving avenues of expansion and entering into related fields." *Morningside Group, 182 F.3d at 140-41.* '

As noted above, plaintiff's only invoiced sale of anything that could loosely be considered "luggage" was the one sale of six tote bags and two briefcases. Jansport's accused product line is a line of staple luggage, with standard pieces such as 20 inch and 24 inch "Pullmans" and garment bags. It is undisputed that Jansport's luggage does not compete with high-end designer luggage and is instead sold at a lower price point at large discount chain department stores and outdoor sports and recreational chain stores. Rudko testified that he wanted plaintiff's products [*32] to be "different" from the type of staple luggage sold in discount chain department stores, which are among Jansport's largest customers. ¹⁷ Indeed, plaintiff's one invoiced sale of luggage was to a high-end, women's boutique on the East Side of Manhattan that sells primarily leather handbags. The parties' goods are sold through different channels of trade, target different customers, and do not directly compete with one another. To the extent plaintiff intends to reenter the "luggage" market later this year, it intends to sell "high-end" products. Nonetheless, drawing all inferences in plaintiff's favor, both parties have or will have used the mark in connection with luggage. Thus, these factors weigh in favor of Momentum.

> 17  Plaintiff argues in its memorandum of law that it and Jansport target the same customers since they both have targeted the same luggage retailer. Plaintiff offers no evidence of this.

### Sophistication of the Buyers

Likelihood of confusion "must be assessed by examining the level [*33] of sophistication of the relevant purchasers" of the plaintiff's and defendant's products. *Sports Auth., 89 F.3d at 965* (citation omitted). Here, both plaintiff's and defendant's products are relatively expensive, and consumers can be expected to inspect them before making a purchase. When doing so, consumers would see the brand name "Jansport," but not the mark "Momentum" on defendant's products. The more relevant class of purchasers likely to have encountered the "Momentum" mark for either party's products are sales representatives and retailer customers. These are sophisticated buyers who would be able quickly to differentiate the plaintiff's and defendant's products.

### Quality of Defendant's Product

Under this factor, the Court examines "whether defendant's products . . . are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Group, 182 F.3d at 142.* Plaintiff has produced no evidence that defendant's products are of an inferior quality to those offered by it.

### Actual Confusion

There is no evidence in this case of a single instance of actual confusion, and plaintiff has [*34] conceded that there has been no actual confusion between its products and Jansport's.

### Defendant's Good Faith

"An inference of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to trade upon the good will represented by that mark." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 67 (2d Cir. 2000).* Here, there is no evidence of any bad faith by Jansport.

There is no evidence that Jansport knew of plaintiff's business or products before its chose the "Momentum" name for its luggage collection. ¹⁸ In fact, after receiving plaintiff's telephone call in July 2000, and learning of plaintiff's alleged trademark rights, Jansport decided to stop using the "Momentum" name with respect to its luggage line, changed its catalog to remove any reference to "Momentum," and contacted retailer customers who used "Momentum" and requested that they stop such use.

> 18  Although Jansport did not conduct a full trademark search for the "Momentum" mark, the failure to conduct such a search does not on its own constitute bad faith. *Streetwise, 159 F.3d at 746.*

[*35] Plaintiff relies entirely on the speculation that Jansport must have noticed references to plaintiff in two

trade publications in 1999, and that Jansport's president must have noticed plaintiff's name on a list of 70 attendees at a 1999 trade conference. Where, as here, plaintiff has had the opportunity to engage in discovery, its "speculative allegations" do not raise a genuine issue of material fact sufficient to survive summary judgment. *Resource Developers v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991). Even though "issues of good faith are generally ill-suited for disposition on summary judgment," *Lang, 949 F.2d at 583* (citation omitted), in this case, plaintiff has failed to introduce any evidence of defendant's bad faith. *See Resource Developers, 926 F.2d at 141* (affirming summary judgment where no material factual issue as to defendant's intent).

In sum, when considered together, the *Polaroid* factors favor the defendant. The plaintiff has failed to present evidence that would prevent the entry of summary judgment for Jansport. The plaintiff has failed to present evidence that numerous [*36] ordinary prudent purchasers are likely to be confused by Jansport's use of the word "Momentum" to describe its luggage line.

*C. Unfair Competition*

The failure of plaintiff's trademark claim, in particular its failure to establish trademark rights in the word "Momentum," is not necessarily fatal to its federal unfair competition claim. *Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1998)*. "Regardless of whether a term is trademarked, a plaintiff may show that the term name is so associated with its goods that use of the same or similar term by another company constitutes a representation that its goods come from the same source." *Id. at 149-50* (citation omitted). Nonetheless, based on the preceding discussion, plaintiff has failed to raise a genuine issue of material fact as to the association of the "Momentum" name with its business or its products. It has offered no evidence beyond the statements of Greystone's co-workers and a personal acquaintance of Rudko as to the recognition of Momentum's name or luggage products in either the luggage trade or in the minds of consumers. Plaintiff's federal claim for unfair competition [*37] is therefore dismissed. [19]

[19] Plaintiff brings claims for trademark infringement, trade dress infringement, misappropriation, and unfair competition under New York common law. "The standards for trademark infringement . . . are essentially the same under the Lanham Act, New York law, and the common law." *Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998); Shaw v. Rizzoli Int'l Publ'ns, Inc., 1999 U.S. Dist. LEXIS 3233, No. 96 Civ. 4259 (JGK), 1999 WL 160084, at *8 (S.D.N.Y. Mar. 23, 1999)*. Similarly, "the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable." *Tri-Star Pictures, 14 F. Supp. 2d at 363; see also Genesee Brewing, 124 F.3d at 149; Ringling Bros. - Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp., 937 F. Supp. 204, 208-09 (S.D.N.Y. 1996)*. Thus, for the same reasons plaintiff's federal claims fail, its corresponding state law claims fail as well.

[*38] *D. Dilution*

Momentum complains that Jansport has diluted plaintiff's trademark. Section 43(c) of the Lanham Act, the Federal Dilution Act, provides remedies for the dilution, of the distinctive quality of famous marks. *15 U.S.C. § 1125(c)*. To prove this claim, a plaintiff must show, *inter alia*, that its mark is famous and inherently distinctive. *15 U.S.C. § 1125(c)(1); TCPIP Holding, 244 F.3d at 93, 95*. As a matter of law, plaintiff's mark is not famous and is not entitled to protection under the Federal Dilution Act. *See 15 U.S.C. § 1125(c)(1)(A)-(H); TCPIP Holding, 244 F.3d at 98-99*. For the reasons explained above, plaintiff has failed to raise a genuine issue of material fact as to the fame of its "Momentum" mark.

To establish a claim for dilution under New York law, plaintiff must prove (1) ownership of a distinctive mark, and (2) likelihood of dilution. N.Y. Gen. Bus. Law § 360-1 (McKinney 1996); *Sports Auth., 89 F.3d at 966*. Since the Court has determined that plaintiff does not own the "Momentum" mark, plaintiff's claim for dilution [*39] fails as a matter of law. *See generally Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1049 (2d Cir. 1992)* (New York's anti-dilution statute protects only "extremely strong" marks). Even assuming that plaintiff owned the "Momentum" mark, however, it could not establish a dilution claim under New York law. Dilution can involve either "blurring or tarnishment." *Sports Authority, 89 F.3d at 966*. Plaintiff contends that the "Momentum" mark has been tarnished by Jansport's actions and that blurring has occurred.

Tarnishment occurs when a trademark is "'linked to products of shoddy quality,' . . .with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996)* (citation omitted). Further, "the sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Id.* Plaintiff has offered no evidence that Jansport's products are of inferior quality or of any possible tarnishment of its products or its [*40] business

by Jansport's use of the "Momentum" mark to identify its luggage collection.

Nor has plaintiff offered any evidence of blurring. Blurring occurs "'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'" *Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 175 (2d Cir. 2000)* (citation omitted). As an initial matter, plaintiff has failed to offer any evidence that the "Momentum" mark is a "unique identifier of the plaintiff's product." Further, plaintiff has failed to show how Jansport's use of the "Momentum" mark will "blur" plaintiff's product identification.

### E. *Additional Discovery*

Plaintiff seeks to avoid the entry of summary judgment against it by requesting further discovery. A party opposing a summary judgment motion will be entitled to further discovery before the motion will be considered when it submits an affidavit explaining:

> 1) the nature of the uncompleted discovery, *i.e.,* what facts are sought and how they are to be obtained; and
>
> 2) [*41] how those facts are reasonably expected to create a genuine issue of material fact; and
>
> 3) what efforts the affiant has made to obtain those facts; and
>
> 4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 926 (2d Cir. 1985).* In addition, "[a] court can reject a request for discovery, even if properly and timely made through a *Rule 56(f)* affidavit, if it deems the request to be based on speculation as to

what potentially could be discovered." *Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).*

Through the affidavit of its attorney, plaintiff requests additional discovery relating to the issues of Jansport's bad faith, continuing infringement, and profits, as well as the existence of confusion in the marketplace. [20] Plaintiff does not state with any particularity what facts it expects the additional discovery to show, or how those facts are to be established. Nor does it state how those facts would create a material factual issue as to whether it has established ownership rights to the "Momentum" name. Most significantly, it does not explain why it was [*42] unable to obtain these facts during the period allotted for discovery.

> 20   Plaintiff also proposes serving subpoenas on *Travelware* and *Showcase International* to show the extent and geographic scope of plaintiff's and defendant's advertisements. Defendant submitted evidence on the extent and geographic scope of these publications.

The plaintiff's request to reopen discovery is denied. None of the topics the plaintiff seeks a second opportunity to explore would cure its failure to establish rights in the mark "Momentum" or otherwise affect the outcome of this motion.

### CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted. Plaintiff's complaint is dismissed in its entirety.

SO ORDERED:

Dated: New York, New York

July 23, 2001

DENISE COTE

United States District Judge

LEXSEE 2001 US DIST LEXIS 8848

**SOLOW BUILDING COMPANY, LLC, Plaintiff, - against - NINE WEST GROUP, INC. and NINE WEST DEVELOPMENT CORPORATION, Defendants.**

00 Civ. 7685 (DC)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 8848*

June 28, 2001, Decided
June 29, 2001, Filed

**DISPOSITION:**    [*1] Second Amended Complaint dismissed with prejudice.

**COUNSEL:** For Plaintiff: Marc S. Dreier, Esq.; Michael A. Nicodema, Esq., DREIER & BARITZ LLP, New York, New York.

For Defendants: Ira S. Sacks, Esq., Rita M. Odin, Esq., Andrea R. Rosenblum, Esq., FRIED FRANK HARRIS SHRIVER & JACOBSON, New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

**CHIN, D. J.**

Plaintiff, a real estate corporation, is headquartered at 9 West 57th Street in New York City, a building with a large red sculpture -- the numeral "9" -- on the sidewalk in front of the property. Although plaintiff has never used the name in its business, it contends that its building has acquired the nickname "9 West." Defendants, manufacturers and retailers of shoes, clothing, and accessories, have used the mark "Nine West" since 1980. Plaintiff sues defendants for trademark dilution, false designation of origin, trademark infringement, and unfair competition.

