Robert L. Powley (RP7674)
James M. Gibson (JG9234)
Powley & Gibson, P.C.
304 Hudson Street, 2nd Floor
New York, New York 10013
Telephone: (212) 226-5054
Facsimile:  (212) 226-5085

Attorneys for Plaintiffs
Energy Intelligence Group, Inc., and
Energy Intelligence Group (UK) Limited

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
| | |
|---|---|
| Energy Intelligence Group, Inc.,<br>Energy Intelligence Group (UK) Limited | ECF Case<br><br>Civil Action No.:<br>08-CV-01497 (DAB) |
| Plaintiffs, | |
| -against- | **PLAINTIFFS'<br>MEMORANDUM OF LAW<br>IN OPPOSITION TO<br>DEFENDANT'S MOTION TO<br>DISMISS** |
| UBS Financial Services, Inc., | |
| Defendant. | |

-------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    INTRODUCTION...................................................................1

II.   ARGUMENT.........................................................................4

   A.   DEFENDANT'S ARGUMENTS FAIL TO
        SUPPORT A RULE 12(B)(6) MOTION TO DISMISS ....................4
           i)    The Question of Whether a Mark Is
                 Generic Is a Question of Fact........................................4

   B.   DEFENDANT HAS FAILED TO REBUT THE
        PRIMA FACIE VALIDITY OF EIG's
        INCONTESTABLE FEDERAL TRADEMARK REGISTRATION..........6

   C.   DEFENDANT'S CASE LAW IS READILY DISTINGUISHABLE
        FROM THE FACTS AT ISSUE   ...........................................8

   D.   EIG'S MARK OIL DAILY® IS NOT GENERIC ...............................9

   E.   PLAINTIFFS' OIL DAILY® PUBLICATION IS AKIN
        TO A NEWSPAPER...........................................................11

   F.   THE APPLICATION OF THE TESTS SET FORTH
        IN CES AND REESE STILL RESULT IN NON-GENERIC
        TREATMENT OF THE MARK OIL DAILY® ...............................13

   G.   DEFENDANT HAS FAILED TO ESTABLISH
        THE ABSENCE OF ANY LIKELIHOOD OF CONFUSION................15
           i)    The Similarity of the Marks ......................................17
           ii)   The Strength of the Mark OIL DAILY®......................18
           iii)  Bad Faith.............................................................18
           iv)   The Proximity of the Goods......................................18
           v)    The Sophistication of the Consumers..........................19

   H.   DEFENDANT'S MOTION TO DISMISS EIG'S
        STATE LAW AND UNFAIR COMPETITION CLAIMS MUST BE
        DENIED...........................................................................20

   I.   DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S
        COMMON LAW TRADEMARK INFRINGEMENT AND
        UNFAIR COMPETITION CLAIMS MUST BE
        DENIED...........................................................................21

   J.   CONCLUSION..................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Abercrombie & Fitch Co. V. Hunting World, Inc.*
  537F.2d, 189 U.S.P.Q. 759 (2d Cir. 1976)……………………………………..8

*Am. ORT, Inc. v. ORT Israel*
  2007 U.S. Dist. LEXIS 51915 (S.D.N.Y. July 17, 2007)…………………………..6

*Bank of America Nat'l Trust and Savings Ass'n v. Amerian Nat'l Bank of St. Joseph*
  201 U.S.P.Q. 842, 845 (T.T.A.B. 1978)…………………………………………..18

*Bolt Elec., Inc. v. City of N.Y.*
  53 F. 3d 465, 469 (2d Cir. 1995)………………………………………………….4

*CES Publishing Corp. v. St. Regis Pub., Inc.*
  531 F.2d 11, 188 U.S.P.Q. 585 (2d Cir. 1980)…………………………..8, 11, 12, 13

*Conley v. Gibson*
  355 U.S. 41, 45-46 (1957)……………………………………………………..4, 15

*Courtenay Comm'ns Corp. v. Hall*
  334 F. 3d 210 (2d Cir. 2003)…………………………………………………..4, 5

*Deere & Co. V. MTD Prods., Inc.*
  2001 WL 435613, *1 (S.D.N.Y. 2001)…………………………………………..15, 19

*Genesee Brewing Company, Inc. v. Stroh Brewing Company, Inc.*
  124 F. 3d 137, 149-150 (2d Cir. 1997)…………………………………………..21

*Hearts on Fire Company, LLC v. LC International Corp.*
  2004 WL 1724932 (S.D.N.Y.)……..…………………………5, 15, 19, 20, 21, 22

*Horizon Mills Corp. v.Qvc, Inc.*
  161 F.Supp.2d 208,215 (S.D.N.Y. 2001)…………………………………………6, 9, 10

*In re Nationwide Indus, Inc.*
  6 U.S.P.Q.2d 1882, 1884 (T.T.A.B. 1988)………………………………………18

*Lane Capital Mgmt v. Lane Cap. Mgmt.*
  192 F.3d 337, 52 U.S.P.Q.2d 1094 (S.D.N.Y.1999)..................................5, 7, 15

*Le Book Publl'g, Inc. v. Black Book Photography*
    418 F. Supp. 2d 305, 2005 U.S. Dist. LEXIS 17967 (S.D.N.Y. 2005)................8, 16

*Lemme v. NBC, Inc.*
    472 F. Supp.2d 433, 442 (E.D.N.Y. 2007)....................................................6

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*
    454 F. 3d 108 (2d Cir. 2006)..............................................................16

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*
    220 F.R.D. 39, 40 (S.D.N.Y. 2004)...................................................15, 19

*Manning Int'l, Inc. v. Home Shopping Newtwork, Inc.*
    152 F. Supp. 432, 437 n.7 (S.D.N. Y. 2001)..........................................15, 19

*Nabisco, Inc. V. Warner-Lambert Co.,*
    220 F. 3d 43 (2d Cir. 2000)...............................................................16

*Novak v. Overture Servs.,*
    309 F.Supp.2d 466 at 458 (S.D.N.Y. 2004)..............................................5

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*
    175 F.3d 266, 273 50 U.S.P.Q.2d 1626 (2d Cir. 1999).....................................8

*Park' n. Fly v. Dollar Park & Fly*
    469 U.S. 189, 105 S. Ct. 658 (1985)....................................................6, 11

*Pilates, Inc. v. Current Concepts, Inc., et al.*
    120 F.Supp.2d 286, 295 57 U.S.P.Q.2d 1174 (S.D.N.Y. 2000).........................7

*Polaroid Corp. v. Polarad Electronics Corp.*
    287 F.2d 492,495 (2d Cir. 1961)......................................................16, 17

*Reese Pub. Co. v. Hampton Int'l, Comm., Inc. et al.*
    620 F.2d 7; 205 U.S.P.Q. 585 (2d Cir. 1980)........................8, 11, 12, 14

*Scheuer v. Rhodes*
    416 U.S. 232, 236, 94 S. Ct. 1683, 1686
    40 L.Ed.2d 90 (1974).....................................................................15

*Simon & Shuster, Inc. v. Dove Audio, Inc.*
    936 F.Supp. 156, 1996 U.S. Dist. LEXIS 12609(S.D.N.Y. 1996).........................11

*Solow Bldg. Co., LLC v. Nine West Group, Inc.*
     No. 00 Civ. 7865, 2001 U.S. Dist. LEXIS 8848 (S.D.N.Y. June 28, 2001),
          *aff'd 48 Fed. App'x 15* (2d Cir. 2002)......................................................9

*The Deal, LLC v. Korangy Pub., Inc.*
     309 F. Supp.2d 512, 523, 69 U.S.P.Q.2d 1775 (S.D.N.Y. 2004).......................7, 9

*Walker v. City of N.Y.*
     974 F.2d 293, 298 (2d Cir. 1992) *cert. denied,* 507 U.S. 961(1993).................4

**Statutes**

     Lanham Act § 2(f), 15.U.S.C. § 1052(a)..................................................6, 11

     Lanham Act § 15, 15.U.S.C. § 1065......................................................6, 11

     Lanham Act § 26, 15.U.S.C. § 1094..........................................................12

     Lanham Act § 43(a), 15.U.S.C. § 1125(a)...............................................4, 21

     New York General Business Law § 360-1....................................................20

**Rules**

     Fed. R. Civ. P. 12(b)(6)........................3, 4, 5, 6, 7, 8, 9, 11, 15, 16, 18 , 19, 20, 21

**Other References**

McCarthy on Trademarks and Unfair
Competition § 12:01 (4th ed. 2008)..........................................................7

McCarthy on Trademarks and Unfair
Competition § 12:12 (4th ed. 2008)..........................................................6

Plaintiffs Energy Intelligence Group, Inc. ("EIG") and Energy Intelligence Group (UK) Limited ("EIG (UK)") (collectively "Plaintiffs") submit this Memorandum of Law, together with the accompanying declaration of Thomas E. Wallin, in opposition to Defendant UBS Financial Services, Inc.'s ("UBS" or "Defendant") Motion to Dismiss the third, fourth and fifth counts of Plaintiffs' Complaint.

## I.    INTRODUCTION

This case concerns Defendant's appropriation of whole or substantial portions of Plaintiffs' copyrighted news articles as well as Defendant's use of the mark DAILY OIL NEWS, in the face of EIG's registered and incontestable trademark OIL DAILY®.

As evinced by Plaintiffs' Complaint for Copyright Infringement; Trademark Infringement; False Designation of Origin; and Unfair Competition (hereinafter "Complaint"), EIG has been using the mark OIL DAILY® since at least as early as 1951, and has registered, incontestable federal rights to use this mark subject to U.S. Trademark Registration No. 2,169,571 in connection with electronic and print publications concerning the energy and petroleum industries.  (Wallin Decl. ¶ 4).

EIG's OIL DAILY® news publication is, in essence, a newspaper which covers stories not only directly related to the energy and petroleum industries, but draws upon a wide array of subject matter including but not limited to the latest developments in the worldwide oil and gas industry, assessments of key market trends and prices, news on mergers and acquisitions, political changes, international events, technological advances, environmental issues, legal news, coverage of oil and gas trade flows, coverage of the natural gas industry regarding supply, distribution and pipeline, markets, demand, and consumption, investment projects and decisions,

spot markets and futures markets, financial and operational performance of companies, licensing policies and acreage awards, upstream developments such as exploration, discoveries, development, production trends and enhanced recovery, mid-stream developments such as pipelines, shipping, tankers and terminals, downstream developments such as refining, marketing, and retail distribution, governmental regulation, alternative fuels and inter-fuel competition, demand for petroleum and economic impact of oil prices and the petroleum business. (Wallin Decl. ¶ 6). The OIL DAILY® publication has a large and diverse subscription base that includes members of investment banks, risk assessment organizations, insurance companies, government departments and agencies, software and hardware suppliers, equipment suppliers, engineering firms, manufacturing companies, steel companies, academic libraries and institutions, law firms, management consultants, press and media companies, petroleum service firms, central banks, financial institutions, trade and industry associations, embassies, research institutions and international organizations in addition to members of the oil and gas industries. (Wallin Decl. ¶ 5).

Over the course of nearly six (6) decades, the OIL DAILY® news publication has generated millions of dollars in revenue, has become well-known and has established significant good will for EIG. (Wallin Decl. ¶ 7).

Defendant and/or Defendant's related company, doing business as UBS Warburg, produces a newsletter using the mark DAILY OIL NEWS, which, on information and belief, is distributed to and used by Defendant's employees and externally to and by Defendant's clients and prospective clients.

In the instant motion, Defendant seeks to dismiss only the trademark and unfair competition claims in Plaintiffs' Complaint.[1]  Defendant's main challenge against the mark OIL DAILY® is that the mark is generic and not subject to trademark protection.  Defendant's argument must fail, because the classification of trademarks involves questions of fact not suitable for resolution under Federal Rule 12(b)(6).  Defendant's argument as to the "likelihood of confusion" must also fail, because the presence or absence of a "likelihood of confusion" is a factual matter similarly unsuitable for resolution under Federal Rule 12(b)(6).

Even if the court were to engage in factual determinations, the facts before this Court go beyond Defendant's inability to rebut the presumptive validity of the federal and incontestable OIL DAILY® registration.  The facts also demonstrate that Defendant's adoption of EIG's distinctive and well-known mark OIL DAILY®, coupled with its misappropriation of Plaintiffs' copyrighted articles, evidence deliberate bad-faith steps by Defendant calculated to deceive and confuse consumers as to the source of Plaintiffs' copyrighted content.  In this light, Plaintiffs have not only succeeded in stating a colorable claim for trademark infringement under the Lanham Act, but have set forth a foundation upon which Plaintiffs are likely to ultimately succeed on the merits.  Accordingly, Defendant's motion to dismiss Plaintiffs' Lanham Act trademark infringement claims must be denied.

---

[1] Though Defendant also seeks the dismissal of Plaintiffs' "dilution claim" (p. 19 of Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss), Defendant appears to have misconstrued Plaintiffs' Count Four, which does not encompass any state law dilution claim.

Defendant's arguments as to EIG's state and common-law trademark claims parallel its argument as to trademark protection under the Lanham Act and must fail for the same reasons. With regard to Defendant's challenges to EIG's state and unfair competition claims, the facts, when viewed in the light most favorable to non-movant Plaintiffs, state actionable causes of action and accordingly, Defendant's Motion to Dismiss must be denied in toto.

## II.    ARGUMENT

### A.    DEFENDANT'S ARGUMENTS FAIL TO SUPPORT A RULE 12(B)(6) MOTION TO DISMISS

#### i)    The Question of Whether a Mark Is Generic Is a Question of Fact

On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. Bolt Elec., Inc. v. City of N.Y., 53 F.3d 465, 469 (2d Cir.1995) (citations omitted).  The Court will grant such a motion only if after viewing a plaintiff's allegations in the most favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Walker v. City of N.Y., 974 F.2d 293, 298 (2d Cir.1992), cert. denied, 507 U.S. 961 (1993). Courtenay Comm'ns Corp. v. Hall, 334 F.3d 210 (2d Cir.2003) (vacating and remanding dismissal of Lanham Act claims where district court had concluded on a motion to dismiss that the mark was generic and that plaintiff had therefore failed to state a claim).

