UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC., ) | ECF Case |
| ENERGY INTELLIGENCE GROUP (UK) ) | |
| LIMITED ) | Civil Action No.: |
| ) | 08-CV-01497 (DAB) |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UBS FINANCIAL SERVICES, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

_____

**<u>MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S</u>**
**<u>MOTION TO DISMISS</u>**

Winston & Strawn LLP
200 Park Avenue
New York, New York
(212) 294-6700 (ph)
(212) 294-4700 (fax)

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

ARGUMENT ...................................................................................................................1

    I.      The Claims Should Be Dismissed as a Matter of Law .............................................1

    II.     Plaintiffs' OIL DAILY Mark is Generic ................................................................4

    III.    Even Were Plaintiffs' Mark Protectable, There Is No Probability of Confusion ....8

CONCLUSION.............................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness, LLC,*
    277 F. Supp. 2d 356 (S.D.N.Y. 2003).......................................................................................10

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
    537 F.2d 4 (2d Cir. 1976) ...........................................................................................................5

*Birtcher Electro Medical Systems, Inc. v. Beacon Laboratories, Inc.,*
    738 F. Supp. 417 (D. Colo. 1990)..............................................................................................5

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
    369 F.3d 212 (2d Cir. 2004).......................................................................................................2

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002).......................................................................................................2

*Clipper Cruise Line, Inc. v. Star Clippers, Inc.,*
    952 F.2d 1046 (8th Cir. 1992) ...................................................................................................4

*Courtenay Commc'ns Corp. v. Hall,*
    334 F.3d 210 (2d Cir. 2003)...............................................................................................2, 3, 4

*Cyril v. Neighborhood P'ship II Hous. Dev. Fund, Inc.,*
    124 Fed. App'x 26 (2d Cir. 2005)..............................................................................................2

*De Jesus v. Sears, Roebuck & Co.,*
    87 F.3d 65 (2d Cir. 1996) .........................................................................................................10

*Door Sys., Inc. v. Pro-Line Door Sys., Inc.,*
    83 F.3d 169 (7th Cir. 1996) .......................................................................................................4

*Eastern Air Lines, Inc. v. New York Air Lines, Inc.,*
    559 F.Supp. 1270 (S.D.N.Y. 1983)...........................................................................................4

*Gear, Inc. v. L.A. Gear California, Inc.,*
    670 F. Supp. 508 (S.D.N.Y. 1987), *vacated in part pursuant to settlement,* 13
    U.S.P.Q.2d 1655, No. 85 Civ. 5754, 1989 WL 407456 (S.D.N.Y. Nov. 30, 1989) .................7

*Hayden v. County of Nassau,*
    180 F.3d 42 (2d Cir. 1999)........................................................................................................2

*In re Sun Oil Co.,*
    426 F.2d 401 (C.C.P.A. 1970) ...................................................................................................7

NY:1178279.2

*interState Net Bank v. NetB@nk, Inc.*,
  221 F. Supp. 2d 513 (D. N.J. 2002) ................................................................................4

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*,
  85 U.S.P.Q.2d 1780, No. 06-0597, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. Jan. 4, 2007)..........9

*Katz v. Modiri*,
  283 F. Supp. 2d 883 (S.D.N.Y. 2003).............................................................................10

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
  192 F.3d 337 (2d Cir. 1999).........................................................................................4

*Le Book Publ'g, Inc. v. Black Book Photography Inc.*,
  418 F. Supp. 2d 305 (S.D.N.Y. 2005)..........................................................................2, 9

*Liquid Controls Corp. v. Liquid Control Corp.*,
  802 F.2d 934 (7th Cir. 1986) .........................................................................................4

*Loctite Corp. v. Nat'l Starch & Chem. Corp.*,
  516 F. Supp. 190 (S.D.N.Y. 1981)..................................................................................7

*Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*,
  561 F.2d 75 (7th Cir. 1977) ..........................................................................................4

*Momentum Luggage & Leisure Bags v. Jansport, Inc.*,
  No. 00 Civ. 7909, 2001 U.S. Dist. LEXIS 10253 (S.D.N.Y. July 23, 2001), *aff'd,* 45
  Fed. App'x 42 (2d Cir. 2002)........................................................................................10

*Montblanc-Simplo v. Aurora Due S.r.L.*,
  363 F. Supp. 2d 467 (E.D.N.Y. 2005) ...........................................................................9

*Nartron Corp. v. STMicroelectronics, Inc.*,
  305 F.3d 397 (6th Cir. 2002) .........................................................................................4

*Novak v. Overture Servs. Inc.*,
  309 F. Supp. 2d 446 (E.D.N.Y. 2004) .........................................................................2, 3

*Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.*,
  53 U.S.P.Q.2d 1406, No. 99 Civ. 280, 1999 WL 707721 (D.N.J. Sept. 13, 1999) ..................4

*Nupla Corp. v. IXL Mfg. Co., Inc.*,
  114 F.3d 191 (Fed. Cir. 1997)........................................................................................4

*Reese Publ'g Co., Inc., v. Hampton Int'l Commc'ns Inc.*,
  620 F.2d 7 (2d Cir. 1980) ..............................................................................................8

*Retail Servs., Inc. v. Freebies Publ'g*,
  364 F.3d 535 (4th Cir. 2004) .........................................................................................4

iii

*Solow Bld'g Co., LLC v. Nine West Group, Inc.*,
   No. 00 Civ. 7685, 2001 U.S. Dist. LEXIS 8848 (S.D.N.Y. June 28, 2001), *aff'd*, 48
   Fed. App'x 15 (2d Cir. 2002)...................................................................................2

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) ....................................................................................4

*TE-TA-MA Truth Found.—Family of URI, Inc. v. World Church of Creator*,
   297 F.3d 662 (7th Cir. 2002) ....................................................................................4

*Teleflora Inc. v. Florists Transworld Delivery Ass'n*,
   217 U.S.P.Q. 1081, No. 81 Civ. 1586, 1981 WL 47056 (C.D.Cal. Sept. 14, 1981).................4

*The Deal, LLC v. Korangy Publ'g*, Inc.,
   309 F. Supp. 2d 512 (S.D.N.Y. 2004)......................................................................7

*Toho Company, Ltd., v. Sears Roebuck & Co.*,
   645 F.2d 788 (1981)...................................................................................................9

## STATUTES

15 U.S.C. § 1052(f)......................................................................................................9

## RULES

Fed. R. Civ. P. 12(b)(6)......................................................................................... passim

## OTHER AUTHORITIES

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:9 (4th ed.
   2008) .........................................................................................................................8

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:18 (4th
   ed. 2008) ...................................................................................................................5

Defendant UBS Financial Services, Inc. ("UBS" or "Defendant") submits this Memorandum of Law in further support of its Motion to Dismiss the third, fourth, and fifth counts of Plaintiffs' Complaint (the "Motion"), with prejudice, on the basis that the claims fail to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

In response to the Motion, and in seeking to enjoin and punish Defendant from using the words "daily" and "oil" to publish its daily research report about oil, Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited ("Plaintiffs" or "EIG") attempt to incorporate facts never pled in their Complaint while pressing arguments devoid of legal reason or rationale.[1]  There is no basis found in the law that would support allowing EIG's trademark claims to survive the Motion.  Plaintiffs' mark OIL DAILY – denoting a daily oil report – is generic.  There is no probability of confusion, no impenetrable magic conferred by registration, and no legal reason why the Court or UBS should be put through the burden of discovery to reach a conclusion that is readily apparent, and one that should be determined pursuant to Fed R. Civ. P. 12(b)(6).[2]

## ARGUMENT

## I.    The Claims Should Be Dismissed as a Matter of Law

Plaintiffs' chief argument in opposition to the Motion seems to be that the Court should not take the proper, and ripe, opportunity to eliminate baseless claims now, but instead should wait until some unspecified fact discovery is completed.  Yet the Court may properly determine on a motion to dismiss that a mark is generic or that there is no probability of confusion between two marks where the Complaint and its supporting documents compel such a result.  In certain instances, as here, the genericness of a mark may be so obvious, or the dissimilarity between two

---

[1] For the Court's convenience, the Complaint is attached to the Declaration of Thomas P. Lane ("Lane Decl.") as Exhibit 1.

[2] Defendant reiterates that it is not a proper party to these claims.

marks so overwhelming, that the facts – even when necessarily construed in the light most favorable to plaintiff – compel dismissal. *See, e.g., Le Book Publ'g, Inc. v. Black Book Photography Inc.*, 418 F. Supp. 2d 305, 308, 311 (S.D.N.Y. 2005) (stating "This Court may only dismiss a complaint if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," then finding that the dissimilarity between the disputed marks "overwhelms any possibility of confusion," that the common term between the marks "is a generic term and cannot be registered as a trademark," and dismissing all trademark and unfair competition claims) (internal quotation omitted). *See also Solow Bld'g Co., LLC v. Nine West Group, Inc.*, No. 00 Civ. 7685, 2001 U.S. Dist. LEXIS 8848, at *17-18 (S.D.N.Y. June 28, 2001), *aff'd,* 48 Fed. App'x 15 (2d Cir. 2002) ("Although the existence of consumer confusion is generally a question of fact, 'in considering a motion to dismiss pursuant to Rule 12(b)(6), the Court may . . . make an initial finding as to whether or not a jury would find a likelihood of confusion as to source.'") (internal citation omitted); *id.* at *19, *23 (finding mark generic and that "consumers … surely will not be confused"). Here, the Court need look no further than the face of the Complaint, the marks, and the proper supporting documents.[3]  No further facts need to be developed: oil means oil, daily means daily, and OIL DAILY means a daily report on oil, no matter how much Plaintiffs now attempt to dress it up as something else.

In attempting to avoid dismissal, Plaintiffs rely on *Novak v. Overture Servs. Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004) and *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210 (2d Cir.

---

[3] In their opposition papers, Plaintiffs attempt to informally amend their Complaint to disguise the genericness of their mark.  Of course, in the context of a Rule 12(b)(6) motion, it is the Complaint and its accompanying and incorporated documents that matter; extraneous declarations of fact appended to opposition briefs are not properly considered.  *See* Opposition at 5 (quoting *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir. 2003) ("The pleadings and documents necessarily relied on (sic) by Plaintiffs' complaint … were all the district court could rightfully consider in deciding the motion to dismiss for failure to state a claim"); *see also Cyril v. Neighborhood P'ship II Hous. Dev. Fund, Inc.*, 124 Fed. App'x 26, 27, n.2 (2d Cir. 2005) (consideration by district court of affidavits submitted on motion to dismiss would be improper); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-54 (2d Cir. 2002); *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999).

2

2003), for the proposition that courts can *never* determine genericness or likelihood of confusion in the context of a Rule 12(b)(6) motion. The cited cases do not stand for such a drastic and expansive proscription. In *Novak*, the court declined to find the mark PETS WAREHOUSE generic. The determination was impossible without the development of further facts because there (unlike here, where Plaintiffs' mark denotes exactly that to which it refers: a daily about oil) PETS WAREHOUSE did not denote a warehouse full of pets, but rather a store – not a warehouse – where pet supplies – not pets – were sold. Discovery was necessary to determine whether consumers considered the terms PETS and WAREHOUSE together to mean a large store that sells pet supplies or a warehouse of pets.

*Hall* is also distinguishable. In that case, the district court dismissed the term "iMarketing" as generic. The Second Circuit's reversal was premised largely on the fact that the district court did not consider the composite nature of plaintiff's mark, including specifically alleged design elements. *Id.* at 215-16, n.5 ("[I]t is worth noting that CCC's complaint is focused on Hall's use of a nearly identical composite mark (*i.e.*, words plus allegedly distinctive design elements) and not just the allegedly generic words alone."). Plaintiffs here do not allege any specific design elements.[4]

Defendant here is not pressing the Court to define a compound term new to the consumer lexicon. The use of the word daily to denote a daily publication is time-honored, as is the term oil to describe oil. Indeed, with Plaintiffs having disclaimed rights to the word daily, this is largely a fight over whether oil means oil, which, of course, in this case it does. While, as Plaintiffs state, it may be "*usually* true that the classification of a mark is a factual question," by no means is it universally true. Opposition at 5 (quoting *Hall*, 334 F.3d at 215) (internal

---

[4] Because Plaintiffs allege nothing about font size, color or design, it is unnecessary to poll Plaintiffs' readership as to how they feel Plaintiffs' mark looks.

quotations and citations omitted) (emphasis added).  The Court can and should find that OIL

DAILY is generic on its face, as a matter of law.

## II.    Plaintiffs' OIL DAILY Mark is Generic

Plaintiffs next attempt to survive dismissal by claiming that because OIL DAILY is a

registered mark, it cannot be generic.  Yet the presumption of validity is neither ironclad nor

unrebuttable.  Indeed, "an incontestable registration is more like a bursting-bubble presumption

of non-generic-ness than like the sort of indomitable presumption" claimed by Plaintiffs.  *TE-TA-*

*MA Truth Found.—Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 665 (7th Cir.

2002).  "The presumption of validity that federal registration confers evaporates as soon as

evidence of invalidity is presented."  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192

F.3d 337, 345 (2d Cir. 1999) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169,

172 (7th Cir. 1996) (cited in Opposition).  Contrary to Plaintiffs' mischaracterizations, courts

routinely find federally registered marks generic, and the evidence of invalidity is presented in

Plaintiffs' own pleadings, and on the very face of the mark.[5]

---

[5] *See, e.g., Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F.Supp. 1270, 1274 (S.D.N.Y. 1983) (finding registered mark SHUTTLE to be generic as refers to air transportation between cities); *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538, 547-548 (4th Cir. 2004) (affirming finding that registered mark FREEBIES was generic as applied to promotional gifts); *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 403-04 (6th Cir. 2002) (affirming finding that registered mark SMART POWER was generic as applied to a type of integrated circuit); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc*., 240 F.3d 832, 840 (9th Cir. 2001) (affirming finding that FIRE-SAFE mark was likely generic as applied to a fire-resistant safe, and subject to cancellation); *Nupla Corp. v. IXL Mfg. Co., Inc.*, 114 F.3d 191, 196 (Fed. Cir. 1997) (affirming finding of genericness and invalidation of registered mark CUSH-N-GRIP as applied to tool handles); *Clipper Cruise Line, Inc. v. Star Clippers, Inc.*, 952 F.2d 1046, 1048 (8th Cir. 1992) (finding that registered mark CLIPPER "possesses no more than a generic meaning with regard to ships and related cruise services"); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938-939 (7th Cir. 1986) (affirming that registered mark LIQUID CONTROLS is generic as applied to industrial equipment); *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 81 (7th Cir. 1977) (finding registered marks LIGHT and LITE to be generic as applied to beer, despite expansive promotional expenditures); *interState Net Bank v. NetB@nk, Inc.*, 221 F. Supp. 2d 513, 527 (D. N.J. 2002) (finding registered mark NETBANK generic); *Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.*, 53 U.S.P.Q.2d 1406, No. 99 Civ. 280, 1999 WL 707721, at *10 (D.N.J. Sept. 13, 1999). (finding registered mark SOFTCHEWS generic as applied to chewable medical tablets); *Teleflora Inc. v. Florists Transworld Delivery Ass'n*, 217 U.S.P.Q. 1081, 1083, No. 81 Civ. 1586, 1981 WL 47056 (C.D.Cal. Sept. 14, 1981) (finding EASTER BASKET to be an unprotectable mark to denote a bouquet of flowers, despite registration).

4

Genericness is determined by the context in which the mark is used and is not defeated by the simple act of registration. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) ("a term that is in one category [of trademark protection] for a particular product may be in quite a different one for another"). The first question is whether the mark is generic in reference to the goods that it denotes. To cite a famous example, IVORY is a generic mark for elephant tusks, but not for soap. *Id.* at 9, n.6. The second question is whether the mark is generic in reference to its targeted consumers. *Id.* at 9 ("a term may have one meaning to one group of users and a different one to others").[6] OIL DAILY is generic both in reference to the goods it denotes and in reference to its target customers: it denotes a daily publication about the oil industry and is targeted to a sophisticated readership with a specific interest in a specific industry: oil. Therefore, the mark is generic.

As alleged in Plaintiffs' Complaint, the focus of *Oil Daily* "is to provide original in-depth and insightful articles regarding the latest developments in the worldwide oil and gas industry." Complaint ¶ 8 (characterizing the international edition of *Oil Daily*). Indeed, its tagline is to be "the *Wall Street Journal* of the oil industry."[7] Yet EIG now declares that *Oil Daily* is not simply an oil daily, but a whole lot more, claiming that it is practically the *Wall Street Journal* itself. Opposition at 12-13. According to EIG in its opposition, *Oil Daily* is, "in essence, a newspaper which covers stories not only directly related to the energy and petroleum industries, but draws upon a wide array of subject matter…." and has "a much broader focus," including news on "political changes, international events … [and] legal news." Opposition at 1; Walkins Decl. ¶ 6; Opposition at 12-13. But *Oil Daily* is not a general distribution newspaper; it is much more

---

[6] For example, most people may not know what an "argon beam coagulator" refers to, but the term is nonetheless generic, as its target consumers -- surgeons -- well know that it is the common name for a surgical instrument. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:18, n.7 (4th ed. 2008) (citing *Birtcher Electro Medical Systems, Inc. v. Beacon Laboratories, Inc.*, 738 F. Supp. 417 (D. Colo. 1990)).