Defendants move to dismiss the Second Amended Complaint (the "Complaint") on the grounds that plaintiff's claims are barred by laches and fail to state a claim upon which relief may be granted. As discussed [*2] below, because the Complaint demonstrates that plaintiff has known of defendants' use of the "Nine West" mark since 1980, has inexcusably delayed the commencement of this action, and has prejudiced defendants by its delay, the Court agrees that the laches defense applies; moreover, even assuming this action is not untimely, the Complaint fails to allege likelihood of confusion and plaintiff's ownership rights to the "9 West" name. Accordingly, plaintiff's Complaint is dismissed.

*BACKGROUND*

**A. *The Parties***

Plaintiff Solow Building Company, LLC ("Solow"), a New York corporation, is a real estate company engaged in constructing and renting commercial and residential properties. It is headquartered at 9 West 57th Street, New York, New York, which is plaintiff's "premier property." (Sec. Am. Compl. PP 1, 10). On the sidewalk in front of its headquarters, plaintiff has placed a nine-foot by five-foot red sculpture of the numeral "9." (*Id.* P 13). Plaintiff's red numeral "9" is a registered mark with the United States Patent and Trademark Office (the "USPTO"). (*Id.* P 12). In addition, plaintiff has registered the mark "SOLO9W57" (*id.* P 14), and it alleges [*3] that "the public has derived the nickname '9 West' from Solow's numeral '9' and/or the SOLOW9W57 service marks as an identification of 9 West 57." [1] (*Id.* P 16).

1    In its Complaint, plaintiff identifies its service mark as both "SOLO9W57" and "SO-LOW9W57." (*See, e.g.*, Sec. Am. Compl. PP 14, 15, 16). It is unclear which version is the proper mark.

Defendant Nine West Group, Inc. is a manufacturer and retailer of shoes, clothing, and accessories. It is a Delaware corporation with its principal place of business

in White Plains, New York. (*Id.* P 2). Defendant Nine West Development Corp. is a wholly owned subsidiary of Nine West Group. [2] (*Id.* P 3).

2   The Court shall refer to defendants collectively as "Nine West."

### B. *Defendants' "Nine West" Mark*

Fisher Camuto Retail Corporation ("Camuto") was the [*4] predecessor of Nine West. (*Id.* P 18). Camuto was a tenant in 9 West 57th Street from July 1977 through June 1982. (*Id.*). In or about 1980, Camuto began doing business under the name "9 West," employing the numeral "9" on its corporate logo similar to plaintiff's "9" sculpture. (*Id.* PP 19, 20). In 1981, in response to plaintiff's demands to cease using the "9" logo, Camuto began using a "script numeral '9.'" (*Id.* P 21).

In 1990, Camuto began using "Nine West" as its corporate logo, and, in 1993, it also began using the name "9 & Co." (*Id.* PP 22-24). Defendants use the marks "for use in connection with the retail sale of women's shoes and handbags." (*Id.* PP 23, 24). Defendants registered both names with the USPTO in 1991 and 1995, respectively. (*Id.*).

In 1996, defendants began using their "Nine West" mark in connection with the retail sale of clothing (such as hosiery, jackets, and sleepwear) and accessories (such as sunglasses, watches, and hats). (*Id.* PP 26-28). Defendants filed trademark applications on their "Nine West" name to cover these products. (*Id.*).

### C. *Investigations of Defendants*

In 1997, the Securities and Exchange Commission [*5] began investigating defendants for accounting irregularities and, along with the United States Customs Service, for circumstances surrounding Brazilian imports. (*Id.* P 34). More recently, the Federal Trade Commission (the "FTC") and all of the state attorney generals investigated defendants for alleged price-fixing, which resulted in a settlement agreement whereby defendants agreed to pay approximately $ 34 million in fines. (*Id.* PP 35, 36).

### DISCUSSION

Plaintiff's Complaint asserts four causes of action: trademark dilution under the Lanham Act; false designation under the Lanham Act; common law trademark infringement and unfair competition; and trademark dilution under New York law. Defendants move to dismiss the Complaint in its entirety, arguing that plaintiff's claims are barred by laches. In addition, defendants argue that the Complaint must be dismissed because, among other things, plaintiff failed to sufficiently plead

likelihood of confusion and its ownership in the mark "9 West."

### I. *Motion to Dismiss Standard*

A complaint may not be dismissed on a motion to dismiss unless it "'appears beyond doubt that the plaintiff can prove no set of facts [*6] in support of his claim which would entitle him to relief.'" *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). Therefore, the issue before the Court "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235-36, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)).

Although the pleading requirements under *Federal Rule of Civil Procedure 8 (a)* are construed liberally, "liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader. If it fails to do so, a motion under *Rule 12(b)(6)* will be granted." *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.,* 10 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) (internal quotation omitted); *accord Scholastic, Inc. v. Stouffer,* 124 F. Supp. 2d 836, 841 (S.D.N.Y. 2000).

[*7] II. *Laches*

To prevail on the defense of laches, defendants must establish three elements: (1) plaintiff had knowledge of defendants' use of its marks; (2) plaintiff inexcusably delayed taking action; and (3) defendants will be prejudiced by permitting plaintiff to assert its rights now. *See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,* 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000) (citation omitted). Although the burden of establishing these factors is usually on defendants, the Second Circuit has instructed that "when the suit is brought after the statutory time has elapsed, the burden is on the complainant to [allege] . . . the circumstances making it inequitable to apply laches in [its] case." *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191 (2d Cir. 1996); *cf. Jose Armando Bermudez & Co. v. Bermudez Int'l,* 2000 U.S. Dist. LEXIS 12354, No. 99 Civ. 9346 (AGS), 2000 WL 1225792, at *8 (S.D.N.Y. Aug. 29, 2000) (conducting this analysis on a motion to dismiss).

The limitations period that courts apply to Lanham Act cases is six years. [3] *See Bermudez,* 2000 WL 1225792, at *8 n.10 (citing *Conopco,* 95 F.3d at 191-92). [*8] Here, plaintiff acknowledges that Camuto "adopted the corporate logo '9 West' and began doing business

under that name" in 1980, and that in 1991 "Camuto filed a trademark application . . . on the name 'Nine West' for use in connection with the retail sale of women's shoes and handbags." (Sec. Am. Compl. PP 19, 23). Plaintiff commenced this suit on October 12, 2000. Accordingly, because the statute of limitations has run, *see Bermudez*, 2000 WL 1225792, at *8 n.10 (noting that the period begins to run "when plaintiff purportedly discovered the alleged infringements"), "a presumption of laches . . . appl[ies] and plaintiff must show why the laches defense ought not be applied in the case." [4] *Conopco, 95 F.3d at 191.*

3  The Second Circuit has explained that "laches is an equitable defense that courts employ instead of a statutory time-bar . . . . Because the Lanham Act establishes no limitations period . . ., and . . . there is no corresponding federal statute of limitations, we look to the most appropriate state statute of limitations for laches purposes." *Conopco, 95 F.3d at 191.* Hence, courts in this circuit apply New York's six-year fraud statute to Lanham Act claims. *See id.; accord Fourth Toro Family, 88 F. Supp. 2d at 196.*

[*9]

4  Even if the statute of limitations has not run, the laches defense may still be applicable. *See Peyser v. Searle Blatt & Co., 2000 U.S. Dist. LEXIS 10793*, No. 99 Civ. 10785 (WK), 2000 WL 1071804, at *5 (S.D.N.Y. Aug. 2, 2000). In such a situation, however, there is no presumption of laches, and, thus, the burden remains on the defendant to prove the defense. *Conopco, 95 F.3d at 191.*

Plaintiff argues that its case should not be dismissed for laches for three reasons. First, plaintiff asserts that laches is not a proper issue for determination on a motion to dismiss. Second, plaintiff asserts that it has not inexcusably delayed taking action. Last, plaintiff asserts that its delay has not prejudiced defendants. [5] I address, and ultimately reject, each of these arguments in turn.

5  In its memorandum in opposition to defendants' motion to dismiss, plaintiff states that the "presumption" of laches "has no basis in law, or logic." (Pl. Mem. at 18). Hence, plaintiff's arguments actually read, *"Defendants Have Failed to Establish* an Unreasonable and Inexcusable Delay in Filing Suit," and *"Defendants Have Failed to Establish* Prejudice." *(Id.* at 17, 18 (emphasis added)). As already noted, however, the Second Circuit has specifically stated that "once the . . . statute has run, a presumption of laches will apply," *Conopco, 95 F.3d at 191,* and the Complaint here clearly indicates that plaintiff com-

menced this action outside the limitations period. *See Bermudez*, 2000 WL 1225792, at *8 n.10. Nonetheless, even if the burden is on defendants to establish laches, as discussed more fully below, defendants have satisfied this burden.

[*10] **A. *Resolving Laches on Motion to Dismiss***

This Court has held: "When the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999)* (citing *Oshiver v. Levin Fishbein Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994),* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure:* Civil 2d § 1357); *accord Bermudez,* 2000 WL 1225792, at *8. Hence, although the defense is fact-specific, the Court can consider laches on a motion to defense.

**B. *Inexcusable Delay***

Although plaintiff acknowledges that it has known of defendants' use of the "Nine West" mark since at least 1981 (Sec. Am. Compl. P 21), plaintiff argues that it has not inexcusably delayed the commencement of this action because its claims are based on "actions taken by Defendants beginning in 1996 and continuing through 2000 . . . ." (Pl. Mem. at 17). To support its position, plaintiff relies exclusively on the decision in *Fourth Toro Family, 88 F. Supp. 2d 188.* [*11] (Pl. Mem. at 18). There, in a dispute between bagel sellers each claiming the right to use the "H & H" name, defendant argued that the action was barred by laches because it had used the name for 12 years prior to plaintiff's suit. The court, however, rejected the defense, noting a number of actions in the intervening years that excused the delay: defendant had "increased the aggressiveness and the scope of its advertising" by imitating plaintiff's campaigns; defendant changed its marketing focus from Manhattan to nationwide; defendant changed its mark to one that was much more similar to plaintiff's mark; defendant adopted a "confusingly similar '800' number"; and defendant traded on plaintiff's kosher certification. *Fourth Toro Family, 88 F. Supp. 2d at 197.* These actions, according to the court, "created instances of both actual, reported confusion and the likelihood of increasing confusion." *Id.* In addition, the court noted that, prior to suing defendant, plaintiff had taken action with the "Trademark Office" on at least three separate occasions and, in fact, obtained "exclusive trademark protection" from the office. *Id. at 197-98.* Thus, the [*12] court concluded that "plaintiff's filing of [the] lawsuit . . . was a direct and timely response to defendant's tactics." *Id. at 198* (citation omitted).