Defendant's Rule 12(b)(6) motion to dismiss EIG's trademark claims under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) is predicated on the assertion that the mark OIL DAILY® is generic and therefore not entitled to protection (See Defendant's Memorandum at p. 6). However, it is well-settled law in the Second Circuit that the classification of a mark is a factual

4

issue, determined by how the public views the mark. See Lane Capital Mgmt. v. Lane Cap. Mgmt., 192 F.3d 337, 52 U.S.P.Q.2d 1094 (S.D.N.Y. 1999) (classification is a question of fact); Courtenay, 334 F.3d at 215 (2ⁿᵈ Cir. 2003); Hearts on Fire Company, LLC v. L C International Corp., 2004 WL 1724932 (S.D.N.Y.) (denying motion to dismiss Lanham Act claims pursuant to Rule 12(b)(6) because classification of trademarks is a factual matter).

This Court has ruled that the question of whether a mark is generic is a factual one which is not appropriately disposed of with a Rule 12(b)(6) motion. In Novak v. Overture Servs., 309 F.Supp.2d 446, 458 (S.D.N.Y. 2004), this Court denied a defendant's Rule 12(b)(6) motion because the factual evaluation necessitated by a finding of genericness would "require evaluation of evidence beyond the pleadings" which is beyond the purview of a Rule 12(b)(6) motion. Id. at 458. This Court in Novak further emphasized the impropriety of deciding the question of "genericness" in the context of a Rule 12(b)(6) motion by declining to rule as a matter of law that Plaintiff's mark "PET WAREHOUSE" mark was generic. Id.   Additionally, as the Second Circuit has stated, "[i]t is usually true that the classification of a mark is a factual question, and that the question turns on how the purchasing public views the mark. The pleadings and documents necessarily relied on by Plaintiff's complaint, which were all that the district court could rightfully consider in deciding the motion to dismiss for failure to state a claim, are insufficient for determining the critical fact of how the public views [a] mark." Courtenay Communs. Corp. v. Hall, 334 F.3d 210, 215 (2d Cir. 2003) (internal citations omitted). Therefore, since Defendant's motion turns on a factual determination of how the mark is viewed by the public, which cannot be determined based solely on the pleadings, it is inappropriate for the Court to grant Defendant's motion at this time and the motion should be denied.

5

**B.    DEFENDANT HAS FAILED TO REBUT THE PRIMA FACIE VALIDITY OF EIG's INCONTESTABLE FEDERAL TRADEMARK REGISTRATION**

EIG's incontestable federal trademark registration No. 2,169,571 for the mark OIL

DAILY® carries with it a strong presumption that the mark is valid and not generic, and

Defendant bears the burden of overcoming this presumption.  See Horizon Mills Corp. v. Qvc,

Inc., 161 F. Supp. 2d 208, 215 (S.D.N.Y. 2001) ("If a plaintiff has a federal trademark

registration, it constitutes a strong presumption that the term is not generic," shifting the burden

to defendant to bring forward evidence to overcome such presumption of non-genericness).  See

also McCarthy, McCarthy on Trademarks and Unfair Competition § 12:12 (4th ed. 2008) ("If the

plaintiff has a federal registration, it constitutes a strong presumption that the term is not generic

and defendant bears the burden of overcoming the presumption.");  Am. ORT, Inc. v. ORT Israel,

2007 U.S. Dist. LEXIS 51915 (S.D.N.Y. July 17, 2007) ("Notably, in making this assessment [of

whether a mark is generic], marks that have been registered with the USPTO are afforded a

presumption of validity."),  Lemme v. NBC, Inc., 472 F. Supp. 2d 433, 442 (E.D.N.Y. 2007)

("[T]he fact that the USPTO accepted Plaintiff's mark for registration creates a presumption that

the mark is valid.").  Defendant has offered no evidence whatsoever to demonstrate that the mark

OIL DAILY® is perceived generically by consumers and instead relies on mere conclusory

statements which are insufficient to rebut the strong presumption of validity and non-genericness

afforded by EIG's trademark registration. [2]

---

[2] It is notable that Defendant on page 18 of its own Memorandum of Law in Support of Defendant's Motion to Dismiss states that "[a]t best, EIG's mark is descriptive..." This statement, in light of the favorable inferences afforded to a non-movant faced with a Rule 12(b)(6) motion, appears to concede that EIG's mark was descriptive in nature before acquiring secondary meaning and significant good will.  EIG's mark is distinctive and has acquired secondary meaning pursuant to the Lanham Act § 2(f) 15 U.S.C. §1052(f).  Additionally, EIG's mark has become incontestable pursuant to the Lanham Act § 15 15 U.S.C. § 1065.  (A copy of the federal registration certificate for U.S. Registration No. 2,169,571 is annexed as Exhibit D to Plaintiff's Complaint.)  Under Park' n Fly v. Dollar Park & Fly, 469 U.S. 189, 105 S. Ct. 658 (1985), incontestable marks such as EIG's mark are not subject to attack on the basis of mere descriptiveness.

It is well-settled that a court may not deem a trademark generic without a significant evidentiary showing. See McCarthy, McCarthy on Trademarks and Unfair Competition § 12.01. The rationale behind this proposition is that, "[b]ecause a finding of genericness may result in the loss of rights which could be valuable intellectual property, a court should not deem a mark generic without persuasive and clear evidence that the contested term has become generic among a majority of the buyer group." Id; C.f. The Deal, LLC v. Korangy Pub., Inc., 309 F.Supp.2d 512, 523, 69 U.S.P.Q.2d 1775 (S.D.N.Y. 2004) (requiring the rebuttal of a registered mark's presumption of validity by a preponderance of the evidence); Pilates, Inc. v. Current Concepts, Inc., et al., 120 F.Supp.2d 286, 295, 57 U.S.P.Q.2d 1174 (S.D.N.Y. 2000) (making no holding as to the burden of proof required for determining "genericness," but surmising in dicta that *at least* a preponderance of the evidence standard would be required). This is consistent with the more general proposition that the classification of a trademark as arbitrary, suggestive, descriptive or generic is a factual determination. Lane Capital Mgmt. v. Lane Cap. Mgmt., 192 F.3d 337, 52 U.S.P.Q.2d 1094 (S.D.N.Y. 1999).

Here, Defendant has proffered no evidence to bolster its challenge to the mark OIL DAILY®, and certainly cannot be said to have demonstrated, by a preponderance of the evidence, that the mark OIL DAILY® is generic. Such a determination would be improper given the procedural posture facing the Court in the instant motion; the absence of any additional evidence presented by Defendant as to the issue of genericness; the presumption of validity attendant to EIG's incontestable federal trademark registration; EIG's prominent and continuous use of the mark OIL DAILY® for almost six (6) decades; and the favorable inferences accorded to non-movants in motions to dismiss under Federal Rule 12(b)(6).

Therefore, by virtue of EIG's U.S. Trademark Registration No. 2,169,571 for the mark OIL DAILY® and the absence of any evidence to rebut the presumption of validity of the mark, Defendant's motion to dismiss count three of the Complaint on the basis that the mark OIL DAILY® is generic, must be denied.

### C.    DEFENDANT'S CASE LAW IS READILY DISTINGUISHABLE FROM THE FACTS AT ISSUE

Defendant relies heavily upon several cases which allegedly support its contention that a court in the Second Circuit, when faced with a Rule 12(b)(6) motion, may properly rule upon the question of whether a mark is generic. However, all of the Second Circuit precedent cited by Defendant is inapplicable to the situation at hand because, unlike the situation in this case, none of those cases involve an incontestable trademark registered on the Principal Register invalidated under a Rule 12(b)(6) motion. Therefore, in each of the cited cases, the moving party was not faced with the burden of overcoming the presumptive validity of an incontestable trademark registration, a burden which Defendant must overcome in the instant motion. Otokoyama Co. Ltd. v. Wine of Japan Import, Inc., 175 F.3d 266, 273 50 U.S.P.Q.2d 1626 (2d Cir. 1999) (challenge to validity of registered marks did not result in dismissal but instead the issue of classification was *remanded* for trial) (emphasis added); Reese Pub. Co., Inc. v. Hampton Int'l Comm. Inc. et al., 620 F.2d 7, 205 U.S.P.Q. 585 (2d Cir. 1980) (involving an *unregistered* mark) (emphasis added); Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 189 U.S.P.Q. 759 (2d Cir. 1976) (classification issue decided on appeal *after trial*) (emphasis added); CES Publishing Corp v. St. Regis Pub., Inc., 531 F.2d 11, 188 U.S.P.Q. 612 (2d Cir. 1975) (involving a registration on the *supplemental register*) (emphasis added); Le Book Publ'g, Inc. v. Black Book Photography, 418 F.Supp.2d 305, 2005 U.S. Dist. LEXIS 17967 (S.D.N.Y. 2005) (no finding of confusion because the only common word in plaintiff's and defendant's mark was

*disclaimed* in plaintiff's registration) (emphasis added); <u>Solow Bldg. Co., LLC v. Nine West</u>

<u>Group, Inc.</u>, No. 00 Civ. 7685, 2001 U.S. Dist. LEXIS 8848 (S.D.N.Y. June 28, 2001), aff'd 48

Fed. App'x 15 (2d Cir. 2002) (the contested "9 West" mark was not registered by plaintiff and

the Rule 12(b)(6) motion was also granted on the basis of *laches*) (emphasis added).

For obvious reasons, Defendant's papers do not highlight the readily distinguishable facts

of its cited authority from the facts at issue in this case. Here, EIG owns a federally registered

trademark and has incontestable rights in the mark OIL DAILY®, which EIG has used

continuously for a span of almost six (6) decades. (Wallin Decl. ¶ 4). EIG's registration creates

a strong presumption of validity, which, when left un-rebutted by any evidence, demands a

finding that the contested mark is not generic. <u>Horizon Mills Corp. v. Qvc, Inc.</u>, 161 F.Supp.2d

208, 214-215, 2001 U.S. Dist. LEXIS 4358 (S.D.N.Y. 2001). Given the paucity of applicable

controlling authority to support Defendant's papers as well as the absence of evidence to rebut

the presumption of validity of the OIL DAILY® federal trademark registration, Defendant cannot

prevail on its 12(b)(6) motion to dismiss. Accordingly, Defendant's motion must be denied.

## D.    EIG'S MARK OIL DAILY® IS NOT GENERIC

Even assuming, arguendo, that Defendant is able to rebut the presumptions of validity

and non-genericness which flow from the OIL DAILY® federal trademark registration, the mark

OIL DAILY® is not generic. As this Court cogently stated in <u>The Deal, LLC v. Korangy Pub.,</u>

<u>Inc.</u>, 309 F.Supp.2d 512, 69 U.S.P.Q.2d 1775 (S.D.N.Y. 2004), "a generic mark is a mark that

can be used synonymously to signify the product associated with the mark." In <u>The Deal</u>, this

Court found that the mark "THE DAILY DEAL" does not immediately convey to the purchaser

that "the product is a news publication dedicated to the coverage of financial and legal news,"

and therefore found "THE DAILY DEAL" to be a protectable mark. <u>Id.</u> at 523.

9

Similarly, the mark OIL DAILY® does not immediately convey to the purchaser the contents or subject matter of the publication. The mark OIL DAILY® is ambiguous as to subject matter because a common-sense reading of the mark OIL DAILY® could relate to any number of goods or industries. For example, the publication could be about automobile racing, skin care, oil painting or cholesterol health. The multiple possible meanings of the mark OIL DAILY® require consumers to make multiple inferential steps from the mark itself before arriving at a conclusion about the nature of the news publication. Indeed, this ambiguity is borne out by the subject matter actually covered in the OIL DAILY® news publication which spans across a wide range of topics and industries which do not immediately come to mind when a consumer sees the mark OIL DAILY®. Among other things, OIL DAILY® articles cover international events, technological advances, environmental issues and legal news. (Wallin Decl. ¶ 6). In sum, the mark OIL DAILY® does not state "what it is" or even "what it is about" and therefore cannot be said to be a generic mark synonymous with any particular class of goods or services.

Also absent from the instant case are the monopolistic concerns which are attendant when a court classifies a mark as generic. Horizon Mills Corp. v. Qvc, Inc., 161 F.Supp.2d 208 (S.D.N.Y. 2001) also available as 2001 U.S. Dist. LEXIS 4358. Defendant levies the bald assertion that "[i]t is difficult, if not impossible, to imagine how Defendant or a publisher of an oil daily might convey the character of their publications and identify themselves to their target audience without the use of the terms *oil* and *daily*." (See Defendant's Memorandum of Law, p, 11). Plaintiffs submit that no significant expenditure of imagination is necessary to realize that alternate titles such as Petroleum and Energy Daily; Daily Gas and Energy News; or Petroleum Industry Daily News could be owned by others while still affording protection to EIG's incontestable, federally registered mark. When a publication's title is "hardly the only way to

describe [the publication]," the title should not be considered a generic mark. Simon & Shuster, Inc. v. Dove Audio, Inc., 936 F.Supp. 156, 1996 U.S.Dist. LEXIS 12609 (S.D.N.Y. 1996).

Finally, we should note that even if the classification of the mark OIL DAILY® was a determination appropriately raised by Defendant's Federal Rule 12(b)(6) Motion to Dismiss, Defendant's arguments are more appropriately directed at a determination of descriptiveness rather than generic treatment.[3]  However, any argument based upon the mere descriptiveness of the mark OIL DAILY® must also fail.  Though EIG's mark OIL DAILY® may have been only descriptive in the past, it has since acquired the requisite secondary meaning under Lanham Act § 2(f), 15 U.S.C. § 1052(f), making it a distinctive mark protectable under federal trademark law.  Under precedent from the Supreme Court, the mark OIL DAILY® is not subject to a "mere descriptiveness" attack because the mark OIL DAILY® has become incontestable under Lanham Act § 15, 15 U.S.C. § 1065.  See  Park' n Fly v. Dollar Park & Fly, 469 U.S. 189, 105 S. Ct. 658 (1985).

In sum, because the mark OIL DAILY® does not immediately connote any class of goods or services, and because the mark OIL DAILY® does not significantly preclude a competitor's ability to name a similar publication, the mark OIL DAILY® is not generic.

## E.    PLAINTIFFS' OIL DAILY® PUBLICATION IS AKIN TO A NEWSPAPER

The principal cases upon which Defendant relies to argue that the mark OIL DAILY® is generic and for the dismissal of Plaintiffs' claims are CES Pub. Corp. v. St. Regis Pub. Inc., 531 F.2D 11, 188 U.S.P.Q. 612 (2d Cir. 1975) and Reese Pub. Co. v. Hampton Int'l. Comm., Inc. et al., 620 F.2d 7; 205 U.S.P.Q. 585 (2d Cir. 1980).  However, as stated above, both of these cases are inapplicable because they do not involve federally registered trademarks on the Principal

---

[3] As discussed above, Defendant's own Memorandum of Law in Support of Defendant's Motion to Dismiss classifies the mark OIL DAILY® as, "[a]t best... descriptive", which would concede the non-generic treatment of the mark given the favorable inferences afforded to a non-movant faced with a Rule 12(b)(6) motion.