[7] *Oil Daily* homepage, *at* http://energyintel.com/PublicationHomePage.asp?publication_id=5.

limited on its face. Every single article in the sample issue of *Oil Daily* available on Plaintiffs' website (and incorporated into the Complaint) is "directly related to the energy and petroleum industries."[8] There is no coverage of "political changes" in the sample issue of *Oil Daily*.[9] There is reporting on international events – for example, a mounting death toll in Nigeria after a "massive oil pipeline fire," and Ecuador lowering its price of Oriente crude oil – but only those relevant to the oil industry. Lane Decl., Exh. 2 at 2, 7. Similarly, what Plaintiffs mean by "legal news" – such as Exxon Mobil challenging an Alaskan Supreme Court ruling, or regulation in the wake of Enron's collapse – is legal news related to the oil industry. *Id.* at 1, 5. *Oil Daily* is neither "All the News That's Fit to Print," nor even "What's News"; it is merely "Today's complete oil and gas news briefing." It is an OIL DAILY about oil, daily.[10] *Id.* at 1. There are no set of facts that Plaintiffs could prove that would demonstrate that *Oil Daily* is not a daily newsletter about the oil industry. The Complaint conclusively demonstrates that *Oil Daily* is about oil. *See also* Complaint, Exh. D (OIL DAILY mark registered "for newsletters dealing with the energy and petroleum industries").

Despite the clear force of the Complaint, and the mark and newsletter itself, Plaintiffs nonetheless assert, disingenuously, that *Oil Daily* could refer to a publication "about automobile racing, skin care, oil painting or cholesterol health." Opposition at 10. Leaving aside the ludicrousness of the argument – a daily newsletter about cholesterol health called *Oil Daily*? –

---

[8] The headlines from the sample issue are, for example: Exxon Challenges Thomson Point Ruling; Mexico's 2007 Budget Harsh on [state oil company] Pemex; Mounts (describing "massive oil pipeline fire"); Late Rally Pushes Nymex Crude Over $61 at Year End; US Spot-Crude Differentials Steady In Thin End-of-Year Trading; Oil Impact of More Protection for Polar Bears, Whales Uncertain; US Regulators May Ease Upon on Tough Post-Enron Rules ("The oil industry has extra problems"); [Brazil state oil company] Petrobras Reports Oil Finds. Lane Decl., Exh. 2.
[9] Just two days before Democrats stood to take control of both houses of Congress for the first time in 12 years and elect the first female Speaker of the House in U.S. history, and just three days after the execution of Saddam Hussein, the lead article in the *Oil Daily* was: "Exxon Challenges Thomson Point Ruling." Lane Decl., Exh. 2.
[10] It is uncontested that *Oil Daily* is in fact published daily, and that Plaintiffs have disclaimed the exclusive right to use the word DAILY. Complaint, Exh. D; *cf.* Complaint ¶ 8 (referring to the international edition of *Oil Daily* as a "daily newsletter"); Lane Decl., Exh. 2 (*Oil Daily* banner: "*Today's* complete oil and gas news briefing") (emphasis added).

6

none of the fields suggested by Plaintiff are actually defined by the word "oil" – but the oil industry is.  Further, genericness is not determined by what a mark *could* refer to.  Otherwise, one could sell – and exclude all others from selling – elephant tusks under the mark IVORY or saucy chicken appetizers under the mark BUFFALO WINGS upon the argument that the marks *could* refer respectively to soap or airplane parts manufactured in upstate New York.  Further, OIL DAILY is not registered to denote oil painting catalogues or medical pamphlets; it is registered "for newsletters dealing with the energy and petroleum industries."  Complaint, Exh. D.  For such use, the OIL DAILY mark is generic.  It states "what it is" and "what it is about." Opposition at 10.  Unlike "THE DAILY DEAL," OIL DAILY does immediately convey what the publication is.  *See* Opposition at 9 (citing *The Deal, LLC v. Korangy Publ'g*, Inc., 309 F. Supp. 2d 512, 524 (S.D.N.Y. 2004)).

It matters little that there remain other generic terms available to Defendant to title its daily oil report.  "[T]he existence of synonyms for a term does not mean the term is not generic." *Loctite Corp. v. Nat'l Starch & Chem. Corp.*, 516 F. Supp. 190, 201 (S.D.N.Y. 1981); *see also Gear, Inc. v. L.A. Gear California, Inc.,* 670 F. Supp. 508, 516 (S.D.N.Y. 1987), *vacated in part pursuant to settlement,* 13 U.S.P.Q.2d 1655, No. 85 Civ. 5754, 1989 WL 407456 (S.D.N.Y. Nov. 30, 1989) ("Even if there are other more common synonyms for the same concept, the term at issue is still generic if its principal meaning in the relevant market is generic.")  Despite the availability of the words petroleum and energy, Plaintiffs cannot appropriate the words oil and daily from the public domain.  *In re Sun Oil Co.*, 426 F.2d 401, 404 (C.C.P.A. 1970) (Rich, J., concurring) ("[A] product may have more than one generically descriptive name. Because one merchandiser has latched onto one of the descriptive terms does not mean it can force its

competitors to limit themselves to the use of the others"); s*ee generally* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:9 (4th ed. 2008).

Finally, there is no set of provable facts that could demonstrate that Plaintiffs' sophisticated readership would regard an oil daily as anything other than a daily newsletter about the oil industry. According to the Complaint, Plaintiffs' readership includes different groups "who *follow the industry*." Complaint ¶ 8 (emphasis added). According to Plaintiffs' website, "every seasoned professional in the oil industry chooses to start their day with *Oil Daily*." Lane Decl., Exh. 3. It is only now, when faced with the Motion, that EIG improperly tries to make *Oil Daily* that which it is not, recharacterizing its supposed readership as never alleged in the Complaint.[11] No matter: a mark is generic whether the publication it denotes is aimed solely at a trade or to a wider consumer base. *Reese Publ'g Co., Inc., v. Hampton Int'l Commc'ns Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) (rejecting appellant's attempt "to distinguish CES Publishing Corp. on the ground that that case involved a 'trade magazine' directed to industry personnel rather than a consumer publication like Reese's 'Video Buyer's Guide.'"). To the seasoned professionals who, according to Plaintiffs' Complaint, make up the vast majority of EIG's readership, an oil daily is not conceivably an email about acne or a one-a-day calendar of olive oil recipes – it is their daily source of information about the industry. In such context, the mark is generic, and given its unprotectability, all of EIG's trademark-related claims must be dismissed.

## III.    Even Were Plaintiffs' Mark Protectable, There Is No Probability of Confusion

Even if Plaintiffs' mark were not generic, their claims would still fail because it is highly improbable that anyone, much less the sophisticated consumers of oil dailies, could possibly

---

[11] Even Plaintiffs' broader constitution of the group still consists predominantly – if not exclusively – of seasoned individuals with an interest in oil.

confuse *Oil Daily* and *UBS Investment Research Daily Oil News*.[12]  The Court can readily make this determination on a Rule 12(b)(6) motion.  *See, e.g., Le Book*, 418 F. Supp. 2d at 311.[13]

According to Plaintiffs, sophisticated readers of the type to review either publication at issue are likely to be confused because the marks are allegedly similar, that OIL DAILY is a strong mark, that Defendants acted in bad faith, that the goods are in close proximity, and that somehow Plaintiffs' consumers – including oil executives and ambassadors – are actually <u>not</u> sophisticated enough not to be confused.  Nonsense.  As UBS set forth in the Motion, the publications do entirely different things and are designed in completely different ways; UBS' publication is about research, with all the attendant regulatory qualifiers; EIG's, by its own admission, is about facts.  The publisher is different, the titles are different, the format is different, the impact is different.

Furthermore, the probability of confusion is necessarily low because Plaintiffs' mark is weak.  In fact, Plaintiffs have effectively conceded the weakness of their mark through its registration under Section 2(f) of the Lanham Act.[14]  Complaint, Exh. D; *Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F. Supp. 2d 467, 479 (E.D.N.Y. 2005) ("registration under Section 2(f)

---

[12] Plaintiffs claim to take "umbrage" with Defendant's characterization of its mark as UBS INVESTMENT RESEARCH DAILY OIL NEWS.  Opposition at 17.  In fact, Plaintiffs properly identified Defendant's mark as such in their Complaint.  Complaint ¶ 28.

[13] See also *Toho Company, Ltd., v. Sears Roebuck & Co.*, 645 F.2d 788, 791 (1981) (plaintiff "has not alleged facts that would permit a conclusion that consumers are likely to be confused"); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, 85 U.S.P.Q.2d 1780, No. 06-0597, 2007 U.S. Dist. LEXIS 288, at *11 (E.D. Pa. Jan. 4, 2007) (finding on motion to dismiss that defendant's use "creates no likelihood of confusion as a matter of law").

[14] Section 2(f) provides, in relevant part:

> (f) Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

15 U.S.C. § 1052(f).

9

weighs against a finding of inherent distinctiveness"); *24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness, LLC,* 277 F. Supp. 2d 356, 361-62 (S.D.N.Y. 2003) (finding mark that had been registered and in continuous use for more than five years to be "descriptive and therefore weak").

Plaintiffs' weak mark does, however, explain why EIG is unable to make any specific allegations of bad faith on the part of UBS.[15]  There are simply no provable set of facts that could demonstrate that Defendant, in choosing the words daily and oil for its daily financial reports about the oil industry, intended to deceive oil industry professionals and injure Plaintiffs. Because Plaintiffs' and Defendant's marks are overwhelming dissimilar, and because of the sophistication of the readership at issue, the weakness of Plaintiffs' mark and their failure to specifically allege bad faith on the part of UBS, there is no probability of confusion and all of Plaintiffs' trademark and unfair competition claims must be dismissed.[16]

## CONCLUSION

A protectable trademark is a prerequisite to trademark protection.  No such protectable trademark exists here, nor is there any probability of confusion.  Further, Plaintiffs' common law unfair competition claim must be dismissed because Plaintiffs have failed to lodge sufficiently specific allegations of bad faith.  For the reasons stated herein and in Defendant's initial memorandum of law, the Court should dismiss Counts Three, Four, and Five of Plaintiffs' Complaint, with prejudice.

---

[15] "Conclusory allegations of … bad faith will not withstand a Rule 12(b)(6) motion to dismiss."  *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996).

[16] Plaintiffs' state law unfair competition claim, however it is characterized, fails for the same reason as their federal claims: the improbability of confusion.  *Katz v. Modiri*, 283 F. Supp. 2d 883, 900 (S.D.N.Y. 2003) ("state and federal unfair competition claims are evaluated under the likelihood of confusion standard") (citations omitted); *Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00 Civ. 7909, 2001 U.S. Dist. LEXIS 10253, at * 37 n.19 (S.D.N.Y. July 23, 2001), *aff'd*, 45 Fed. App'x 42 (2d Cir. 2002) ("the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable") (internal citations omitted).

Dated:  May 5, 2008

WINSTON & STRAWN LLP


BY:  /s/ Thomas P. Lane_____
        Michael S. Elkin (ME-2300)
        Thomas P. Lane  (TL-8983)

200 Park Avenue
New York, New York 10166
(212) 294-6700

*Of Counsel*:

Timothy M. Broas

1700 K Street, N.W.
Washington, D.C.  20006-3817
(202) 282-5000

*Attorneys for Defendant*

11

# APPENDIX

Westlaw.

124 Fed.Appx. 26                                                                                          Page 1
124 Fed.Appx. 26, 2005 WL 181659 (C.A.2 (N.Y.))
**(Cite as: 124 Fed.Appx. 26, 2005 WL 181659)**

CCyril v. Neighborhood Partnership II Housing
Development Fund, Inc.
C.A.2 (N.Y.),2005.
This case was not selected for publication in the
Federal Reporter.RULINGS BY SUMMARY
ORDER DO NOT HAVE PRECEDENTIAL
EFFECT. CITATION TO SUMMARY ORDERS
FILED AFTER JANUARY 1, 2007, IS
PERMITTED AND IS GOVERNED BY THIS
COURT'S LOCAL RULE 0.23 AND FEDERAL
RULE OF APPELLATE PROCEDURE 32.1. IN A
BRIEF OR OTHER PAPER IN WHICH A
LITIGANT CITES A SUMMARY ORDER, IN
EACH PARAGRAPH IN WHICH A CITATION
APPEARS, AT LEAST ONE CITATION MUST
EITHER BE TO THE FEDERAL APPENDIX OR
BE ACCOMPANIED BY THE NOTATION:
"(SUMMARY ORDER)", UNLESS THE
SUMMARY ORDER IS AVAILABLE IN AN
ELECTRONIC DATABASE WHICH IS
PUBLICLY ACCESSIBLE WITHOUT PAYMENT
OF FEE (SUCH AS THE DATABASE
AVAILABLE AT
HTTP://WWW.CA2.USCOURTS.GOV), THE
PARTY CITING THE SUMMARY ORDER MUST
FILE AND SERVE A COPY OF THAT
SUMMARY ORDER TOGETHER WITH THE
PAPER IN WHICH THE SUMMARY ORDER IS
CITED. IF NO COPY IS SERVED BY REASON
OF THE AVAILABILITY OF THE ORDER ON
SUCH A DATABASE, THE CITATION MUST
INCLUDE REFERENCE TO THAT DATABASE
AND THE DOCKET NUMBER OF THE CASE IN
WHICH THE ORDER WAS ENTERED.Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Second Circuit Rules §
0.23. (FIND CTA2 s 0.23.)
    United States Court of Appeals,Second Circuit.
        Okolie CYRIL, Plaintiff-Appellant,
                        v.
    NEIGHBORHOOD PARTNERSHIP II HOUSING
    DEVELOPMENT FUND, INC., Bushwick-
Ridgewood Properties, Inc., Defendants-Appellees.
                **Docket No. 03-7518.**

                    Jan. 25, 2005.

**Background:** Operator of dry cleaning business sued
defendants, alleging that they had engaged in unfair
housing practices by, inter alia, denying him right to
purchase and rehabilitate building and in evicting him
from those premises, in which he had operated his
business. The United States District Court for the
Eastern District of New York, Amon, J., dismissed
complaint. Operator appealed.

**Holdings:** The Court of Appeals held that:
(1) setting aside of entry of default was not abuse of
discretion, and
(2) operator failed to state claim under Uniform
Relocation Assistance and Real Property Acquisition
Policies Act (URA).

Affirmed.

                West Headnotes

[1] Federal Civil Procedure 170A ⚖2444.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(B) By Default
            170AXVII(B)2 Setting Aside
                170Ak2444 Grounds
                    170Ak2444.1 k. In General. Most
Cited Cases
Setting aside entry of default, based on finding that
defendant was not properly served with summons and
complaint, was not abuse of discretion in action for
alleged unfair housing practices and discrimination.
Fed.Rules Civ.Proc.Rule 55(c), 28 U.S.C.A.

[2] Federal Civil Procedure 170A ⚖2444.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(B) By Default
            170AXVII(B)2 Setting Aside
                170Ak2444 Grounds
                    170Ak2444.1 k. In General. Most
Cited Cases

**Federal Civil Procedure 170A ⚖2450**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 Fed.Appx. 26
124 Fed.Appx. 26, 2005 WL 181659 (C.A.2 (N.Y.))
**(Cite as: 124 Fed.Appx. 26, 2005 WL 181659)**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(B) By Default
         170AXVII(B)2 Setting Aside
            170Ak2450 k. Meritorious Cause of
Action or Defense. Most Cited Cases
Setting aside of entry of default was not abuse of
discretion in action for alleged unfair housing
practices and discrimination, given district court's
findings that default was not wilful, as demonstrated
by counsel's diligence after slight delay due to illness,
that plaintiff was not prejudiced by setting aside of
default, and that defendant presented meritorious
defense that complaint failed to state claim.
Fed.Rules Civ.Proc.Rule 55(c), 28 U.S.C.A.

**[3] Eminent Domain 148 ⚖═293(1)**

148 Eminent Domain
   148IV Remedies of Owners of Property; Inverse
Condemnation
      148k293 Pleading
         148k293(1) k. Petition or Complaint. Most
Cited Cases
Operator of dry cleaning business, who allegedly was
denied right to purchase and rehabilitate building and
was evicted from those premises, failed to state claim
under Uniform Relocation Assistance and Real
Property Acquisition Policies Act (URA), which
provided compensation to individuals and businesses
displaced in the course of federally funded projects,
given absence of allegation that operator's
displacement was related to federal or federally-
assisted project. Uniform Relocation Assistance and
Real Property Acquisition Policies Act of 1970, §
101 et seq., 42 U.S.C.A. § 4601 et seq.

**\*26** Appeal from the United States District Court for
the Eastern District of New York (Amon, Judge).
AFTER ARGUMENT AND UPON DUE
CONSIDERATION, IT IS HEREBY ORDERED,
ADJUDGED AND DECREED\*27 that the judgment
of the District Court is hereby AFFIRMED.
Okolie Cyril, Corona, NY, for Appellant, pro se.
James Tenney (Peter James Johnson, Jr., on the
brief), Leahey & Johnson, P.C., New York, NY, for
Appellees.

PRESENT: STRAUB, KATZMANN, Circuit Judges,
and EATON, Judge.[FN1]

FN1. The Honorable Richard K. Eaton,
Judge, United States Court of International
Trade, sitting by designation.

*SUMMARY ORDER*

**\*\*1** Plaintiff-Appellant Okolie Cyril, *pro se,* appeals
from a judgment of the United States District Court
for the Eastern District of New York (Amon, *Judge* ),
dismissing his complaint alleging that Defendants
engaged in unfair housing practices and
discrimination by, *inter alia,* denying him the right to
purchase and rehabilitate a building located in
Brooklyn, New York and in evicting him from these
premises in which he had operated a dry cleaning
business. Familiarity with the facts, claims, and
arguments is assumed. Upon review of the record and
applicable law, we affirm the judgment for
substantially the reasons stated in the Magistrate
Judge's Report and Recommendation, as adopted by
the District Court.