In contrast, plaintiff here took no action against defendants until it commenced this action in October 2000, and defendants took no actions that increased the likelihood of confusion between the parties' marks or their services. Defendants have used the "Nine West" mark, with plaintiff's knowledge, since 1980. In 1981, plaintiff demanded that Camuto alter his "9 West" logo because it allegedly violated plaintiff's red numeral "9" trademark. (Sec. Am. Compl. P 21). For the next two decades, however, plaintiff took no action even as defendants "continued to use the name[s] . . . openly and notoriously . . . ." (Id. P 25). Plaintiff does not allege that it sought exclusive protection for the "9 West" mark, cf. Fourth Toro Family, 88 F. Supp. 2d at 197-98, it does not allege that it notified defendants of its concerns, cf. Bermudez, 2000 WL 1225792, at *8 (declining to apply laches, in part, because plaintiff had "notified [defendant] of its concerns relating to possible infringement, [*13] " and because defendant, in response, had represented that it would no longer engage in the allegedly infringing conduct), and it does not allege that it conducted an "investigation into the merits of [its] case." [6] Cf. Peyser, 2000 WL 1071804, at *6 (noting that a "reasonable investigation into the merits . . . will in effect toll the laches period").

    6   In its memorandum in opposition to defendants' motion to dismiss, plaintiff does not assert that it took any of these actions.

In addition, plaintiff does not allege that defendants' use of the "Nine West" mark, including their post-1996 use, "increased the likelihood of confusion" between its real estate business or its properties and defendants' shoe and clothing business. The crux of the Fourth Toro Family decision was that in the intervening years defendant's actions "altered the competitive environment between plaintiff and defendant." 88 F. Supp. 2d at 198. Here, plaintiff does not, and cannot, make such an allegation. [*14] Rather, plaintiff merely alleges that defendants' actions during that time "expanded the public's awareness of [defendants'] 'Nine West' name." [7] (Sec. Am. Compl. P 26 (emphasis added)). Accordingly, the Complaint does not sufficiently allege that the filing of this lawsuit in October 2000, more than 20 years after defendants began using the "Nine West" name, was either a direct or a timely response to defendants' actions. Cf. Fourth Toro Family, 88 F. Supp. 2d at 198.

    7   Plaintiff also argues that the SEC's and FTC's investigations of defendants, beginning in 1997, and the resulting "negative publicity," "caused the public to associate [defendants' marks] with dishonesty, fraudulent practices and illegal conduct. As a direct result, 9 West 57 has become wrongly associated with dishonesty, fraudulent practices and illegal conduct." (Sec. Am. Compl. P 37).

This argument is meritless. First, the Complaint does not allege that the investigations increased the likelihood of confusion between the parties. Second, as discussed by the Fifth Circuit, plaintiff is proposing that a "trademark owner has a property right in his mark, but only so long as he personally is not unpopular with the general public." Exxon Corp. v. Oxford Clothes, Inc., 109 F.3d 1070, 1084 (5th Cir. 1997). Like the Fifth Circuit, I "reject this highly unorthodox view of trademark law." Id.

### [*15] C. Prejudice to Defendants

"A defendant has been prejudiced when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim. Specifically, prejudice is present when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" Bermudez, 2000 WL 1225792, at *8 (quoting Conopco, 95 F.3d at 192). Here, the Complaint alleges the following: in 1980, Camuto began using a variation on the "Nine West" name; in 1981, plaintiff demanded that Camuto alter the style of his logo; in 1990, Camuto began using "Nine West" as its corporate logo; in 1991, Camuto filed a trademark application on the name "Nine West"; in 1993, defendants began to use the name "9 & Co.," and, in 1995, they applied for trademark protection for the name; from 1996 through 2000 defendants expanded its line of consumer products from shoes and handbags to include certain types of clothing apparel and accessories, and defendants filed trademark applications to cover these products under their "Nine West" mark. Thus, in part because of plaintiff's inaction as to defendants' [*16] use of the "Nine West" mark, defendants have used the name for more than 20 years "in the manufacture and retail sale of clothing and accessories . . . ." (Sec. Am. Compl. P 2). Aside from the one concern that it raised in 1981, plaintiff has allowed defendants to use the "Nine West" name uncontested for two decades.

Nonetheless, plaintiff argues that defendants have not suffered prejudice because "since 1996, Defendants have changed the manner in which they used the 'Nine West' name by expanding their business activities to include a wide variety of consumer products . . . ." [8] (Pl. Mem. at 19). This argument, however, supports the opposite conclusion -- that plaintiff's inaction prejudiced defendants -- as defendants decided to "expand [their] business activities" after 16 years of selling shoes and handbags with no action from plaintiff. (Sec. Am. Compl. P 26). Cf. Peyser, 2000 WL 1071804, at *7-8 (noting that "courts have had little tolerance for cries of 'prejudice' from defendants who . . . were put on notice of an infringement").

2001 U.S. Dist. LEXIS 8848, *

8  Plaintiff's additional argument that defendants have failed to "establish" prejudice because "since 1997, [they] have been engaged in a series of illegal activities which have lent notoriety to the 'Nine West' name" is irrelevant. The issue before the Court is whether defendants have suffered prejudice because of *plaintiff's* inactions.

[*17]  Accordingly, because plaintiff has known of defendants' use of the "Nine West" name since 1980, has inexcusably delayed the commencement of an action against defendants, and has allowed defendants to maintain and expand their business activities by its delay, thus prejudicing defendants, plaintiff's claims are barred by laches. Laches is clear on the face of plaintiff's Complaint; it is clear that plaintiff "can prove no set of facts to avoid the insuperable bar," *Lennon, 63 F. Supp. 2d at 439;* and there is no reason why the Court "should permit plaintiff[] to 'sleep on [its] rights' to sue under any of [its] claims." *Peyser,* 2000 WL 1071804, at *9.

### III. *Additional Grounds for Dismissal*

#### A. *Likelihood of Confusion*

Even assuming the Complaint is not barred by laches, plaintiff's cause of action also fails because the Complaint fails to sufficiently allege any likelihood of confusion between the parties' marks, as required by the Lanham Act and New York common law. *See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45-46 (2d Cir. 2000).* Although the existence of consumer confusion is generally a question [*18] of fact, "in considering a motion to dismiss pursuant to *Rule 12(b)(6),* the Court may . . . make an initial finding as to whether or not a jury would find a likelihood of confusion as to source." *Textile Deliveries, Inc. v. Stagno, 1990 U.S. Dist. LEXIS 13309,* *16, No. 90 Civ. 2020 (JFK), 1990 WL 155709, at *6 (S.D.N.Y. Oct. 9, 1990); accord Schieffelin & Co. v. Jack Co. of Boca, Inc., 725 F. Supp. 1314, 1323 (S.D.N.Y. 1989)* (noting that for a motion to dismiss "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source" (quoting *Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231, 246 (2d Cir. 1983))).* Thus, the Court, accepting the facts as alleged in plaintiff's Complaint as true, must conclude whether a legal claim exists based on those facts. Here, plaintiff has failed to allege the existence of likelihood of confusion. [superscript 9]

9  This is in contrast to the facts in *Solow v. BMW (US) Holding Corp., 1998 U.S. Dist. LEXIS 16059,* No. 97 Civ. 1373 (DC), 1998 WL 717613, at *4 (S.D.N.Y. Oct. 14, 1998), where I denied a motion to dismiss a complaint filed by Solow that

did allege a likelihood of confusion. There, in a case involving BMW's use -- in a television commercial -- of a red numeral "5" sculpture in front of a building similar in style to plaintiff's 9 West 57th Street property, Solow "unequivocally" alleged likelihood of confusion. *See id.* Moreover, in that case, unlike here, Solow did not wait 20 years to commence its action.

[*19]

In addressing likelihood of confusion, courts apply the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961):* (i) strength of plaintiff's mark; (ii) similarities of the parties' marks; (iii) proximity of the parties' products in the marketplace; (iv) likelihood that plaintiff will bridge the gap between the products; (v) actual confusion; (vi) defendants' intent in adopting their mark; (vii) quality of defendants' product; and (viii) sophistication of the relevant consumer group. *See also Nabisco, 220 F.3d at 46.* As the Second Circuit has noted, "the ultimate question [is] whether consumers are likely to be confused." *Id.* (quotation and citation omitted).

Here, the Complaint makes no allegations at all as to five of the *Polaroid* factors (iii, iv, vi, vii, and viii). The absence of any such discussion is not surprising, as those factors all weigh against a finding of confusion. As to the "ultimate question" of the likelihood of consumer confusion, the Complaint provides that plaintiff is a "corporation engaged in the business of real estate construction and the rental of distinctive commercial [*20] and residential properties." (Sec. Am. Compl. P 1). Defendants, in turn, manufacture and sell women's footwear, handbags, and, for the last six years, additional items such as hosiery, sunglasses, watches, and bed sheets. (*Id.* PP 24-28). Thus, there is clearly no proximity between the parties' businesses or their products, and there is simply no competition between the parties. *See Charles Atlas, Ltd v. DC Comics, Inc., 112 F. Supp. 2d 330, 339 (S.D.N.Y. 2000)* (noting that because the parties "are simply not in direct competition . . . the likelihood of confusion is greatly reduced"). Moreover, consumers who seek real estate construction or property rentals surely will not be confused by a company that manufactures and sells women shoes, handbags, clothing, and accessories.

Accordingly, the Court concludes that the Complaint's allegations exceed the "outer limits . . . within which a jury is permitted to make the factual determination [that] there is a likelihood of confusion as to source." Based on the facts alleged, no legal claim exists.