Register for which a presumption of validity attaches as in the present action – <u>CES</u> involved a mark on the supplemental register, and <u>Reese</u> involved an unregistered mark.  <u>See</u> Lanham Act § 26, 15 U.S.C.S. § 1094 (denying marks registered on the Supplemental Register the prima facie validity of marks registered on the Principal Register).

Even setting aside the presumption of validity attached to the mark OIL DAILY®, the tests of <u>CES</u> and <u>Reese</u> are inapplicable because of the nature of the OIL DAILY® publication. The publication in <u>CES</u> was a trade magazine "distributed free of charge to manufacturers, distributors and dealers in the consumer electronics trade[.]" 531 F.2d 11.  The publication in <u>Reese</u> was a magazine "devoted to displaying and discussing" the goods of a particular trade. 620 F.2d 7.

The OIL DAILY® publication is qualitatively different from the publications in <u>CES</u> and <u>Reese</u>.  Instead of being targeted to any particular trade as was the case in <u>CES</u>, the OIL DAILY® publication has a large and diverse subscription base that includes members of investment banks, risk assessment organizations, insurance companies, government departments and agencies, software and hardware suppliers, equipment suppliers, engineering firms, manufacturing companies, steel companies, academic libraries and institutions, law firms, management consultants, press and media companies, petroleum service firms, central banks, financial institutions, trade and industry associations, embassies, research institutions and international organizations in addition to members of the oil and gas industries.  (Wallin Decl. ¶ 5).  Instead of being about the goods or services of a particular trade as was the case in <u>Reese</u>, the OIL DAILY® publication has a much broader focus, which, as stated previously, includes but is not limited to news on mergers and acquisitions, political changes, international events,

technological advances, environmental issues, legal news, licensing policies and governmental regulation. (Wallin Decl. ¶ 6).

In short, the OIL DAILY® publication is a newspaper and not a trade-specific magazine as was the case in CES and Reese[4], and therefore the genericism tests set forth in CES and Reese are not applicable here. To find otherwise would lead to the absurd result that renowned, incontestable marks with a rich history of distinctive significance, such as THE WALL STREET JOURNAL®[5], the FINANCIAL TIMES®[6] or EIG's OIL DAILY® publication would be deprived of protection under the Lanham Act.

### F.    THE APPLICATION OF THE TESTS SET FORTH IN CES AND REESE STILL RESULT IN NON-GENERIC TREATMENT OF THE MARK OIL DAILY®

Even assuming, arguendo, that the rationale of CES and Reese applies to the mark OIL DAILY®, (despite the news-reporting nature of the OIL DAILY® publication and despite the presumption of validity attendant to EIG's incontestable federal registration), the mark OIL DAILY® is still not rendered generic.

The "fountainhead" principles levied by Defendant to mount its "genericism" attack on the mark OIL DAILY® derive from CES Pub. Corp. v. St. Regis Pub. Inc., 531 F.2D 11, 188 U.S.P.Q. 612 (2d Cir. 1975). In CES, the Second Circuit advanced the general proposition that "[c]ourts have been reluctant to find a magazine title to be generic, perhaps in part because the magazines in such cases were not literally the class the title designated but were about that class." Id. at 531 F.2d at 14. The CES court then noted a special rule applying to trademarks that serve as titles of "trade magazines," holding that such marks are deemed generic if they

---

[4] To be precise, even though the magazine in Reese was a consumer magazine, the magazine was still devoted to displaying and discussing the goods of a *particular trade.*
[5] U.S. Federal Trademark Registration No. 408,379
[6] U.S. Federal Trademark Registration No. 1,221,616

consist of a "word which names not only the class of goods but a class of magazines devoted to displaying and discussing those goods." Id.

More recently, the Second Circuit clarified the test set forth by CES for determining whether periodical titles are generic. In Reese Pub. Co. v. Hampton Int'l. Comm., Inc. et al., 620 F.2d 7; 205 U.S.P.Q. 585 (2d Cir. 1980), the Second Circuit again endorsed the general proposition that "courts have been properly reluctant to find magazine titles generic in cases where the magazines 'were not literally the class the title designated but were about that class[,]'" while crystallizing the specialized proposition as follows: Magazine titles which are "not only a class of goods but a class of magazines about those goods" are generic.[7]

Under Second Circuit precedent as stated in Reese Pub. Co., the mark OIL DAILY® cannot be said to be generic. The mark OIL DAILY® is not the name of a "particular class of goods or products." Nor can it be said that the content of the OIL DAILY® publication discusses the goods or products of "a particular trade." As discussed above, a common-sense reading of the mark OIL DAILY® could relate to any number of goods or industries: the magazine could be about health care, skin care, oil painting or car racing. The subject matter covered by the Oil DAILY® publication spans a wide range of topics and industries which are not synonymously connoted by the mark OIL DAILY® itself. Among other things, the OIL DAILY® publication includes articles covering international events, political changes, technological advances, environmental issues and legal news. (Wallin Decl. ¶ 6).

In light of the current record before this Court, the mark OIL DAILY® cannot be said to connote to consumers any particular class or industry. Therefore, the more general proposition

---

[7] It is also notable that the factual context in Reese was markedly different from the context which faces this Court in the instant motion. Unlike the record in Reese, the record before this Court does not provide a myriad of examples where the trademark, OIL DAILY®, is used in a generic manner. Also, as stated before, unlike the contested mark in Reese, the mark OIL DAILY® in the instant litigation is registered and incontestable.

stated in <u>Reese</u> and <u>CES</u> applies: courts should be reluctant to find generic any title that is not literally the class that the title specifies. It remains unestablished at this point, prior to discovery, what the meaning of "Give me an 'oil daily'" could mean to any consumer. Moreover, for the purposes of a motion to dismiss under Rule 12(b)(6), where factual issues are to be viewed in the light most favorable to the non-movant, and in light of the presumption of validity attendant to the OIL DAILY® registration, this Court cannot at this stage render a factual determination as to the appropriate classification of the mark OIL DAILY®. <u>See Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); <u>Conley</u>, 355 U.S. at 45, 78 S.Ct. at 102. <u>See also</u> <u>Lane Capital Mgmt. v. Lane Cap. Mgmt.</u>, 192 F.3d 337, 52 U.S.P.Q.2d 1094 (classification is a question of fact). Accordingly, this Court must deny Defendant's motion, even when applying the authority of <u>CES</u> and <u>Reese</u>, the principal cases relied upon by Defendant in its argument as to generic treatment.

## G.    DEFENDANT HAS FAILED TO ESTABLISH THE ABSENCE OF ANY LIKELIHOOD OF CONFUSION

The arguments levied by Defendant regarding the absence of any likelihood of confusion between EIG's and Defendant's marks seem to again ignore the procedural posture presented by Defendant's Rule 12(b)(6) Motion to Dismiss. As the cases within this circuit have repeatedly dictated, a Rule 12(b)(6) motion is not proper for a determination of the likelihood of confusion, which is a fact-specific inquiry going beyond the confines of a complaint. <u>Maharishi Hardy Blechman Ltd. V. Abercrombie & Fitch Co.</u>, 220 F.R.D. 39, 40 (S.D.N.Y. 2004) ("the question of likelihood of confusion is a fact-specific inquiry which would require the Court to resolve disputed fact questions beyond the complaint"); <u>Hearts On Fire Co. LLC v. L C Int'l. Corp.</u>, 2004 WL 1724932 at *4 (S.D.N.Y. 2004) (resolution of the Polaroid factors would constitute a finding of fact inappropriate for a motion to dismiss); <u>Manning Int'l, Inc. v. Home Shopping</u>

Network, Inc., 152 F.Supp.432, 437 n.7 (S.D.N.Y. 2001); Deere & Co. v. MTD Prods., Inc.,

2001 WL 435613, *1 (S.D.N.Y. 2001) ("[o]n a motion to dismiss the Court must accept the

allegations in [the] complaint as true and it cannot undertake the fact-dependent likelihood of

confusion analysis."). Therefore, Defendant's entire argument relating to the likelihood of

confusion is improper and irrelevant.

Defendant's citation to Le Book Publ'g, Inc. v. Black Book Photography, 418 F.Supp.2d

305, 2005 U.S. Dist. LEXIS 17967 (S.D.N.Y. 2005), is inapposite, because the facts at hand in

Le Book involved a situation where the *only similarity* between the plaintiff's and defendant's

mark was a word which was *disclaimed by plaintiff* in its registration. The instant case presents

markedly different facts, as Defendant, through its use of the mark DAILY OIL NEWS, has

appropriated *all the terms* within EIG's mark OIL DAILY®, and not just the disclaimed word

"daily." Similarly, Defendant's reliance on Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43

(2d Cir. 2000) is misplaced given that the procedural posture of Nabisco is that of a Federal Rule

56 motion for summary judgment and not a motion to dismiss confined to the pleadings and

made under Federal Rule 12(b)(6), as is the case in the instant motion presented to this Court.

Assuming, arguendo that it is proper to delve into the factual analysis necessitated by the

"Polaroid Factors," the facts before this Court, viewed in the light most favorable to non-movant

Plaintiffs, demonstrate that a likelihood of confusion is present. In the Second Circuit, courts

apply the non-exclusive multi-factor test developed by Judge Friendly in Polaroid Corp. v.

Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.1961). See also Louis Vuitton Malletier v.

Dooney & Bourke, Inc., 454 F.3d 108 (2d Cir. 2006). The test in Polaroid ("Polaroid Test")

directs the Court to balance (1) the strength of the mark, (2) the similarity of the two marks, (3)

the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the

gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers to determine a likelihood of confusion ("Polaroid Factors"). See generally Polaroid, 287 F.2d 492 (2d Cir. 1961).

>    i)    The Similarity of the Marks

Assuming, arguendo, the factual analysis of likelihood of confusion is appropriate at this stage in the litigation, the factors of the Polaroid Test, when viewed in the light most favorable to non-movant Plaintiffs, weigh against Defendant. Firstly, Plaintiffs take some umbrage with Defendant's suggestion that the mark used by Defendant is best characterized as "UBS INVESTMENT RESEARCH DAILY OIL NEWS." Instead, the court's attention is directed to the exhibits relied upon by Defendant annexed as Exhibits 7 and 8 to the Declaration of Thomas P. Lane ("Lane Declaration"), which clearly demonstrate that the term "DAILY OIL NEWS" is set apart from "UBS INVESTMENT RESEARCH" by differing color fields on the first page, and that for the succeeding pages, "DAILY OIL NEWS" is used alone, without the terms "UBS INVESTMENT RESEARCH." Questions of fact abound not only as to the similarity of the two marks, but also as to how consumers perceive Defendant's varying usage of its mark. Common sense itself raises the notion that whenever a reader saves and prints out an article on the successive pages of Defendant's publication, they will be exposed to Defendant's mark "DAILY OIL NEWS" without any reference to "UBS INVESTMENT RESEARCH." Therefore, Defendant's mark is properly characterized as "DAILY OIL NEWS" and, as such, encompasses the entirety of the mark OIL DAILY® without further distinctive terms. In sum, Defendant's mark is confusingly similar in sight, sound and meaning to the mark OIL DAILY®.

Though it is anticipated that Defendant will argue that the mark DAILY OIL NEWS uses the terms in a different order, the mere transposition of terms does not automatically vitiate the

similarity of the marks, and at the very least raises a question of fact as to the similarity of the marks not suitable for resolution in a Rule 12(b)(6) motion. See generally In re Nationwide Indus., Inc., 6 U.S.P.Q.2d 1882, 1884 (T.T.A.B. 1988); Bank of America Nat'l Trust and Savings Ass'n v. American Nat'l Bank of St. Joseph, 201 U.S.P.Q. 842, 845 (T.T.A.B. 1978). Ultimately, these facts, when viewed in the light most favorable to the non-movant Plaintiffs, demand an inference that the marks are similar, and that consumers are likely to be confused by Defendant's use of the mark DAILY OIL NEWS. Thus, this factor weighs in favor of Plaintiffs.

ii) The Strength of the Mark OIL DAILY®

As the alleged in the Complaint, EIG's incontestably registered mark, in continuous use for almost six (6) decades (Wallin Decl. ¶ 4), has generated millions of dollars in revenue, has become well-known and has established significant good will for EIG. (Wallin Decl. ¶ 7). Thus, the mark OIL DAILY® is sufficiently distinctive that, when viewed in the light most favorable to the non-movant Plaintiffs, the mark is entitled to protection from Defendant's use of the mark DAILY OIL NEWS.

iii) Bad Faith

Similarly, Defendant's argument as to the "lack of bad faith" prong of the Polaroid Factors must fail. Plaintiffs' Complaint, viewed in the light most favorable to non-movant Plaintiffs, clearly asserts both Defendant's willful, wholesale misappropriation of Plaintiffs' copyrighted works coupled with Defendant's adoption of a confusingly similar mark to an extent sufficient to assert a colorable claim of bad-faith for the purposes of a Rule 12(b)(6) motion. (See Complaint Counts One, Two and Three).

iv) The Proximity of the Goods

As alleged within Counts One and Two of Plaintiffs' Complaint, Defendant has

misappropriated whole or substantial portions of several copyrighted articles owned by Plaintiffs. These facts, when viewed in the light most favorable to the non-movant Plaintiffs, seem to indicate that Defendant's misappropriation resulted in both publications containing identical or similar stories, therefore rendering the Plaintiffs' and Defendant's goods close in proximity. In other words, the wholesale misappropriation of Plaintiffs' copyrighted articles establishes for the purposes of a Rule 12(b)(6) motion, that the "goods" are similar and this factor weighs in favor of a finding of a likelihood of confusion.

v)    The Sophistication of the Consumers

Finally, Defendant's claim as to the sophistication of Plaintiffs' consumers goes against the weight of the evidence before this Court and the factual inferences which must be made in favor of the non-movant in the context of Defendant's Rule 12(b)(6) motion. In contrast to the categories of readers cherry-picked by Defendant to allege the sophistication of Plaintiffs' consuming public, the Declaration of Thomas E. Wallin establishes that the relevant consuming public is sufficiently diverse and varied (Wallin Decl. ¶ 5) that the Court cannot find, as a matter of law, that the Plaintiffs' consuming public is so "sophisticated" as to preclude a finding of a "likelihood of confusion." Instead the facts, when viewed in the context of a Rule 12(b)(6) motion, demand that the factual determination as to *any factor* relating to the likelihood of confusion be reserved until discovery evidence is produced. Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co., 220 F.R.D. 39, 40 (S.D.N.Y. 2004); Hearts On fire Co. LLC v. L C Int'l. Corp., 2004 WL 1724932 at *4 (S.D.N.Y. 2004); Manning Int'l, Inc. v. Home Shopping Network, Inc., 152 F.Supp.432, 437 n.7 (S.D.N.Y. 2001); Deere & Co. v. MTD Prods., Inc., 2001 WL 435613, *1 (S.D.N.Y. 2001).