**[1]** This Court reviews the District Court's disposition
of motions for default and default judgment pursuant
to Fed.R.Civ.P. 55 for an abuse of discretion. *See,
e.g., Commercial Bank of Kuwait v. Rafidain Bank,*
15 F.3d 238, 243 (2d Cir.1994) (*citing Davis v.
Musler,* 713 F.2d 907, 913 (2d Cir.1983)). Pursuant
to Fed.R.Civ.P. 55(c), a district court may vacate a
default after assessing whether: "(1) the default was
wilful; (2) setting aside the default would prejudice
the adversary; and (3) a meritorious defense is
presented." *Enron Oil Corp. v. Masonori Diakuhara,*
10 F.3d 90, 96 (2d Cir.1993). In order to make a
sufficient showing of a meritorious defense, "the
defendant need not establish his defense
conclusively, but he must present evidence of facts
that, if proven at trial, would constitute a complete
defense." *State Street Bank and Trust Co. v.
Inversiones Errazuriz Limitada,* 374 F.3d 158, 167
(2d Cir.2004) (internal quotation marks omitted).
"Other relevant equitable factors may also be
considered, for instance, whether the failure to follow
a rule of procedure was a mistake made in good faith
and whether the entry of default would bring about a
harsh or unfair result." *Enron Oil Corp.,* 10 F.3d at
96.

**[2]** The District Court did not abuse its discretion by
setting aside the entry of default. As to Bushwick

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 Fed.Appx. 26
124 Fed.Appx. 26, 2005 WL 181659 (C.A.2 (N.Y.))
**(Cite as: 124 Fed.Appx. 26, 2005 WL 181659)**

Page 3

Properties, the District Court did not abuse its discretion in finding that it was not properly served with the summons and complaint. As to Neighborhood Partnership, the District Court did not abuse its discretion in finding that the default was not wilful, as demonstrated by counsel's diligence after a slight delay due to illness, that Plaintiff was not prejudiced by setting aside the default, and that Neighborhood Properties presented a meritorious defense-that Plaintiff's complaint failed to state a claim.[FN2]

> FN2. Though it appears that the District Court considered the affidavits presented by Defendants in ruling on the motion for default judgment, it does not appear to have considered those affidavits in ruling upon the motion to dismiss, which consideration would have been improper. *See, e.g., Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (review of motion to dismiss is limited to the facts and allegations that are contained in the complaint and in any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits).

**\*28\*\*2** This Court undertakes a *de novo* review of a district court's dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6). *Gryl v. Shire Pharms. Group PLC,* 298 F.3d 136, 140 (2d Cir.2002). In ruling on the sufficiency of the complaint, we accept as true the allegations contained in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Id.* A dismissal pursuant to Rule 12(b)(6) is inappropriate " 'unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.' " *Id.* (quoting *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000)).

As to Plaintiff's claims under the Fair Housing Act of 1968, as amended by the Fair Housing Amendment Act of 1988, 42 U.S.C. § 3601*et seq.* ("FHA"), we conclude that Plaintiff failed to state a claim upon which relief could be granted, even under the liberal pleading standards set forth in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Accordingly, the District Court correctly dismissed Plaintiff's FHA claim.

[3] The District Court also correctly concluded that Plaintiff failed to state a claim under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), which provides compensation to individuals and businesses displaced in the course of federally funded projects. *See Supreme Oil Co. v. Metro. Transp. Auth.,* 157 F.3d 148, 150 (2d Cir.1998). Plaintiff makes no allegation that his displacement was related to a federal or federally-assisted project.

As to Plaintiff's constitutional claims, the District Court held that Plaintiff failed to allege sufficient facts to sustain a cause of action upon which relief could be granted. We conclude that, again, even under the liberal pleading standards set forth in *Swierkiewicz,* Plaintiff has failed to state a valid constitutional claim. We also note that Plaintiff was given an opportunity to amend, and declined to avail himself of that opportunity.

Finally, the District Court did not abuse its discretion in declining to assert supplemental jurisdiction over Plaintiff's state law claims. *See First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 182-83 (2d Cir.2004).

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.

C.A.2 (N.Y.),2005.
Cyril v. Neighborhood Partnership II Housing Development Fund, Inc.
124 Fed.Appx. 26, 2005 WL 181659 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2007 U.S. DIST. LEXIS 288

## J.G. WENTWORTH, S.S.C. LIMITED PARTNERSHIP v. SETTLEMENT FUND-ING LLC d/b/a PEACHTREE SETTLEMENT FUNDING

### CIVIL ACTION NO. 06-0597

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2007 U.S. Dist. LEXIS 288; 85 U.S.P.Q.2D (BNA) 1780*

### January 4, 2007, Decided

**COUNSEL:** [*1] For J.G. WENTWORTH S.S.C. LIMITED PARTNERSHIP, Plaintiff: JAMES JOSEPH WALDENBERGER, LEAD ATTORNEY, OCHROCH & GRABER PC, PHILADELPHIA, PA; RICHARD L. CRISONA, LEAD ATTORNEY, ABELMAN FRAYNE & SCHWAB, NEW YORK, NY.

For SETTLEMENT FUNDING, LLC, doing business as PEACHTREE SETTLEMENT FUNDING, Defendant: LYNN CHARYTAN, SAMIR C. JAIN, LEAD AT-TORNEYS, WILMER CUTLER PICKERING HALE & DORR LLP, WASHINGTON, DC; PETER F. MARVIN, MARVIN & HENKIN, PHILADELPHIA, PA.

**JUDGES:** THOMAS N. O'NEILL, JR., J.

**OPINION BY:** THOMAS N. O'NEILL

## OPINION

### MEMORANDUM

On April 10, 2006, plaintiff J.G. Wentworth filed an amended complaint against defendant Peachtree Settlement Funding alleging that defendant engaged in acts of trademark infringement, false representation, trademark dilution, and injury to business reputation in violation of Sections 32(1) and 43(a) of the Lanham Act, *15 U.S.C. §§ 1114(1)* and *1125(a) (2006)*. Plaintiff also asserts Pennsylvania state law claims of trademark infringement and unfair competition. [1] Before me now is defendant's motion to dismiss pursuant to Fed. R. Civ. P. Before me now is defendant's motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* [*2] , plaintiff's response, and defendant's reply thereto.

1   I note that "[t]he test for common law trade-mark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act." *Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc., 94 F. Supp. 2d 566, 580 (E.D. Pa. 1999); see also Bijur Lubricating Corp. v. Devco Corp., 332 F. Supp. 2d 722, 727 (D.N.J. 2004)* ("[I]n the Third Circuit the test for common law infringement and unfair competition is identical to the test for federal infringement and unfair competition.") (citations omitted). The sole distinction between the federal and state analyses is that the federal claims require an effect on interstate commerce. *See Scott Fetzer Co. v. Gehring, 288 F. Supp. 2d 696, 703 (E.D. Pa. 2003)*. Pursuant to established law, the following analysis applies to both the federal and state law claims at issue in this case.

### BACKGROUND

#### I. Parties and [*3] Claims

Plaintiff, a Nevada limited partnership headquartered in Pennsylvania, is a finance company that specializes in providing immediate cash payments in exchange for the rights to future payments from structured settlements, annuities, real estate notes and other assets. Plaintiff regards itself as the undisputed leader in the structured settlement industry and alleges that its registered trademarks for its name and its stylized printing of its name have achieved recognition among the industry and consuming public as a result of extensive promotional efforts, including advertising on television and the internet. Plaintiff alleges that it maintains internet websites at *www.jgwfunding.com* and *www.jgwentworth.com* as a critical means of promoting its services and for the benefit of potential consumers.

Case 1:08-cv-01497-DAB    Document 13-2    Filed 05/05/2008    Page 7 of 22

Page 2

2007 U.S. Dist. LEXIS 288, *; 85 U.S.P.Q.2D (BNA) 1780

Defendant, a Georgia limited liability company headquartered in Florida, is a finance company that specializes in providing immediate cash payments in exchange for the rights to future payments from structured settlements and annuities. According to plaintiff, defendant is plaintiff's next nearest competitor in the settlement fund industry. Defendant maintains internet websites [*4] at *www.settlementfunders.com, www.settlementfunding.com,* and *www.peachtreesettlementfunding.com.*

Plaintiff's claims arise from defendant's alleged use of plaintiff's trademarks in two ways: (1) through Google's AdWords program; and (2) in the "meta tags" for defendant's website. Plaintiff alleges that these uses of plaintiff's name ensures that a link to defendant's website will appear immediately proximate to a link to defendant's website when individuals conduct internet searches for "J.G. Wentworth" or "JG Wentworth."

## II. Google's AdWords Program

Among other services, Google provides an internet search engine that finds websites related to terms provided by internet users. An internet user seeking information will enter various terms into a space provided on Google's website, and Google's computers will search its database for websites relevant to the terms provided. The Google search engine then will present an ordered list of relevant websites identified by the Google database with the most relevant website listed first. The Google search engine will also present a separate list of websites in a "Sponsored Links" section, either at the top or in the right [*5] margin of the search-results screen.

Google's AdWords program is the keyword-triggered advertising program that generates the Sponsored Links section on the search-results screen. Advertisers participating in AdWords purchase or bid on certain keywords, paying Google for the right to have links to their websites displayed in the Sponsored Links section whenever an internet user searches for those words. Additionally, each time an internet user clicks on a particular Sponsored Link, Google charges a fee to the AdWords participant associated with that linked website. Businesses often participate in the AdWords program to generate more visits to their websites.

Plaintiff alleges that defendant infringes on plaintiff's mark through Google's AdWords program by using the terms "J.G. Wentworth" or "JG Wentworth" as its keywords so that an internet search for those terms produces a Sponsored Link to defendant's website immediately proximate to the link to plaintiff's website on the search-results screen. Plaintiff maintains that defendant's participation in Google's AdWords program further infringes upon plaintiff's mark because at least eight different websites use the Google database and [*6] thus produce links to defendant's website in response to searches for "J.G. Wentworth" or "JG Wentworth."

The links to defendant's website at issue always appear as independent and distinct links on the search result pages, and plaintiff does not allege that defendant's advertisements and links incorporate plaintiff's marks in any way.

## III. Meta Tags

Plaintiff further alleges that defendant has inserted plaintiff's marks into its keyword meta tags for its website. "Meta tags" are pieces of the Hyper Text Markup Language ("HTML") source code which contain keywords used to describe the contents of a web page. There are three types of meta tags: (1) descriptive meta tags, which describe the content of the document; (2) keyword meta tags, which are used by internet search engines to help determine whether a particular web page is relevant to a search term entered by a user; and (3) robot meta tags, which indicate to search engines that certain web pages are not to be indexed by the search engine. Meta tags are invisible to Internet users but are used by search engines to index websites. Upon indexing relevant websites, a search engine uses algorithms to process the keywords [*7] in the meta tags to produce a search results page that displays links to relevant websites in a list typically in order of decreasing relevance.

Plaintiff alleges that defendant uses plaintiff's marks in its keyword meta tags for fourteen different web pages on defendant's website. Plaintiff asserts that this alleged use infringes upon its mark and causes search engines to include a link to defendant's website on the search results page when users search the Internet for "J.G. Wentworth" or "JG Wentworth." Plaintiff contends that defendant infringes upon plaintiff's mark because a link to defendant's website appears in response to searches on ten internet search engines that have no relationship with Google.

## IV. Harm to J.G. Wentworth

Plaintiff asserts that defendant's alleged uses of plaintiff's marks through the AdWords program and in keyword meta tags constitute infringing acts that are intended to confuse consumers and to divert potential consumers away from plaintiff's website. Plaintiff contends that by using plaintiff's marks in these ways defendant steals plaintiff's potential customers and erodes the distinctiveness of plaintiff's marks, thus causing a significant [*8] loss of profits to plaintiff. Plaintiff further alleges that defendant intermittently complies with plaintiff's demands to cease all use of its marks, and this com-

Case 1:08-cv-01497-DAB    Document 13-2    Filed 05/05/2008    Page 8 of 22

Page 3

2007 U.S. Dist. LEXIS 288, *; 85 U.S.P.Q.2D (BNA) 1780

pliance evinces a practice of knowing infringement on the part of defendant.

### STANDARD OF REVIEW

*Federal Rule of Civil Procedure 12(b)(6)* permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)* (2006). In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn there-from, in plaintiff's complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff[] may be entitled to relief." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)* (citations omitted). Nevertheless, in evaluating plaintiff's pleadings I will not credit any "bald assertions." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).* Nor will I accept as true legal conclusions or unwarranted factual inferences. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* [*9] "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendant on notice of the essential elements of the plaintiff['s] cause of action." *Nami, 82 F.3d at 65.* "It is black-letter law that [a] motion to dismiss for failure to state a claim . . . is to be evaluated only on the pleadings." *Mele v. FRB, 359 F.3d 251, 257 (3d Cir. 2004) citing A.D. Bedell Wholesale Co. v. Philip Morris, Inc., 263 F.3d 239, 266 (3d Cir. 2001).* When considering a *Rule 12(b)(6)* motion, I do not "inquire whether the plaintiff[] will ultimately prevail, only whether [he is] entitled to offer evidence to support [his] claims." *Nami, 82 F.3d at 65 citing Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).* Thus, a *Rule 12(b)(6)* motion may be granted "only if it appears that the plaintiff[] could prove no set of facts that would entitle [him] to relief." *Id. citing Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).*

### DISCUSSION

In order to establish violations of either *Section 32(1)* or *Section 43(a)* of the Lanham Act, [2] plaintiff [*10] must demonstrate: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994).*

2    *Section 32(1)* of the Lanham Act states:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

*15 U.S.C. § 1114(1).*

*Section 43(a)* of the Lanham Act states:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the

Case 1:08-cv-01497-DAB    Document 13-2    Filed 05/05/2008    Page 9 of 22

Page 4

2007 U.S. Dist. LEXIS 288, *; 85 U.S.P.Q.2D (BNA) 1780

origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*15 U.S.C. § 1125(a)(1).*

[*11] In the present motion, defendant asserts that plaintiff cannot meet the third element of a trademark infringement and unfair competition claim. Specifically, defendant argues that: (1) plaintiff cannot demonstrate that defendant made use of plaintiff's marks to identify the source of goods or services, and (2) no likelihood of confusion exists as a matter of law. I find that defendant made trademark use of plaintiff's marks, but because this use creates no likelihood of confusion as a matter of law I will grant defendant's motion to dismiss.

*I. Trademark Use*

The first issue presented here is whether purchase and use of a trademark-protected keyword for the purpose of triggering internet advertising constitutes the type of "use in commerce" contemplated by the Lanham Act. Defendant, in its motion to dismiss, cites numerous cases from other circuits for the general proposition that "[t]here can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the products and services being advertised by the defendant." *Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003).* Pursuant to this proposition, [*12] defendant argues that plaintiff fails to state a claim because defendant's alleged uses of plaintiff's marks in this case through Google's AdWords program and in keyword meta tags in no way identify the source of the goods and services, as the alleged uses of the plaintiff's marks are confined to source code unpublished to potential consumers. Defendant asserts that this "pure machine-linking function," *U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 725-26 (E.D. Va. 2003),* is a "non-trademark way of using another's mark -- that is, [] a way that does not identify the source of a product," analogous to drug manufacturers' practices of purchasing rights to place its generic products next to name brand competitors' products on a drug store shelf.

Motion to Dismiss of Defendant at 9-10 (internal quotation marks omitted) *quoting Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 695 (6th Cir. 2003).*

The United States District Court for the District of New Jersey recently faced this precise question as it pertains to Google's AdWords program. *See Buying for the Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310, 2006 U.S. Dist. LEXIS 76371, 2006 WL 3000459* [*13] *(D.N.J. Oct. 20, 2006).* As is alleged here, defendant in *Buying for the Home* purchased search terms through Google's AdWords program, including plaintiff's marks, to generate Sponsored Links. *2006 U.S. Dist. LEXIS 76371, [WL] at *7.* The Court first acknowledged that "[t]he Third Circuit has not spoken on the issue of whether the purchase and/or sale of keywords that trigger advertising constitutes the type of 'use' contemplated by the Lanham Act, and decisions from other courts that have addressed the issue are conflicting." *2006 U.S. Dist. LEXIS 76371, [WL] at *6.* While recognizing that participation in Google's AdWords program "is certainly not a traditional 'use in commerce'" under prior applications of the Lanham Act, in the context of this new technology the Court held that such acts satisfy the Lanham Act's "use" requirement. *2006 U.S. Dist. LEXIS 76371, [WL] at *8.* The Court reasoned:

First, the alleged purchase of the keyword was a commercial transaction that occurred "in commerce," trading on the value of Plaintiff's mark. Second, Defendants' alleged use was both "in commerce" and "in connection with any goods or services" in that Plaintiff's mark was allegedly used to trigger commercial advertising which included a link to Defendants' [*14] furniture retailing website. Therefore, not only was the alleged use of Plaintiff's mark tied to the promotion of Defendants' good and retail services, but the mark was used to provide a computer user with direct access (i.e., a link) to Defendants' website through which the user could make furniture purchases. The Court finds that these allegations clearly satisfy the Lanham Act's "use" requirement.

*Id.*

This reasoning contradicts the analyses of the cases cited by defendant, including a recent opinion by the United States Court of Appeals for the Second Circuit which stated:

Case 1:08-cv-01497-DAB    Document 13-2    Filed 05/05/2008    Page 10 of 22

Page 6

2007 U.S. Dist. LEXIS 288, *; 85 U.S.P.Q.2D (BNA) 1780

of a different product or service identified [*19] by a similar mark." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001)* (citations omitted). "The marks need not be identical and proof of actual confusion is not necessary to establish a likelihood of confusion." *First Am. Mktg. Corp. v. Canella, 2004 U.S. Dist. LEXIS 2251, 2004 WL 250537, at *4 (E.D. Pa. Jan. 26, 2004) citing Fisons, 30 F.3d at 477* (emphasis in original omitted). As plaintiff recognizes, the Court of Appeals has held that "initial interest confusion is actionable under the Lanham Act." *Checkpoint Sys., 269 F.3d at 292.* Initial interest confusion applies where "similar marks could ultimately affect a consumer's consideration of the defendant's product as well as affect the plaintiff's goodwill with its customers." *Id. at 293 citing Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 260 (2d Cir. 1987)* ("[P]otential purchasers would be misled into an initial interest in [defendant]. Such initial confusion works a sufficient trademark injury.").