#### B. *Plaintiff's "9 West" Mark*

In the Complaint, plaintiff alleges that "the public has derived the nickname [*21] '9 West' . . . [and] uses

the nickname '9 West' to identify 9 West 57 and has come to uniquely associate the nickname '9 West' with the building." (Sec. Am. Compl. P 16). The Complaint does not allege, however, that *plaintiff* uses, or has ever used, the nickname "9 West," or that *plaintiff* uses, or has ever used, the nickname to identify the building at 9 West 57. Hence, defendants argue that plaintiff "cannot have acquired ownership rights in the mark '9 West.'" (Defs. Mem. at 12-13); *see 15 U.S.C. § 1127* (defining "trademark" as "any word, name, symbol, or device . . . *used by [the applicant]*" seeking trademark protection (emphasis added)).

In response, plaintiff does not challenge defendants' assertion that it does not use the nickname but, instead, relies on *National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991),* for its argument that "even without 'use' of trademark directly by the claimant. . . , nicknames of trademarks or names used only by the public give rise to protectable rights . . . ." (Pl. Mem. at 20). While the court there did state, in dicta, [*22] that public-created nicknames do give rise to protectable rights, the court's holding rested on the fact that *plaintiff* had "made significant use of [the nickname] as its trade name . . . ." *National Cable Television, 937 F.2d at 1577-78.*

In *Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 812 (2d Cir. 1999),* a case involving a motorcycle manufacturer's and a motorcycle repairer's competing use of the word "hog," the Second Circuit noted the *National Cable Television* decision but did not indicate "whether or not we agree with [the] decision[] . . . ." The court did note, however, that the nickname "hog," like plaintiff's alleged nickname "9 West," differed "significantly" from the nickname at issue in *National Cable Television* in that the nickname "hog" was "a generic term in the language as applied" to motorcycles. [10] *Id.* The court stated: "The public has no more right than a manufacturer to withdraw from the language a generic term, already applicable to the relevant category of products, and accord it trademark significance, at least as long as the term retains some generic meaning." " *Id.*

[10]    As noted by the Second Circuit, the term "hog" was used "to refer to motorcycles generally

and large motorcycles in particular." *Harley-Davidson, 164 F.3d at 808.*

[*23]

[11]    Moreover, the Second Circuit denied trademark protection to plaintiff's use of "hog" despite the fact that plaintiff itself had begun to use the term in connection with its merchandise, advertising, and promotion. *Harley-Davidson, 164 F.3d at 809.* Here, as already noted, the Complaint does not allege that plaintiff itself ever used the nickname "9 West."

There is a "9 West" on almost every cross-street in Manhattan, and, thus, "9 West" surely retains a "generic meaning" in the "language" of building addresses, which is how plaintiff uses the name. Under the reasoning of *Harley-Davidson,* therefore, plaintiff would not be permitted to accord trademark significance to the public-created nickname "9 West" in an action against another building that sought to use it. Hence, if plaintiff cannot enforce the nickname against another real estate company, then plaintiff should not be permitted to enforce the "9 West" nickname against a shoe and clothing company.

Accordingly, plaintiff has no trademark right to the term "9 West," a nickname that, according to the Complaint, was [*24] created and is used only by the public, and one that is generic.

## CONCLUSION

Based on the foregoing, all of plaintiff's claims are barred by the laches defense. In addition, plaintiff has failed to sufficiently allege likelihood of confusion and ownership rights in the name "9 West." Hence, the Second Amended Complaint is dismissed in its entirety, with prejudice, and the Clerk of Court shall enter judgment accordingly.

SO ORDERED.

Dated: New York, New York

June 28, 2001

DENNY CHIN

United States District Judge

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

**H**Swatch Group (U.S.) Inc. v. Movado Corp.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
THE SWATCH GROUP (U.S.) INC, Plaintiff,
v.
MOVADO CORPORATION, Defendant.
No. 01 Civ. 0286(RLC).

April 10, 2003.

**Background:** Trademark holder brought action against competitor asserting trademark infringement, false designation of origin, and false advertising under Lanham Act, and dilution under state law.

**Holdings:** On competitor's motion for summary judgment, the District Court, Carter, J., held that:
(1) trademark holder did not establish likelihood of confusion between its "VENTURA" mark and competing watch maker's "VENTURE" mark, and
(2) trademark holder could not establish dilution of its "VENTURA" mark by competing watch maker's "VENTURE" mark under New York law.

Motion granted.

West Headnotes

[1] Trademarks 382T $\Longleftrightarrow$ 1092

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1090 Nature of Marks
            382Tk1092 k. Strength or Fame of Marks; Degree of Distinctiveness. Most Cited Cases
    (Formerly 382k356 Trade Regulation)

Trademarks 382T $\Longleftrightarrow$ 1112

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1112 k. Persons Confused;

Circumstances of Sale. Most Cited Cases
    (Formerly 382k356 Trade Regulation)

Trademarks 382T $\Longleftrightarrow$ 1113

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1113 k. Accompaniments Mitigating Confusion; Disclaimers. Most Cited Cases
    (Formerly 382k356 Trade Regulation)

Trademark holder did not establish likelihood of confusion between its "VENTURA" mark and competing watch maker's "VENTURE" mark, in lawsuit alleging trademark infringement, common law infringement, and false designation of origin, where VENTURA mark was only moderately strong, parties prominent use of their house marks on their watches and in their advertisements diminished possibility of confusion, and care taken by consumers in purchase of expensive watches made confusion unlikely due to proximity. Lanham Trade-Mark Act, § 32, 15 U.S.C.A. § 1114(a).

[2] Trademarks 382T $\Longleftrightarrow$ 1468

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(B) Dilution
            382Tk1468 k. Marks Protected; Strength or Fame. Most Cited Cases
    (Formerly 382k366 Trade Regulation)

Trademark holder could not establish dilution of its "VENTURA" mark by competing watch maker's "VENTURE" mark under New York law, since dilution statute only protected extremely strong marks, and VENTURA mark was only moderately strong. McKinney's General Business Law § 360-1.

Trademarks 382T $\Longleftrightarrow$ 1800

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
    (Formerly 382k736 Trade Regulation)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

Page 2

VENTURA.

Collen IP, Ossining, New York, Jess M. Collen, James R. Hastings, Matthew C. Wagner, for Plaintiff, of counsel.

Fross Zelnick Lehrman & Zissu, P.C., New York, New York, Patrick T. Perkins, Tamar Niv Bessinger, for Defendant, of counsel.

## OPINION

CARTER, J.
*1 Plaintiff, The Swatch Group (U.S.) Inc. ("Swatch"), brings this action against defendant, Movado Corporation ("Movado"), asserting trademark infringement, false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125(a), as well as injury to business reputation under New York General Business Law § 360-1 and common law trademark infringement. Now before the court are defendant's motion for summary judgment and plaintiff's cross motion for partial summary judgment.

## BACKGROUND

Hamilton Watch Company ("Hamilton"), a division of Swatch, introduced a watch with the trademark VENTURA in 1957. (Pl.'s Rule 56.1(a) Stmt. Mat. Facts ¶ 6.) This was the world's first electric watch, however, since that time, the watches sold under the VENTURA mark have transitioned from electric to quartz movement. (Id. at ¶ 9.) Hamilton is an American watch brand, and marketing efforts have focused on the message that Hamilton's watches are "uniquely American." (Faivet Dep. at 80.)

The face of the VENTURA watch features the Hamilton logo, and is triangular or boomerang-shaped. (Wang Decl. Ex. 1.) Almost all of the watches in the VENTURA line have a leather band and contain an image of an electric bolt running horizontally through the center of the watch face. (Id.; Def.'s Ex. 14; Faivet Dep. at 33.) The VENTURA mark does not appear on any part of Hamilton's VENTURA watch itself, nor does it appear on its packaging, except on a sticker on one side of the box, above the watch's bar code. (Faivet Dep. at 43-45.)

In Spring of 1998, Movado, through its ESQ division, introduced a watch line called VENTURE.[FN1] (Def.'s Mem. Supp. Summ. J. at 3.) Most of the watches in this line have a stainless steel band and a rectangular face, although ESQ also recently introduced a round face style. (Diamond Decl. ¶ 5.) The face of VENTURE watch depicts the ESQ SWISS logo, conveying that the watch has Swiss movement. (Id. at ¶ 7.) The VENTURE mark does not appear anywhere on the watch or on its packaging. (Id.)

    FN1. On January 29, 1998, before adopting the VENTURE mark, a full search for the trademark VENTURE was conducted. (Def.'s Mem. in Further Supp. Summ. J. at 19; Gilsenan Dep. at 31-32.) Swatch does not claim that this search revealed the existence of its VENTURA mark.

## DISCUSSION

*A. Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56, F.R. Civ. P. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Nevertheless, the moving party will be entitled to judgment as a matter of law where the nonmoving party fails to make a significant showing on an essential element of its case with respect to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment "may not rest upon mere allegations," rather it must "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), F.R. Civ. P.[FN2]

    FN2. This case involves cross-motions for summary judgment, making the analysis marginally more complex in that all parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

are both moving and nonmoving parties simultaneously. Rather than review the record twice, this opinion analyzes the case primarily as a motion for summary judgment by defendant, drawing all inferences in favor of plaintiff.

*B. Trademark Infringement and False Designation of Origin*

**\*2** When deciding whether a trademark owner will be protected against the unauthorized use of its mark, or one very similar, the crucial issue is " 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." ' *McGregor-Doniger Inc. v. Drizzle Inc.,* 559 F.2d 1126, 1130 (2d Cir.1979) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,*439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). Thus, in order to prevail on a claim of false designation of origin under 15 U.S.C. § 1125(a) or trademark infringement under 15 U.S.C. § 1114, a plaintiff must demonstrate a likelihood of confusion as to the source of the parties' respective products.[FN3]*SeeNabisco Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 44-45 (2d Cir.2000).

> FN3. The proof required to prevail on a common law infringement claim mirrors that necessary to prevail under the Lanham Act. *SeeIvoclar N. Am., Inc. v. Dentsply Intern., Inc.,* 41 F.Supp.2d 274 (S.D.N.Y.1998) (Carter, J.) (citing *Tri-Star Pictures, Inc. v. Leisure Time Prods.,* 17 F.3d 38, 43 (2d Cir.1994)).

The yardsticks to be applied in determining whether there is a likelihood of confusion are set forth in the classic case of *Polaroid Corp. v. Polarod Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert denied,*368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors include 1) the strength of the mark; 2) the degree of similarity between the two marks; 3) the proximity of the products; 4) the likelihood plaintiff will bridge the gap between the two products; 5) actual confusion between the two marks; 6) defendant's good faith in adopting its mark; 7) the quality of defendant's product; and 8) the

sophistication of the buyers of the parties' goods. *Polaroid Corp.,* 287 F.2d at 495. This list of factors is not exclusive, nor is any one factor determinative. See*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993) (citations omitted)."The proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists."*Id.* (citation omitted).