**H.    DEFENDANT'S MOTION TO DISMISS PLAINTIFFS STATE LAW AND UNFAIR COMPETITION CLAIMS MUST BE DENIED**

Defendant seeks to dismiss Plaintiffs' state law unfair competition claim under Rule 12(b)(6).  To succeed under New York General Business Law § 360-l, a plaintiff must establish "[l]ikelihood of injury to business reputation *or* of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief…"  New York General Business Law § 360-l (emphasis added).  Plaintiffs have adequately alleged a likelihood of injury to business reputation in its Complaint.  Viewing the facts in the light most favorable to Plaintiffs, EIG's allegations establish that Defendant misappropriated wholesale Plaintiffs' articles, re-introducing Plaintiffs' articles under Defendant's own brand name that is confusing similar to EIG's mark OIL DAILY®.  These actions by Defendant clearly placed Plaintiff in the untenable position of having to compete against its own goods, diminishing Plaintiff's business profits as well as wrongfully pilfering the good will of EIG.  Defendant's motion to dismiss EIG's state law unfair competition claim should therefore be dismissed.  See Hearts on Fire, 2004 WL 1724932 (S.D.N.Y.) (denying motion to dismiss state law unfair competition claim because plaintiff's allegations of harm to reputation due to confusion between the marks were sufficient to defeat a 12(b)(6) motion).

**I.    DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS MUST BE DENIED**

Defendant seeks to dismiss Plaintiffs' New York common law trademark infringement and unfair competition claim under Rule 12(b)(6).  The elements of an unfair competition and infringement claim under New York common law are the same as the elements to a claim under Lanham Act § 43(a), 15 U.S. C. § 1125(a), but with an additional element of bad faith.  See Genesee Brewing Company, Inc. v. Stroh Brewing Company, Inc., 124 F.3d 137, 149-150 (2d Cir. 1997).  As outlined above, since Defendant's motion to dismiss Plaintiffs' claims under Lanham Act § 43(a) 15 U.S.C. § 1125(a) are deficient and premature, the only remaining question is whether the extra element of bad faith is alleged in the Complaint sufficient to support a common law unfair competition claim.  Plaintiffs allege in the Complaint that Defendant willfully appropriated Plaintiffs' copyrighted content and further allege under Section D of the Complaint entitled "Defendant's Improper use of EIG's Federally Registered Trademark" that Defendant "deliberately embarked on a course of conduct that has for its purpose and effect to infringe EIG's rights and compete unfairly with EIG in the sale and distribution of newsletters" (See Complaint at 12).  Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs' allegations should be considered true for the purposes of a Rule 12(b)(6) motion and are therefore sufficient to support a claim of bad faith under New York common law. See Hearts on Fire, 2004 WL 1724932 (S.D.N.Y.) (plaintiff's allegations of bad faith in its complaint were sufficient to support a state law unfair competition cause of action against a 12(b)(6) motion to dismiss).  Therefore, since Plaintiffs have sufficiently alleged bad faith on the pleadings and because of the heretofore cited reasons why Defendant's motion to dismiss

Plaintiffs' claim under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) should be denied,

Defendant's motion to dismiss the common law unfair competition claim should be similarly

denied. See Id. at 4 (motion to dismiss common law unfair competition claim was denied

because defendant's motion to dismiss the Lanham Act claim was denied and plaintiff alleged

bad faith on the pleadings).

**J.       CONCLUSION**

For the reasons stated above, the Court should deny Defendant's Motion to Dismiss counts

three, four, and five of Plaintiffs' Complaint.


Respectfully submitted,

Dated:  April 28, 2008                By: _____
                                          Robert L. Powley (RP7674)
                                          James M. Gibson (JG9234)
                                          Powley & Gibson, P.C.
                                          304 Hudson Street, 2nd Floor
                                          New York, New York 10013
                                          Telephone: (212) 226-5054
                                          Facsimile:  (212) 226-5085

                                          Attorneys for Plaintiffs
                                          Energy Intelligence Group, Inc. and
                                          Energy Intelligence Group (UK) Limited

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of PLAINTIFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS was served upon counsel for Defendant by ECF and First-Class Mail, postage prepaid, on this 28th day of April 2008, addressed as follows:

> Michael S. Elkin, Esq.
> Thomas P. Lane, Esq.
> Winston & Strawn LLP
> 200 Park Avenue
> New York, NY 10166

_____

Bruni Casiano

# APPENDIX OF UNREPORTED CASES

LEXSEE 2007 U.S. DIST. LEXIS 51915

**AMERICAN ORT, INC., Plaintiff, -v- ORT ISRAEL, Defendant.**

**07 CV 2332 (KMK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 51915*

**July 17, 2007, Decided**
**July 17, 2007, Filed**

**COUNSEL:** [*1] Kathleen Elizabeth McCarthy, Esq., Joseph Colin Foley, Esq., Morgan & Finnegan, LLP, New York, New York, Counsel for Plaintiff.

Jacob Steven Wharton, Esq., Michael E. Ray, Esq., Womble Carlyle Sandridge & Rice, PLLC, Winston-Salem, North Carolina, Counsel for Plaintiff.

Daniel Simon Ebenstein, Esq., Chester Rothstein, Esq., Holly Pekowsky, Esq., Michael Joshua Kasdan, Esq., Amster, Rothstein & Ebenstein LLC, New York, New York, Counsel for Defendant.

**JUDGES:** KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KENNETH M. KARAS

**OPINION**

OPINION & ORDER

KENNETH M. KARAS, District Judge:

With this action, two formerly affiliated charitable organizations continue, in federal court, a trademark dispute that was initiated in January before the United States Patent and Trademark Office. Plaintiff, American ORT, Inc., brings this case under the Trademark Act of 1946 (the "Lanham Act"), *15 U.S.C. § 1051 et seq.*, alleging that Defendant, ORT Israel, violated Plaintiff's registered trademark through Defendant's use of the word "ORT" in its American fundraising efforts. On May 8, 2007, Plaintiff filed this Motion, which seeks to preliminarily enjoin Defendant from using the ORT mark to solicit charitable donations in the [*2] United States. The Motion was fully briefed on June 13, 2007, and the Court heard oral argument on June 20, 2007. Because there is no material disagreement as to the facts, the Court did not conduct a factual hearing. For the following reasons, Plaintiff's Motion for a Preliminary Injunction is GRANTED.

1. Background

A. The Founding of ORT and the ORT Community

The original ORT society was founded in Russia in 1880. (Compl. P 8; Answer P 8.) Its mission was to provide educational assistance and vocational training to impoverished Jewish people. (Def.'s Mem. 2; Pl.'s Mem. 2.) The word "ORT" is an acronym derived from a Russian phrase meaning "Society for Trades and Agricultural Labor." (Def.'s Mem. 2; Pl.'s Mem. 2.) ORT is also known by the English acronym "Organization for Rehabilitation through Training." Today, organizations that use the term ORT exist around the world. (Def.'s Mem. 2 (stating that there are "approximately twenty autonomous non-profit organizations" that use the word ORT in their name).)

World ORT, an umbrella organization, was founded in 1921. (Pl.'s Mem. 3.) Plaintiff was founded in the United States in 1922 under the name American ORT Society. (Kessler Aff. P 10; [*3] Compl. P 9.) Plaintiff is not the only non-profit organization operating in the United States that uses the word ORT in its name. Both World ORT and Women's American ORT ("WAO"), an organization founded in 1927 as an affiliate of American ORT, conduct fundraising activities in the United States. According to Plaintiff, World ORT's fundraising efforts "are generally limited to Jewish federations" and "are conducted in coordination with and [with] the approval of American ORT." (Nadler Aff. P 1.) Plaintiff also claims that, "[f]rom the beginning, American ORT and Women's American ORT were connected," noting, for example, that one of the founders of WAO was the wife of one Plaintiff's founders. (*Id.*) WAO's 1969 incorporation papers identify WAO as a "member" of American

ORT, and in an agreement executed that same year, Plaintiff gave WAO express permission to use the ORT name on the condition that WAO cease using that name if WAO ever disassociated itself from Plaintiff. (Kessler Aff. II PP 2, 5.) Defendant disputes this connection between Plaintiff and WAO, arguing that the two organizations are distinct, autonomous entities, each independently using the word "ORT" in its domestic literature [*4] and fundraising. [1]

> [1]    Defendant's support for this proposition is thin, consisting primarily of an affidavit from the Director General of ORT Israel, which states: "It is my understanding that neither American ORT or World ORT has ever exercised any control over the operations of any of the autonomous ORT organizations." (Peleg Aff. P 27; see also Def.'s Mem. 4-5.)

Defendant was founded in Israel in 1949, where it is incorporated as a "public benefit organization." (Peleg Aff. P 10.) Like the other ORT organizations in their respective countries, Defendant operates schools throughout Israel, specializing in "scientific and technological education." (Def.'s Mem. 3.) Defendant has the largest network of schools in the ORT community, with "more than 160 educational institutions" throughout Israel. (Id.) Plaintiff does not dispute that Defendant has a right to use the ORT mark in Israel.

## B. The Dispute Between World ORT and ORT Israel

Until 2006, Plaintiff, Defendant, WAO, and numerous other "ORTs" located around the world were joint members of World ORT, which, according to its bylaws, is "a federation of autonomous National Organizations constituted in the form of an association." (Peleg Aff., [*5] Ex. 1.) However, in September 2006, a dispute arose between Defendant and World ORT, and, as a result, Defendant suspended its active participation in World ORT. (Id. P 37.) According to Defendant, the dispute occurred when World ORT "dramatically reduced" the funds that it allocated to Defendant, "with only 10 percent . . . of all the World ORT funds . . . being allocated to ORT Israel despite the fact that ORT Israel is the largest organization participating in World ORT and represents more than 70% of the activities touted by World ORT." (Id. P 38.) Plaintiff does not dispute that World ORT reduced the funds that it allocated to Defendant, but Plaintiff claims that World ORT did so only after Defendant failed repeatedly to submit certain financial reports to World ORT. (Pl.'s Mem. 5.)

In order to continue raising funds in the United States following its break with World ORT, Defendant "elected to work primarily with a new U.S. tax-exempt entity . . ., which w[ould] provide funds directly to ORT

Israel from U.S. donors." (Def.'s Mem. 7.) At the time this Motion was filed, this entity "ha[d] been considering names such as Educate Israel, Inc. [or] TEC Israel" and planned to solicit [*6] donations from both individual and corporate donors, using the tag line "Global Support for ORT Israel." (Peleg Aff. PP 51-52.) Moreover, on at least one occasion, Defendant has already solicited funds in the United States using the ORT Israel name. (Nadler Aff., Exs. 1A-1G.)

## C. Plaintiff's Registration of the ORT Trademark

On January 29, 2002, Plaintiff registered the "ORT" trademark with the United States Patent and Trademark Office ("USPTO"). (Kessler Aff. P 8, Ex. 3.) Almost five years later, on January 26, 2007, Defendant petitioned the USPTO to cancel the registration "on the grounds that the mark was generic, merely descriptive without secondary meaning, and/or had been abandoned by American ORT." (Def.'s Mem. 8.) Plaintiff filed the Complaint in this action on March 21, 2007. Shortly thereafter, Plaintiff successfully moved the USPTO to stay the cancellation proceeding pending the resolution of this action. (Kasdan Aff., Exs. 33-34.)

## II. Discussion

### A. Standard of Review

#### 1. Preliminary Injunction Standard

"To obtain a preliminary injunction, plaintiff must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going [*7] to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 113-14 (2d Cir. 2006). "In trademark disputes, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) (quotations omitted); accord Ptak Bros. Jewelry, Inc. v. Ptak, No. 06 Civ. 13732, 2007 U.S. Dist. LEXIS 39283, 2007 WL 1536934, at *5 (S.D.N.Y. May 29, 2007).

#### 2. Trademark Infringement

A trademark infringement claim is analyzed under a two-prong test: "First, [courts] look to see whether plaintiff's mark merits protection, and second, whether defendant's use of a similar mark is likely to cause customer confusion." [2] Dooney & Bourke, Inc., 454 F.3d at 115; see also GreenPoint Fin. Corp. v. Sperry & Hutchinson Co., 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) ("To prevail on a claim for infringement under the Lanham Act, a plaintiff must show that (1) it has a distinctive mark sub-

ject to protection; and (2) the defendant's mark results in a likelihood of confusion."). "The first of [*8] these questions relates closely to the second, because a trademark's distinctiveness -- the key consideration in assessing its protectability -- is also a factor in determining the likelihood of confusion." *Playtex Prods., Inc. v. Georgia-Pac. Corp., 390 F.3d 158, 161 (2d Cir. 2004).*

    2    A defendant in a trademark infringement action may also prevail by establishing certain enumerated defenses, including the defense of "fair use." *See 15 U.S.C. § 1115(b)* (listing defenses under the Lanham Act). Under the fair use defense, where "a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine." *EMI Catalogue P'ship v. Hill, Holliday, Conners, Cosmopulos Inc., 228 F.3d 56, 65 (2d Cir. 2000).* Here, although Defendant notes that it "would be impossible in view of its history" for Defendant to identify its product without using the ORT brand (Def.'s Mem. 7), Defendant does not raise the defense of fair use. Therefore, because that issue has not been presented, the Court does not address what use of the ORT mark, if any, might constitute [*9] fair use given Defendant's historical relationship to Plaintiff's mark.

**B. Plaintiff's Mark is Distinctive and Subject to Protection**

When determining whether a disputed mark is subject to protection under the Lanham Act, courts in the Second Circuit begin by categorizing the mark. The Second Circuit recognizes four such categories of marks, each subject to a different level of protection:

    (1) generic terms, which refer to the genus or class of which the product is a species, and are not entitled to protection even with proof of secondary meaning, i.e., proof that the public has come to associate the term with a particular source; (2) descriptive terms, which convey an immediate idea of some characteristic or attribute of the product and are entitled to protection with proof of secondary meaning; (3) suggestive terms, which require some imagination on the part of the consumer to ascertain the nature of the product, and are thus distinctive enough to be entitled to protection even without proof of secondary meaning; and (4) arbitrary or fanciful terms, which are so distinctive

and indicative of a product's source, rather than its qualities or attributes, that they, unlike suggestive terms, [*10] enjoy trademark protection without the need of debating whether they are "merely descriptive."

*Papercutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 561-62 (2d Cir. 1990).* Here, Plaintiff argues that the term ORT is suggestive, arbitrary, or fanciful. (*See* Pl.'s Reply Mem. 4-5.) Defendant, of course, disagrees and contends that ORT cannot be a valid trademark because the term is generic or descriptive, without secondary meaning. (Def.'s Mem. 9-13.)

"A generic mark is one that refers to the genus of which the particular product is a species. However, a mark is not generic when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 296 (S.D.N.Y. 2000)* (citations and quotations omitted). Descriptive terms, in contrast, "are those that describe a thing, or 'how it is,' rather than name that thing, or 'what it is.'" *Horizon Mills Corp. v. QVC, Inc., 161 F. Supp. 2d 208, 212 (S.D.N.Y. 2001).* This distinction is more "one of degree" than of kind, *id.,* and courts have recognized the difficulties involved in delineating these definitions. *See Papercutter, Inc., 900 F.2d at 562* (noting [*11] that the categories of trademark terms are "difficult of definition"). Terms that designate a "particular region, cultural movement, or legend" have been found to be generic, *Otokoyama Co. v. Wine of Japan Imp., Inc., 175 F.3d 266, 271 (2d Cir. 1999),* and a term found to be generic will not be protected by the Lanham Act even though it is in a language other than English. *Id. at 271.*

In determining whether a term is generic or descriptive, courts assess the term's "'primary significance' to the buying public." *Horizon Mills Corp., 161 F. Supp. 2d at 212; see also Pilates, 120 F. Supp. 2d at 296* (stating that the genericness inquiry turns on the "primary significance of the term in the minds of the consuming public"). In the Second Circuit, courts making this assessment look to several factors, including: "(i) proof of widespread use by competitors that has not been contested by the seller; (ii) generic use by the seller himself; (iii) dictionary definitions; (iv) media usage, such as newspaper or magazine articles; and (v) consumer surveys." *Horizon Mills, 161 F. Supp. 2d at 214; accord Pilates, 120 F. Supp. 2d at 297.*

Notably, in making this assessment, marks that have been registered [*12] with the USPTO are afforded a presumption of validity. *See Lemme v. NBC, Inc., 472 F. Supp. 2d 433, 442 (E.D.N.Y. 2007)* ("[T]he fact that the

USPTO accepted Plaintiff's mark for registration creates a presumption that the mark is valid."). Moreover, if the USPTO accepts a mark for registration without requiring "proof of secondary meaning," courts recognize a "presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). This "confers a procedural advantage on the registrant in an infringement action: the opposing party must overcome the presumption that the purchasing public perceives the mark to be inherently distinctive." *Id.; see also Lemme*, 472 F. Supp. 2d at 443 ("The burden . . . therefore shifts to Defendant to proffer evidence that the mark is not valid, i.e., that it is generic or descriptive with no secondary meaning."). Accordingly, a defendant seeking to invalidate a registered trademark bears the burden of establishing, by a preponderance of the evidence, that the mark is either generic or descriptive. [3] *See Papercutter, Inc.*, 900 F.2d at 563 [*13] ("[A] defendant may petition for cancellation of the plaintiff's registration . . . by rebutting the presumption of a plaintiff's right to exclusive use of a registered mark by a preponderance of the evidence.").

> 3   In an attempt to avoid this burden, Defendant argues that Plaintiff was able to register its mark only by misleading the USPTO and that, therefore, the Court should not apply the usual presumption of distinctiveness. However, Defendant has not pleaded "fraud on the USPTO," *cf., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ. 5316, 2006 U.S. Dist. LEXIS 71091, 2006 WL 2807213, at *4-*5 (S.D.N.Y. Sept. 28, 2006) (listing elements of "fraud on the [US]PTO"), and, indeed, has admitted that "we don't have a basis yet to call it fraud." (Hr'g Tr. 56, June 20, 2007.) Accordingly, the Court will apply the presumption of distinctiveness, although Defendant will be permitted to attempt to rebut the presumption by reference to any facts that were allegedly misrepresented.

Here, Defendant has failed to meet this burden. First, Defendant has offered insufficient "proof of widespread use [of the mark] by competitors that has not been contested by the seller . . . ." *Horizon Mills Corp.*, 161 F. Supp. 2d at 214. [*14] Although, as Defendant points out, other organizations, including WAO and World ORT, have operated and raised funds in the United States under the ORT name, on the evidence before the Court, those organizations did so only in collaboration with Plaintiff, not as Plaintiff's "competitors." (*See* Kessler Aff. II PP 5, 9.) Indeed, when entities unaffiliated with Plaintiff have used the ORT name, Plaintiff has acted quickly and successfully to prevent such use. (*See id.*, P 10, Exs. 10-11.)

Second, Defendant has not come forward with evidence that Plaintiff itself uses the term ORT generically or descriptively. *See Horizon Mills Corp.*, 161 F. Supp. 2d at 214 (listing "generic use by the seller himself" as a factor in determining whether a mark is generic). On the contrary, on its website and in its pleadings, Plaintiff uses the term ORT as a proper name to identify either the original ORT organization in Russia, the ORT branches with which Plaintiff is currently affiliated, or the work of those affiliated entities. For example, Plaintiff states that: "ORT was originally established in 1880" (Kasdan Aff., Ex. 3); "ORT is one of the largest global hi-tech education organizations in the world" [*15] (*id.*); and "ORT schools . . . are helping many students who are coping with trauma . . . ." (*Id.*, Ex. 17.) Simply put, Plaintiff uses the term ORT as a mark, not generically or descriptively. And while Plaintiff acknowledges that the ORT name arises from a Russian acronym (Compl. P 8; Kasdan Aff., Ex. 3), nowhere in the record does Plaintiff use the term ORT in reference to a cultural "movement" or an independent "heritage or mission," as Defendant would view the term. (*See* Def.'s Mem. 2, 11.) Indeed, in its application for funds from the United Jewish Federation, Defendant itself never once uses the term ORT generically or descriptively, instead repeatedly using the term as a proper name. (*See* Nadler Aff., Exs. 1A-1B ("The program is a natural outgrowth of ORT's strategic investment . . . ."; "As in all ORT projects, we will use an external evaluator . . . .").)

Third, Defendant has failed to demonstrate that the term ORT is used generically or descriptively in the media, "such as [in] newspaper or magazine articles." *Horizon Mills Corp.*, 161 F. Supp. 2d at 214. The few articles that are part of the record use the term ORT primarily, if not exclusively, as a proper name to identify [*16] either World ORT or the various affiliated "ORT chapters operating in 56 countries" (Kasdan Aff., Ex. 16, 44-45), not to denote a cultural movement. *Cf. Pilates*, 120 F. Supp. 2d at 300-02 (finding genericness where defendant submitted 775 articles, a book, and several videotapes of news broadcasts, all of which primarily used the term "Pilates" generically). Finally, Defendant has not submitted a consumer survey that might establish that the term ORT is generic. *See Horizon Mills Corp.*, 161 F. Supp. 2d at 214 (noting that courts consider consumer surveys as a factor in determining a mark's genericness); *cf. Pilates*, 120 F. Supp. 2d at 302-04 (finding genericness where defendant submitted a survey of 273 people in which "everyone surveyed described Pilates as a type of exercise," not as a brand).

Defendant does, however, submit definitions taken from two acronym dictionaries. (Kasdan Aff., Exs. 1-2.) "Though not conclusive, dictionary definitions of a word to denote a category of products are significant evidence

of genericness because they usually reflect the public's perception of a word's meaning and its contemporary usage." *Harley Davidson, Inc. v. Grottanelli, 164 F.3d 806, 810 (2d Cir. 1999).* [*17] But reliance on an acronym dictionary, unlike reliance on a traditional dictionary, gets Defendant only halfway there. For even if Defendant establishes that the term ORT stands for an independent Russian or English phrase, the question remains whether, in the public's perception, that phrase represents a generic "category of products" or simply the name of an organization. Here, to the extent that the dictionaries at issue resolve that second question at all, the resolution favors Plaintiff, as the only dictionary that addresses the meaning of the phrase states simply that ORT is an "acronym . . . used in the names of several Jewish social welfare organizations." (Kasdan Aff., Exs. 1.) Accordingly, the fact alone that Plaintiff's mark is found in an acronym dictionary is insufficient to meet Defendant's burden of establishing that Plaintiff's registered mark is generic or descriptive. Moreover, in light of the term's distinctive use by the media, by Plaintiff, and, indeed, by Defendant itself, the evidence supports a finding that the consumer public views the term ORT as distinctive, not as generic or descriptive. Accordingly, because at this point in the proceedings Defendant has [*18] failed to produce sufficient evidence to overcome the presumption that the relevant consumer public views Plaintiff's mark as distinctive, the Court finds that, for the purposes of this Motion, Plaintiff holds a valid, protectable mark. [4]

> 4 Because the Court makes this finding, Defendant's reliance on *First Church of Christ, Scientist v. Evans, 105 N.J. 297, 520 A.2d 1347 (N.J. 1987),* is inapposite. In *Evans,* the New Jersey Supreme Court held that an individual Christian Science church that had previously been affiliated with the national Christian Science "Mother Church" could still use the Christian Science name despite having broken ties with the national organization. Unlike the instant case, however, the *Evans* court based its decision on its finding that the term "Christian Science" was generic and therefore was unprotected under the Lanham Act. *Id. at 1354* ("[W]e have concluded that 'Christian Science Church' is generic . . . ."). Because Defendant has failed to rebut the presumption that the term ORT is distinctive, this case is distinguishable from *Evans.*

C. Defendant's Use of the ORT Mark is Likely to Cause Customer Confusion

Because the Court finds that Plaintiff has a valid mark, it must [*19] next assess whether Defendant's use of the mark creates a likelihood of confusion. "In analyzing this second prong of the test for trademark infringe-

ment, courts apply the non-exclusive multi-factor test developed by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961).*" *Dooney & Bourke, Inc., 454 F.3d at 116.* Under this test, a court must consider: "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap [i.e., entering a market related to that in which the defendant sells its product], (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers." *Id.* Based on the evidence currently before the Court, these factors strongly favor a finding of infringement.

1. The *Polaroid* Factors

a. Strength of the Mark

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis. There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130-31 (2d Cir. 2004)* [*20] (citations omitted). Under this rubric, Plaintiff's mark is strong. With respect to the first component, as discussed above, the Court finds that the term ORT is inherently distinctive. With respect to the second, the evidence before the Court suggests that, in the relevant marketplace, Plaintiff's mark specifically identifies Plaintiff as the source of its services. Plaintiff has used the ORT mark in the United States for over eighty years and has registered the mark with the USPTO. Since 1922, Plaintiff and its affiliates "have used the ORT trademark in hundreds, if not thousands of campaigns to raise funds in the United States," and in the process have built strong relationships with donor families and institutions. (Kessler Aff. PP 10, 13.) Moreover, Plaintiff has policed its mark, and where others have used it, they have done so with Plaintiff's permission and cooperation. [5] Taken together, this evidence indicates that, in the United States, Plaintiff's mark is strongly "origin-indicating." *Savin Corp. v. Savin Group, 391 F.3d 439, 457 (2d Cir. 2004).*

> 5 Defendant contests this, claiming that Defendant itself has "participated in fundraising activities in the United States." (Def.'s [*21] Mem. 14.) However, when pressed at oral argument, Defendant conceded that it has engaged in domestic fundraising only indirectly, through Plaintiff or its affiliates. (Hr'g Tr. 42.)

b. Similarity of the Marks

On their face, Plaintiff's and Defendant's marks are clearly similar. Both marks prominently feature the term ORT, and Defendant's mark differs from Plaintiff's mark

only by virtue of the geographical descriptor "Israel," which in some instances is written in Hebrew. (*See* Nadler Aff., Ex. 1B.) Defendant argues that this geographical descriptor is sufficient to distinguish the two marks. (Def.'s Mem. 15.) But Defendant cites to no authority to support this position, and, indeed, the caselaw supports the opposite view. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981) ("[It] does not alleviate the confusion when commonly the trademarked name is preceded by a geographical identification."). Accordingly, the Court finds that this factor favors Plaintiff.

### c. Proximity of the Products and Bridging the Gap

"The proximity inquiry asks to what extent the two products compete with each other." *Brennan's, Inc.*, 360 F.3d at 134. Here, it cannot be reasonably disputed that Plaintiff [*22] and Defendant closely compete. Defendant has targeted many of the same donors as has Plaintiff (*see* Kessler Aff. PP 29, 33, 35, 37), and the two charitable organizations perform similar educational and vocational services for the benefit of the same general community. This factor therefore strongly favors Plaintiff. The related bridging the gap factor, which asks whether the purported trademark holder is likely to develop a product for sale in the alleged infringer's market, is irrelevant where, as here, the two companies already compete in the same market. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) ("Because . . . [the plaintiff's and defendant's] products are already in competitive proximity, there is really no gap to bridge . . . .").

### d. Actual Confusion

To prevail on a trademark infringement case under the Lanham Act, a plaintiff need not present evidence of actual confusion, only a likelihood of confusion. *See Savin Corp.*, 391 F.3d at 459 ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act . . . ." (quotations omitted and alteration in original)). However, the Second Circuit has held that such evidence strongly [*23] supports a finding of likelihood of confusion: "There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Id.; see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) ("It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion. We have therefore deemed evidence of actual confusion particularly relevant to the inquiry." (quotations and citations omitted)). Here, Plaintiff has established that, in the short time since Defendant began soliciting donations in the United States, at least one of Plaintiff's donors has already been confused by Defendant's use of the ORT

mark. [6] Accordingly, this important factor favors Plaintiff.

> 6   In this incident, a representative of the United Jewish Federation of Pittsburgh (the "UJF") was solicited for donations by both Defendant and one of Plaintiff's affiliates. (*See* Nadler Aff. P 2.) Mistaking Defendant's funding proposal for that of Plaintiff's affiliate, the UJF contacted the affiliate and requested that it submit only one proposal. (*See id.*, Ex. 2.) While the UJF did not ultimately donate to Defendant, it cannot reasonably [*24] be disputed that the UJF was confused by Defendant's use of the ORT mark. Indeed, had Plaintiff's affiliate not contemporaneously solicited a donation, it is unlikely that the UJF would have realized its mistake.