The Court of Appeals, in approving initial interest confusion as probative of a Lanham Act violation, [*20] reasoned that "[w]ithout initial interest protection, an infringer could use an established mark to create confusion as to a product's source thereby receiving a 'free ride on the good will' of the established mark." *Id. at 294-95 citing Mobil Oil Corp., 818 F.2d at 260* (holding that likelihood that "potential purchases would be misled into an initial interest" justifies a finding of infringement). In *Checkpoint Systems,* the Court of Appeals noted that other courts have "equated initial interest confusion to a 'bait and switch scheme.'" *Id. at 294 citing Dorr-Oliver, Inc. v. Fluid Quip, Inc., 94 F.3d 376, 382 (7th Cir. 1996)* ("[T]he Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated. This 'bait and switch' of producers, also known as 'initial interest' confusion, will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers. [*21] " (internal citation omitted)). Essentially, initial interest protection has extended the Lanham Act's applicability to pre-sale confusion as well as post-sale confusion. *See id. at 295* (finding that the 1962 amendment to the Lanham Act which deleted the term "purchasers" from the Act "expanded the reach of the Lanham Act beyond mere purchases to recognize pre-sale confusion as well as post-sale confusion").

Plaintiff argues that initial interest confusion applies to defendant's use of plaintiff's registered marks through Google's AdWords program and in its keyword meta tags. Though plaintiff cites numerous cases from other jurisdictions that extend initial interest protection to keyword meta tags, plaintiff notes that the Court of Appeals for this Circuit has not done so. The seminal case supporting plaintiff's position is *Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036 (9th Cir. 1999).* In *Brookfield,* defendant's use of plaintiff's "MovieBuff" mark in its meta tags caused numerous search engines to display a link to defendant's website when users searched the Internet for "Movie-Buff." *Id. at 1062.* The United [*22] States Court of Appeals for the Ninth Circuit held that, although use of a protected mark in meta tags does not result in confusion as great as use of a protected mark in a domain name, defendant's use of plaintiff's mark still resulted in initial interest confusion because defendant was improperly benefitting from the goodwill plaintiff developed in its mark. *Id.*

I respectfully disagree with the Ninth Circuit's conclusion in *Brookfield.* The Court asserted that "[w]eb surfers looking for [plaintiff's] "MovieBuff" products who are taken by a search engine to [defendant's website] will find a database similar enough . . . such that a sizeable number of consumers who were originally looking for [plaintiff's] product will simply decide to utilize [defendant's] offerings instead." *Id.* I find this to be a material mischaracterization of the operation of internet search engines. At no point are potential consumers "taken by a search engine" to defendant's website due to defendant's use of plaintiff's marks in meta tags. Rather, as in the present case, a link to defendant's website appears on the search results page as one of many choices for the potential consumer to [*23] investigate. As stated above, the links to defendant's website always appear as independent and distinct links on the search result pages regardless of whether they are generated through Google's AdWords program or search of the keyword meta tags of defendant's website. Further, plaintiff does not allege that defendant's advertisements and links incorporate plaintiff's marks in any way discernable to internet users and potential customers.

Like *Buying for the Home,* the cases cited by the Ninth Circuit in *Brookfield* recognized that initial interest confusion must create in consumers confusion as to the source of the goods or services or a misunderstanding as to an association between the mark holder and the mark user. *See, e.g., Mobil Oil, 818 F.2d at 260* (finding initial interest protection applied where defendant's use of the term "Pegasus" would cause confusion with plaintiff's mark, a flying horse symbol in the form of a Pegasus, because "potential purchasers would be misled into an initial interest in [defendant]" as a result of such use). Due to the separate and distinct nature of the links created on any of the search results pages in question, [*24] potential consumers have no opportunity to confuse de-

2007 U.S. Dist. LEXIS 288, *; 85 U.S.P.Q.2D (BNA) 1780

fendant's services, goods, advertisements, links or websites for those of plaintiff. Therefore, I find that initial interest protection does not apply here. Because no reasonable factfinder could find a likelihood of confusion under the set of facts alleged by plaintiff, I will grant defendant's motion to dismiss.

An appropriate Order follows.

### ORDER

AND NOW, this 4th day of January 2007, upon consideration of defendant's motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, plaintiff's response, and defendant's reply thereto, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendant's motion is GRANTED and plaintiff's complaint is DISMISSED.

The CLERK OF COURT is DIRECTED to close this case statistically.

s/ THOMAS N. O'NEILL, JR., J.

LEXSEE 2001 U.S. DIST. LEXIS 10253

**MOMENTUM LUGGAGE & LEISURE BAGS, a partnership between ROBERT RUDKO and WILLIAM M. GREYSTONE, Plaintiff, -v- JANSPORT, INC., LUGGAGE & LEATHER GOODS MANUFACTURERS OF AMERICA, INC., and BUSINESS JOURNALS, INC., Defendants.**

**00 CIV. 7909 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 10253*

**July 23, 2001, Decided
July 23, 2001, Filed**

**DISPOSITION:**    [*1] Defendant's motion for summary judgment granted. Plaintiff's complaint dismissed.

**COUNSEL:** For Plaintiff: John P. Bostany, The Bostany Law Firm, New York, NY.

For Jansport, Inc., Defendant: Thomas A. Canova, Gianni P. Servodidio, Pennie & Edmonds LLP, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiff Momentum Luggage & Leisure Bags ("Momentum") filed this action on October 17, 2000, and moved for a temporary restraining order and preliminary injunction, seeking to enjoin defendants' use of plaintiff's alleged trademark -- "Momentum" -- in connection with the promotion of a line of luggage defendant Jansport, Inc. ("Jansport") introduced in 2000. [1] At an initial conference on October 19, 2000, plaintiff requested expedited discovery in lieu of a preliminary injunction. [2] This Opinion addresses Jansport's motion for summary judgment, which followed the close of discovery.

1    Plaintiff has voluntarily discontinued its claims against Business Journals, Inc. and Lug-

gage & Leather Goods Manufacturers of America, Inc.

[*2]

2    Pursuant to the Court's Pretrial Scheduling Order of October 23, 2000, discovery was to be completed by February 23, 2001, and the parties were placed on the April trial ready calendar.

In its complaint, plaintiff asserts that it "developed . . . the Momentum trademark to identify a line of *luggage and bags*, which Momentum has marketed, sold and advertised widely." (emphasis supplied). Plaintiff alleges that it "has and continues to prominently display the 'Momentum' trade dress and trademark for its Momentum *luggage* products," and that "Momentum has extensively advertised and promoted the Momentum *luggage* by its trade dress and trademarks in various media in the United States." (emphasis supplied). [3] The complaint further alleges that, based on plaintiff's "continuous and exclusive use of the trade dress and trademark, the extensive advertisement and promotion of the *luggage* sold using its trade dress and trademark, and its sales, the purchasing public has come to associate Momentum as the source and sponsor of the *Momentum line of luggage marketed as Momentum luggage* [*3] ." (emphasis supplied).

3    Plaintiff's complaint alleges that the "the Momentum trade dress is the word mark itself used to identify Momentum's line of luggage and bags." Since plaintiff's "trade dress" claim is solely an assertion that the word "Momentum" was infringed, a discussion of plaintiff's trademark claim will fully address any trade dress rights asserted here.

In sharp contrast to its allegations, the record submitted on this summary judgment motion shows that plaintiff's "use" of the "Momentum" mark in connection with anything that could be liberally construed as luggage has consisted of one sale in 1999, of a few tote bags and briefcases and one paid advertisement for a tote bag in 1999, in a trade journal. Notwithstanding these meager activities, plaintiff alleged that Jansport violated the Lanham Act and New York's General Business Law by infringing plaintiff's trade dress, diluting plaintiff's trademark, and engaging in acts of unfair competition, false designation of origin, and false description [*4] or representation. For the reasons set forth below, Jansport's motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff is a partnership between Robert Rudko ("Rudko") and William Greystone ("Greystone"). As noted, plaintiff claims trademark rights in the name "Momentum," which is the name of its partnership and the name used in connection with its one sale of "luggage and bags" in 1999. Plaintiff owns no federal or state trademark registration for the name "Momentum."

The plaintiff's business arose in the mid-1990s from discussions between Rudko and Greystone about forming a company to sell high-end leather cellular telephone cases. To create the appearance of an established business, they rented a mail box from Mail Boxes, Etc. at 244 Madison Avenue in Manhattan to use as the company address.

Rudko and Greystone filed partnership papers in 1996, using Greystone's parents' address in Long Island, New York, where Greystone lived at the time. The name of the partnership was "Celmate." During 1996, neither Rudko nor Greystone devoted their full time to the partnership. [4] During their free time, however, Greystone [*5] measured cellular telephone dimensions and prepared drawings, and Rudko engaged in "office activities," such as paying a bill for a piece of leather. The business was operated out of the partners' homes. Plaintiff made no sales in 1995, and made two sales in 1996, which totaled about $ 1300 to $ 1500. Plaintiff did not pay for any advertising or promotional efforts, but received "photographic consideration" and "small write-ups" for the cellular telephone cases in two trade magazines. Plaintiff did not market its products in 1997, and lost between $ 10,000 and $ 50,000 that year.

4 Rudko has worked at various jobs over the last twelve years, since graduating from high school. Greystone has worked as a salesperson in the luggage department of Bloomingdale's for the past six years.

In 1997, Rudko and Greystone decided to switch their focus and to develop a business to sell high-end leather luggage pieces and call the luggage collection "Momentum." Greystone chose the name "Momentum" to identify both the partnership [*6] and luggage because he had "always liked the name and equated it with a fast-pace such as the pace of New York." They changed the partnership name from Celmate to Momentum on April 5, 1999.

Before 1999, plaintiff kept its Momentum name "confidential," and its first attempt to sell any products bearing the mark Momentum was on February 18-20, 1999, at the first luggage trade show that either Rudko or Greystone had ever attended, the International Travelgoods, Leather and Accessories ("ITLA") trade show in Florida. [5] It had ordered five to seven sample tote bags, satchels, and a small, "computer style briefcase" -- all made out of "crinkle vellenium," a micro fiber used in raincoats -- about three weeks before the show. At the show, plaintiff shared booth space with another exhibitor. Plaintiff made no sales at the trade show. [6] The ITLA is only open to members of the luggage industry and is not open to the general public.

5 Plaintiff made two invoiced sales of leather envelopes in 1998, under the company name Celmate/Momentum to a store in Manhattan. These envelopes did not bear the "Momentum" mark. The gross sales from plaintiff's business activities in 1998 totaled approximately $ 800.

[*7]

6 In his deposition testimony, Rudko stated that plaintiff did not make any sales at the trade show. Long after his deposition and in connection with the filing of his papers opposing this motion, Rudko corrected his answer in an errata sheet to assert that plaintiff wrote its "original Sam Flax order" at the trade show. In his affidavit submitted with plaintiff's opposition papers, Rudko states that this order was for "a dozen of our portfolio style envelopes." Jansport claims not only that the errata sheet was produced more than 30 days after the deposition, and thus not admissible under *Rule 30(e), Fed. R. Civ. P.*, but has also submitted a declaration from Rolf Fjord, an employee of Sam Flax, the alleged purchaser at the trade show. Fjord states that his company did not order any goods from Momentum at the trade show.

Plaintiff's only paid advertisement for its Momentum products or business was a quarter-page advertisement for a tote bag in the March/April 1999 issue of *Travelware* magazine. [7] Plaintiff also had several unpaid mentions, product photographs, and directory listings in issues [*8] of the trade magazines *Travelware* and *Show-*

*case International.* [8] None of these publications resulted in any sales.

> 7   The word "Momentum" does not appear on the tote bag pictured in the advertisement, but is a significant feature of the advertisement.
>
> 8   *Travelware* has over 12,000 subscribers and is published seven times a year. *Showcase International* is now known as *Travel Goods Showcase*, and is published by Travel Goods Association (formerly Luggage & Leather Goods Manufacturers of America, Inc.) six times a year. The trade journal is not available on newsstands or otherwise available to the general public. Rather, the 12,000 subscribers are industry members, such as manufacturers, sales representatives, wholesalers, distributors, and retail stores. The journal is also distributed to about 1,500 members of the trade and consumer press.

Plaintiff has made only one arms-length sale of anything that could be loosely termed luggage. [9] On July 19, 1999, plaintiff sold six tote bags and [*9] two briefcases for $ 760 to a retail store named Max Tamara after Greystone walked into the store on his lunch hour to peddle the products. According to Greystone, these products were embossed with the "Momentum logo," which is the word "Momentum" in capital letters. [10] Max Tamara is a high-end boutique in Manhattan, which specializes in designer handbags. The owner of Max Tamara had not previously heard of the Momentum company or product line. After July 1999, plaintiff did not sell any more "luggage" to Max Tamara. [11] In 1999, plaintiff also made one invoiced sale of leather envelopes to an art supply store in Manhattan. [12] These envelopes did not bear the trademark Momentum. Plaintiff's gross sales in 1999 were approximately $ 1400 to $ 1500.

> 9   In an Opinion of February 1, 2001, the Court precluded certain documentary evidence produced by plaintiff, pursuant to *Rule 37, Fed. R. Civ. P. Momentum Luggage & Leisure Bags v. Jansport, Inc., 2001 U.S. Dist. LEXIS 760*, No. 00 Civ. 7909, 2001 WL 91707, at *2 (S.D.N.Y. Feb. 1, 2001). The Court found that such a severe sanction was necessary where, as here, plaintiff had failed to participate in discovery in good faith -- discovery which plaintiff requested proceed on an expedited basis. Further, the Court found that plaintiff's delay in producing discovery had prejudiced Jansport. *Id.*

[*10]

> 10   The only evidence of any "logo" in the record is the word "Momentum" in plaintiff's one paid advertisement and the testimony from Greystone that some of the bags sold to Max Tamara

in 1999 were embossed on the front with the "Momentum" mark. While plaintiff concedes that the leather envelopes it sold in the past did not have the "Momentum" mark on them, it has submitted a sample leather envelope which is embossed with the name "Momentum" on the inside as an example of its "logo." In both the advertisement and the sample envelope submitted with plaintiff's opposition papers, the "logo" is simply the word "Momentum" in capital letters.

> 11   While plaintiff asserts that it received payment from several individuals for Momentum tote bags in 1999, these were not arms-length transactions. They were undocumented cash transactions to friends for which the plaintiff has no invoices. Rudko also states that plaintiff made a sale of two leather envelopes to the U.S. House of Representatives in 2000, and he attaches to his affidavit a copy of a check, dated March 12, 2001, made payable to "Momentum Leather" from New York Representative Michael P. Forbes.
>
> 12   Plaintiff's complaint alleges that Jansport infringed on its "luggage and bags." It does not mention envelopes.

[*11]   In 2000, plaintiff did not solicit any sales of luggage or tote bags and made no invoiced sales of any luggage or tote bags. According to Rudko, Momentum focused exclusively on selling envelopes. Plaintiff made three invoiced sales of leather envelopes to an art supply store and a designer leather goods store in Manhattan. The name "Momentum" was not on these envelopes; its gross sales for all of its business activities in 2000, totaled approximately $ 1500. Although plaintiff asserts that it is expecting to launch a luggage line in late August 2001, it has no sales orders or inventory. [13] Further, there is no evidence that the "Momentum" mark will be placed on the luggage itself or on point of sale materials.

> 13   Momentum states that it has formed a joint venture with The White Mountain Stitching Company for its fall 2001 luggage collection, but has not produced any evidence aside from Rudko's statements in his affidavit and an unsworn, un-notarized statement from Scott Manning, the general manager of White Mountain Stitching.

[*12]   Defendant Jansport is one of the world's largest manufacturers of backpacks with annual sales of Jansport branded products of approximately $ 200 million. Jansport spends about $ 5 million a year on advertising the Jansport brand in the United States alone. It is not disputed that the "Jansport" brand name is "famous" in the United States.

In 1998, Jansport began to develop a new line of nylon luggage as a natural expansion of its backpack business. In August 1999, Jansport selected the designation "Momentum" as its "collection" name for the new Jansport luggage line. [14] Jansport has never used the name "Momentum Collection," however, on any of the luggage itself. Nor has Jansport used the name on any hang tags, point of sale materials, or on anything that would be seen by consumers. The only name that appears on Jansport's luggage or its hang tags for its luggage is "Jansport."

14    A market research firm proposed the name "Momentum" to Jansport. The firm was not aware of plaintiff's company.

Jansport has [*13] used the name "Momentum" or "Momentum Collection" in connection with promotional materials distributed to the trade, such as a wholesale catalog, purchase order form, CD-Rom, and trade show literature. Jansport distributed these materials to its sales representatives and certain members of the luggage trade. The name "Momentum" appears twice in the 18-page Jansport luggage catalog for the year 2000. Jansport has never used the name "Momentum" by itself without the "Jansport" brand name. Jansport uses "collection" names such as "Momentum" to differentiate among its various product lines. Collection names typically serve as stand-ins for style numbers, which are a combination of numbers and letters. The use of collection names is a common practice. Indeed, plaintiff has used the collection name "Tribeca" even though it was aware that another company used that name for its luggage business.

Jansport's new luggage line includes staple luggage pieces such as 20 and 24 inch Pullmans, a flight bag, and a garment bag. Its luggage is sold at a lower price point than the higher-end luggage such as Louis Vuitton, Gucci, Prada, Tumi, and Hartman. The majority of Jansport's sales of luggage have [*14] been to (1) a large, discount chain department store; (2) outdoor recreational chain stores; and (3) specialty stores.

In late July 2000, Rudko left a message with a receptionist at Jansport, claiming that plaintiff owned a business named "Momentum" on Madison Avenue in New York City. After receiving plaintiff's phone call, Jansport revised its promotional materials for its upcoming December 2000 holiday promotion and for its 2001 luggage line by removing any reference to the designation "Momentum" or "Momentum Collection."