[1] Looking to these factors, it is apparent that in the case of competing products, the likelihood of bridging the gap is not a relevant inquiry.[FN4]*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1044 (2d Cir.1992). Also, there is no evidence that the products at issue here differ in quality; therefore, a comparison of the quality of the products would not be helpful in determining the likelihood of confusion. *Seeid.*The remaining factors require additional discussion.

> FN4. The "bridging the gap" factor considers whether the senior user may wish to enter the defendant's market in the future. *Ivoclar N. Am., Inc. v. Dentsply Int'l, Inc.,* 41 F.Supp.2d 274, 282 (S.D.N.Y.1998) (Carter, J.).

*1. Strength of the Mark*

The strength of the mark analysis focuses on "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source."*W.W.W. Pharmaceutical Co.,* 984 F.2d at 572 (citation omitted). A mark's strength is measured by the degree to which it is inherently distinctive, and the court is also permitted to consider the degree to which it is distinctive in the marketplace, in other words, the degree to which the mark has acquired a secondary meaning. *McGregor-Doniger,* 559 F.2d at 1131-33.

**\*3** To gauge the inherent distinctiveness of a mark, courts have used four classifications: 1) generic, 2) descriptive, 3) suggestive, and 4) arbitrary or fanciful. *W.W.W. Pharmaceutical Co.,* 984 F.2d at 572 (citation omitted). The Second Circuit has defined these categories as follows:

A generic mark is generally a common description of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

Page 4

goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of goods.... Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and with ease of establishing infringement.

*Id.* (citations and internal quotation marks omitted).

Movado does not contest that the VENTURA mark is arbitrary for watches. (Def.'s Mem. Further Supp. Summ. J. at 7.) Rather, defendant argues that the distinctiveness of plaintiff's mark has been diluted through third party uses of the VENTURA mark and similar marks in the watch industry. *See Lever Bros. Co. v. Am. Bakeries Co.,* 693 F.2d 251, 256 (2d Cir.1982) (holding that third party use diluted the strength of an arbitrary mark).

In support of its argument, Movado presents evidence that a Swiss watch manufacturer, Ventura Design on Time S.A. ("Ventura DoT"), markets watches in the United States under the marks VENTURA DESIGN ON TIME and SEGMENTS BY VENTURA with plaintiff's permission.[FN5] Sometimes both brands of watches are sold in the same stores. (Fischer Decl. ¶ 2.) In addition, three stores that sell watches use the trade names VENTURA or VENTURE, including Venture Stationers in New York City, which sells Hamilton's VENTURA watches, Ventura Fine Jewelers in Kenosha Wisconsin, which also sells VENTURA watches, and Ventura & Sons, a watch wholesaler in Miami, Florida. (*Id.* at ¶¶ 3-5.)

> FN5. Specifically, in exchange for allowing Ventura DoT to use those marks in connection with the sale of watches in the United States, plaintiff is permitted to use its VENTURA mark in Europe where Ventura DoT has prior rights in the mark. (Def.'s Mem. at 6, Ex. 19.)

Ultimately, the strength of a mark depends on its distinctiveness, or its "origin-indicating" quality, in the eyes of the purchasing public. *Lever Bros.,* 693 F.2d at 256 (quoting *McGregor-Doniger,* 559 F.2d at

1131). Third party use, particularly by Ventura DoT, which sells luxury watches nationwide, surely dilutes the distinctiveness of plaintiff's mark for watches. Therefore, the protection to which that mark is entitled is diminished. The court holds that the VENTURA mark is only moderately strong; accordingly, the "strength of the mark factor" weighs only slightly in plaintiff's favor.[FN6]

> FN6. As noted above, distinctiveness may also be established with evidence that a mark has acquired a secondary meaning. Though Swatch claims that the VENTURA is one of its most well-known watch lines, the evidence presented by plaintiff (including confidential sales and advertising data) does not support a finding of secondary meaning in the minds of consumers. (Faivet Decl. ¶ 5; Faivet Dep. at 159-61.)

### 2. *Similarity of the Marks*

In assessing this factor, similarity between the marks in and of itself is not the test-for this reason, cases involving the alteration, addition, or elimination of only a single letter from the old mark to the new reach divergent results. *McGregor-Doniger,* 559 F.2d at 1133 (citations omitted). Rather, the crux of the issue is whether the similarity is likely to cause confusion among numerous customers who are ordinarily prudent. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 139-40 (2d Cir.1999).

*4 When a product's brand name is prominently featured, the likelihood of confusion based on a subsidiary mark is unlikely. *See Nabisco, Inc. v. Warner Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000). In some cases this can even be dispositive of the likelihood of confusion issue. *See id.* Although the marks VENTURA and VENTURE are similar visually and aurally, viewed in their commercial context this similarity could not reasonably be expected to be perceived by and remembered by potential purchasers who do not even see these marks when examining the watches.[FN7] In addition to being the only marks on the watches themselves, the HAMILTON and ESQ marks are by far the dominant marks in the parties' advertisements, with the marks VENTURA and VENTURE appearing in much

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

smaller type.[FN6]The prominent use of the house marks HAMILTON and ESQ on the parties' watches and in all of their advertisements goes far to eliminate the possibility of confusion in this case. This factor, if not dispositive, weighs most heavily in Movado's favor. *Seeid.*(ICE BREAKERS and DENTYNE ICE for gum held dissimilar and this was dispositive, where defendant "prominently-indeed primarily-identifie[d] DENTYNE ICE as a member of the DENTYNE family of gums...."); *W.W.W. Pharmaceutical Co.,* 984 F.2d at 573 (SPORTSTICK and RIGHT GUARD SPORT STICK held not similar, in part because the RIGHT·GUARD line name was prominently featured in advertising and on the product, in letters three times the size of the SPORT STICK portion of the mark); *Bristol-Myers,* 973 F.2d at 1045-46 (TYLENOL P.M. and EXCEDRIN P.M. trade dresses held not similar because "the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion....").

> FN7. The sticker on the outer box of the Ventura watches contains the VENTURA mark, but this mark is not prominent. In any case, this outer box would not normally be seen by a prospective purchaser. (Faivet Dep. at 79-80.)

> FN8. For example, in magazine advertisements placed by Movado in eleven publications nationwide in the Fall of 2000 and Spring of 2001, the ESQ mark was twenty times larger than the VENTURE mark. (Def.'s 56.1 Stmt. at 35, Reitter Decl. at 2.)

3. *Proximity of the Products/Sophistication of the Purchasers*[FN9]

> FN9. These factors are analogous and may be considered together.*Ivoclar,* 41 F.Supp.2d at 280 (citing *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981)).

To the extent goods serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion. *W.W.W. Pharmaceutical Co.,* 984 F.2d at 573 (citation omitted). This effect will be mitigated,

however, when consumers are sophisticated and/or careful in their purchases of particular types of goods.

Several facts support a finding of proximity of the goods in this case. VENTURA and VENTURE watches are of similar price and are targeted to similar consumers. The watches are advertised in similar channels and are sold in the same stores. In department stores, ESQ watches are often presented in a separate case from Hamilton watches; however, in smaller watch or jewelry stores, VENTURA and VENTURE watches may be displayed together.

Yet even if the goods are proximate, the sophistication or care of purchasers weighs against a likelihood of confusion on this basis. The average consumer spending hundreds of dollars on a watch that will be worn for years is likely to give close attention to the type of watch he or she is buying. *See, e.g.,McGregor-Doniger* 559 F.2d at 1137 ("The greater the value of the article, the more careful the typical consumer can be expected to be ..."); *Merriam-Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 72 (2d Cir.1994) (consumers will exercise care when purchasing dictionaries that cost $20 and will be used for several years); *Revlon, Inc. v. Jerrell, Inc.,* 713 F.Supp. 93 at 99 (S.D.N.Y.1989) (Leisure, J) ("To the extent that a distributor sells its product to apparently sophisticated shoppers at high quality department stores, customer sophistication usually militates against a finding of likelihood of confusion").

*5 In sum, the care taken by consumers of expensive watches makes confusion due to the proximity of these goods unlikely.[FN10]The "proximity of the products" and "sophistication of the purchasers" factors weigh in Movado's favor.

> FN10. The absence of evidence of actual confusion, discussed below, further detracts from the significance of proximity of the goods. *SeeLever Bros.,* 693 F.2d at 257.

4. *Actual Confusion*

Although the watches at issue have co-existed in the marketplace for over four years, plaintiff presents no instances of actual customer confusion between VENTURA and VENTURE watches.[FN11]Nor does plaintiff present a consumer survey indicating a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

likelihood of confusion.[FN12]While a plaintiff need not prove actual confusion in order to prevail in an infringement action, Swatch's failure to show actual confusion may weigh against a finding of likelihood of confusion. See *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999) (noting that where consumers are exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected by survey or otherwise, this can be a powerful indication of no likelihood of confusion) (citing *McGregor-Doniger,* 559 F.2d at 1136). This factor weighs in defendant's favor.

> FN11. Plaintiff submits a Macy's advertisement in which VENTURA is misspelled as VENTURE as its only proof of actual consumer confusion. Plaintiff's evidence is insufficient as a matter of law, as there is no indication that consumers were actually confused after the advertisement was published in December of 2001.

> FN12. It is defendant who submits results of a market survey, indicating that only 1% of respondents were confused as to the source of the watches at issue. Plaintiff attacks the methodology of the survey; however, it is unnecessary to resolve that issue here because even if the court were to assume *arguendo* that the survey were flawed, it would not help plaintiff in proving actual confusion.

*4. Good Faith*

The "good faith" factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *W.W.W. Pharmaceutical Co.,* 984 F.2d at 575 (quoting *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 583 (2d Cir.1991)). Significantly, Movado conducted a full trademark search before adopting its VENTURE mark. See *id.*(no bad faith found, in part because defendant had a trademark search performed prior to adopting the mark).

Plaintiff argues that defendant's alleged infringement of the VENTURA mark is part of a pattern of bad faith infringement of Swatch's marks. Specifically,

plaintiff claims that two other marks, EVEREST and GRAMERCY, were also appropriated by Movado. Swatch's argument is not supported by the facts in the record. Defendant conducted full trademark searches before adopting the EVEREST and GRAMERCY marks, the results of which were devoid of any reference to plaintiff's alleged marks. (Def.'s Exs. 35, 36.) Nor has Swatch presented evidence that it has prior rights in the EVEREST or GRAMERCY marks. As there is a lack of affirmative evidence demonstrating bad faith, this factor also weighs against Swatch.