### e. Good Faith

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388. While "[b]ad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark," *id.* at 389, such an inference would be inappropriate here. Although Defendant clearly knew of Plaintiff's use of the ORT mark in the United States, Defendant did not "adopt[] its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill." *Savin Corp.*, 391 F.3d at 460 (quotations omitted, second alteration in original). On the contrary, Defendant adopted its mark in Israel decades before it anticipated directly soliciting donations in the United States, and Plaintiff has presented no evidence that Defendant has sought to "sow confusion" between its mark with that of Plaintiff. [*25] Accordingly, the Court finds Defendant has not acted in bad faith in its use of the ORT mark.

### f. Quality and Customer Sophistication

The quality and customer sophistication factors do not support either Party. The record is simply too sparse to determine either the relative quality of Plaintiff's and Defendant's products or the sophistication of the target donors, and the Court will not speculate as to the merits of these positions based on an insufficient record. [7]

> 7   Plaintiff alleges that Defendant's services are inferior because Defendant is insufficiently transparent, an allegation that Defendant disputes. (Pl.'s Mem. 19; Def.'s Mem. 20-21.) Defendant, for its part, submits several statements made by Plaintiff which attest to the high quality of Defendant's services. (Def.'s Mem. 20.) The dispute

regarding Defendant's alleged lack of transparency is largely peripheral to these proceedings and, in any event, cannot be resolved on the record before the Court.

2. Balancing the Factors

Taking all of the *Polaroid* factors into account, the likelihood-of-confusion inquiry is not a close question. Four of the factors strongly favor Plaintiff, including the "particularly relevant" factor of actual [*26] confusion. *Virgin Enters., 335 F.3d at 151.* Only one factor, good faith, favors Defendant. More importantly, given the close similarity of the marks and the services offered, as well as the fact that Defendant's solicitations target the same potential donors as do Plaintiff's, the Court finds it likely that some donors will be confused by Defendant's use of the ORT mark. *See Playtex Prods., Inc., 390 F.3d at 162* ("When balancing the factors, district courts generally should not treat any single factor as dispositive . . . . Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." (internal quotations and citations omitted)). Accordingly, the Court finds that Plaintiff has met its burden of establishing a likelihood of confusion.

D. Irreparable Harm

Finally, the Court concludes that Plaintiff has shown the irreparable harm necessary for injunctive relief. As noted, in the Second Circuit, a plaintiff "who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." *Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005).* [*27] Here, as discussed above, Plaintiff has established a likelihood of confusion. And because Defendant seeks donations from individuals and corporations who, like all potential donors, have only limited resources, the Court finds that, even absent the presumption, such confusion will cause Plaintiff irreparable harm.

Moreover, Plaintiff has not unduly delayed in seeking injunctive relief nor done anything else to defeat the presumption of irreparable injury, having sought this relief within weeks of learning the full extent of Defendant's fundraising activities using the ORT mark in the United States. *See id. at 144-45; Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995).* Therefore, the Court finds that Plaintiff has established irreparable harm absent a preliminary injunction.

III. Conclusion

For the foregoing reasons, the Court finds that Plaintiff has established both irreparable harm and a likelihood of success on the merits. Accordingly, it is hereby

ORDERED that Defendant ORT Israel and its officers, agents, employees, and attorneys, and those persons in active concert of participation with them who receive actual notice of this Order, are: (i) enjoined from using [*28] the ORT mark for fundraising in the United States; and (ii) enjoined from representing to any party that they are authorized to use the ORT mark for purposes of or in connection with fundraising in the United States. This preliminary injunction is effective immediately and shall remain in effect through trial or until modified by this Court. It is further

ORDERED that within one week of the filing of this Opinion, the Parties are to submit to the Court memoranda of law addressing the propriety and amount of a bond. These memoranda of law shall not exceed five pages.

SO ORDERED.

DATED: New York, New York

July 17, 2007

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 435613 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d, 2001 WL 435613)**

**H**
Deere & Co. v. MTD Products, Inc.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DEERE & COMPANY, Plaintiff,
v.
MTD PRODUCTS, INC., Defendant.
**No. 00 CIV 5936 LMM.**

April 30, 2001.

MEMORANDUM AND ORDER

MCKENNA , D.J.

*1 Deere & Company ("Deere" or "plaintiff") filed a complaint against MTD Products, Inc. ("MTD" or "defendant") alleging trademark and trade dress infringement under the Lanham Act, 15 U.S.C. §§ 1114 , 1125(a) ; unfair competition under New York common law; and dilution under the Lanham Act, 15 U.S.C. § 1125(c) and New York Gen. Bus. L. § 360 -1 . Presently before the Court is defendant's motion to dismiss. For the reasons set forth below, defendant's motion is denied.

Both plaintiff and defendant manufacture lawn and garden equipment, such as tractors, mowers and snow-blowers. Plaintiff's products are primarily green in color with yellow trim. Plaintiff has trademarked its green and yellow logo and trade dress, and claims that consumers associate its green and yellow color combination with high quality and reliability. Defendant's products are also green and yellow, but primarily yellow with green trim. Plaintiff claims that defendant intentionally chose to use green and yellow for its lawn and garden care products to capitalize on the goodwill of the Deere trademark and trade dress. There appears to be no dispute that the parties use different shades of green and yellow or that all of their products display their respective logos. MTD moves to dismiss Deere's claims on the grounds that (1) the parties' respective marks and products are so dissimilar that there is no likelihood of confusion as a matter of law and (2) Deere's claims are barred by laches. (Def.'s Mem. at 1-2.)

Legal Standard

Under Rule 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6) . The court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) . A court should dismiss a complaint only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) ).

## I. Likelihood of Confusion

Defendant does not argue that the complaint insufficiently alleges any claim. Instead, defendant argues that because there is no likelihood of confusion between Deere and MTD lawn and garden equipment, all five counts of the complaint should be dismissed. Although likelihood of confusion is an element of plaintiff's claims for trademark infringement and unfair competition, *Nabisco, Inc. v.. Warner-Lambert Co.,* 220 F.3d 43, 45-46 (2d Cir.2000) , and, defendant argues, a standard applied in deciding dilution claims, (Def.'s Mem. at 15), it is not an inquiry appropriate on a motion to dismiss. The complaint alleges that because of MTD's use of green and yellow, "Deere's customers and the public are likely to be, and have been, deceived or confused as to the source, origin, sponsorship and/or endorsement of MTD's products and their relationship to Deere."(Compl. ¶ 28, *see also id.* ¶¶ 29, 36-37.)On a motion to dismiss the Court must accept the allegations in complaint as true and it cannot undertake the fact-dependant likelihood of confusion analysis.*Solow v. BMW (US) Holding Corp.,* No. 97 Civ. 1373, 1998 WL 717613 , at *3-*4 (S.D.N.Y. Oct. 14, 1998). Thus, the Court rejects defendant's argument that the complaint must be dismissed on the grounds that the MTD and Deere products at issue are dissimilar.

## II. Laches

**\*2** Defendant also argues that the complaint should be dismissed because plaintiff is barred from bringing its claims by laches. Defendant makes much of the fact that the complaint does not refute the affirmative defense of laches, but, because laches is an affirmative defense, plaintiff does not have the burden to do so in a complaint. More important, a determination that a claim is barred by laches requires a factual inquiry into the reasons for plaintiff's delay and the extent and nature of the prejudice suffered by defendant as a result of that delay. *See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,* 88 F.Supp.2d 188, 196 (S.D.N.Y.2000) . Again, this inquiry is inappropriate on a motion to dismiss. *Karlen v. New York Univ.,* 464 F.Supp. 704, 708 (S.D.N.Y.1979) . Thus, the Court rejects defendant's argument that plaintiff's claims are barred by laches.

## Conclusion

Defendant's motion to dismiss is denied.

SO ORDERED.

S.D.N.Y.,2001.
Deere & Co. v. MTD Products, Inc.
Not Reported in F.Supp.2d, 2001 WL 435613 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1724932 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1724932)**

**C**

Hearts on Fire Company, LLC. v. L C Intern. Corp.

S.D.N.Y.,2004.

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

HEARTS ON FIRE COMPANY, LLC, Plaintiff

v.

L C INTERNATIONAL CORP., Defendant.

**No. 04Civ.2536LTSMHD.**

July 30, 2004.

Nixon Peabody LLP, By: Marc L. Fried , Robert P. Sherman , Mark D. Robins , New York, New York, for Plaintiff, Hearts On Fire Company, LLC.

Patterson, Belknap, Webb & Tyler LLP, By: Jeffrey I.D. Lewis , New York, New York, for Defendant, L C International Corp.

*MEMORANDUM OPINION AND ORDER*

SWAIN , J.

**\*1** Plaintiff Hearts On Fire Company, LLC ("HOF") brings this action asserting causes of action for unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) , dilution under New York State General Business Law § 360-1 , and unfair competition under common law against Defendant L C International Corp. ("L C International"). This matter comes before the Court on the motion of Defendant pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief may be granted. The Court has jurisdiction of this case pursuant to 28 U.S.C.A. §§ 1331 and 1338(a) and (b) . The state law claims are properly before the court under 28 U.S.C.A. § 1367(a) . Venue is proper pursuant to 28 U.S.C.A. § 1391(b) and (c) .

The Court has considered thoroughly all of the parties' submissions relating to the instant motion. For the foregoing reasons, Defendant L C International Corp.'s motion to dismiss is denied in its entirety.

BACKGROUND

The following relevant facts are alleged in the Plaintiff's Amended Complaint. Hearts On Fire Company, LLC is a Massachusetts company with its principal place of business in Boston, Massachusetts. (Amend.Compl.¶ 1.) HOF provides jewelry and cut diamonds to authorized retailers. (*Id.* ) The company is a major distributor of branded diamonds, which are diamonds containing source-designated trademarks, and sells high-quality stones to authorized retailers throughout the United States. (*Id.* ¶ 6.) HOF has been the exclusive user of the Hearts On Fire mark in its distribution, sale, and advertising since 1996.(*Id.* ¶ 10.)HOF alleges that beginning on January 1, 1997, it began using the marks "The World's Most Perfectly Cut

Diamond™" and "The Most Perfectly Cut Diamond in the World™" exclusively and continuously in its distribution, sale, and advertising of cut diamonds. (*Id.* ¶ 12.)HOF asserts that the general public associates these marks with its goods and services. (*Id.* ¶ 13.)

L C International Corp. is a New York corporation with its principal place of business in New York, New York. (*Id.* ¶ 2.) L C International is a provider of loose diamonds, and promotes its diamond sales through its website, www.lcidiamonds.com. (Id.¶¶ 14-15.)L C International specializes in the "Hearts and Arrow Ideal Cut" diamond, creating a pattern within the diamond that is similar to the specialized cut diamond of the Plaintiff. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 4.)

In the Complaint, Plaintiff alleges that Defendant is infringing on the two subsidiary marks by promoting and distributing the phrase "the most perfectly fashioned diamond in the world."(Id.¶¶ 16-18.)Plaintiff alleges that L C International's use of this phrase in connection with its location in its advertising demonstrates Defendant's intent to confuse customers. (Id.¶¶ 16-17.)Plaintiff claims that the phrase "is likely to cause confusion, mistake, and deception among the general public" regarding the origin of the goods and affiliation with HOF cut diamonds. (Id.¶ 18.)Plaintiff seeks injunctive relief pursuant to 15 U.S.C.A. § 1116 , damages under § 1117(a), and destruction of articles infringing HOF's marks under § 1118. (Id.¶¶ 24-26.)

## DISCUSSION

### Rule 12(b)(6) Standard

**\*2** A motion to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the court to accept as true the material facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Courtenay Communications Corp. v. Hall,* 334 F.3d 210, 213 (2d Cir.2003) (internal citations omitted). A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) ).Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(1) . "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." ' *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) (citing *Conley v. Gibson,* 355 U.S. at 47).

### Lanham Act Claim

Plaintiff brings trademark claims under the Lanham Act for unfair competition and false designation of origin. Section 1125 of the Act prohibits infringement of unregistered trademarks. 15 U.S.C.A. § 1125(a) (2004) . To prevail on a claim of trademark infringement under this section, a plaintiff must show that it owns a trademark that (1) is entitled to protection, and (2) the defendant's unauthorized use of similar marks in commerce is likely to cause confusion. *See Virgin Enterprises LTD v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003) . The strength of the mark determines whether it is entitled to protection. The Second Circuit evaluates the strength of trademarks according to the test articulated in *Abercrombie & Fitch Co., Inc. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976) . Marks are classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id.* Generic marks are not entitled to protection; however, marks that are either inherently distinctive or have acquired distinctiveness through secondary meaning are protected. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 112 S.Ct. 2753, 2757 (1992) . To establish secondary meaning, "a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself

."*Bristol-Myers Squibb Company v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992) (citing *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 (1982) ). Judge Friendly outlined factors in *Polaroid Corp. v. Polarad Elecs. Corp.* that have been consistently used within the Second Circuit to determine whether a likelihood of confusion exists. 287 F.2d 492, 495 (2d Cir.1961) . The non-exclusive factors are (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood the prior owner will bridge the gap, (5) actual confusion, (6) the defendant's good faith in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the buyers. *Id.; see also New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 557 (2d Cir.2002) .

*3 Defendant argues that Plaintiff's phrases are generic and descriptive and thus, even if they have acquired secondary meaning, they are not entitled to protection under the Lanham Act. (Memo. of Law in Supp. of Defs.' Mot. to Dismiss at 6-14.) Defendant also asserts a fair use defense, claiming that the wording is laudatory and therefore not entitled to protection. *Id.* The classification of a mark, however, is based on how the purchasing public for the particular good perceives the mark. *Courtenay Communications Corp. v. Hall,* 334 F.3d at 215 . This initial classification, which is a requisite determination for a trademark infringement claim, is a factual determination.*Id.* As the Second Circuit recently explained:

It is usually true that the classification of a mark is a factual question, and that the question turns on how the purchasing public views the mark. The pleadings and documents necessarily relied upon by plaintiff's complaint, which were all that the district court could rightfully consider in deciding the motion to dismiss for failure to state a claim, are insufficient for determining the critical fact of how the public views [a] mark.

*Id.* (internal citations omitted). Defendant's classification argument is thus premature.