There is no evidence of consumer confusion and plaintiff has conceded that there has been no actual confusion. [15] There is also no evidence that Momentum lost any sales because of Jansport's use of the name "Momentum" for its line of luggage.

15    During discovery, plaintiff repeatedly represented that it had no knowledge of any actual confusion. In opposition to this motion, Momentum has submitted several nearly identical affidavits from Greystone's co-workers at Bloomingdale's, which state that they saw Jansport's advertisements for the "Momentum Collection" in trade magazines and believed plaintiff had licensed the name to Jansport.

[*15] Several companies besides Jansport have also used the "Momentum" name in connection with their products. A manufacturer named The Coleman Company sells a "Momentum" branded backpack, which has been on the market for two years, and a manufacturer named Outdoor Products sells a "Momentum" wheeled backpack with a retractable luggage handle, which has been on the market since the fall of 2000. A luggage manufacturer named Skyway Luggage filed a federal trademark application for the mark "Momentum" for luggage in 1999, but withdrew the application after Rudko told one of its representatives that it owned trademark rights in the name "Momentum."

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56(c), Fed. R. Civ. P.* The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1987).* [*16] The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994).* When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. *Rule 56(e), Fed. R. Civ. P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).*

### A. Common Law Trademark Rights

Jansport argues that Momentum's *de minimus* activities did not create common law trademark rights in the word "Momentum." Although plaintiff contends it has continuously exploited the mark "Momentum" since February 1999, in connection with luggage, it has advertised

Case 1:08-cv-01497-DAB      Document 13-2      Filed 05/05/2008      Page 17 of 22

Page 5
2001 U.S. Dist. LEXIS 10253, *

a tote bag once and has only shown one sale of six tote bags and two briefcases. Its informal and sporadic sales activity does not constitute sufficient use of a trademark in commerce to qualify [*17] for Lanham Act protection.

Section 43(a) of the Lanham Act provides a cause of action against any party who

> in connection with any goods . . . or any container for goods, *uses in commerce* any word, term, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship or approval of his or her goods . . . by another person.

*15 U.S.C. § 1125(a)* (emphasis supplied). The Lanham Act defines "use in commerce" as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. [A] mark shall be deemed to be in use in commerce on goods when it is placed in any manner on the goods . . . or the displays associated therewith or on the tags or labels affixed thereto . . . and the goods are sold or transported in commerce.

*15 U.S.C. § 1127*; *United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 63 L. Ed. 141, 39 S. Ct. 48 (1918)*; *Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir. 1998)*.

To prevail on a Lanham Act infringement [*18] claim, a plaintiff must satisfy two elements: it must demonstrate that "'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Morningside Group Ltd. v. Morningside Capital Group, 182 F.3d 133, 137 (2d Cir. 1999)* (citation omitted). Thus, plaintiff must first show that its mark is entitled to Lanham Act protection. As the Supreme Court stated, "the right to a particular mark grows out of its use, not its mere adoption." *United Drug, 248, 248 U.S. at 97*. See Buti, 139 F.3d at 103*. Further,

> under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, *as long as the initial appropria-*

*tion and use are accompanied by an intention to continue exploiting the mark commercially.*

*LaSociete Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974)* (emphasis supplied). Because "the right to a particular mark grows out of its use, . . . to [*19] prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Id. at 1271-72. See Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 315-16 (3d Cir. 1999); Larsen v. Terk Techs. Corp., 151 F.3d 140, 146 (4th Cir. 1998)*. Accordingly, the Second Circuit has observed that

> "trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade. Absent these elements, no trademark can be created or exist."

*LaSociete Anonyme, 495 F.2d at 1274* (citation omitted). *See Lucent Info., 186 F.3d at 317-18* (plaintiff did not acquire common law trademark rights in mark where plaintiff made only one sale using mark and promotional activities were limited to sending out announcement of new business and making several product presentations).

The activities in which Momentum engaged can be divided into two categories: (1) advertising [*20] and promotion, and (2) sales. Neither of these activities, taken singly or together, were sufficient to create ownership rights in the "Momentum" mark.

Despite plaintiff's allegations in the complaint that its "luggage and bags" were "marketed . . . and advertised widely," this was not the case. Momentum exhibited at one luggage trade show two years ago, paid for one advertisement for Momentum luggage, and had several mentions in two trade journals. While Momentum argues that it should not be penalized for its "word of mouth" marketing, door-to-door sales calls, or lack of significant paid advertising, Momentum's activities do not constitute sufficient commercial promotion to establish common law trademark ownership. *See, e.g., Windows User, Inc. v. Reed Bus. Publ'g Ltd., 795 F. Supp. 103, 105, 109 (S.D.N.Y. 1992)* (distributing a brochure with 50,000 copies of another publication and contacting 200 potential advertisers). *Compare Marvel Comics Ltd. v. Defiant, a Division of Enlightened Entm't Ltd., 837 F. Supp. 546, 549 (S.D.N.Y. 1993)* (denying motion to dis-

miss because plaintiff's allegations that title was announced to 13 million readers established [*21] necessary commercial use.

Momentum has never made any sale of products commonly classified as luggage. It made one invoiced sale of tote bags and briefcases for $ 760 in 1999, and did not attempt to solicit any sales for Momentum luggage or tote bags in 2000. [16] Momentum claims that this one sale is enough to establish common law trademark rights in the "Momentum" name. While "a single use in trade may sustain trademark rights if followed by continuous commercial utilization," *Blue Bell v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975)*, plaintiff's commercial use of its mark has been too sporadic to create such rights. For example, the Second Circuit has found that a plaintiff's 89 sales in 20 years was not "the kind of bona fide use intended to afford a basis for trademark protection." *LaSociete Anonyme, 495 F.2d at 1272*. The Court noted that the plaintiff had not "put its product on the market in any meaningful way," and had given "no indication that it has any current plans to do so." *Id. at 1272-73. See Jaffe v. Simon & Schuster Inc., 3 U.S.P.Q.2D (BNA) 1047, 1049*, No. 86 Civ. 1577 (GLG), 1987 WL 124312 [*22] (S.D.N.Y. Jan. 16, 1987) (granting summary judgment for defendant, finding that sales to personal friends and relatives do not constitute ownership of the mark and that federal trademark laws are not invoked by a small shipment of goods between business associates).

> 16    Plaintiff made one sale of leather envelopes in 1999, and three sales in 2000. Plaintiff made no profit and $ 1400-$ 1500 in gross revenue in 1999, and made no profit and $ 1500 in gross revenue in 2000.

The conclusion that the plaintiff's limited activities do not constitute a "use in commerce" is underscored by an analysis of its claim that its trademark rights extend across the nation. The Third Circuit has set out a test for determining whether a party has established common law trademark rights in a specific geographic area: (1) volume of sales; (2) growth trends; (3) the number of persons purchasing the product in relation to the potential number of purchasers; and (4) the amount of product advertising. *Lucent Info., 186 F.3d at 317.* [*23]

Applying these four factors to plaintiff's evidence, each weighs against Momentum: (1) Momentum's sale volume was *de minimus*; (2) because it made only one sale, there is no growth trend to review, *see Lucent Info., 186 F.3d at 317*; (3) there are many potential customers for luggage and bags, but only one retailer purchased eight items; and (4) Momentum's advertising and promotion were sporadic and limited. In *Natural Footwear*, the Third Circuit found that no trademark rights were estab-

lished by the defendant's "*de minimus*" sales, which the court defined to be gross sales of less than $ 5,000 and to less than 50 customers for any state in at least two of three years for which there was data. *Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1400 (3d Cir. 1985)* (denying nationwide injunction). *See also Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 503 (7th Cir. 1992)* (plaintiff's few sales over the counter in Illinois and a few items mailed to friends in Texas and Florida insufficient to create rights); *Jaffe, 3 U.S.P.Q.2D (BNA) at 1049* (nominal sales to friends and relatives did not constitute bona [*24] fide commercial use).

Finally, it is relevant to place the paucity of plaintiff's sales and advertising in the context of its commercial activities as a whole. For example, plaintiff has never leased office space, operates its business out of a residential apartment shared by Rudko and Greystone, and rents a mail box at "Mail Boxes, Etc." on Madison Avenue to give the impression that it has an established business. Plaintiff has no manufacturing or warehousing facilities and keeps its inventory of cellular telephone covers and other items in Rudko and Greystone's apartment. Further, plaintiff does not have any distribution or delivery arrangement, and instead uses the United States Postal Service or, in the case of the 1999 sale to Max Tamara and the 2000 sales of leather envelopes to Sam Flax, personal delivery. Finally, Greystone is employed full time by another company, and Momentum has not reported any income over the past two years. *See, e.g., Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45, 48, 52 (S.D.N.Y. 1965)* (where plaintiff had no telephone listing, did no advertising, had no factory, had no reportable income from sales, did not sell to any department [*25] stores, and sold to relatives and personal friends, plaintiff "was not operating such a bona fide commercial operation as would entitle it to claim ownership of the mark it used").

In sum, Momentum has not raised a genuine issue of material fact that it has made deliberate and continuous use of the "Momentum" mark in commerce in connection with "luggage" or bags. It has failed to present sufficient evidence to support a claim that it has a valid mark entitled to protection in connection with the sale of luggage.

### B. *Trademark Infringement*

Since plaintiff has not demonstrated that it has a valid mark entitled to protection, its Lanham Act claim for infringement must be dismissed. *See Morningside Group, 182 F.3d at 137*. Even if plaintiff owned common law trademark rights in the "Momentum" mark, however, its federal claim for trademark infringement would fail because it has not shown that Jansport's use of the "Momentum" mark is likely to cause confusion. To establish a trademark infringement claim under the

Lanham Act, a plaintiff must prove that "'numerous ordinary prudent purchasers are likely to be misled or confused'" because of the defendant's mark. *Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 477-78 (2d Cir. 1996)* [*26] (citation omitted). A finding of infringement must be supported by "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 743 (2d Cir. 1998). See also Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997).*

*Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961),* identifies eight non-exhaustive factors relevant to the likelihood of confusion inquiry: (a) the strength of the plaintiff's mark; (b) the degree of similarity between the plaintiff's and the defendant's marks; (c) the proximity of the products; (d) the likelihood that the plaintiff will bridge the gap, using the mark on products closer to the defendant's area of commerce; (e) the sophistication of the buyers; (f) the quality of the defendant's product; (g) actual confusion; and (h) the defendant's good or bad faith. *See TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88, 100 (2d Cir. 2001).* No single one of these factors is dispositive. *Morningside Group, 182 F.3d at 139.* Further,

> the evaluation of the *Polaroid* factors is not a mechanical [*27] process 'where the party with the greatest number of factors weighing in its favor wins.' Rather, a court should focus on the ultimate question of whether consumers are likely to be confused.

*Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 584 (2d Cir. 1993)* (citation omitted). Summary judgment is appropriate where the undisputed evidence would lead only to one conclusion under the *Polaroid* test as to whether confusion is likely. *Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996); Cadbury Beverages, Inc., 73 F.3d at 478.*

### Strength of the Mark

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." *Streetwise Maps, 159 F.3d at 743.* In determining a mark's inherent distinctiveness, this Court uses the familiar typology developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976),* under which a mark is classified in one of four categories "progressing from least to most distinctive: [*28] (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful." *TCPIP Holding, 244 F.3d at 93.*

Although plaintiff argues that its mark is arbitrary, at most, the "Momentum" mark is suggestive. Suggestive marks require "imagination, thought and perception to reach a conclusion as to the nature of goods." *Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999)* (citation omitted). Greystone stated in his deposition that he selected the "Momentum" name because it described "movement" and "motion." Although this explanation might support Jansport's argument that the name is merely descriptive, the Court concludes that it requires some degree of imagination to relate the "Momentum" name to luggage. As a consequence, there is no need to prove secondary meaning. "Marks that do not directly describe goods or their attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning." *TCPIP Holding, 244 F.3d at 94.*

"Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark. [Courts] must still consider [*29] the mark's distinctiveness in the marketplace." *Streetwise Maps, 159 F.3d at 744* (citation omitted). "Momentum" is not distinctive in the marketplace. As described above, other manufacturers of luggage and bags have used the "Momentum" mark in the sale of their products. Such third-party use weakens the strength of plaintiff's mark. *See id.; Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 581 (2d Cir. 1991).* Moreover, the plaintiff has none of the classic indicia of a strong mark, such as extensive sales or advertising. *See Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc., 832 F.2d 1317, 1321 (2d Cir. 1987).* Thus, while plaintiff's mark is suggestive, it is a weak mark.

### Similarity of the Marks

To assess the similarity between two marks, the Court considers whether the similarity is likely to cause consumer confusion. *Morningside Group, 182 F.3d at 139-40.* The similarity of marks is determined by evaluating a mark in its entirety, and in the context in which it is presented. *Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 394 (2d Cir. 1995).*

Compared in their entirety, [*30] plaintiff's use of the "Momentum" name and Jansport's use of the "Momentum" or "Momentum Collection" name are not confusingly similar. Although both the plaintiff and Jansport use an identical word, Jansport did not use the designation "Momentum" as a brand name trademark or anywhere on the luggage pieces themselves, on the hang tags, or on any advertising or promotion directed at consumers. Jansport instead used "Momentum" as a descriptive collection name, and did so only in promotional materials distributed to the trade. Finally, Jansport never used the designation "Momentum" or "Momentum Col-

lection" without the prominent use of the "Jansport" brand name. It always has the brand name "Jansport" on each piece of luggage. Prominent use of a famous brand name "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." *Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000). See W.W.W. Pharm, Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993)* (finding the marks "Sportstick" and "Right Guard Sport Stick" not confusingly similar because of the use of the [*31] company name). Thus, this factor favors Jansport.

*Proximity and Likelihood of Bridging the Gap*

Under the *Polaroid* factors addressing the proximity of the marks and the likelihood of bridging the gap, the Court considers the nature of the products themselves, whether and to what extent the two products compete with each other, the structure of the relevant market, and whether a plaintiff is likely to enter defendant's market or "bridge the gap," recognizing "the senior user's interest in preserving avenues of expansion and entering into related fields." *Morningside Group, 182 F.3d at 140-41.*

As noted above, plaintiff's only invoiced sale of anything that could loosely be considered "luggage" was the one sale of six tote bags and two briefcases. Jansport's accused product line is a line of staple luggage, with standard pieces such as 20 inch and 24 inch "Pullmans" and garment bags. It is undisputed that Jansport's luggage does not compete with high-end designer luggage and is instead sold at a lower price point at large discount chain department stores and outdoor sports and recreational chain stores. Rudko testified that he wanted plaintiff's products [*32] to be "different" from the type of staple luggage sold in discount chain department stores, which are among Jansport's largest customers. [17] Indeed, plaintiff's one invoiced sale of luggage was to a high-end, women's boutique on the East Side of Manhattan that sells primarily leather handbags. The parties' goods are sold through different channels of trade, target different customers, and do not directly compete with one another. To the extent plaintiff intends to reenter the "luggage" market later this year, it intends to sell "high-end" products. Nonetheless, drawing all inferences in plaintiff's favor, both parties have or will have used the mark in connection with luggage. Thus, these factors weigh in favor of Momentum.

> [17] Plaintiff argues in its memorandum of law that it and Jansport target the same customers since they both have targeted the same luggage retailer. Plaintiff offers no evidence of this.

*Sophistication of the Buyers*

Likelihood of confusion "must be assessed by examining the level [*33] of sophistication of the relevant purchasers" of the plaintiff's and defendant's products. *Sports Auth., 89 F.3d at 965* (citation omitted). Here, both plaintiff's and defendant's products are relatively expensive, and consumers can be expected to inspect them before making a purchase. When doing so, consumers would see the brand name "Jansport," but not the mark "Momentum" on defendant's products. The more relevant class of purchasers likely to have encountered the "Momentum" mark for either party's products are sales representatives and retailer customers. These are sophisticated buyers who would be able quickly to differentiate the plaintiff's and defendant's products.

*Quality of Defendant's Product*

Under this factor, the Court examines "whether defendant's products . . . are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Group, 182 F.3d at 142.* Plaintiff has produced no evidence that defendant's products are of an inferior quality to those offered by it.

*Actual Confusion*

There is no evidence in this case of a single instance of actual confusion, and plaintiff has [*34] conceded that there has been no actual confusion between its products and Jansport's.

*Defendant's Good Faith*

"An inference of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to trade upon the good will represented by that mark." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 67 (2d Cir. 2000).* Here, there is no evidence of any bad faith by Jansport.

There is no evidence that Jansport knew of plaintiff's business or products before its chose the "Momentum" name for its luggage collection. [18] In fact, after receiving plaintiff's telephone call in July 2000, and learning of plaintiff's alleged trademark rights, Jansport decided to stop using the "Momentum" name with respect to its luggage line, changed its catalog to remove any reference to "Momentum," and contacted retailer customers who used "Momentum" and requested that they stop such use.

> [18] Although Jansport did not conduct a full trademark search for the "Momentum" mark, the failure to conduct such a search does not on its own constitute bad faith. *Streetwise, 159 F.3d at 746.*

[*35] Plaintiff relies entirely on the speculation that Jansport must have noticed references to plaintiff in two

trade publications in 1999, and that Jansport's president must have noticed plaintiff's name on a list of 70 attendees at a 1999 trade conference. Where, as here, plaintiff has had the opportunity to engage in discovery, its "speculative allegations" do not raise a genuine issue of material fact sufficient to survive summary judgment. *Resource Developers v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 141 (2d Cir. 1991).* Even though "issues of good faith are generally ill-suited for disposition on summary judgment," *Lang, 949 F.2d at 583* (citation omitted), in this case, plaintiff has failed to introduce any evidence of defendant's bad faith. *See Resource Developers, 926 F.2d at 141* (affirming summary judgment where no material factual issue as to defendant's intent).