*5. Review of the Polaroid Factors*

Weighing the above factors, most of which favor defendant, the court holds that plaintiff cannot establish a likelihood of confusion between the VENTURA and VENTURE marks as a matter of law. Accordingly, summary judgment is granted to defendant with respect to Swatch's trademark infringement, common law infringement, and false designation of origin claims.

*C. Injury to Business Reputation*

[2] Swatch also alleges that Movado's sale of VENTURE watches violates New York General Business Law § 360-1, which provides:

*6 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

The Second Circuit has held that this statute protects only "extremely strong marks," and has noted that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Kraft General Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 134 (S.D.N.Y.1993) (Leisure, J.) (citing *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030-33 (2d Cir.1989)). Having already determined that Swatch's VENTURA mark is only moderately strong in the infringement context, the court concludes that Swatch is not entitled to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1872656)

Page 7

protection under § 360-1.

*D. False Advertising*

Swatch has not presented any evidence to support a claim that Movado "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of [its] goods, services, or commercial activities ."*See*15 U.S.C. § 1125(a)(1)(B). This claim fails as a matter of law.

CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in its entirety.

IT IS SO ORDERED.

S.D.N.Y.,2003.
Swatch Group (U.S.) Inc. v. Movado Corp.
Not Reported in F.Supp.2d, 2003 WL 1872656 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2002 US DIST LEXIS 1478

**TE-TA-MA Truth Foundation - Family of URI, Inc., Plaintiff, v. The World Church of the Creator, Defendant.**

No. 00 C 2638

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2002 U.S. Dist. LEXIS 1478; 61 U.S.P.Q.2D (BNA) 1914*

**January 31, 2002, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted: plaintiff's motion for summary judgment denied. Defendant's motion for judgment on the pleadings denied as moot. Plaintiff's motion to strike defendant's surreply denied as moot.

**COUNSEL:** For TE-TA-MA TRUTH FOUNDATION - FAMILY OF URI, INC., plaintiff: James M. Amend, Paul R. Steadman, Kevin John O'Shea, Jami A Jarosch, Kirkland & Ellis, Chicago, IL.

WORLD CHURCH OF THE CREATOR, THE, defendant, pro se, East Peoria, IL.

For WORLD CHURCH OF THE CREATOR, THE, defendant: Todd M. Reardon, A Citizen's Law Office, Charleston, IL.

**JUDGES:** JOAN HUMPHREY LEFKOW, United States District Judge.

**OPINION BY:** JOAN HUMPHREY LEFKOW

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, TE-TA-MA Truth Foundation - Family of URI, Inc. ("Church of the Creator"), filed a multi-count complaint against defendant, World Church of the Creator, alleging trademark infringement, unfair competition, and dilution under the Lanham Act, *15 U.S.C. 1051 et seq.*§§, and claims for trademark infringement, unfair competition and dilution under state law. The court has federal question jurisdiction over the Lanham [*2] Act claims under *15 U.S.C. § 1121* and *28 U.S.C. § 1331*, and the diversity jurisdiction over the state claims under *28 U.S.C. § 1332*. Both parties have moved for summary

judgment, incorporating their arguments made in the pending motion for judgment on the pleadings. For the reasons articulated below, the court grants defendant's motion for summary judgment, denies plaintiff's motion for summary judgment, and denies the motion for judgment on the pleadings as moot.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Fed R. Civ. P. 56(c)* Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).* [*3] In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id., 477 U.S. at 324, 106 S. Ct. at 2553; Insolia v. Philip Morris Inc., 216 F.3d 596, 598 (7th Cir. 2000).* A material fact must be outcome determinative under the governing law. *Insolia, 216 F.3d at 598-599.* Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp., 200 F.3d 485, 492 (7th Cir. 2000),* the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).* On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella v.*

*Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th Cir. 1997).*

## FACTS

Plaintiff is a [*4] religious organization and a California corporation with its principal place of business in Ashland, Oregon. In 1988, plaintiff received U.S. Trademark Registration No. 1,496,724 ("Registration 1,496,724") for a mark consisting of a design phrase comprised of a symbol and the phrase CHURCH OF THE CREATOR. The registration provides that,

> No claim is made to the exclusive right to use 'church', apart from the mark as shown. The mark includes a background six-pointed star grid emanating light radiations, centered about a descending/ascending dove, centered about and cradling within its breast, the planetary sphere of earth.

(Pl.'s 56.1 Statement, Ex. 1.) The trademark is for use on "religious instructional and teaching materials namely, newsletters, books, journals, pamphlets, and brochures; photographs, calendars, posters, writing paper and envelopes, note cards; printed adhesive decals[.]" *Id.*

Plaintiff has made extensive use of the name and mark CHURCH OF THE CREATOR(R) in connection with services, including conducting classes, lectures, and seminars on religion and self-help; providing ministerial services; providing religious consulting services; providing [*5] ministerial ordination services; providing religious, spiritual, self-help and educational information by means of a global computer network; and providing computer services, namely, on-line magazines, newsletters and bulletins in the fields of religion, spirituality and self-help. Plaintiff has used the mark continuously and extensively in the United States, on and in connection with goods and services which it provides and distributes, since at least February 26, 1982.

In 1993, plaintiff filed a Combined Affidavit of Use and Incontestability of a Mark Under Sections 8 and 15 [of the Lanham Act, *15 U.S.C. §§ 1058, 1065*], on Registration 1,496,724, which the United States Patent and Trademark Office accepted. Plaintiff maintains a website, www.churchofthecreator.org and plaintiff's Vice President and Director, James Germain URI ("URI"), reviews all e-mail received at plaintiff's e-mail address, cotcmother[at]aol.com, which is posted on plaintiff's website, and reviews all letters received at plaintiff's mailing address.

Defendant is a body of religious adherents and a non-profit unincorporated association with its headquarters and principal place of [*6] business in East Peoria, Illinois. Defendant's members adhere to the religion of "Creativity," a religion that espouses that the "White Race" is "the Creator" of all worthwhile culture and civilization. Defendant uses the name "World Church of the Creator" to communicate its messages through flyers, pamphlets, brochures, newsletters, television talk-show appearances and news interviews, and the Internet. Defendant's messages are frequently white-supremacist, racist, and anti-Semitic.

Plaintiff asserts that defendant's messages are incompatible with and antithetical to the messages conveyed by plaintiff's religious instructional and teaching material, [1] and that beginning in February, 1999 through October, 2000, Mr. URI reviewed and printed e-mails (from persons unknown to plaintiff, except one member of plaintiff's church) as well as a couple of letters, which plaintiff claims establish that consumers have been confused about the source of plaintiff's services as a result of defendant's use of its mark. Many of the e-mails expressed criticism about the white-supremacist message, while others expressed agreement with it.

> 1    Plaintiff does not set forth in its 56.1 Statement the nature of its "messages," but one of the attachments in its 56.1 Statement contains a "Sacred Mandate" which Mr. URI explains is the "document signed by members of Plaintiff's church to indicate their decision to join in principle and witness of Plaintiff's church." This document provides:
>
>> CHURCH OF THE CREATOR(R) Supports The Family Unification of Mankind In all Aspects Of The Whole. We of Like Mind Join Harmoniously In Oneness, Knowing That There Is Only One Creator-Source. The Many In One, Dedicate Our Physical Embodiments To The God Expression In Form, Bringing Forth By Example To This Planet Earth Love, Light and Peace. Therefore, Once Decreeing DIVINE RIGHT OF ORDER(R) In All Thoughts - All Things, Our Universe Automatically Aligns Into Manifestation of Heaven On Earth. Through The Priesthood of Melchizedek We Are One In The Body of Jesus Christ As Above So Below.

Page 3

2002 U.S. Dist. LEXIS 1478, *; 61 U.S.P.Q.2D (BNA) 1914

(Pl.'s 56.1 Statement, Ex. 3, URI Decl. P 26, and Ex. 13.)

[*7] In May 2000, plaintiff brought suit against defendant alleging claims of infringement of a federally-registered trademark in violation of the Lanham Act, *15 U.S.C. § 1114(1)* (Count I), unfair competition in violation of the Lanham Act *15 U.S.C. § 1125(a)* (Count II), federal dilution (*15 U.S.C. § 1125(c)*) and state dilution (Illinois Trademark Registration Protection Act, *765 ILCS 1036/65* (1998)) (Count III), common law trademark and unfair competition (Count IV), and deceptive trade practices (Illinois Uniform Deceptive Trade Practices Act, *815 ILCS 510/1 et seq.* (1992)) (Count V [2]). Plaintiff requests an injunction, profits, punitive damages for allegedly willful violations of above said laws, and attorneys' fees and costs.

2   Plaintiff identified the Illinois deceptive trade practices claim as Count VI in the complaint, but because there is no count in the complaint designated Count V, the court considers this an oversight and refers to it as Count V.

## [*8] DISCUSSION

Defendant has moved for summary judgment, arguing that it is entitled to judgment on all of plaintiff's claims because (1) the term "Church of the Creator" is generic and thus plaintiff does not have a protectable trademark in "Church of the Creator," and (2) to grant the remedies plaintiff seeks would violate the *First Amendment* rights of defendant's adherents to freely practice their religion. Plaintiff has also moved for summary judgment, arguing that it is entitled to judgment because it is undisputed it has a protectable trademark and that defendant's use of the mark caused consumer confusion. Because the court concludes that defendant is entitled to summary judgment on the basis that the term "Church of the Creator" is generic and there is no material question of fact with respect to any other elements of plaintiff's claims (federal or state), it does not address defendant's *First Amendment* argument.

## Counts I and II

In Count I, plaintiff asserts that defendant infringed its federally-registered trademark in violation of Section 32 of the Lanham Act, *15 U.S.C. § 1114(1).* [3] In Count II, plaintiff asserts that defendant made [*9] false representations, descriptions and designations of origin of its goods and services in violation of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a).* [4] To prevail on either claim, proof of two elements is required: (1) plaintiff's mark is protectable and (2) defendant's use of the mark is likely to cause confusion among consumers. *Packman v.*

*Chicago Tribune Co., 267 F.3d 628, 638 and n.8 (7th Cir. 2001)* (citing *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461 (7th Cir. 2000)).*

3   *15 U.S.C. § 1114(1),* provides: "Any person who shall, without the consent of the registrant-- (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided."