Plaintiff's Amended Complaint alleges that the marks are entitled to protection as they have become associated with HOF's diamond products. (Amend.Compl.¶ 21.) Plaintiff further alleges that Defendant's use of a similar mark without permission is likely to cause confusion among the public. (*Id.* ¶¶ 22, 25.)Plaintiff has pleaded that its phrases have acquired distinctiveness through continuous and exclusive uses since 1997 and that Defendant's phrase is likely to cause confusion. (*Id.* ¶¶ 21-22, 25-26.)Plaintiff has therefore pleaded facts supporting all elements of the Lanham Act cause of action asserted in the Amended Complaint. Accordingly, it does not appear beyond doubt that Plaintiff can prove no set of facts to support his claim for relief. The motion to dismiss the Lanham Act claim is therefore denied.[FN1]

> FN1. The Defendant has not challenged the contributory infringement claim asserted by Plaintiff in Count One of the Complaint. As the Lanham Act elements are critical to a finding of contributory infringement, the contributory negligence claim is also not ripe for dismissal according to Rule 12(b)(6) of the Federal Rules of Civil Procedure .

*Dilution Under Common Law*

Plaintiff alleges that Defendant violated New York State General Business Law § 360-I . (Amend.Compl.¶ 28.) To plead a successful cause of action under the New York dilution law, a plaintiff must prove (1) ownership of a mark that is distinctive or has acquired distinctiveness through secondary meaning, and (2) a likelihood of dilution through blurring [FN2] or tarnishment.[FN3] *See New York Stock Exchange, Inc.,* 293 F.3d at 557-558 . Six factors are often used to determine the likelihood of blurring: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumer, (4) predatory intent, (5) renown of the senior mark, (6) renown of the junior mark. *See Katz v. Modiri,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003) (citing *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2d Cir.1994) ).

> FN2. Blurring occurs when the defendant uses a mark that is the same or similar to the plaintiff's mark to identify its goods, causing a potential loss of distinctiveness of the plaintiff's mark to the plaintiff's product. *See New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 558 (2d Cir.2002) .

FN3. Tarnishment occurs when the defendant uses the mark in a way that dilutes the quality or prestige associated with the plaintiff's mark because of confusion between the two marks. *See New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 558 (2d Cir.2002) .

\*4 Defendant moves to dismiss the common law dilution claim, asserting that Plaintiff's marks are not strong or distinctive, as required by statute, and are instead generic and descriptive. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 15-16.) Plaintiff's Amended Complaint, however, alleges that the marks have acquired distinctiveness due to the public's strong association of the mark with Plaintiff's product. (Amend.Compl.¶ 21.) Furthermore, the Amended Complaint alleges that Plaintiff's reputation has suffered due to confusion between the two products. (*Id.* ¶¶ 24-25.)Defendant therefore has not established beyond doubt that Plaintiff can prove no set of facts to support its New York dilution claim for relief. Defendant's motion to dismiss the New York State General Business Law § 360-I claim is therefore denied.

*Unfair Competition Under Common Law*

Plaintiff alleges that Defendant committed unfair competition under common law. The elements of an unfair competition claim under New York law are the same as the Lanham Act elements listed above, with an added bad faith requirement. *See Genesee Brewing Company, Inc. v. Stroh Brewing Company, Inc.,* 124 F.3d 137, 149-150 (2d. Cir.1997) . As previously explained, proof of a likelihood of confusion requires an analysis of the *Polaroid* factors, resolution of which would constitute premature fact finding inappropriate upon a motion to dismiss. *See Courtenay Communications Corp.,* 334 F.3d at 213 . Similarly, any determinations regarding Defendant's potential bad faith, which would involve a factual inquiry, would also be premature. *See Castle Rock Entertainment v. Carol Publishing Group, Inc.,* 955 F.Supp. 260, 274 (S.D.N.Y.1997) . Plaintiff has made allegations sufficient to support a cause of action against Defendant for unfair competition. Additionally, the Amended Complaint asserts that Defendant has "willfully, intentionally, and knowingly used a designation confusingly similar" to Plaintiff's marks. (Amend.Compl.¶ 37.) The Court therefore cannot conclude that there is no set of facts which would support the plaintiff's common law unfair competition claim for relief. Accordingly, Defendant's motion to dismiss the common law unfair competition claim is denied.

For the foregoing reasons, Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is denied in its entirety.

SO ORDERED.

S.D.N.Y.,2004.
Hearts on Fire Company, LLC. v. L C Intern. Corp.
Not Reported in F.Supp.2d, 2004 WL 1724932 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2001 U.S. DIST. LEXIS 8848

**SOLOW BUILDING COMPANY, LLC, Plaintiff, - against - NINE WEST GROUP, INC. and NINE WEST DEVELOPMENT CORPORATION, Defendants.**

**00 Civ. 7685 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 8848*

**June 28, 2001, Decided
June 29, 2001, Filed**

**DISPOSITION:** [*1] Second Amended Complaint dismissed with prejudice.

**COUNSEL:** For Plaintiff: Marc S. Dreier, Esq., Michael A. Nicodema, Esq., DREIER & BARITZ LLP, New York, New York.

For Defendants: Ira S. Sacks, Esq., Rita M. Odin, Esq., Andrea R. Rosenblum, Esq., FRIED FRANK HARRIS SHRIVER & JACOBSON, New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

**CHIN, D. J.**

Plaintiff, a real estate corporation, is headquartered at 9 West 57th Street in New York City, a building with a large red sculpture -- the numeral "9" -- on the sidewalk in front of the property. Although plaintiff has never used the name in its business, it contends that its building has acquired the nickname "9 West." Defendants, manufacturers and retailers of shoes, clothing, and accessories, have used the mark "Nine West" since 1980. Plaintiff sues defendants for trademark dilution, false designation of origin, trademark infringement, and unfair competition.

Defendants move to dismiss the Second Amended Complaint (the "Complaint") on the grounds that plaintiff's claims are barred by laches and fail to state a claim upon which relief may be granted. As discussed [*2]

below, because the Complaint demonstrates that plaintiff has known of defendants' use of the "Nine West" mark since 1980, has inexcusably delayed the commencement of this action, and has prejudiced defendants by its delay, the Court agrees that its laches defense applies; moreover, even assuming this action is not untimely, the Complaint fails to allege likelihood of confusion and plaintiff's ownership rights to the "9 West" name. Accordingly, plaintiff's Complaint is dismissed.

*BACKGROUND*

A. *The Parties*

Plaintiff Solow Building Company, LLC ("Solow"), a New York corporation, is a real estate company engaged in constructing and renting commercial and residential properties. It is headquartered at 9 West 57th Street, New York, New York, which is plaintiff's "premier property." (Sec. Am. Compl. PP 1, 10). On the sidewalk in front of its headquarters, plaintiff has placed a nine-foot by five-foot red sculpture of the numeral "9." (*Id.* P 13). Plaintiff's red numeral "9" is a registered mark with the United States Patent and Trademark Office (the "USPTO"). (*Id.* P 12). In addition, plaintiff has registered the mark "SOLO9W57" (*id.* P 14), and it alleges [*3] that "the public has derived the nickname '9 West' from Solow's numeral '9' and/or the SOLOW9W57 service marks as an identification of 9 West 57." [1] (*Id.* P 16).

> 1 In its Complaint, plaintiff identifies its service mark as both "SOLO9W57" and "SOLOW9W57." (*See, e.g.*, Sec. Am. Compl. PP 14, 15, 16). It is unclear which version is the proper mark.

Defendant Nine West Group, Inc. is a manufacturer and retailer of shoes, clothing, and accessories. It is a Delaware corporation with its principal place of business

in White Plains, New York. (*Id.* P 2). Defendant Nine West Development Corp. is a wholly owned subsidiary of Nine West Group. [2] (*Id.* P 3).

> 2    The Court shall refer to defendants collectively as "Nine West."

### B. *Defendants' "Nine West" Mark*

Fisher Camuto Retail Corporation ("Camuto") was the [*4] predecessor of Nine West. (*Id.* P 18). Camuto was a tenant in 9 West 57th Street from July 1977 through June 1982. (*Id.*). In or about 1980, Camuto began doing business under the name "9 West," employing the numeral "9" on its corporate logo similar to plaintiff's "9" sculpture. (*Id.* PP 19, 20). In 1981, in response to plaintiff's demands to cease using the "9" logo, Camuto began using a "script numeral '9.'" (*Id.* P 21).

In 1990, Camuto began using "Nine West" as its corporate logo, and, in 1993, it also began using the name "9 & Co." (*Id.* PP 22-24). Defendants use the marks "for use in connection with the retail sale of women's shoes and handbags." (*Id.* PP 23, 24). Defendants registered both names with the USPTO in 1991 and 1995, respectively. (*Id.*).

In 1996, defendants began using their "Nine West" mark in connection with the retail sale of clothing (such as hosiery, jackets, and sleepwear) and accessories (such as sunglasses, watches, and hats). (*Id.* PP 26-28). Defendants filed trademark applications on their "Nine West" name to cover these products. (*Id.*).

### C. *Investigations of Defendants*

In 1997, the Securities and Exchange Commission [*5] began investigating defendants for accounting irregularities and, along with the United States Customs Service, for circumstances surrounding Brazilian imports. (*Id.* P 34). More recently, the Federal Trade Commission (the "FTC") and all of the state attorney generals investigated defendants for alleged price-fixing, which resulted in a settlement agreement whereby defendants agreed to pay approximately $ 34 million in fines. (*Id.* PP 35, 36).

### DISCUSSION

Plaintiff's Complaint asserts four causes of action: trademark dilution under the Lanham Act; false designation under the Lanham Act; common law trademark infringement and unfair competition; and trademark dilution under New York law. Defendants move to dismiss the Complaint in its entirety, arguing that plaintiff's claims are barred by laches. In addition, defendants argue that the Complaint must be dismissed because, among other things, plaintiff failed to sufficiently plead

likelihood of confusion and its ownership in the mark "9 West."

### I. *Motion to Dismiss Standard*

A complaint may not be dismissed on a motion to dismiss unless it "'appears beyond doubt that the plaintiff can prove no set of facts [*6] in support of his claim which would entitle him to relief.'" *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). Therefore, the issue before the Court "'is not whether a plaintiff will ultimately prevail but whether the claimant is ent:tled to offer evidence to support the claims.'" *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 235-36, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*).

Although the pleading requirements under *Federal Rule of Civil Procedure 8 (a)* are construed liberally, "liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader. If it fails to do so, a motion :nder *Rule 12(b)(6)* will be granted." *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 10 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) (internal quotation omitted); *accord Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 841 (S.D.N.Y. 2000).

[*7] II. *Laches*

To prevail on the defense of laches, defendants must establish three elements: (1) plaintiff had knowledge of defendants' use of its marks; (2) plaintiff inexcusably delayed taking action; and (3) defendants will be prejudiced by permitting plaintiff to assert its rights now. *See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000) (citation omitted). Although the burden of establishing these factors is usually on defendants, the Second Circuit has instructed that "when the suit is brought after the statutory time has elapsed, the burden is on the complainant to [allege] . . . the circumstances making :t inequitable to apply laches in [its] case." *Conopco, Inc. v. Campbell Soup Co._, 95 F.3d 187, 191 (2d Cir. 1996); cf. Jose Armando Bermudez & Co. v. Bermudez Int'l, 2000 U.S. Dist. LEXIS 12354*, No. 99 Civ. 9346 (AGS), 2000 WL 1225792, at *8 (S.D.N.Y. Aug. 29, 2000) (conducting this analysis on a motion to dismiss).

The limitations period that courts apply to Lanham Act cases is six years. [3] *See Bermudez*, 2000 WL 1225792, at *8 n.10 (citing *Conopco, 95 F.3d* at 191-92). [*8] Here, plaintiff acknowledges that Camuto "adopted the corporate logo '9 West' and began doing business

under that name" in 1980, and that in 1991 "Camuto filed a trademark application . . . on the name 'Nine West' for use in connection with the retail sale of women's shoes and handbags." (Sec. Am. Compl. PP 19, 23). Plaintiff commenced this suit on October 12, 2000. Accordingly, because the statute of limitations has run, *see Bermudez*, 2000 WL 1225792, at *8 n.10 (noting that the period begins to run "when plaintiff purportedly discovered the alleged infringements"), "a presumption of laches . . . appl[ies] and plaintiff must show why the laches defense ought not to be applied in the case." [4] *Conopco, 95 F.3d at 191.*

> 3  The Second Circuit has explained that "laches is an equitable defense that courts employ instead of a statutory time-bar . . . . Because the Lanham Act establishes no limitations period . . ., and . . . there is no corresponding federal statute of limitations, we look to the most appropriate state statute of limitations for laches purposes." *Conopco, 95 F.3d at 191.* Hence, courts in this circuit apply New York's six-year fraud statute to Lanham Act claims. *See id.; accord Fourth Toro Family, 88 F. Supp. 2d at 196.*

[*9]

> 4  Even if the statute of limitations has not run, the laches defense may still be applicable. *See Peyser v. Searle Blatt & Co., 2000 U.S. Dist. LEXIS 10793,* No. 99 Civ. 10785 (WK), 2000 WL 1071804, at *5 (S.D.N.Y. Aug. 2, 2000). In such a situation, however, there is no presumption of laches, and, thus, the burden remains on the defendant to prove the defense. *Conopco, 95 F.3d at 191.*

Plaintiff argues that its case should not be dismissed for laches for three reasons. First, plaintiff asserts that laches is not a proper issue for determination on a motion to dismiss. Second, plaintiff asserts that it has not inexcusably delayed taking action. Last, plaintiff asserts that its delay has not prejudiced defendants. [5] I address, and ultimately reject, each of these arguments in turn.

> 5  In its memorandum in opposition to defendants' motion to dismiss, plaintiff states that the "presumption" of laches "has no basis in law, or logic." (Pl. Mem. at 18). Hence, plaintiff's arguments actually read, "*Defendants Have Failed to Establish* an Unreasonable and Inexcusable Delay in Filing Suit," and "*Defendants Have Failed to Establish* Prejudice." (*Id.* at 17, 18 (emphasis added)). As already noted, however, the Second Circuit has specifically stated that "once the . . . statute has run, a presumption of laches will apply," *Conopco, 95 F.3d at 191,* and the Complaint here clearly indicates that plaintiff com-

menced this action outside the limitations period. *See Bermudez,* 2000 WL 1225792, at *8 n.10. Nonetheless, even if the burden is on defendants to establish laches, as discussed more fully below, defendants have satisfied this burden.

[*10] **A.** *Resolving Laches on Motion to Dismiss*

This Court has held: "When the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999)* (citing *Oshiver v. Levin Fishbein Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994),* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 2d § 1357); accord Bermudez,* 2000 WL 1225792, at *8. Hence, although the defense is fact-specific, the Court can consider laches on a motion to defense.