In sum, when considered together, the *Polaroid* factors favor the defendant. The plaintiff has failed to present evidence that would prevent the entry of summary judgment for Jansport. The plaintiff has failed to present evidence that numerous [*36] ordinary prudent purchasers are likely to be confused by Jansport's use of the word "Momentum" to describe its luggage line.

## C. Unfair Competition

The failure of plaintiff's trademark claim, in particular its failure to establish trademark rights in the word "Momentum," is not necessarily fatal to its related unfair competition claim. *Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1998).* "Regardless of whether a term is trademarked, a plaintiff may show that the term name is so associated with its goods that use of the same or similar term by another company constitutes a representation that its goods come from the same source." *Id. at 149-50* (citation omitted). Nonetheless, based on the preceding discussion, plaintiff has failed to raise a genuine issue of material fact as to the association of the "Momentum" name with its business or its products. It has offered no evidence beyond the statements of Greystone's co-workers and a personal acquaintance of Rudko as to the recognition of Momentum's name or luggage products in either the luggage trade or in the minds of consumers. Plaintiff's federal claim for unfair competition [*37] is therefore dismissed.[19]

> 19    Plaintiff brings claims for trademark infringement, trade dress infringement, misappropriation, and unfair competition under New York common law. "The standards for trademark infringement . . . are essentially the same under the Lanham Act, New York law, and the common law." *Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998); Shaw v. Rizolli Int'l Publ'ns, Inc., 1999 U.S. Dist. LEXIS*

*3233,* No. 96 Civ. 4259 (JGK), 1999 WL 160084, at *8 (S.D.N.Y. Mar. 23, 1999). Similarly, "the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable." *Tri-Star Pictures, 14 F. Supp. 2d at 363; see also Genesee Brewing, 124 F.3d at 149; Ringling Bros. - Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp., 937 F. Supp. 204, 208-09 (S.D.N.Y. 1996).* Thus, for the same reasons plaintiff's federal claims fail, its corresponding state law claims fail as well.

## [*38] D. Dilution

Momentum complains that Jansport has diluted plaintiff's trademark. Section 43(c) of the Lanham Act, the Federal Dilution Act, provides remedies for the dilution, of the distinctive quality of famous marks. *15 U.S.C. § 1125(c).* To prove this claim, a plaintiff must show, *inter alia,* that its mark is famous and inherently distinctive. *15 U.S.C. § 1125(c)(1); TCPIP Holding, 244 F.3d at 93, 95.* As a matter of law, plaintiff's mark is not famous and is not entitled to protection under the Federal Dilution Act. *See 15 U.S.C. § 1125(c)(1)(A)-(H); TCPIP Holding, 244 F.3d at 98-99.* For the reasons explained above, plaintiff has failed to raise a genuine issue of material fact as to the fame of its "Momentum" mark.

To establish a claim for dilution under New York law, plaintiff must prove (1) ownership of a distinctive mark, and (2) likelihood of dilution. N.Y. Gen. Bus. Law § 360-1 (McKinney 1996); *Sports Auth., 89 F.3d at 966.* Since the Court has determined that plaintiff does not own the "Momentum" mark, plaintiff's claim for dilution [*39] fails as a matter of law. *See generally Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1049 (2d Cir. 1992)* (New York's anti-dilution statute protects only "extremely strong" marks). Even assuming that plaintiff owned the "Momentum" mark, however, it could not establish a dilution claim under New York law. Dilution can involve either "blurring or tarnishment." *Sports Authority, 89 F.3d at 966.* Plaintiff contends that the "Momentum" mark has been tarnished by Jansport's actions and that blurring has occurred.

Tarnishment occurs when a trademark is "'linked to products of shoddy quality,' . . .with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996)* (citation omitted). Further, "the sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Id.* Plaintiff has offered no evidence that Jansport's products are of inferior quality or of any possible tarnishment of its products or its [*40] business

by Jansport's use of the "Momentum" mark to identify its luggage collection.

Nor has plaintiff offered any evidence of blurring. Blurring occurs "'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'" *Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 175 (2d Cir. 2000)* (citation omitted). As an initial matter, plaintiff has failed to offer any evidence that the "Momentum" mark is a "unique identifier of the plaintiff's product." Further, plaintiff has failed to show how Jansport's use of the "Momentum" mark will "blur" plaintiff's product identification.

E. *Additional Discovery*

Plaintiff seeks to avoid the entry of summary judgment against it by requesting further discovery. A party opposing a summary judgment motion will be entitled to further discovery before the motion will be considered when it submits an affidavit explaining:

> 1) the nature of the uncompleted discovery, *i.e.*, what facts are sought and how they are to be obtained; and

> 2) [*41] how those facts are reasonably expected to create a genuine issue of material fact; and

> 3) what efforts the affiant has made to obtain those facts; and

> 4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 926 (2d Cir. 1985).* In addition, "[a] court can reject a request for discovery, even if properly and timely made through a *Rule 56(f)* affidavit, if it deems the request to be based on speculation as to

what potentially could be discovered." *Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).*

Through the affidavit of its attorney, plaintiff requests additional discovery relating to the issues of Jansport's bad faith, continuing infringement, and profits, as well as the existence of confusion in the marketplace. [20] Plaintiff does not state with any particularity what facts it expects the additional discovery to show, or how those facts are to be established. Nor does it state how those facts would create a material factual issue as to whether it has established ownership rights to the "Momentum" name. Most significantly, it does not explain why it was [*42] unable to obtain these facts during the period allotted for discovery.

> 20  Plaintiff also proposes serving subpoenas on *Travelware* and *Showcase International* to show the extent and geographic scope of plaintiff's and defendant's advertisements. Defendant submitted evidence on the extent and geographic scope of these publications.

The plaintiff's request to reopen discovery is denied. None of the topics the plaintiff seeks a second opportunity to explore would cure its failure to establish rights in the mark "Momentum" or otherwise affect the outcome of this motion.

**CONCLUSION**

For the reasons stated, defendant's motion for summary judgment is granted. Plaintiff's complaint is dismissed in its entirety.

SO ORDERED:

Dated: New York, New York

July 23, 2001

DENISE COTE

United States District Judge

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 707721 (D.N.J.), 53 U.S.P.Q.2d 1406
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 707721)**

▶Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.

D.N.J.,1999.

United States District Court, D. New Jersey.
NOVARTIS CONSUMER HEALTH, INC.,
Plaintiff,
v.
McNEIL-PPC, INC.
**No. CIV. 99-280(WHW).**

Sept. 13, 1999.

WALLS, District Judge.
**\*1 I. Introduction**

This matter is before the Court on the summary judgment motions of defendant McNeilPPC, Inc. ("McNeil") to dismiss the complaint and for judgment in its favor on its counterclaim, and of plaintiff Novartis Consumer Health Inc. ("Novartis") to dismiss McNeil's counterclaim. McNeil's motion for summary judgment was originally scheduled for April 26, 1999, but this Court granted Novartis's request for a stay pending the completion of discovery until July 26, 1999. The parties submitted additional material on McNeil's summary judgment motion, Novartis moved for summary judgment to dismiss McNeil's counterclaim, and McNeil cross-moved for summary judgment on its counterclaim. The Court granted Novartis's motion for an additional stay pending the resolution of certain discovery issues. The motions were stayed until now, September 13, 1999.

Defendant's motion for summary judgment to dismiss the complaint is granted. Defendant's counterclaim is dismissed for failure to state a claim upon which relief may be granted.

**II. Background**

On January 20, 1999, Novartis sued McNeil for trademark infringement, false designation of origin and unfair competition based on defendant's unauthorized use of the mark Soft-Chews. Novartis is the manufacturer of the Triaminic brand of over-the-counter pharmaceutical products which includes cough, cold, allergy, and sinus products. McNeil, a division of Johnson & Johnson, is the manufacturer of the Tylenol brand of over-the-counter acetaminophen based pain relievers and fever reducers. Novartis manufactures a line of Triaminic products for children in the form of soft, chewable, fast-dissolving tablets under the Softchews mark. (See Compl. Ex. A.) Novartis is the owner of a registration on the Supplemental Register of the United States Patent and Trademark Office ("PTO") for its SOFTCHEWS <u>FN1</u> mark for "cough, cold, allergy and sinus pharmaceutical preparation" (Reg. No. 1,979,054) which issued on June 4, 1996. (Compl.¶ 7, Ex. B.) McNeil has marketed a line of Tylenol pain-relieving and fever-reducing products for children under the mark Soft-Chews. (See Compl. Ex. D.)

> <u>FN1.</u> Although the term "SOFTCHEWS" appears in upper-case letters on Novartis's Supplemental Registration, Novartis uses the term in upper and lower case letters on its products. It does not, however, hyphenate the term as does McNeil. For the purpose of these motions, whether the term appears in upper or lower case letters or is hyphenated is irrelevant.

Plaintiff's mark softchews is registered with the PTO, not on the Principal Register, but on the Supplemental Register. Plaintiff's predecessor, Sandoz Corporation, had initially applied for registration of the term "soft chews" with the PTO on the Principal Register on April 5, 1995 on the basis of its intent to use the mark-it had not yet used the mark. (Reynolds Decl. Ex. A.) On September 11, 1995, the PTO refused registration of the proposed mark on the Principal Register because it "merely describe[d] the goods." (PTO Office Action, Reynolds Decl. Ex. A.) The PTO explained that "[t]he proposed mark SOFT CHEWS appears to indicate that the goods are soft and for chewing."(Id.) On February 15, 1996, Novartis filed an "Amendment to Allege Use" with the PTO in which it declared that it had used the mark "soft chews" in commerce since November 29, 1995. (Reynolds Decl. Ex. A.) On March 1, 1996,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 1999 WL 707721 (D.N.J.), 53 U.S.P.Q.2d 1406
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 707721)**

Novartis amended its application to register the term "softchews" rather than "soft chews" on the Supplemental rather than Principal Register. (Id.) The mark "softchews" was registered on the Supplemental Register on June 4, 1996. (Id.; Reg. No. 1,979,054.)

**\*2** Novartis claims that McNeil's use of the term Soft-Chews is a copy or colorable imitation of its registered softchews mark in violation of § 32(c) of the Lanham Act, 15 U.S.C. § 1114(1). Novartis also claims that McNeil's prominent use of Soft-Chews in its advertising and promotions conveys the misleading commercial impression to the public that McNeil's pharmaceutical products are affiliated, connected, or associated with those of Novartis and creates a false or misleading designation of origin in violation of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1). Plaintiff also claims reverse confusion-that defendant's use of the mark creates a likelihood of confusion and leads the public to believe that the plaintiff, not the defendant, is the trademark infringer. Finally, plaintiff claims that defendant has violated the New Jersey Unfair Competition statute, N.J.S.A. § 56:4-1 and the New Jersey common law prohibiting trademark infringement and unfair competition.

On February 26, 1999, McNeil filed a counterclaim against Novartis under § 14 of the Lanham Act, 15 U.S.C. § 1064 for cancellation of a fraudulently obtained trademark registration. McNeil asserts that Novartis initially sought to register the term "soft chews" on the Principal Register of the PTO on the basis of an intent to use application-an application for registration of a mark that the applicant has yet to use but intends to use in the future. An applicant may apply for registration on the Principal Register, but not on the Supplemental Register, on the basis of intended use. McNeil claims that Novartis's later amendment of its application alleging that it had first used the "soft chews" mark on November 29, 1995 was false and that its registration of the mark "softchews" on the Supplemental Register was therefore fraudulently obtained. McNeil alleges that Novartis did not make any actual, bona fide use of the "soft chews" mark in commerce until about July, 1998. McNeil charges Novartis with fraudulently obtaining registration of the "softchews" mark on the Supplemental Register and claims that it has been damaged by this fraudulently obtained registration.

Defendant McNeil has moved for summary judgment to dismiss the complaint on the grounds that softchews is not a legally protectable mark and there is no likelihood of confusion between Children's Tylenol Soft-Chews and Triaminic Softchews. McNeil argues that softchews is a generic term, or in the alternative, that it is merely descriptive and that it has not acquired distinctiveness through secondary meaning. Novartis responds that softchews is a suggestive, not a generic or descriptive term. Novartis also says that softchews has acquired secondary meaning and there is a likelihood of confusion between plaintiff's softchews and defendant's soft-chews.

Plaintiff Novartis moves for summary judgment dismissal of McNeil's counterclaim and McNeil cross-moves for summary judgment on its counterclaim. Novartis argues that its November 29, 1995 shipment of Softchews constituted a "use in commerce" under § 45 of the Lanham Act and that McNeil cannot prove fraud. McNeil maintains that proof of fraudulent intent is not required to cancel a trademark on the Supplemental Register or to recover damages, and that even if it were required to show fraudulent intent, it has met its burden. Moreover, McNeil contends that Novartis's one-time product test on November 29, 1995 does not constitute a bona fide use in commerce under the trademark laws.

**\*3 III. Discussion**

A. Summary Judgment Standard

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of fact and that [it] is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 3
Not Reported in F.Supp.2d, 1999 WL 707721 (D.N.J.), 53 U.S.P.Q.2d 1406
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 707721)**

proof. *See Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Phillip Ship Building Co. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,*429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3d Cir.1980).

**B. Plaintiff's Claims under the Lanham Act, the New Jersey Trademark Act, and under New Jersey Common Law**

Defendant McNeil argues that plaintiffs' claims under sections 32(c) and 43(a) of the Lanham Act fail because the softchews mark is not a valid and legally protectable mark and because there is no likelihood of confusion between Children's Tylenol Soft-Chews and Triaminic Softchews. Specifically, defendant McNeil contends that because Novartis registered softchews on the Supplemental Register, the mark is not entitled to any statutory presumption that it is a trademark and not a generic name. McNeil maintains that softchews is a generic term, or at best a descriptive one that has not acquired secondary meaning. Novartis argues that the mark is suggestive, that it has acquired secondary meaning, and that McNeil's use of the mark is likely to create confusion as to the origin of Novartis's product.

**\*4** To prevail on a claim for trademark infringement or false designation of origin under §§ 32(c) or 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), a plaintiff must establish that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services."*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472, 473 (3d Cir.1994) (citing *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3d Cir.), *cert. denied,*502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991)). The requirements for a successful claim under the New Jersey Trademark Act, N.J.S.A. 56:4-1 or trademark infringement under New Jersey common law are the same. *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.,* 952 F.Supp. 1084, 1091 (D.N.J.1997) ("N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act and the analysis for trademark infringement under New Jersey common law is the same as under Section 43(a)(1) [of the Lanham Act]"). Here, defendant McNeil contests the validity and protectability of the mark as well as the likelihood that its use of the mark may create confusion as to the origin of plaintiff's product.

**1. Whether Softchews Is a Legally Protectable Mark**

That plaintiff's mark is registered on the Supplemental Register rather than the Principal Register has definitive legal significance. Registration of a mark on the Principal Register provides "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate" of registration. 15 U.S.C. § 1057(b). Registration of a mark on the Supplemental Register, however, does not entitle a mark to this statutory presumption. 15 U.S.C. § 1094 ("applications for and registrations on the supplemental register shall not be subject to or receive the advantages of sections 1051(b), 1052(e), 1052(f), 1057(b), 1057(c), 1062(a), 1063 to 1068, inclusive, 1072, 1115 and 1124 of [Title 15]." Unlike Principal Registration, "Supplemental Registration creates no substantive rights."3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:37 at 19-75 (4th ed.1998). However, one benefit conferred by Supplemental Registration is that "questions of validity, ownership and infringement of Supplemental Registrations are governed by federal law," and a suit for the infringement of a mark registered on the Supplemental Register may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 707721 (D.N.J.), 53 U.S.P.Q.2d 1406
(Cite as: Not Reported in F.Supp.2d, 1999 WL 707721)

brought in federal court, "along with a related claim of unfair competition."Id.

*5 To be registered on the Principal Register, a mark must be a trademark, that is, "any word, name, symbol, or devise, or any combination thereof" which a person uses or has a bona fide intention to use in interstate commerce, "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even in that source is unknown."15 U.S.C. § 1127. A "trademark by which the goods of the applicant may be distinguished from the goods of others" may be registered on the Principal Register unless it, inter alia, "when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them," or "comprises any matter that, as a whole, is functional."15 U.S.C. § 1052. "Eligibility for registration on the Supplemental Register, 15 U.S.C. § 1091, requires that the term does not meet the requirements of registration on the Principal Register but is deemed capable of achieving an association with the source of the product."In re Bush Brothers & Co., 884 F.2d 569 (Fed.Cir.1989); 15 U.S.C. § 1091. In addition, to be registered on the Supplemental Register, a mark must be "in lawful use in commerce by the owner thereof, on or in connection with any goods or services."15 U.S.C. § 1091(a). A bona fide intent to use the mark in commerce does not satisfy the "use in commerce" requirement for registration on the Supplemental Register. 3 McCarthy, supra, § 19:33 at 19-72 (4th ed.1998). Although 15 U.S.C. § 1095 provides that "[r]egistration of a mark on the supplemental register shall not constitute an admission that the mark has not acquired distinctiveness.," there is nothing in the Lanham Act "to preclude Supplemental Registration from being deemed an admission against interest that the term is not inherently distinctive."Id. § 19:35 at 19-73. The "very presence [of a mark] on the Supplemental Register indicates a preliminary determination that the mark is not distinctive of the applicant's goods."Id. § 19:36 at 19-75.

If a mark has not been registered on the Principal Register, it may nonetheless be valid and legally protectable "if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'"A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir.1986)(quoting

1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15.1 at 657 (2d ed.1984)). The validity of a mark which has not been registered on the Principal Register "depends on proof of secondary meaning, unless the unregistered mark is inherently distinctive."Fisons, 30 F.3d at 472.