4   *15 U.S.C. § 1125(a),* provides: "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

[*10] A trademark is "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." *15 U.S.C. § 1127.* The purpose of trademark law is to "aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 726 (7th Cir. 1998)* (quotation omitted). Nevertheless, trademark protection is not intended to "interfere with the traditional policies of a competitive market, and courts have generally recognized that the public substantially benefits from competition." *Id.* (citation omitted); *see also Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986)* ("The goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive . . . , enable the consumer to discover in the

least possible amount of time [*11] and with the least possible amount of head-scratching whether a particular brand is that firm's brand or a competitor's brand.").

Marks are generally classified in increasing levels of distinctiveness: generic; descriptive; suggestive; arbitrary; and fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992); Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976)* (Friendly, J.). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection. In contrast, generic marks -- those that 'refer to the genus of which the particular product is a species,' . . . -- are not registrable as trademarks." *Two Pesos, 505 U.S. at 768* (internal quotations and citations omitted); *Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 935 (7th Cir. 1986)* (A generic (or common descriptive) term "can never function as a trademark."). A term that is "merely descriptive" may be protectable as a trademark if it has acquired secondary meaning. [*12] *Liquid Controls, 802 F.2d at 935*. "A merely descriptive term is one that specifically describes a characteristic or an ingredient of a product." *Id. at 936*.

Defendant argues that it is undisputed that the term "Church of the Creator" is generic and therefore is not protectable as a trademark. Plaintiff responds that because its registered mark CHURCH OF THE CREATOR(R) has become "incontestable," defendant cannot assert the defense of genericness as a matter of law and, even if it could, defendant has presented no evidence to overcome the presumption that the mark is not generic. [5] With respect to plaintiff's first contention, while it is true that a registered mark becomes incontestable after five years of continuous use, *15 U.S.C. § 1065*, and once incontestable, the registration is "conclusive evidence of the validity of the registered mark," *15 U.S.C. § 1115(b)*, plaintiff's assertion that genericness is not a defense to an incontestable mark is contrary to both the statute [6] and case law, [7] and the citations relied upon by plaintiff do not support such a contention. [8]

> [5] *See Liquid Controls, 802 F.2d at 936* (The fact of registration entitles plaintiff to the presumption that the mark is not generic, *§ 1115(a)*, but the presumption may be overcome by proof that it is generic.).

[*13]

> [6] *See 15 U.S.C. § 1065(4)* (The right to use the registered mark "shall be incontestable: Provided, That-- . . . *no incontestable right shall be acquired in a mark which is the generic name for the goods or services* or a portion thereof, for which it is registered."); *15 U.S.C. § 1115(b)* ("To the

extent that *the right to use the registered mark has become incontestable* under *section 1065* of this title, the registration shall be conclusive evidence of the validity of the registered mark . . . .") (emphases added).

> [7] *See Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., 240 F.3d 832, 840 (9th Cir. 2001)* ("An incontestable mark may be challenged, however, on the grounds that the mark is generic.") (citing *15 U.S.C. § 1115(b)* and *Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985)); Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church, 887 F.2d 228, 231 (9th Cir. 1989); see also 2 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 12:60 (4th ed. 2001)* ("The incontestability provisions of § 15 do not bar the defense that the mark has become generic.") (citing *15 U.S.C. § 1065(4)* and cases)); cf. *Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 n.7 (3d Cir. 1990)* (discussing interplay of statutory provisions and noting that "the term 'incontestable' is obviously somewhat misleading, since there are as many as 21 possible exceptions/defenses to the general rule of incontestability").

[*14]

> [8] Plaintiff relies on *section 1115(b)*; however, as set forth *supra* n. 6, *section 1115(b)* applies only to the extent a mark has become incontestable, and by operation of *section 1065(4)* an incontestable right cannot be acquired in a generic mark. Plaintiff's reliance on *Sovereign Order of St. John of Jerusalem, Inc. v. Grady*, actually supports the rule that genericness is a defense to an incontestable mark. *119 F.3d 1236, 1240 (6th Cir. 1997)* (accepting for purposes of argument that defendant's statutory argument regarding availability of defense was correct but upheld dismissal for lack of evidence). Finally, plaintiff's argument that Congress did not provide for the defense of genericness under the Lanham Act (*see* Pl.'s Opp. to Def.'s Mot. for J. on the Pleadings, at 2) ("Although Congress considered including genericness [as a defense], it declined to do so. *Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 201, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985)* (citing Hearings on S. 895 before the Subcommittee of the Senate Committee on Patents, 77th Cong., 2d Sess., at 45, 47 (1942) ("Also mentioned [and rejected] was the possibility of including as a defense to infringement of an incontestable mark the 'fact that a mark is a descriptive, generic, or geographical term or device.'")), is

Page 5

2002 U.S. Dist. LEXIS 1478, *; 61 U.S.P.Q.2D (BNA) 1914

unavailing. The Court's comment in *Park N'Fly*, relied on by plaintiff, was made in the context of its holding that, under the Lanham Act, an incontestable mark could not be challenged on the basis of "mere descriptiveness." *469 U.S. at 201.* The Court did not hold (nor did it suggest that Congress so intended) that the Lanham Act did not provide for a challenge based on genericness alone. To the contrary, the Court noted, within the same discussion, that the "supporters of the incontestability provisions . . . observed that a generic mark cannot become incontestable," *id.*, and earlier in its opinion referred to the Conference Committee's agreement to an amendment providing that "no incontestable right can be acquired in a mark that is a common descriptive, i.e. generic, term," and that "Congress could easily have denied incontestability to merely descriptive marks as well . . . had that been its intention." *Id. at 197.*

Alternatively, plaintiff argues, without citation, that the Court in *Park N' Fly* recognized only that a party may petition for cancellation of a generic mark with the Patent and Trademark Office under *15 U.S.C. § 1064(3)*, but could not assert genericness as a defense to an infringement action. Again, however, *Park N' Fly* did not so hold and to imply as much would, as defendant points out, render meaningless the federal district court's concurrent authority under the Lanham Act to adjudicate such registration: "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, . . . and otherwise rectify the register with respect to the registrations of any party to the action." *15 U.S.C. § 1119.*

[*15] In any event, defendant does not seek to challenge the registered mark as a whole, but merely that part of the mark containing the term "Church of the Creator" and, as such, plaintiff is not entitled to the presumption that registration affords. [9] Likewise, the presumption applies only when the trademark is used on the goods and services specified in the registration, [10] which in plaintiff's case are "religious instructional and teaching materials [of the kinds described in the registration]." From what the court can make of plaintiff's complaint and the facts in the record, however, the "goods and services" on which the defendant used the term "Church of the Creator" are its "messages," which defendant communicates through flyers, pamphlets, brochures, newsletters, television talk-show appearances and news interviews, and the Internet. [11] Alternatively (and because the parties assume as much), even if "Church of the Creator" were protected as a registered trademark, the evidence is more than sufficient to overcome any presumption that the term "Church of the Creator" is not generic and, indeed, there is no material fact with respect to whether the term is generic. *See Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 171 (7th Cir. 1996)* [*16] (The question as to whether a term is generic "is a question of fact" and "as with any question of fact can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered.").

9   The registration itself indicates that "no claim is made to the exclusive right to use 'church', apart from the mark as shown. *The mark includes a background six-pointed star grid emanating light radiations, centered about a descending/ascending dove, centered about and cradling within its breast, the planetary sphere of earth.*" (Pl.'s 56.1 Statement, Ex. 1) (emphasis added). *See 15 U.S.C. §§ 1115(a), (b)* (Registration is evidence of a trademark's validity, registration, ownership and exclusive right to use it "subject to any conditions or limitations in the registration[.]"); *In re National Data Corp., 753 F.2d 1056, 1059 (Fed. Cir. 1985)* ("The registration affords *prima facie* rights in the mark *as a whole*, not in any component.") (emphases in the original); *Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1042-43 (2d Cir. 1980)* (holding that the owner of a registered trademark "Saratoga Vichy" could not assert rights in an unregistered trademark "Saratoga" absent proof of secondary meaning); 2 McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 12:40 ("It is possible to obtain federal registration of a logo or design composite even if the design consists of letters spelling out a generic name if the word is displayed in very distinctive lettering *or is accompanied by a distinctive design.* However, such a registration does not give any exclusive right to use the generic word per se. The only exclusive right from such a 'picture' registration is the use of that exact 'picture' which happens to spell out a generic name of the goods. Such logo registrations are no more than registrations of a picture or design which happens to spell out a generic name. Such registrations should not be viewed as giving protection to a generic name per se.") (emphasis added). The court, therefore, need not consider defendant's request (*see* Def.'s Reply to Mot. for J. on the Pleadings, at 5) to cancel plaintiff's registration on the basis that the term "Church of the Creator" is generic because, as just noted, the registration encompasses more

2002 U.S. Dist. LEXIS 1478, *; 61 U.S.P.Q.2D (BNA) 1914

Page 6

than that term and defendant has not claimed that the composite registration is generic.

[*17]

10    15 U.S.C. §§ 1115(a), (b) (Registration is evidence of a trademark's validity, registration, ownership and exclusive right to use it "on or in connection with the goods or services specified in the registration[.]"); Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 77 (7th Cir. 1977).

11    In essence, plaintiff seeks to prohibit defendant from referring to itself by the same or similar name as plaintiff in communicating its message. (See Compl. P 13 ("The close similarities of the marks have led and would likely lead the public mistakenly to believe that [plaintiff] has approved, sponsored, or endorsed [defendant's] messages or activities, or that [plaintiff] and [defendant] are the same organization (or parts of the same organization)."); id. P 19 ("[Defendant's] activities have caused, and . . . will continue to cause a likelihood of confusion and deception of members of the public an injury to [plaintiff's] good will and reputation as symbolized by CHURCH OF THE CREATOR(R) mark."); see also PP 23-24. See Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534 (9th Cir. 1989) ("Trademarks and trade names are technically distinct. Trade names are symbols used to distinguish companies, partnerships and businesses. Trade names symbolize the reputation of a business as a whole. In contrast, trademarks and service marks are designed to identify and distinguish a company's goods and services.") (emphasis added). However, the same general standards apply to a claim brought under the Lanham Act, whether termed a trade mark or trade name. Id.