**B.** *Inexcusable Delay*

Although plaintiff acknowledges that it has known of defendants' use of the "Nine West" mark since at least 1981 (Sec. Am. Compl. P 21), plaintiff argues that it has not inexcusably delayed the commencement of this action because its claims are based on "actions taken by Defendants beginning in 1996 and continuing through 2000 . . . ." (Pl. Mem. at 17). To support its position, plaintiff relies exclusively on the decision in *Fourth Toro Family, 88 F. Supp. 2d 188.* [*11] (Pl. Mem. at 18). There, in a dispute between bagel sellers each claiming the right to use the "H & H" name, defendant argued that the action was barred by laches because it had used the name for 12 years prior to plaintiff's suit. The court, however, rejected the defense, noting a number of actions in the intervening years that excused the delay: defendant had "increased the aggressiveness and the scope of its advertising" by imitating plaintiff's campaigns; defendant changed its marketing focus from Manhattan to nationwide; defendant changed its mark to one that was much more similar to plaintiff's mark; defendant adopted a "confusingly similar '800' number"; and defendant traded on plaintiff's kosher certification. *Fourth Toro Family, 88 F. Supp. 2d at 197.* These actions, according to the court, "created instances of both actual, reported confusion and the likelihood of increasing confusion." *Id.* In addition, the court noted that, prior to suing defendant, plaintiff had taken action with the "Trademark Office" on at least three separate occasions and, in fact, obtained "exclusive trademark protection" from the office. *Id. at 197-98.* Thus, the [*12] court concluded that "plaintiff's filing of [the] lawsuit . . . was a direct and timely response to defendant's tactics." *Id. at 198* (citation omitted).

In contrast, plaintiff here took no action against defendants until it commenced this action in October 2000, and defendants took no actions that increased the likelihood of confusion between the parties' marks or their services. Defendants have used the "Nine West" mark, with plaintiff's knowledge, since 1980. In 1981, plaintiff demanded that Camuto alter his "9 West" logo because it allegedly violated plaintiff's red numeral "9" trademark. (Sec. Am. Compl. P 21). For the next two decades, however, plaintiff took no action even as defendants "continued to use the name[s] . . . openly and notoriously . . . ." (*Id.* P 25). Plaintiff does not allege that it sought exclusive protection for the "9 West" mark, *cf. Fourth Toro Family,* 88 F. Supp. 2d at 197-98, it does not allege that it notified defendants of its concerns, *cf. Bermudez,* 2000 WL 1225792, at *8 (declining to apply laches, in part, because plaintiff had "notified [defendant] of its concerns relating to possible infringement, [*13] " and because defendant, in response, had represented that it would no longer engage in the allegedly infringing conduct), and it does not allege that it conducted an "investigation into the merits of [its] case." [6] *Cf. Peyser,* 2000 WL 1071804, at *6 (noting that a "reasonable investigation into the merits . . . will in effect toll the laches period").

> 6    In its memorandum in opposition to defendants' motion to dismiss, plaintiff does not assert that it took any of these actions.

In addition, plaintiff does not allege that defendants' use of the "Nine West" mark, including their post-1996 use, "increased the likelihood of confusion" between its real estate business or its properties and defendants' shoe and clothing business. The crux of the *Fourth Toro Family* decision was that in the intervening years defendant's actions "altered the competitive environment between plaintiff and defendant." *88 F. Supp. 2d at 198.* Here, plaintiff does not, and cannot, make such an allegation. [*14] Rather, plaintiff merely alleges that defendants' actions during that time "expanded the public's awareness of *[defendants']* 'Nine West' name." [7] (Sec. Am. Compl. P 26 (emphasis added)). Accordingly, the Complaint does not sufficiently allege that the filing of this lawsuit in October 2000, more than 20 years after defendants began using the "Nine West" name, was either a direct or a timely response to defendants' actions. *Cf. Fourth Toro Family,* 88 F. Supp. 2d at 198.

> 7    Plaintiff also argues that the SEC's and FTC's investigations of defendants, beginning in 1997, and the resulting "negative publicity," "caused the public to associate [defendants' marks] with dishonesty, fraudulent practices and illegal conduct. As a direct result, 9 West 57 has become wrongly associated with dishonesty, fraudulent practices and illegal conduct." (Sec. Am. Compl. P 37).

This argument is meritless. First, the Complaint does not allege that the investigations increased the likelihood of confusion between the parties. Second, as discussed by the Fifth Circuit, plaintiff is proposing that a "trademark owner has a property right in his mark, but only so long as he personally is not unpopular with the general public." *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1084 (5th Cir. 1997). Like the Fifth Circuit, I "reject this highly unorthodox view of trademark law." *Id.*

[*15] **C. *Prejudice to Defendants***

"A defendant has been prejudiced when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim. Specifically, prejudice is present when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" *Bermudez,* 2000 WL 1225792, at *8 (quoting *Conopco,* 95 F.3d at 192). Here, the Complaint alleges the following: in 1980, Camuto began using a variation on the "Nine West" name; in 1981, plaintiff demanded that Camuto alter the style of his logo; in 1990, Camuto began using "Nine West" as its corporate logo; in 1991, Camuto filed a trademark application on the name "Nine West"; in 1993, defendants began to use the name "9 & Co.," and, in 1995, they applied for trademark protection for the name; from 1996 through 2000 defendants expanded its line of consumer products from shoes and handbags to include certain types of clothing apparel and accessories, and defendants filed trademark applications to cover these products under their "Nine West" name. Thus, in part because of plaintiff's inaction as to defendants' [*16] use of the "Nine West" mark, defendants have used the name for more than 20 years "in the manufacture and retail sale of clothing and accessories . . . ." (Sec. Am. Compl. P 2). Aside from the one concern that it raised in 1981, plaintiff has allowed defendants to use the "Nine West" name uncontested for two decades.

Nonetheless, plaintiff argues that defendants have not suffered prejudice because "since 1996, Defendants have changed the manner in which they used the 'Nine West' name by expanding their business activities to include a wide variety of consumer products . . . ." [8] (Pl. Mem. at 19). This argument, however, supports the opposite conclusion -- that plaintiff's inaction prejudiced defendants -- as defendants decided to "expand [their] business activities" after 16 years of selling shoes and handbags with no action from plaintiff. (Sec. Am. Compl. P 26). *Cf. Peyser,* 2000 WL 1071804, at *7-8 (noting that "courts have had little tolerance for cries of 'prejudice' from defendants who . . . were put on notice of an infringement").

8  Plaintiff's additional argument that defendants have failed to "establish" prejudice because "since 1997, [they] have been engaged in a series of illegal activities which have lent notoriety to the 'Nine West' name" is irrelevant. The issue before the Court is whether defendants have suffered prejudice because of *plaintiff's* inactions.

[*17] Accordingly, because plaintiff has known of defendants' use of the "Nine West" name since 1980, has inexcusably delayed the commencement of an action against defendants, and has allowed defendants to maintain and expand their business activities by its delay, thus prejudicing defendants, plaintiff's claims are barred by laches. Laches is clear on the face of plaintiff's Complaint; it is clear that plaintiff "can prove no set of facts to avoid the insuperable bar," *Lennon, 63 F. Supp. 2d at 439*; and there is no reason why the Court "should permit plaintiff[] to 'sleep on [its] rights' to sue under any of [its] claims." *Peyser, 2000 WL 1071804, at \*9.*

## III. *Additional Grounds for Dismissal*

### A. *Likelihood of Confusion*

Even assuming the Complaint is not barred by laches, plaintiff's cause of action also fails because the Complaint fails to sufficiently allege any likelihood of confusion between the parties' marks, as required by the Lanham Act and New York common law. *See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45-46 (2d Cir. 2000).* Although the existence of consumer confusion is generally a question [*18] of fact, "in considering a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may . . . make an initial finding as to whether or not a jury would find a likelihood of confusion as to source." *Textile Deliveries, Inc. v. Stagno, 1990 U.S. Dist. LEXIS 13309, \*16, No. 90 Civ. 2020 (JFK), 1990 WL 155709, at \*6 (S.D.N.Y. Oct. 9, 1990); accord Schieffelin & Co. v. Jack Co. of Boca, Inc., 725 F. Supp. 1314, 1323 (S.D.N.Y. 1989)* (noting that for a motion to dismiss "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source" (quoting *Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231, 246 (2d Cir. 1983)))*. Thus, the Court, accepting the facts as alleged in plaintiff's Complaint as true, must conclude whether a legal claim exists based on those facts. Here, plaintiff has failed to allege the existence of likelihood of confusion. [9]

9  This is in contrast to the facts in *Solow v. BMW (US) Holding Corp., 1998 U.S. Dist. LEXIS 16059,* No. 97 Civ. 1373 (DC), 1998 WL 717613, at \*4 (S.D.N.Y. Oct. 14, 1998), where I denied a motion to dismiss a complaint filed by Solow that

did allege a likelihood of confusion. There, in a case involving BMW's use -- in a television commercial -- of a red numeral "5" sculpture in front of a building similar in style to plaintiff's 9 West 57th Street property, Solow "unequivocally" alleged likelihood of confusion. *See id.* Moreover, in that case, unlike here, Solow did not wait 20 years to commence its action.

[*19]

In addressing likelihood of confusion, courts apply the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)*: (i) strength of plaintiff's mark; (ii) similarities of the parties' marks; (iii) proximity of the parties' products in the marketplace; (iv) likelihood that plaintiff will bridge the gap between the products; (v) actual confusion; (vi) defendants' intent in adopting their mark; (vii) quality of defendants' product; and (viii) sophistication of the relevant consumer group. *See also Nabisco, 220 F.3d at 46.* As the Second Circuit has noted, "the ultimate question [is] whether consumers are likely to be confused." *Id.* (quotation and citation omitted).

Here, the Complaint makes no allegations at all as to five of the *Polaroid* factors (iii, iv, vi, vii, and viii). The absence of any such discussion is not surprising, as those factors all weigh against a finding of confusion. As to the "ultimate question" of the likelihood of consumer confusion, the Complaint provides that plaintiff is a "corporation engaged in the business of real estate construction and the rental of distinctive commercial [*20] and residential properties." (Sec. Am. Compl. P 1). Defendants, in turn, manufacture and sell women's footwear, handbags, and, for the last six years, additional items such as hosiery, sunglasses, watches, and bed sheets. (*Id.* PP 24-28). Thus, there is clearly no proximity between the parties' businesses or their products, and there is simply no competition between the parties. *See Charles Atlas, Ltd v. DC Comics, Inc., 112 F. Supp. 2d 330, 339 (S.D.N.Y. 2000)* (noting that because the parties "are simply not in direct competition . . . the likelihood of confusion is greatly reduced"). Moreover, consumers who seek real estate construction or property rentals surely will not be confused by a company that manufactures and sells women shoes, handbags, clothing, and accessories.

Accordingly, the Court concludes that the Complaint's allegations exceed the "outer limits . . . within which a jury is permitted to make the factual determination [that] there is a likelihood of confusion as to source." Based on the facts alleged, no legal claim exists.

### B. *Plaintiff's "9 West" Mark*

In the Complaint, plaintiff alleges that "the public has derived the nickname [*21] '9 West' . . . [and] uses

the nickname '9 West' to identify 9 West 57 and has come to uniquely associate the nickname '9 West' with the building." (Sec. Am. Compl. P 16). The Complaint does not allege, however, that *plaintiff* uses, or has ever used, the nickname "9 West," or that *plaintiff* uses, or has ever used, the nickname to identify the building at 9 West 57. Hence, defendants argue that plaintiff "cannot have acquired ownership rights in the mark '9 West.'" (Defs. Mem. at 12-13); *see 15 U.S.C. § 1127* (defining "trademark" as "any word, name, symbol, or device . . . *used by [the applicant]*" seeking trademark protection (emphasis added)).

In response, plaintiff does not challenge defendants' assertion that it does not use the nickname, but, instead, relies on *National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991)*, for its argument that "even without 'use' of trademark directly by the claimant. . . , nicknames of trademarks or names used only by the public give rise to protectable rights . . . ." (Pl. Mem. at 20). While the court there did state, in dicta, [*22] that public-created nicknames do give rise to protectable rights, the court's holding rested on the fact that *plaintiff* had "made significant use of [the nickname] as its trade name . . . ." *National Cable Television, 937 F.2d at 1577-78*.

In *Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 812 (2d Cir. 1999)*, a case involving a motorcycle manufacturer's and a motorcycle repairer's competing use of the word "hog," the Second Circuit noted the *National Cable Television* decision but did not indicate "whether or not we agree with [the] decision[] . . . ." The court did note, however, that the nickname "hog," like plaintiff's alleged nickname "9 West," differed "significantly" from the nickname at issue in *National Cable Television* in that the nickname "hog" was "a generic term in the language as applied" to motorcycles. [10] *Id.* The court stated: "The public has no more right than a manufacturer to withdraw from the language a generic term, already applicable to the relevant category of products, and accord it trademark significance, at least as long as the term retains some generic meaning." [11] *Id.*

    10    As noted by the Second Circuit, the term "hog" was used "to refer to motorcycles generally

and large motorcycles in particular." *Harley-Davidson, 164 F.3d at 808.*

[*23]
    11    Moreover, the Second Circuit denied trademark protection to plaintiff's use of "hog" despite the fact that plaintiff itself had begun to use the term in connection with its merchandise, advertising, and promotion. *Harley-Davidson, 164 F.3d at 809.* Here, as already noted, the Complaint does not allege that plaintiff itself ever used the nickname "9 West."

There is a "9 West" on almost every cross-street in Manhattan, and, thus, "9 West" surely retains a "generic meaning" in the "language" of building addresses, which is how plaintiff uses the name. Under the reasoning of *Harley-Davidson*, therefore, plaintiff would not be permitted to accord trademark significance to the public-created nickname "9 West" in an action against another building that sought to use it. Hence, if plaintiff cannot enforce the nickname against another real estate company, then plaintiff should not be permitted to enforce the "9 West" nickname against a shoe and clothing company.

Accordingly, plaintiff has no trademark right to the term "9 West," a nickname that, according to the Complaint, was [*24] created and is used only by the public, and one that is generic.

## CONCLUSION

Based on the foregoing, all of plaintiff's claims are barred by the laches defense. In addition, plaintiff has failed to sufficiently allege likelihood of confusion and ownership rights in the name "9 West." Hence, the Second Amended Complaint is dismissed in its entirety, with prejudice, and the Clerk of Court shall enter judgment accordingly.

SO ORDERED.

Dated: New York, New York

June 28, 2001

DENNY CHIN

United States District Judge