The distinctiveness of a mark is measured along a continuum, "from the nondistinctive to the inherently distinctive: Marks are (1) generic, (2) descriptive, (3) suggestive[,] (4) arbitrary, or [ (5) ] fanciful."Harlem Wizards, 952 F.Supp. at 1092;Canfield, 808 F.2d at 296. In Harlem Wizards, this Court described this continuum:

*6 A generic term functions as the common descriptive name of a class of products and [is] generally not legally protectable.... A descriptive mark immediately conveys a characteristic, ingredient or quality of the article or service it identifies and acquires protected status only if the plaintiff can demonstrate that the goods or services have achieved secondary meaning.... Suggestive, arbitrary and fanciful marks are afforded the highest level of trademark protection.... A suggestive mark requires the consumer to use imagination, thought, or perception to determine the character of the goods or service.... An arbitrary mark employs terms that do not describe or suggest any attribute of goods or services sold and a fanciful mark uses unfamiliar language coined expressly for the purpose of trademark protection.

Harlem Wizards, 952 F.Supp. at 1092-1093 (internal citations omitted); Canfield, 808 F.2d at 296. A term which is descriptive but has acquired secondary meaning, suggestive, arbitrary, or fanciful is legally protectable. See Canfield, 808 F.2d at 292. A mark which is generic or is "descriptive but lacks sufficient secondary meaning" is not protectable. Canfield, 808 F.2d at 292. Although a generic term may acquire secondary meaning, it is not protectable. Canfield, 808 F.2d at 297. A generic mark "is never protectable because even complete 'success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name.'Therefore, evidence that a generic term is identified with one producer, indicative of a secondary meaning for a descriptive term, proves only what courts call 'de facto' secondary meaning."Canfield, 808 F.2d at 297 (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2001 U.S. DIST. LEXIS 8848

**SOLOW BUILDING COMPANY, LLC, Plaintiff, - against - NINE WEST GROUP, INC. and NINE WEST DEVELOPMENT CORPORATION, Defendants.**

**00 Civ. 7685 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 8848*

**June 28, 2001, Decided**
**June 29, 2001, Filed**

**DISPOSITION:**    [*1] Second Amended Complaint dismissed with prejudice.

**COUNSEL:** For Plaintiff: Marc S. Dreier, Esq., Michael A. Nicodema, Esq., DREIER & BARITZ LLP, New York, New York.

For Defendants: Ira S. Sacks, Esq., Rita M. Odin, Esq., Andrea R. Rosenblum, Esq., FRIED FRANK HARRIS SHRIVER & JACOBSON, New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

**CHIN, D. J.**

Plaintiff, a real estate corporation, is headquartered at 9 West 57th Street in New York City, a building with a large red sculpture -- the numeral "9" -- on the sidewalk in front of the property. Although plaintiff has never used the name in its business, it contends that its building has acquired the nickname "9 West." Defendants, manufacturers and retailers of shoes, clothing, and accessories, have used the mark "Nine West" since 1980. Plaintiff sues defendants for trademark dilution, false designation of origin, trademark infringement, and unfair competition.

Defendants move to dismiss the Second Amended Complaint (the "Complaint") on the grounds that plaintiff's claims are barred by laches and fail to state a claim upon which relief may be granted. As discussed [*2]

below, because the Complaint demonstrates that plaintiff has known of defendants' use of the "Nine West" mark since 1980, has inexcusably delayed the commencement of this action, and has prejudiced defendants by its delay, the Court agrees that the laches defense applies; more-over, even assuming this action is not untimely, the Complaint fails to allege likelihood of confusion and plaintiff's ownership rights to the "9 West" name. Accordingly, plaintiff's Complaint is dismissed.

*BACKGROUND*

**A. *The Parties***

Plaintiff Solow Building Company, LLC ("Solow"), a New York corporation, is a real estate company engaged in constructing and renting commercial and residential properties. It is headquartered at 9 West 57th Street, New York, New York, which is plaintiff's "premier property." (Sec. Am. Compl. PP 1, 10). On the sidewalk in front of its headquarters, plaintiff has placed a nine-foot by five-foot red sculpture of the numeral "9." (*Id.* P 13). Plaintiff's red "9" is a registered mark with the United States Patent and Trademark Office (the "USPTO"). (*Id.* P 12). In addition, plaintiff has registered the mark "SOLO9W57" (*id.* P 14), and it alleges [*3] that "the public has derived the nickname '9 West' from Solow's numeral '9' and/or the SOLOW9W57 service marks as an identification of 9 West 57." [1] (*Id.* P 16).

> 1  In its Complaint, plaintiff identifies its service mark as both "SOLO9W57" and "SO-LOW9W57." (*See, e.g.,* Sec. Am. Compl. PP 14, 15, 16). It is unclear which version is the proper mark.

Defendant Nine West Group, Inc. is a manufacturer and retailer of shoes, clothing, and accessories. It is a Delaware corporation with its principal place of business

in White Plains, New York. (*Id.* P 2). Defendant Nine West Development Corp. is a wholly owned subsidiary of Nine West Group. [2] (*Id.* P 3).

> 2   The Court shall refer to defendants collectively as "Nine West."

### B. *Defendants' "Nine West" Mark*

Fisher Camuto Retail Corporation ("Camuto") was the [*4] predecessor of Nine West. (*Id.* P 18). Camuto was a tenant in 9 West 57th Street from July 1977 through June 1982. (*Id.*). In or about 1980, Camuto began doing business under the name "9 West," employing the numeral "9" on its corporate logo similar to plaintiff's "9" sculpture. (*Id.* PP 19, 20). In 1981, in response to plaintiff's demands to cease using the "9" logo, Camuto began using a "script numeral '9.'" (*Id.* P 21).

In 1990, Camuto began using "Nine West" as its corporate logo, and, in 1993, it also began using the name "9 & Co." (*Id.* PP 22-24). Defendants use the marks "for use in connection with the retail sale of women's shoes and handbags." (*Id.* PP 23, 24). Defendants registered both names with the USPTO in 1991 and 1995, respectively. (*Id.*).

In 1996, defendants began using their "Nine West" mark in connection with the retail sale of clothing (such as hosiery, jackets, and sleepwear) and accessories (such as sunglasses, watches, and hats). (*Id.* PP 26-28). Defendants filed trademark applications on their "Nine West" name to cover these products. (*Id.*).

### C. *Investigations of Defendants*

In 1997, the Securities and Exchange Commission [*5] began investigating defendants for accounting irregularities and, along with the United States Customs Service, for circumstances surrounding Brazilian imports. (*Id.* P 34). More recently, the Federal Trade Commission (the "FTC") and all of the state attorney generals investigated defendants for alleged price-fixing, which resulted in a settlement agreement whereby defendants agreed to pay approximately $ 34 million in fines. (*Id.* PP 35, 36).

### *DISCUSSION*

Plaintiff's Complaint asserts four causes of action: trademark dilution under the Lanham Act; false designation under the Lanham Act; common law trademark infringement and unfair competition; and trademark dilution under New York law. Defendants move to dismiss the Complaint in its entirety, arguing that plaintiff's claims are barred by laches. In addition, defendants argue that the Complaint must be dismissed because, among other things, plaintiff failed to sufficiently plead

likelihood of confusion and its ownership in the mark "9 West."

### I. *Motion to Dismiss Standard*

A complaint may not be dismissed on a motion to dismiss unless it "'appears beyond doubt that the plaintiff can prove no set of facts [*6] in support of his claim which would entitle him to relief.'" *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). Therefore, the issue before the Court "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)).

Although the pleading requirements under *Federal Rule of Civil Procedure 8 (a)* are construed liberally, "liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader. If it fails to do so, a motion under *Rule 12(b)(6)* will be granted." *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 10 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) (internal quotation omitted); *accord Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 841 (S.D.N.Y. 2000).

### [*7] II. *Laches*

To prevail on the defense of laches, defendants must establish three elements: (1) plaintiff had knowledge of defendants' use of its marks; (2) plaintiff inexcusably delayed taking action; and (3) defendants will be prejudiced by permitting plaintiff to assert its rights now. *See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000) (citation omitted). Although the burden of establishing these factors is usually on defendants, the Second Circuit has instructed that "when the suit is brought after the statutory time has elapsed, the burden is on the complainant to [allege] . . . the circumstances making it inequitable to apply laches in [its] case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *cf. Jose Armando Bermudez & Co. v. Bermudez Int'l*, 2000 U.S. Dist. LEXIS 12354, No. 99 Civ. 9346 (AGS), 2000 WL 1225792, at *8 (S.D.N.Y. Aug. 29, 2000) (conducting this analysis on a motion to dismiss).

The limitations period that courts apply to Lanham Act cases is six years. [3] *See Bermudez*, 2000 WL 1225792, at *8 n.10 (citing *Conopco*, 95 F.3d at 191-92). [*8] Here, plaintiff acknowledges that Camuto "adopted the corporate logo '9 West' and began doing business

under that name" in 1980, and that in 1991 "Camuto filed a trademark application . . . on the name 'Nine West' for use in connection with the retail sale of women's shoes and handbags." (Sec. Am. Compl. PP 19, 23). Plaintiff commenced this suit on October 12, 2000. Accordingly, because the statute of limitations has run, *see Bermudez*, 2000 WL 1225792, at *8 n.10 (noting that the period begins to run "when plaintiff purportedly discovered the alleged infringements"), "a presumption of laches . . . appl[ies] and plaintiff must show why the laches defense ought not be applied in the case." [4] *Conopco, 95 F.3d at 191.*

> 3 The Second Circuit has explained that "laches is an equitable defense that courts employ instead of a statutory time-bar . . . . Because the Lanham Act establishes no limitations period . . ., and . . . there is no corresponding federal statute of limitations, we look to the most appropriate state statute of limitations for laches purposes." *Conopco, 95 F.3d at 191.* Hence, courts in this circuit apply New York's six-year fraud statute to Lanham Act claims. *See id.; accord Fourth Toro Family, 88 F. Supp. 2d at 196.*

[*9]

> 4 Even if the statute of limitations has not run, the laches defense may still be applicable. *See Peyser v. Searle Blatt & Co., 2000 U.S. Dist. LEXIS 10793,* No. 99 Civ. 10785 (WK), 2000 WL 1071804, at *5 (S.D.N.Y. Aug. 2, 2000). In such a situation, however, there is no presumption of laches, and, thus, the burden remains on the defendant to prove the defense. *Conopco, 95 F.3d at 191.*

Plaintiff argues that its case should not be dismissed for laches for three reasons. First, plaintiff asserts that laches is not a proper issue for determination on a motion to dismiss. Second, plaintiff asserts that it has not inexcusably delayed taking action. Last, plaintiff asserts that its delay has not prejudiced defendants. [5] I address, and ultimately reject, each of these arguments in turn.

> 5 In its memorandum in opposition to defendants' motion to dismiss, plaintiff states that the "presumption" of laches "has no basis in law, or logic." (Pl. Mem. at 18). Hence, plaintiff's arguments actually read, *"Defendants Have Failed to Establish* an Unreasonable and Inexcusable Delay in Filing Suit," and *"Defendants Have Failed to Establish* Prejudice." (*Id.* at 17, 18 (emphasis added)). As already noted, however, the Second Circuit has specifically stated that "once the . . . statute has run, a presumption of laches will apply," *Conopco, 95 F.3d at 191,* and the Complaint here clearly indicates that plaintiff com-

menced this action outside the limitations period. *See Bermudez,* 2000 WL 1225792, at *8 n.10. Nonetheless, even if the burden is on defendants to establish laches, as discussed more fully below, defendants have satisfied this burden.

### [*10] A. *Resolving Laches on Motion to Dismiss*

This Court has held: "When the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999)* (citing *Oshiver v. Levin Fishbein Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994),* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure:* Civil 2d § 1357); *accord Bermudez,* 2000 WL 1225792, at *8. Hence, although the defense is fact-specific, the Court can consider laches on a motion to defense.

### B. *Inexcusable Delay*

Although plaintiff acknowledges that it has known of defendants' use of the "Nine West" mark since at least 1981 (Sec. Am. Compl. P 21), plaintiff argues that it has not inexcusably delayed the commencement of this action because its claims are based on "actions taken by Defendants beginning in 1996 and continuing through 2000 . . . ." (Pl. Mem. at 17). To support its position, plaintiff relies exclusively on the decision in *Fourth Toro Family, 88 F. Supp. 2d 188.* [*11] (Pl. Mem. at 18). There, in a dispute between bagel sellers each claiming the right to use the "H & H" name, defendant argued that the action was barred by laches because it had used the name for 12 years prior to plaintiff's suit. The court, however, rejected the defense, noting a number of actions in the intervening years that excused the delay: defendant had "increased the aggressiveness and the scope of its advertising" by imitating plaintiff's campaigns; defendant changed its marketing focus from Manhattan to nationwide; defendant changed its mark to one that was much more similar to plaintiff's mark; defendant adopted a "confusingly similar '800' number"; and defendant traded on plaintiff's kosher certification. *Fourth Toro Family, 88 F. Supp. 2d at 197.* These actions, according to the court, "created instances of both actual, reported confusion and the likelihood of increasing confusion." *Id.* In addition, the court noted that, prior to suing defendant, plaintiff had taken action with the "Trademark Office" on at least three separate occasions and, in fact, obtained "exclusive trademark protection" from the office. *Id. at 197-98.* Thus, the [*12] court concluded that "plaintiff's filing of [the] lawsuit . . . was a direct and timely response to defendant's tactics." *Id. at 198* (citation omitted).

In contrast, plaintiff here took no action against defendants until it commenced this action in October 2000, and defendants took no actions that increased the likelihood of confusion between the parties' marks or their services. Defendants have used the "Nine West" mark, with plaintiff's knowledge, since 1980. In 1981, plaintiff demanded that Camuto alter his "9 West" logo because it allegedly violated plaintiff's red numeral "9" trademark. (Sec. Am. Compl. P 21). For the next two decades, however, plaintiff took no action even as defendants "continued to use the name[s] . . . openly and notoriously . . . ." (*Id.* P 25). Plaintiff does not allege that it sought exclusive protection for the "9 West" mark, *cf. Fourth Toro Family,* 88 F. Supp. 2d at 197-98, it does not allege that it notified defendants of its concerns, *cf. Bermudez,* 2000 WL 1225792, at *8 (declining to apply laches, in part, because plaintiff had "notified [defendant] of its concerns relating to possible infringement, [*13] " and because defendant, in response, had represented that it would no longer engage in the allegedly infringing conduct), and it does not allege that it conducted an "investigation into the merits of [its] case." [6] *Cf. Peyser,* 2000 WL 1071804, at *6 (noting that a "reasonable investigation into the merits . . . will in effect toll the laches period").

> 6   In its memorandum in opposition to defendants' motion to dismiss, plaintiff does not assert that it took any of these actions.

In addition, plaintiff does not allege that defendants' use of the "Nine West" mark, including their post-1996 use, "increased the likelihood of confusion" between its real estate business or its properties and defendants' shoe and clothing business. The crux of the *Fourth Toro Family* decision was that in the intervening years defendant's actions "altered the competitive environment between plaintiff and defendant." 88 F. Supp. 2d at 198. Here, plaintiff does not, and cannot, make such an allegation. [*14] Rather, plaintiff merely alleges that defendants' actions during that time "expanded the public's awareness of [*defendants'*] 'Nine West' name." [7] (Sec. Am. Compl. P 26 (emphasis added)). Accordingly, the Complaint does not sufficiently allege that the filing of this lawsuit in October 2000, more than 20 years after defendants began using the "Nine West" name, was either a direct or a timely response to defendants' actions. *Cf. Fourth Toro Family,* 88 F. Supp. 2d at 198.

> 7   Plaintiff also argues that the SEC's and FTC's investigations of defendants, beginning in 1997, and the resulting "negative publicity," "caused the public to associate [defendants' marks] with dishonesty, fraudulent practices and illegal conduct. As a direct result, 9 West 57 has become wrongly associated with dishonesty, fraudulent practices and illegal conduct." (Sec. Am. Compl. P 37).

This argument is meritless. First, the Complaint does not allege that the investigations increased the likelihood of confusion between the parties. Second, as discussed by the Fifth Circuit, plaintiff is proposing that a "trademark owner has a property right in his mark, but only so long as he personally is not unpopular with the general public." *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1084 (5th Cir. 1997). Like the Fifth Circuit, I "reject this highly unorthodox view of trademark law." *Id.*

### [*15] C. *Prejudice to Defendants*

"A defendant has been prejudiced when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim. Specifically, prejudice is present when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" *Bermudez,* 2000 WL 1225792, at *8 (quoting *Conopco,* 95 F.3d at 192). Here, the Complaint alleges the following: in 1980, Camuto began using a variation on the "Nine West" name; in 1981, plaintiff demanded that Camuto alter the style of his logo; in 1990, Camuto began using "Nine West" as its corporate logo; in 1991, Camuto filed a trademark application on the name "Nine West"; in 1993, defendants began to use the name "9 & Co.," and, in 1995, they applied for trademark protection for the name; from 1996 through 2000 defendants expanded its line of consumer products from shoes and handbags to include certain types of clothing apparel and accessories, and defendants filed trademark applications to cover these products under their "Nine West" name. Thus, in part because of plaintiff's inaction as to defendants' [*16] use of the "Nine West" mark, defendants have used the name for more than 20 years "in the manufacture and retail sale of clothing and accessories . . . ." (Sec. Am. Compl. P 2). Aside from the one concern that it raised in 1981, plaintiff has allowed defendants to use the "Nine West" name uncontested for two decades.

Nonetheless, plaintiff argues that defendants have not suffered prejudice because "since 1996, Defendants have changed the manner in which they used the 'Nine West' name by expanding their business activities to include a wide variety of consumer products . . . ." [8] (Pl. Mem. at 19). This argument, however, supports the opposite conclusion -- that plaintiff's inaction prejudiced defendants -- as defendants decided to "expand [their] business activities" after 16 years of selling shoes and handbags with no action from plaintiff. (Sec. Am. Compl. P 26). *Cf. Peyser,* 2000 WL 1071804, at *7-8 (noting that "courts have had little tolerance for cries of 'prejudice' from defendants who . . . were put on notice of an infringement").