[*18]  In deciding the question of genericness of the term "Church of the Creator," the court must consider the term as a whole. Mil-Mar Shoe Co. v. Shonac Corp., 75 F.3d 1153, 1161 (7th Cir. 1996). Whether a term is generic in the mind of the public is a question "of linguistic usage," and the Seventh Circuit sanctions reference to the dictionary as well as the yellow pages of the phone book. Door Sys., 83 F.3d at 171; Liquid Controls, 802 F.2d at 937-38; see also Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 80 (7th Cir. 1977) (Court may take judicial notice of "generally accepted English usage" in dictionary.). If a term appears "in a standard dictionary in lower case, this would be powerful evidence that the term was generic, because nouns and other nominatives listed in dictionaries, save for the occasional proper name, denote kinds rather than specific entities ('dog,' not 'Fido')." Door Sys., 83 F.3d at 171. The fact

that a term comprised of more than one word is not found in the dictionary, however, is not dispositive. Liquid Controls, 802 F.2d at 938. And while individual [*19] generic words may together form "more than the sum of their parts" and become a protectable trademark, "other composite terms are nothing more than the sum of their parts" and even together form only a generic and, therefore, unprotectable term. Id.

The court concludes that the combination of the word "church" and the words "of," "the," and "creator," which neither party disputes are generic by themselves, constitute only a generic term when combined together. The term "church" is defined as

1: a building for public worship and esp. Christian worship 2: the clergy or officialdom of a religious body 3: a body or organization of religious believers: as: the whole body of Christians b: denomination c: congregation 4: a public divine worship goes to [approximately] every Sunday 5: the clerical profession considered the [approximately] as a possible career

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, p. 205 (10th ed. 1999). The term "creator" is defined as: "one that creates usu. by bringing something new or original into being; esp, cap: GOD." Id. at 272. Together these words denote a class or genus of churches -- those that consist of a building for worship [*20] of, or body of religious believers in, a creator-entity. While the term "Church of the Creator" is not as generic as "church" by itself, the term "Church of the Creator" is at least generic for a subcategory of churches, namely those that consist of a building for worship of, or a body of believers in, a creator-entity. [13] See Liquid Controls, 802 F.2d at 938 ("Liquid Controls" is generic for devices to measure and control liquids.); Mil-Mar Shoe, 75 F.3d at 1160 ("Warehouse Shoes" and "Shoe Warehouse" is generic in that "both signify a particular type, category, or genus of retail stores: large stores that sell shoes in high volume at discount prices."); Blinded Veterans Ass'n v. Blinded Am. Veterans Found., 277 U.S. App. D.C. 65, 872 F.2d 1035, 1041 (D.C. Cir. 1989) ("Blinded Veterans" generic for persons who are former members of the armed forces who had lost their vision); [13] see also In re Computer Store, Inc., 211 U.S.P.Q. 72, 75 (T.T.A.B. 1981) (affirming refusal of registration of "The Computer Store" on finding that it was generic for computer sales services). That there is no evidence in the 2001 Chicago [*21] Consumer Yellow Pages of a church using the term "Church of the Creator" in its name does not give rise to an issue of fact in this case. See Liquid Controls, 802 F.2d at 938.

Page 7

2002 U.S. Dist. LEXIS 1478, *; 61 U.S.P.Q.2D (BNA) 1914

12  In this sense, defendant's analogy to the term "Church of God" is helpful. Since "god" is defined as

> 1: cap: the supreme or ultimate reality: as a: the Being perfect in power, wisdom, and goodness who is worshiped as creator and ruler of the universe b Christian Science: the incorporeal divine Principle ruling over all as eternal Spirit: infinite Mind 2: a being or object believed to have more than natural attributes and powers and to require human worship; specif: one controlling a particular aspect or part of reality 3: a person or thing of supreme value 4: a powerful ruler

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, p. 500, a "church of god" would be generic for an organization of believers in the supreme or ultimate reality or one controlling a particular aspect of reality. Certainly, one church could not incorporate the name "church of god" as their own and prohibit all others from using it, even if one church believes that "god" refers to different entities or realities. Indeed, the genericness of the phrase "church of god" is further evidenced by the yellow pages.

[*22]

13  Plaintiff's attempt to distinguish *Liquid Controls and Blinded Veterans* on the basis that the marks at issue in those cases denoted types of products and services with which they were used and here plaintiff used its mark not to refer to "churches" but only in relationship to the products plaintiff provides is unavailing, for the reason previously noted, *supra* n. 11.

Moreover, that plaintiff might consider creator to be "god" [*] and defendant the "White Race," does not establish that the term is not generic, but rather are differences that serve to distinguish plaintiff's brand from defendant's. Because the term "Church of the Creator" is generic, however, neither can lay claim to it as their own. It remains in the public domain. *See Pro-Line, 83 F.3d at 171* ("The trademarking of generic terms would impose excessive costs of information on competitors and consumers and is therefore forbidden.") (citations omitted); *Blau Plumbing, Inc., 781 F.2d at 609-10* (Stating that "it is no purpose of trademark protection to allow a firm to prevent its competitors [*23] from informing consumers

about the attributes of the competitors' brands" and a company "cannot appropriate the English language, and by doing so render a competitor inarticulate."); *Blinded Veterans Ass'n, 872 F.2d at 1039* ("Because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded trademark protection even if it becomes associated with only one source."); *cf. New Thought Church v. Chapin, 159 A.D. 723, 144 N.Y.S. 1026 (N.Y. App. Div. 1913)* (denying plaintiff "New Thought Church" an injunction against defendant who sought to conduct services under name "New Thought Services," reasoning that plaintiff could not claim an exclusive right to a name that consisted of words, which together were only generic, and stating that plaintiff "is not in a position to successfully claim a monopoly of teaching this form of religious faith by means of organizations known by the generic names of churches").

14  Although plaintiff has not specifically stated how it defines "creator," in arguing against defendant's genericness argument, plaintiff appears to maintain that the term is defined by reference to "god." (*See* Pl.'s Opp. to Mot. for J. on the Pleadings, at 6.)

[*24]  Because plaintiff does not have a protectable trademark in the term "Church of the Creator" defendant is entitled to summary judgment on plaintiff's federal trademark and unfair competition claims. [15]

15  The Seventh Circuit has held that even if a term is generic, a plaintiff may have a claim for "passing off" under *15 U.S.C. § 1125(a)*. *See Liquid Controls, 802 F.2d at 939-40*. However, to establish a "passing off" claim, there must be evidence of confusion resulting from more than just similarity of names; there must be some evidence of fraud -- that defendant is "trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *Id. at 940* (citation omitted). Plaintiff does not appear to make such a contention. (*See* Pl.'s Mem. in Support of Summary J., at 7) ("Plaintiff does not contend that Defendant intended to traffic on the goodwill of Plaintiff's name."). In any event, even if it has, occasional misdirected mail, which seems to be the result of a mere confusion of similarity of names, is not sufficient to establish a "passing off" claim. *Id.*

[*25] Count III

In Count III, plaintiff seeks injunctive relief for dilution of its mark under Section 43(c) of the Lanham Act,

Page 8

2002 U.S. Dist. LEXIS 1478, *; 61 U.S.P.Q.2D (BNA) 1914

*15 U.S.C. § 1125(c),* [16] and the Illinois Trademark Regis-tration Protection Act, *765 ILCS 1036/65* (1998). [17] To prevail on a Lanham Act dilution claim, plaintiff must establish: "(1) the mark is famous; (2) the alleged in-fringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce." *Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 639 (7th Cir. 1999)* (citations omitted). A finding that the mark in question is generic precludes recovery. *See Illinois High School Ass'n v. GTE Vantage Inc., 99 F.3d 244, 247 (7th Cir. 1996)* ("If a mark becomes generic it is no longer distinctive, as [*15 U.S.C. § 1125(c)(1)*] requires."); *Na-bisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d Cir. 1999)* ("[Generic words] are totally without distinctive-ness and are ineligible for protection [under *15 U.S.C. § 1125(c)*] as marks because to give them [*26] protection would be to deprive competitors of the right to refer to their products by name."). Likewise, to establish a claim under the Illinois Trademark Registration Protection Act, plaintiff must establish, *inter alia,* that its mark is "dis-tinctive." *Kern v. WKQX Radio, 175 Ill. App. 3d 624, 529 N.E.2d 1149, 1156-57, 125 Ill. Dec. 73 (1st Dist. 1988)* (citing *Ye Olde Tavern Cheese Prods., Inc. v. Planters Peanuts Div., Standard Brands, Inc., 261 F. Supp. 200 (N.D. Ill. 1966), aff'd, 394 F.2d 833 (7th Cir. 1967))*. As with the federal claim, however, a finding of genericness precludes recovery. *See id.* Because the Court has concluded that "Church of the Creator" is ge-neric, defendant is entitled to summary judgment on plaintiff's dilution claims.

[*27]

16  *15 U.S.C. § 1125(c),* provides: "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsec-tion."

17  *765 ILCS 1036/65,* provides: "The owner of a mark which is famous in this State shall be enti-tled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use of a mark or trade name, if the use begins af-ter the mark has become famous and causes dilu-tion of the distinctive quality of the mark, and to obtain such other relief as is provided in this Sec-tion."

**Counts IV and V**

In Count IV, plaintiff seeks relief for common law trademark infringement and unfair competition. In Count V, plaintiff seeks relief for defendant's alleged deceptive acts or practices in the conduct of business in violation of Illinois Uniform Deceptive Trade Practices Act, *815 ILCS 510/1 et seq.* Because plaintiff cannot succeed in showing that it has a protectable trademark in the name "Church of the Creator," however, it cannot prevail on its state claims for common law trademark and unfair and deceptive business practices. *Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 908 (7th Cir. 1983)* (granting summary [*28] judgment on state claims after finding plaintiff did not have valid trademark); *Spex, Inc. v. Joy of Spex, Inc., 847 F. Supp. 567, 579 (N.D. Ill. 1994)* (dismissing claim brought under the Illinois Deceptive Trade Practices Act). Therefore, defendant is entitled to summary judgment on these claims as well.

**CONCLUSION**

For the reasons set forth above, the court grants de-fendant's motion for summary judgment [# 45], denies plaintiff's motion for summary judgment [# 42], denies, as moot, defendant's motion for judgment on the plead-ings [# 24] and denies, as moot, plaintiff's motion to strike defendant's surreply [# 64].

Date: January 31, 2002

Enter:

JOAN HUMPHREY LEFKOW

United States District Judge

**JUDGMENT IN A CIVIL CASE**

IT IS HEREBY ORDERED AND ADJUDGED that defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied as moot. Defendant's motion for judgment on the pleadings is denied as moot. Plaintiff's motion to strike defendant's surreply is denied as moot. Judgment is entered in favor of the defendant and against the plaintiff.

Date: 1/31/2002