8  Plaintiff's additional argument that defendants have failed to "establish" prejudice because "since 1997, [they] have been engaged in a series of illegal activities which have lent notoriety to the 'Nine West' name" is irrelevant. The issue before the Court is whether defendants have suffered prejudice because of *plaintiff's* inactions.

[*17]  Accordingly, because plaintiff has known of defendants' use of the "Nine West" name since 1980, has inexcusably delayed the commencement of an action against defendants, and has allowed defendants to maintain and expand their business activities by its delay, thus prejudicing defendants, plaintiff's claims are barred by laches. Laches is clear on the face of plaintiff's Complaint; it is clear that plaintiff "can prove no set of facts to avoid the insuperable bar," *Lennon, 63 F. Supp. 2d at 439*; and there is no reason why the Court "should permit plaintiff[] to 'sleep on [its] rights' to sue under any of [its] claims." *Peyser*, 2000 WL 1071804, at *9.

### III. *Additional Grounds for Dismissal*

#### A. *Likelihood of Confusion*

Even assuming the Complaint is not barred by laches, plaintiff's cause of action also fails because the Complaint fails to sufficiently allege any likelihood of confusion between the parties' marks, as required by the Lanham Act and New York common law. *See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45-46 (2d Cir. 2000)*. Although the existence of consumer confusion is generally a question [*18] of fact, "in considering a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may . . . make an initial finding as to whether or not a jury would find a likelihood of confusion as to source." *Textile Deliveries, Inc. v. Stagno, 1990 U.S. Dist. LEXIS 13309, *16, No. 90 Civ. 2020 (JFK), 1990 WL 155709, at *6 (S.D.N.Y. Oct. 9, 1990); accord Schieffelin & Co. v. Jack Co. of Boca, Inc., 725 F. Supp. 1314, 1323 (S.D.N.Y. 1989)* (noting that for a motion to dismiss "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source" (quoting *Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231, 246 (2d Cir. 1983)))*. Thus, the Court, accepting the facts as alleged in plaintiff's Complaint as true, must conclude whether a legal claim exists based on those facts. Here, plaintiff has failed to allege the existence of likelihood of confusion. [9]

9  This is in contrast to the facts in *Solow v. BMW (US) Holding Corp., 1998 U.S. Dist. LEXIS 16059, No. 97 Civ. 1373 (DC), 1998 WL 717613, at *4 (S.D.N.Y. Oct. 14, 1998)*, where I denied a motion to dismiss a complaint filed by Solow that

did allege a likelihood of confusion. There, in a case involving BMW's use -- in a television commercial -- of a red numeral "5" sculpture in front of a building similar in style to plaintiff's 9 West 57th Street property, Solow "unequivocally" alleged likelihood of confusion. *See id.* Moreover, in that case, unlike here, Solow did not wait 20 years to commence its action.

[*19]

In addressing likelihood of confusion, courts apply the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)*: (i) strength of plaintiff's mark; (ii) similarities of the parties' marks; (iii) proximity of the parties' products in the marketplace; (iv) likelihood that plaintiff will bridge the gap between the products; (v) actual confusion; (vi) defendants' intent in adopting their mark; (vii) quality of defendants' product; and (viii) sophistication of the relevant consumer group. *See also Nabisco, 220 F.3d at 46*. As the Second Circuit has noted, "the ultimate question [is] whether consumers are likely to be confused." *Id.* (quotation and citation omitted).

Here, the Complaint makes no allegations at all as to five of the *Polaroid* factors (iii, iv, vi, vii, and viii). The absence of any such discussion is not surprising, as those factors all weigh against a finding of confusion. As to the "ultimate question" of the likelihood of consumer confusion, the Complaint provides that plaintiff is a "corporation engaged in the business of real estate construction and the rental of distinctive commercial [*20] and residential properties." (Sec. Am. Compl. P 1). Defendants, in turn, manufacture and sell women's footwear, handbags, and, for the last six years, additional items such as hosiery, sunglasses, watches, and bed sheets. (*Id.* PP 24-28). Thus, there is clearly no proximity between the parties' businesses or their products, and there is simply no competition between the parties. *See Charles Atlas, Ltd v. DC Comics, Inc., 112 F. Supp. 2d 330, 339 (S.D.N.Y. 2000)* (noting that because the parties "are simply not in direct competition . . . the likelihood of confusion is greatly reduced"). Moreover, consumers who seek real estate construction or property rentals surely will not be confused by a company that manufactures and sells women shoes, handbags, clothing, and accessories.

Accordingly, the Court concludes that the Complaint's allegations exceed the "outer limits . . . within which a jury is permitted to make the factual determination [that] there is a likelihood of confusion as to source." Based on the facts alleged, no legal claim exists.

#### B. *Plaintiff's "9 West" Mark*

In the Complaint, plaintiff alleges that "the public has derived the nickname [*21] '9 West' . . . [and] uses

the nickname '9 West' to identify 9 West 57 and has come to uniquely associate the nickname '9 West' with the building." (Sec. Am. Compl. P 16). The Complaint does not allege, however, that *plaintiff* uses, or has ever used, the nickname "9 West," or that *plaintiff* uses, or has ever used, the nickname to identify the building at 9 West 57. Hence, defendants argue that plaintiff "cannot have acquired ownership rights in the mark '9 West.'" (Defs. Mem. at 12-13); *see 15 U.S.C. § 1127* (defining "trademark" as "any word, name, symbol, or device . . . *used by [the applicant]*" seeking trademark protection (emphasis added)).

In response, plaintiff does not challenge defendants' assertion that it does not use the nickname, but, instead, relies on *National Cable Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991)*, for its argument that "even without 'use' of trademark directly by the claimant. . . , nicknames of trademarks or names used only by the public give rise to protectable rights . . . ." (Pl. Mem. at 20). While the court there did state, in dicta, [*22] that public-created nicknames do give rise to protectable rights, the court's holding rested on the fact that *plaintiff* had "made significant use of [the nickname] as its trade name . . . ." *National Cable Television, 937 F.2d at 1577-78.*

In *Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 812 (2d Cir. 1999)*, a case involving a motorcycle manufacturer's and a motorcycle repairer's competing use of the word "hog," the Second Circuit noted the *National Cable Television* decision but did not indicate "whether or not we agree with [the] decision[] . . . ." The court did note, however, that the nickname "hog," like plaintiff's alleged nickname "9 West," differed "significantly" from the nickname at issue in *National Cable Television* in that the nickname "hog" was "a generic term in the language as applied" to motorcycles. [10] *Id.* The court stated: "The public has no more right than a manufacturer to withdraw from the language a generic term, already applicable to the relevant category of products, and accord it trademark significance, at least as long as the term retains some generic meaning." [11] *Id.*

10   As noted by the Second Circuit, the term "hog" was used "to refer to motorcycles generally and large motorcycles in particular." *Harley-Davidson, 164 F.3d at 808.*

[*23]

11   Moreover, the Second Circuit denied trademark protection to plaintiff's use of "hog" despite the fact that plaintiff itself had begun to use the term in connection with its merchandise, advertising, and promotion. *Harley-Davidson, 164 F.3d at 809.* Here, as already noted, the Complaint does not allege that plaintiff itself ever used the nickname "9 West."

There is a "9 West" on almost every cross-street in Manhattan, and, thus, "9 West" surely retains a "generic meaning" in the "language" of building addresses, which is how plaintiff uses the name. Under the reasoning of *Harley-Davidson*, therefore, plaintiff would not be permitted to accord trademark significance to the public-created nickname "9 West" in an action against another building that sought to use it. Hence, if plaintiff cannot enforce the nickname against another real estate company, then plaintiff should not be permitted to enforce the "9 West" nickname against a shoe and clothing company.

Accordingly, plaintiff has no trademark right to the term "9 West," a nickname that, according to the Complaint, was [*24] created and is used only by the public, and one that is generic.

## CONCLUSION

Based on the foregoing, all of plaintiff's claims are barred by the laches defense. In addition, plaintiff has failed to sufficiently allege likelihood of confusion and ownership rights in the name "9 West." Hence, the Second Amended Complaint is dismissed in its entirety, with prejudice, and the Clerk of Court shall enter judgment accordingly.

SO ORDERED.

Dated: New York, New York

June 28, 2001

DENNY CHIN

United States District Judge

Westlaw.



217 U.S.P.Q. 1081                                                              Page 1
1981 WL 47056 (C.D.Cal.), 217 U.S.P.Q. 1081
**(Cite as: 217 U.S.P.Q. 1081)**

©Teleflora Inc.
v.
Florists Transworld Delivery Association

District Court, C. D. California

No. 81-1586

Decided Sept. 14, 1981
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Pleading and practice in courts -- Motions --**
**For summary judgment -- Issues determined (§**
**53.6335)**
Determination that mark is common descriptive
name for product, that it is merely descriptive of
product and lacks secondary meaning, may
appropriately be made on summary judgment.

**TRADEMARKS**
**[2] Cancellation -- Mark and use of parties --**
**Description marks (§ 67.1815)**
Federal registration of mark that is shown to be
common descriptive name of product, or merely
descriptive and lacking secondary meaning, is subject
to cancellation by court in action involving mark
under 15 USC 1119, 1064(C), and 1052(e).

**TRADEMARKS**
**[3] Marks and names subject to ownership --**
**Descriptive -- Particular marks (§ 67.5081)**
Because "Easter basket" is common descriptive
name for bouquet in basket for Easter, it cannot be
trademark subject to monopolization under federal
trademark laws or at common law.

**TRADEMARKS**
**[4] Marks and names subect to ownership --**
**Descriptive -- Particular marks (§ 67.5081)**
"Easter basket bouquet" is not distinguished in
trademark sense from common descriptive term
"Easter basket" for bouquets in baskets at Easter, by
addition of word "bouquet."

**TRADEMARKS**

**[5] Marks and names subject to ownership --**
**Secondary meaning (§ 67.523)**
Evidence of secondary meaning cannot enable
common descriptive name for product to be
monopolized as trademark for it.

**\*1082** Action by Teleflora Inc., against Florists
Transworld Delivery Association, for declaration of
trademark invalidity and non-infringement, and to
cancel defendant's registered trademark, in which
defendant counterclaims for trademark infringement,
Lanham Act violations, and unfair competition. On
plaintiff's motion for summary judgment. Motion
granted in part.

Laurence H. Pretty, Fulwider, Patton, Rieber, Lee &
Utecht, Loren R. Rothschild, and Fogel, Rothschild
& Ostrov, all of Los Angeles, Calif., for plaintiff.

William Poms, Bernard R. Gans, and Poms, Smith,
Lande & Rose, P.C., all of Los Angeles, Calif., for
defendant.

Waters, District Judge.

**Findings of Fact**
The Court finds that, on the evidence presented on
Plaintiff's Motion for Summary Judgment, there are
no genuine issues as to the existence of any of the
following material facts:

1. Plaintiff Teleflora Inc. (hereinafter "Teleflora") is
a corporation organized and existing under the laws
of the state of California having its principal offices
at 2400 Compton Boulevard, Redondo Beach,
California 90278. It is engaged in business as a
clearing-house for floral wire orders and engages in
said business in California and throughout the United
States.

2. Defendant Florists Transworld Delivery
Association (hereinafter "FTD") is a non-profit
corporation organized and existing under the laws of
the state of Michigan. FTD is a trade association
consisting of approximately 17,400 member florists
throughout the United States. FTD is engaged in
interstate commerce as a clearinghouse for floral wire

217 U.S.P.Q. 1081                                                              Page 2
1981 WL 47056 (C.D.Cal.), 217 U.S.P.Q. 1081
(Cite as: 217 U.S.P.Q. 1081)

orders in California and throughout the United States. FTD is licensed to do business in the state of California and is doing business in Los Angeles, within the judicial district.

3. Defendant FTD is the registrant of the mark EASTER BASKET for "Floral Arrangements," Registration No. 1,056,688, registered January 18, 1977, stating a date of first use in commerce on July 3, 1975. Said registration, having been registered less than five years prior to the filing of this lawsuit, has not achieved the status of incontestability under the federal trademark laws. FTD utilizes its mark "Easter Basket" in connection with seasonal promotions at Easter of bouquets in baskets.

4. In 1981 Teleflora utilized a seasonal promotion comprising a bouquet in a basket for Easter. Teleflora's promotion included publication of an advertisement in the national press for "Teleflora's Basket Bouquet for Easter." The promotion also included promotional materials provided to Teleflora's retail florists for its Easter basket bouquet.

5. There are no single word synonyms for Easter or basket having the familiarity of those words. The word bouquet is in common usage for an arrangement of flowers. The words bouquet, basket and Easter are available to any merchant needing to inform the public in brief and familiar words that its product is a bouquet in a basket for Easter.

7. Teleflora's identification of itself, in its press advertisement and in its promotional materials, as the source of the goods offered is in no way calculated to attribute the source of the merchandise to anyone other than Teleflora or its Teleflorist subscribers.

9. As applied to floral arrangements, Easter basket is the common descriptive name for a bouquet in a basket for Easter.

13. Teleflora's prominent and repeated identification of itself, in its national press advertisement and in its trade promotional materials, as the source of the bouquet in a basket for Easter thus advertised and promoted negates FTD's claim of false designation of origin of such goods.

## Conclusions of Law

1. The Court has jurisdiction of Plaintiff's First and Second Claims, for declaratory relief under 28 U.S.C. Sections 2201 and 1338(a), there being an actual controversy between the parties concerning the validity and infringement of a trademark registered under the federal trademark laws. Jurisdiction of the Third Claim, for cancellation of FTD's registered trademark, arises under the Lanham Act, 15 U.S.C. 1119 and 1121. Venue with respect to Defendant FTD is proper herein under 28 U.S.C. 1391(c).

2. This Court has jurisdiction of Defendant's First Amended Counterclaim, for federal trademark infringement, under 15 U.S.C. 1051 et seq; of its Second Amended Counterclaim, for common law trademark infringement, under 28 U.S.C. 1338(b) and the principles of pendent jurisdiction; of the Third Amended Counterclaim, for false designation of origin under 15 U.S.C. 1125(a), *1083 under 15 U.S.C. 1121 and 1338(a), and; of the Fourth Amended Counterclaim, for common law unfair competition, under 28 U.S.C. 1338(b) and the principles of pendent jurisdiction. Venue herein is proper as to Teleflora under 28 U.S.C. 1391(c).

3. By Stipulation and Order filed herein on May 15, 1981, pursuant to which Defendant was granted leave to file its amended counterclaims subsequent to the filing Teleflora's Motion for Summary Judgment, such summary judgment motion is treated as filed against all the amended counterclaims.

*Fair Use*

7. Accordingly, Teleflora's fair use requires dismissal of all FTD's counterclaims and summary judgment for Teleflora on its Second Claim for a declaration that it has not committed trademark infringement.

*Common Descriptive Name*

[1] 8. The determination that a mark is the common descriptive name for the product, or that it is merely descriptive of the product and lacks secondary meaning, may appropriately be made on summary judgment. Surgicenters of America, Inc., 601 F.2d 1011, 202 USPQ 401 (9th Cir. 1979). CES Publishing Corp. v. St. Regis Publications, Inc., 531 F.2d 11, 188 USPQ 612 (2nd Cir. 1975); Imported Auto Parts Corp. v. R. B. Shaller & Sons, Inc., 202 USPQ 235 (Minn. Sup. Ct. 1977); K-Jack Engineering Co., Inc. v. Peter's Newsrack, Inc.,

217 U.S.P.Q. 1081
1981 WL 47056 (C.D.Cal.), 217 U.S.P.Q. 1081
(Cite as: 217 U.S.P.Q. 1081)

205 USPQ 696 (C.D. Cal. 1978).

[2] 9. The federal registration of a mark which is shown to be the common descriptive name of the product, or merely descriptive and lacking secondary meaning, is subject to cancellation by a court in an action involving the mark under 15 U.S.C. Sections 1119, 1064(c), and 1052(e).

[3] 10. Because the term Easter basket is the common descriptive name for a bouquet in a basket for Easter, it cannot be a trademark subject to monopolization by FTD under the federal trademark laws or at common law. J. Kohnstam, Ltd. v. Louis Marx and Company, 280 F.2d 437, 126 USPQ 362 (C.C.P.A.1960); Miller Brewing Company v. G. Heileman Brewing Company, 561 F.2d 75, 195 USPQ 281 (7th Cir. 1977); Anti-Monopoly, Inc. v. General Mills Fun Group, 611 F.2d 296, 204 USPQ 978 (9th Cir. 1979); Surgicenters of America v. Medical Dental Surgeries Co., 601 F.2d 1011, 202 USPQ 401 (9th Cir. 1979).

11. Although the term Easter basket also has descriptive significance independent of floral arrangements, it is the common descriptive name by which bouquets in a basket for Easter are aptly described. Kohnstam, supra, at p. 440, 126 USPQ at 364.

[4] 12. The term Easter basket bouquet is not distinquished in a trademark sense from the common descriptive term Easter basket, for bouquets in baskets at Easter, by the addition of the word bouquet.

[5] 13. Evidence of secondary meaning, even if, arguendo, it could be presented, cannot enable the common descriptive name for a product to be monopolized as a trademark for it. Surgicenter of America, supra; CES Publishing Corp. v. St. Regis Publications, Inc., 531 F.2d 11, 15, 188 USPQ 612, 616 (2nd Cir. 1975).

14. Summary judgment for Teleflora is required on the ground that Easter basket is a common descriptive name on all its Claims for Relief and dismissal of all Defendant's Amended Counterclaims. Surgicenters, supra; Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 207 USPQ 278 (5th Cir. 1980).

*Descriptive and Without Secondary Meaning*
21. Any conclusion of law which should more fittingly be denominated a finding of fact should have such effect, and vice versa.

C.D.Cal.

217 U.S.P.Q. 1081

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.